

# IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MICHELLE DAWN MURPHY,<br>　　　　　Plaintiff,<br><br>v.<br><br>1.　THE CITY OF TULSA,<br>2.　MIKE COOK, in his individual capacity,<br>3.　TIMOTHY HARRIS, in his individual capacity,<br>4.　WAYNE ALLEN, in his individual capacity,<br>5.　DOUG NOORDYKE, in his individual capacity,<br>6.　B.K SMITH, in his individual capacity;<br>7.　GARY OTTERSTROM, in his individual capacity<br>8.　ANN MORRIS, in her individual capacity,<br>9.　ANN REED, in her individual capacity,<br>10.　DAVID SUGIYAMA, in his individual capacity,<br>11.　TOM GIBSON, in his individual capacity,<br>12.　MARY LONG, in her individual capacity,<br>13.　TARA VALOUCH, in her individual capacity,<br>14.　JERI POPLIN, in her individual capacity,<br>15.　DORIS UNAP, in her individual capacity,<br>16.　Other Unknown Supervisors, in their individual capacity,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**

SEP 14 2015

Phil Lombardi, Clerk
U.S. DISTRICT COURT

**15 CV - 528 CVE - PJC**

## COMPLAINT

Ms. Michelle Murphy, by and through her attorneys, *White and Weddle* and *O'Carroll & O'Carroll,* states as follows:



1.  This action is unrelated to any previous action filed in this Court;

**INTRODUCTION**

2.  On November 21, 1995, Ms. Murphy, an innocent woman, was convicted of first degree murder in Tulsa, Oklahoma;

3.  Wrongfully arrested at the age of seventeen (17) and sentenced to life without the possibility of parole for the murder of her infant child, Ms. Murphy languished in prison for nearly twenty (20) years before she was exonerated by Judge William C. Kellough;

4.  On September 12, 2014, Judge Kellough issued an agreed order of innocence which was approved by Defendant, Tim Harris, which dismissed the murder charge with prejudice;

5.  Ms. Murphy, who was a mother of two (2) children, was victimized by the defendants and wrongfully held accountable for the murder of her infant son, Travis, who was murdered by an unknown person on September 12, 1994;

6.  On September 12, 1994, Ms. Murphy awoke to find that her infant son, Travis, was missing. She was mortified to find his body in the kitchen, nearly decapitated. Stunned and in a state of shock she ran to her neighbors who called 991. Within a less than two (2) hours, Ms. Murphy was placed in handcuffs and taken to the police station, never to return;

7.  The named defendants, all agents for the government, were culpable in this miscarriage of justice. Ms. Murphy's wrongful arrest, detention, prosecution, conviction, and imprisonment were the result of egregious misconduct by law enforcement officers, forensic analysts and their supervisors, acting individually and

in concert to use any means necessary to obtain a conviction;

8.  Detective Mike Cook coerced a confession from the seventeen (17) year-old Ms. Murphy which had no basis in reality and Cook knowingly used this false evidence to support a probable cause arrest affidavit;

9.  Det. Cook prompted and threatened Ms. Murphy into stating she was in a "dream" and she "accidently fell" and, if Cook is credited, she accidently cut through the bone, grizzle and sinew of her infant son's neck;

10.  At the end of the day, TPD was stuck with an implausible statement and a misleading new release to the media that Ms. Murphy was a murderess who had "confessed";

11.  Faced with this reality, acting individually and in concert, the defendants then intentionally planted evidence and fabricated false inculpatory evidence against Ms. Murphy, irreparably and unconstitutionally tainting her criminal trial by distorting the other evidence presented against her—faulty and false blood comparison evidence from the so-called forensic lab and evidence from a paid informant whose recent released from a mental hospital was withheld from the jury;

12.  Det. Cook even groomed the probable killer into a star eyewitness before this witness died under mysterious circumstances;

13.  Ten (10) years into her incarceration, criminalist Sugiyama, eliminated her hope of release when TPDFL he  defied a court order in 2004 to evade the testing of exculpatory evidence which would have afforded Ms. Murphy a new trial;

14.  Prosecutor Tim Harris,  acting outside his duties, facilitated the adoption of Ms. Murphy's 2 year-old daughter and thereby forever alienated the daughter from her

mother and inflicted extreme emotional distress on Ms. Murphy;

15.    DNA was pivotal in exonerating Ms. Murphy and the DNA results in this case are capable of being entered into a law enforcement DNA data base (CODIS), but the government has chosen not to do so;

16.    Beyond compensating Ms. Murphy for the nearly twenty (20) years stolen from her and her continuing injuries, this action seeks to redress the unlawful municipal policies and practices pursuant to which defendants, acting under color of law both independently and in concert, violated Ms. Murphy's clearly established rights as guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the laws of the State of Oklahoma;

17.    Plaintiff seeks damages, both compensatory and punitive, affirmative and equitable relief, an award of costs and attorneys fees, and such other and further relief as this court deems equitable and just;

### JURISDICTION AND VENUE

18.    The Plaintiff, Ms. Michelle Murphy, brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of her rights as secured by the United States Constitution;

19.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343;

20.    Plaintiff's prayer for attorney fees is authorized by 42 U.S.C. § 1988;

21.    Supplemental jurisdiction over Ms. Michelle Murphy's state law claims exists pursuant to 28 U.S.C. § 1367(a);

22.    Plaintiff has complied with the requirements of Okla. Stat. Ann. tit. 51, § 156

("GTCA") by making and serving a notice of claim on the Office of the City Clerk of the City of Tulsa, Oklahoma, and the Office of Risk Management in Oklahoma City, Oklahoma on February 12, 2014, within the time required by Okla. Stat. Ann. tit. 51, § 156(B). More than 90 days have elapsed since service of that notice, and no offer of settlement has been made;

23. Venue is proper in the Northern District of Oklahoma pursuant to 28 U.S.C. § 1391(b);

**JURY DEMAND**

24. Pursuant to the Seventh Amendment of the United States Constitution, the Plaintiff requests a jury trial on all issues and claims set forth in this Complaint;

**PARTIES**

25. The Plaintiff, Michelle Murphy, is and was at all time relevant to this complaint, a citizen and resident of the State of Oklahoma. She currently resides in Tulsa, Oklahoma and so resided at the time of these events;

26. The City of Tulsa is a municipality that is a political subdivision of the State of Oklahoma authorized to sue and be sued in its incorporated name. The City of Tulsa, was the employer of most of the individual defendants, and is and was, at all times relevant to this Complaint, responsible for the policies, practices, training and customs and subsequent ratification of same by the Tulsa Police Department (TPD) and the Tulsa Police Department Forensic Laboratory (TPDFL). The City of Tulsa is the responsible party for both the civil rights complaints and for the supplemental state claims;

27. Police officers, Cook, Noordyke, Allen, Smith, and Otterstrom were at all times

relevant to this Complaint duly appointed and acting police officers of the TPD acting under color of law and in their individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Tulsa and State of Oklahoma.  They are sued in their individual capacity.

28.   Defendants,  Ann Morris, Ann Reed, Tara Valouch and David Sugiyama  were at all times relevant to this Complaint criminalists with the TPDFL, acting under color of law and in their individual capacity within the scope of their employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the City of Tulsa and State of Oklahoma. They are sued in their individual capacity;

29.   The defendant, Timothy Harris, was at all times relevant hereto an Assistant District Attorney and then the duly elected District Attorney for Tulsa County in the State of Oklahoma.  Mr. Harris was acting under color of law, performing non judicial functions.  He is sued in his individual capacity.  His office is identified as ("TCDA");

30.   The defendants, Poplin and Unap, were at all times relevant hereto employees of the Department of Human Services ("DHS").  The defendants Gibson and Long were at all times relevant hereto criminalists for the Oklahoma Bureau of Investigation ("OSBI").  They were acting under color of law and in their individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usages of the State of Oklahoma's DHS and the OSBI.  They are being sued in their individual capacity;

31.   Upon information and belief there were other unknown TPD, TPDFL, DHS and OSBI supervisors who were also acting under color of law during the events in

question. Ms. Murphy reserves the right to amend this complaint and add them as parties. The unknown persons are designated Jane Roe 1-10;

### THE CRIME AND SUBSEQUENT INVESTIGATION

32.   Monday morning, September 12, 1994, at approximately 6:00 a.m., Michelle Murphy awoke and could not find her three month old infant son, Travis, who had been sleeping next to her on the living room couch along with her two year old daughter, Little Michelle;

33.   Ms. Murphy was dizzy and her head hurt.  The front door was open, although she had locked both the front and back door before she went to sleep as she repeatedly informed the police;

34.   Ms. Murphy discovered her son on the kitchen floor lying on his back in a pool of blood.  His head was nearly decapitated from his body, attached only by a thin sliver of skin;

35.   Ms. Murphy  ran out the backdoor and went to a neighbor's apartment.  The neighbor called 911 at approximately 6:16 a.m.;

36.   All of the witnesses stated that Ms. Murphy was stunned and in a state of shock. She was rocking back and forth on the neighbor's couch, holding her knees and bemoaning the death of her son;

37.   Earlier that morning at 3:11 a.m.  TPD responded to an anonymous 911 call reporting a disturbance at Ms. Murphy's apartment.  The caller stated, "it sounded like a knife had been thrown against the wall";

38.   Unbeknownst to TPD, this call was placed by an emotionally disturbed teenage neighbor, William Michael Lee, who had a documented history of violence,

aggression and abuse against teachers, students, animals and family members;

39.    Prior to Travis Wood's murder, Lee decapitated a cat and hung its head on the porch of a lesbian couple who Lee did not like and who lived in the apartment complex;

40.    Lee had an unrequited crush on Ms. Murphy, and had a documented history of responding violently to rejection.  Ms. Murphy rejected Lee's overtures shortly before Travis's murder;

41.    In response to the 911 call at 3:11 a.m., TPD officers B.K Smith and Gary Otterstrom arrived to Ms. Murphy's apartment.  There was a chair placed against the screen door on the outside, blocking any egress from the apartment;

42.    The front door was partially opened about six inches.  There were no lights on in the apartment.  Using his flashlight, Officer Smith observed a white female adult with blonde hair sleeping on an L-shaped couch. Her legs were bare.  A two year old child lay sleeping at her feet, propped up in the corner of the couch.   The officers did not see an infant;

43.    The TPD officers knocked loudly several times and loudly called out "Tulsa Police" twice.  The officers stated in reports that although Ms. Murphy stirred, she did not awaken;

44.    The officers testified they did not know  whether Ms. Murphy was asleep or unconscious.  Nevertheless,  they did nothing.   They never went inside.  They never checked the back door.  They never knew  whether the adult female and/or child were injured or in danger.  They never determined whether anyone was hiding inside the apartment.  They never discovered who made the 911 call. They never

attempted to secure the apartment. They never heard an infant. They just left. The condition of the young woman and the young child was unknown. The front door was still open;

45. Based upon the body temperature of Travis, had TPD officers Smith and Otterstrom properly investigated at 3:11 a.m., the murder may have been prevented, the killer may have been caught in the act, or the killer may have been apprehended;

46. Officers Smith and Otterstrom were deliberately indifferent to the health and safety of Ms. Murphy and her children. They were deliberately indifferent to their obligations to protect and serve. They were not trained properly or supervised properly;

47. Officers Smith and Otterstrom did not properly perform their duty. Had these officers done so, Ms. Murphy would not have been charged;

48. Approximately three hours after they responded to the first 911 call, these same TPD officers, Smith and Otterstrom, returned in response to the second 911 call regarding Travis Wood's murder. The front door was still open. The chair was still propped up against the front screen door. The chair was never examined, fingerprinted, photographed or preserved;

49. When the police arrived, Ms. Murphy was wearing the same clothes she had on when she was observed by TPD officers at 3:15 a.m. No blood was detected on Ms. Murphy's clothes or person, or on her daughter, Little Michelle;

50. TPD Detective Noordyke, of the TPD's Scientific Investigation Unit, was responsible for gathering forensic evidence. He testified that he never fingerprinted the chair propped up against the outside front screen door because he "didn't know it was

part of the case." Noordyke admitted he did no investigation unless lead detective Mike Cook requested it;

51. The murder case was assigned to Det. Mike Cook. TPD Sgt. Wayne Allen supervised both Cook and Noordyke;

## DET. COOK COERCED A FALSE CONFESSION FROM MS. MURPHY AND FALSELY SWORN AN ARREST AFFIDAVIT

52. Det. Cook was a seasoned homicide detective who had a reputation with his peers and supervisors for cutting corners by forcing confessions. He was known to take all of the suspects into custody and tell them all that by the end of the day one of them would be charged;

53. Det. Cook detained and interrogated Ms. Murphy for more than six (6) hours. Cook repeatedly told her she could see her daughter if she gave him a statement admitting responsibility for Travis's death;

54. Ms. Murphy repeatedly protested her innocence;

55. Det. Cook was unrelenting. He inspected and touched Michelle's bare thigh under her dress and also examined her head without a female officer being present;

56. Det. Cook was menacing, alternating threats with promises while simultaneously demeaning Ms. Murphy;

57. There were no witnesses in the room. There was no parent or guardian in the room as then required by law. There was no video camera in the room;

58. There was a tape recorder in the room with a tape beside it but Cook never turned it on until the last twenty some minutes of the interrogation;

59. Det. Cook told Ms. Murphy that they had a murder weapon-a maroon handled knife.

Cook wrongly believed that a marooned handled knife was discovered at the scene. Cook wanted to make sure that marooned handled knife was mentioned in the tape recorded statement so he fed it, and most everything else, to the young exhausted woman;

60.   Ms. Murphy acquiesced, conflated an argument with a neighbor she had into a "dream" she stated she got into a fight with a neighbor, knives were drawn, and Ms. Murphy "accidently fell" on her baby with the knife, accidentally killing him. This statement was the only portion of the interrogation Cook recorded;

61.   Det. Cook knew the baby could not have died in the manner described. Det. Cook knew that it would take great force to cut through the bone, grizzle and sinew of Travis's neck;

62.   Det. Cook easily verified that the female neighbor, had not been there;

63.   This false confession, that Cook knew to be false, was the sole basis for Cook's arrest warrant;

64.   Det. Cook untruthfully claimed that he "never had a false confession occur in his experience;"

65.   In fact, Cook coerced a false confession from a teenaged suspect in 1989, just six years earlier. A Tulsa County District Court judge excluded the confession which resulted in media coverage. Upon information and belief no action was ever taken against Cook for his prior misconduct;

66.   Upon information and belief, Cook's record will reveal numerous false confessions;

67.   Sgt. Allen was well aware of Det. Cook's characteristics. In light of what Sgt. Allen knew about William Lee, Sgt Allen was deliberately, if not recklessly, indifferent to

Cook violating Ms. Murphy's rights;

### DET. COOK CORROBORATED THE "CONFESSION" WITH THE WRONG COLORED "MURDER WEAPON"

68.   No murder weapon was ever found.  Det Cook was frustrated.  He had nothing to support the fantastical "confession" of Ms. Murphy;

69.   At the time of the interrogation, Cook believed that a knife found at the scene was maroon; however, now Cook was stuck, because, upon closer inspection,  the knife was actually brown;

70.   Undaunted, on March 13, 1995, after Michelle had been in jail for six months, her empty  apartment was supposedly vandalized;

71.   A  security guard called Tim Harris.  Mr. Harris called Det. Cook who called Det. Noordyke;

72.   Det. Noordyke return to the apartment.  Noordyke claimed he went to the upstairs bedroom of the home that had previously been searched and videotaped;

73.   Det. Noordyke then contended he saw an open and obvious maroon handled knife.  This knife was conveniently placed with the handle extending from a pile of clothing;

74.   This knife was not in Noordyke's video of the home;

75.   Substantial evidence establishes that Det. Cook and Det. Noordyke, and possibly others, conspired to plant this knife in an effort to corroborate Ms. Murphy's coerced statement;

### WILLIAM LEE, THE SUSPECT TURNED STAR WITNESS

76.   Det. Cook seized Ms. Murphy before he even knew of the existence of William Lee, the body temperature of Ms. Murphy's son or the other evidence at the scene;

77.    By the time Cook found out about Lee, extensive media coverage, complete with details of her "confession," had already branded Ms. Murphy the killer;

78.    Around the time of the first 911 call, Ms. Murphy's neighbor, Kervin Washington, was outside. Mr. Washington knew William Lee by sight;

79.    Shortly after 3:00 a.m., Mr. Washington observed William Lee run past. Lee was wearing only a pair of dark shorts. Lee was shoeless. Lee was shirtless;

80.    TPD learned of Mr. Washington's story and informed Sgt. Allen who questioned Lee twice. Twice, Lee lied and said he never left his apartment that night. Eventually, Lee admitted to making the first 911 call;

81.    Approximately two (2) days after the crime Sgt. Allen took Lee to the police station for a statement and turned Lee over to Det. Cook;

82.    After talking with Cook, Lee became went from suspect to star witness, falsely claiming he saw Ms. Murphy killed her baby;

83.    Lee's statement to Cook was implausible. It contained conclusions, falsehoods, and information that "did not make sense" to Cook and that "concerned" Cook;

84.    Lee told Cook Ms. Murphy had been punched and her eye was puffy. No officers observed this and Michelle's mug shot reveals Lee's statement was untrue. Lee told Cook he saw Eugene Wood, Michelle's former boyfriend and Travis's father, at the apartment having an argument with Ms. Murphy the night of the murder;

85.    Det. Cook confirmed that Mr. Wood had an alibi that night, contrary to Lee's assertion. Lee told Cook at one point Mr. Wood heard something and walked towards the door so Lee hid behind a bush. Photographs revealed the apartment had no bushes;

Page 13

86. Lee told Cook he looked through pieces of holes in the blinds to see into the kitchen. Photographs taken of the blinds on the window show the blinds were open so Lee would not have had to look through holes;

87. Lee claimed he heard Ms. Murphy turn the water on and off to wash off blood. The water would not turn off when police arrived at the scene. Police took the sink trap which tested negative for blood;

88. Lee claimed he saw a stab wound in the victim's chest. That was impossible. This wound was not visible to either the investigating officers nor the medical examiner until the blood was washed off by the medical examiner;

89. Lee said he saw Travis on the floor in a puddle of blood. Lee said Travis's head was tilted back. Lee said Travis's throat was slashed. Lee said Travis's hands were fisted. Lee said Travis was wearing only a diaper. Lee said he stood there and looked at the dead baby "for a few minutes";

90. William Lee was obviously inside the home;

91. Det. Cook didn't know Lee had a crush on Ms. Murphy. He did not know Lee had been suspended from school the days leading up to the murder;

92. Det. Cook didn't know that neighborhood witnesses said that Lee routinely carried a large folding knife upon his belt;

93. Det. Cook never learned that Lee chased women in the apartment complex and scared them. Cook never learned Lee was considered weird. Cook never checked into Lee's background. Cook never talked to anyone at Lee's school. Cook never learned that Lee had an extensive record going back several years at Children's Medical Center. Cook never investigated Lee's psychological history. Cook didn't

know that when Lee arrived at school the next day, he was overheard talking to himself by his teacher saying "the b**ch deserved it;"

94.  Det. Cook was unaware as to the temperature and level or rigor mortis in Travis's body which placed the time of death before, not after, 3:00 a.m. as Lee claimed;

95.  Det. Cook never asked Lee about the chair against the front door screen which prevented someone from exiting through that door.  Cook never fingerprinted the chair.  Cook didn't think it was relevant that Lee was wearing nothing but shorts when he was seen running at 3:00 a.m.;

96.  Det. Cook never searched Lee's apartment for knives or anything else.  Cook wasn't bothered that Lee claimed he made the 911 call over a situation where the perpetrator had left and the event was over;

97.  Det. Cook "just assumed" Lee was telling the truth. Cook never investigated Lee's reputation for truthfulness. He "never questioned it;"

98.  Det. Cook never went back to the apartment to determine what could have been seen because he "couldn't duplicate the circumstances."  According to Officers Smith and Otterstrom, it was not  possible to see inside without the flashlight;

99.  All of these facts about William Lee and Travis's body were established by witnesses;

100.  At the preliminary hearing, Lee admitted that Cook fed him information.  Lee also revealed his expertise in killing without getting bloody;

101.  Lee testified there are "two ways" to kill.  He testified if the killer was holding the baby, the killer would get blood on him.  He testified if the baby was put down on the ground, the killer would not get blood on him;

102. Det. Cook testified he never knew the substance of Lee's preliminary hearing testimony and never bothered to find out;

103. The Honorable Pete Messler was presiding over the preliminary hearing.  Upon hearing and, more importantly, viewing Lee, Judge Messler stopped the hearing and informed ADA Tim Harris, that it was obvious Lee was the actual killer;

104. Det. Cook, who had already coerced a confession and planted evidence, could not relent;

105. Sgt. Allen, who did know that Lee was lying,  knew or should have known of Det. Cook's deceptive and dishonest methods.  Sgt. Allen was recklessly indifferent to these methods and facilitated this miscarriage of justice;

**MR. HARRIS'S HAD AN IMPROPER MOTIVE TO HAVE MS. MURPHY'S DAUGHTER ADOPTED AND HIS DIRECTION OF THE DEPARTMENT OF HUMAN SERVICES WORKERS WAS INVESTIGATORY**

106. At the time of this murder Tim Harris was a prosecutor at the Tulsa County Juvenile Bureau;

107. As the Juvenile ADA, Mr. Harris removed Ms. Murphy and her sister from their home because they had been abused by their mother's boyfriend;

108. Mr. Harris was motivated to keep Little Michelle from her mother out of fear the same thing would happen to her;

109. During the trial more than a year after Travis's death, Mr. Harris told the jury in closing argument that "[i]f you believe William Lee committed this crime, get back there, quickly come back, set this woman free and tell her to go home and figure out how to get [Little] Ms. Murphy back into her custody;"

110. At the onset of the investigation Little Michelle had been placed in a foster home

with parents who were well acquainted with Mr. Harris. These parents were wanting to adopt a child. These parents were not usual foster parents. These parents were relatively wealthy. Little Michelle never left this family;

111. Upon information and belief, Mr. Harris made a commitment to facilitate this family's adoption of Little Michelle;

112. The morning of Travis's death and before charges were filed, Mr. Harris dispatched DHS workers Jeri Poplin and Doris Unap to Ms. Murphy's apartment complex;

113. These workers talked to neighbors and witnesses as did the police. DHS workers Poplin and Unap reported nothing positive in any document;

114. All the reports were negative to Ms. Murphy and more than a few DHS reports contradicted the TPD reports;

115. These DHS workers even talked to Ms. Murphy while she was in jail after she obtained legal counsel. This was done at the behest of Mr. Harris who used this information at trial contrary to the trial court's order suppressing the statements;

116. Upon information and belief, DHS workers Poplin and Unap were directed by Mr. Harris to solicit inflammatory statements about Ms. Murphy's parenting skills, regardless of the truth, in order to permanently remove Ms. Murphy's daughter and create the impression that Ms. Murphy was a person worthy of punishment;

117. Mr. Harris was a conflicted prosecutor who abused his position to facilitate an adoption to his, upon information and belief, friends;

118. Mr. Harris was acting under color of law, but not within the scope of the judicial functions of a prosecutor in facilitating Little Michelle's adoption;

119. Mr. Harris was outside the scope of his employment. Mr. Harris was using his

position of power for a personal advantage;

120. Upon information and belief, Mr. Harris participated in making Little Michelle a deprived child by signing or assisting another to sign the affidavit;

121. Little Michelle was only 2.4 years-old at the time of the murder. As a result of this deprived affidavit, DHS workers, Poplin and Unap, and others questioned her to the extent that Little Michelle now has false memories and believes that her biological mother is a murderer;

122. This indoctrination caused a loss of consortium between an child and her mother that still persists today. Beyond stealing her youth; these defendants systematically stole her daughter;

123. The poisoning of a child's mind against her mother is extreme, outrageous and cruel:

### THE BLOOD EVIDENCE

124. TPD had issued a press release identifying Ms. Murphy as the perpetrator before the end of the first day of its "investigation." Thus, TPD in general and the defendants in particular were highly motivated to suppress any evidence of Ms. Murphy's innocence;

125. A drape in Ms. Murphy's  home separated the kitchen from the living room. The drape had a visible blood stain of a left hand print, thumb, fingers and palm,  on the kitchen side;

126. Prior to trial TPDFL, cut out almost the entire blood stain from the hallway drape;

127.  In 2014, Ms. Murphy established through DNA testing that this drape contained the blood of an unknown male which was in close proximity to the bloody hand print on

the drape;

128. In 1994, ABO blood typing had been well-established having been utilized since the turn of the Century. In 1994, physicians routinely did *in utero* ABO blood typing;

129. TPDFL chemist Ann Morris knowingly prepared a false report. She claimed that the victim's ABO blood type was "inconclusive" because infants do not have antigens. This was patently untrue and known by Ms. Morris to be untrue;

130. Both William Lee and Travis Woods were blood type O and, upon information and belief, Ms. Morris knew their blood type;

131. Ms. Morris also reported that the unknown blood on the floor and front door were type AB blood which was also false. Upon information and belief Ms. Morris also knew this report to be false;

132. Morris's false reporting of the presence of type AB blood when the samples were actually type O, enabled Mr. Harris to falsely suggest to the jury that the AB blood came from Ms. Murphy;

133. As a result of Ms. Morris' s report, Mr. Harris declared to the jury in closing argument that "the blood outside the door is type AB. Isn't that interesting." "It is not the child's blood." Defense counsel objected;

134. Undaunted, Mr. Harris drove the point home further stating, "there is AB blood one other place, that is here on the floor . . . It is not the child's blood." Hence, the jury deliberated wrongly believing that there was AB blood at the scene which came from Ms. Murphy;

135. Ann Morris also sent some of the unknown items at the scene, and the known blood of Travis Woods, to the OSBI;

136. Within the OSBI lab, the established relationship between Tom Gibson and Mary Long was that Ms. Long did the testing and Mr. Gibson would sign off on her reports and testify;

137. Upon information and belief at the time of trial Ms. Long no longer testified because her work was being questioned and was subsequently discredited by Judge Seay in the Fritz and Williamson exonerations for capital murder. *See Ronald Keith Williamson v. Dan Reynolds,* 904 F. Supp. 1529 (1995); *see also The Innocent Man* by John Grisham;

138. OSBI chemist Mary Long performed a DNA profile of Travis Woods, and a DNA profile of the blood cut out from the drape, item number 16;

139. This designation was contemporaneously questioned by Dr. Arthur Eisenberg, the OSBI DNA Unit Consultant who conducted the peer review of Long's DNA test. Dr. Eisenberg expressed a concern that Ms. Long was unnecessarily resizing the alleles;

140. The OSBI report stated that "genetic locus D2S44" of the DNA profile matched the decedent, Travis. The report further provided that the probability Caucasian males would have this locus are every one in fifty;

141. The other locus tested by Ms. Long was "inconclusive" because of the resizing;

142. OSBI also did an ABO blood typing on Ms. Murphy's known blood. Criminalist Gibson, who was aided and abetted by criminalist, Mary Long, diminished the importance of Michelle being blood type A by stating the test results of her blood were "consistent with type A, however not able to confirm group;"

143. No competent criminalist would have been unable to perform a reverse (confirming)

test on a simple ABO blood typing from a known subject's blood in 1994, when, as here, the criminalist had several vials of Ms. Murphy's blood available to them;

144. Upon information and belief, Gibson and Long deliberately falsified the evidence;

145. The false and misleading reports of Gibson and Long allowed the prosecutor to claim the report was not exculpatory and he did not turn it over to defense counsel;[1]

146. The false and misleading reports from Gibson and Long allowed the prosecutor to falsely prejudice the jury into believing that Ms. Murphy was the source of the AB blood at the scene;

147. The wrongful and deliberate actions of these OSBI agents substantially contributed to Ms. Murphy being wrongfully convicted;

**THE 2004-2005 *RELIAGENE* DECEPTION**

148. Like many innocent people in prison, Ms. Murphy never stopped trying to get released. With the onset of DNA exonerations, Oklahoma had enacted a DNA division of the *Oklahoma Indigent Defense System;*

149. Ms. Murphy gained their attention and they agreed to investigate her case;

150. In 2004, at the request of the *Oklahoma Indigent Defense System*, Judge Tom Gillert ordered TPDFL to send seven items of evidence to *Reliagene* Laboratory for DNA testing. These seven items included the hallway "off white drape (left half) with blood";

151. In response to this order TPDFL chemist David Sugiyama retrieved each item, photographed each  item, and examined each item;

---

[1] Ms. Murphy believes the report to be exculpatory; however, her information and belief is that the prosecutor will claim it was not and releasing it was within his discretion.

152.   The 2004, Court Order required that TPDFL send these items.  The Order did not allow TPDFL to examine them and make a subjective determination as to whether they should be sent;

153.   However, Mr. Sugiyama did not comply with the order.  Rather, according to Sugiyama, he examined the items, did not see blood and then withheld the drape and another two (2) other items;

154.   In 2014, tests on the drape conducted by *Forensic Analysis Science* ("FAS") confirmed  third party male blood in close proximity to the cut out on the drape.  These results were crucial to Ms. Murphy's exoneration;

155.   It is notable that contrary to Sugiyama's assertions, two (2) of the three (3) items contained blood visible to the naked eye; however, the blood had degraded on the other;

156.   Mr. Harris stated in open court and on the record that if he would have known of the *Reliagene* report he would have vacated Ms. Murphy's conviction in 2005;

157.   In 2005, TPD and TCDA,  and TPDFL received the *Reliagene* report.  The *Reliagene* report confirmed the so-called "AB" blood in item number 2 did not originate from Ms. Murphy;

158.   Thus, even without Mr. Harris's declaration, revealing this deception should have gained Ms. Murphy a new trial;

159.   The deception by Sugiyama, and possibly others, was the direct cause of Ms. Murphy languishing another ten (10) years, more or less, in prison;

**IN 2004 THE TPDFL WAS STILL DELIBERATELY INDIFFERENT TO PRESERVING AND PRODUCING EVIDENCE**

160.   In 2005, Mr. Sugiyama also split samples, changed containers and did not keep

proper records.  Several container envelopes were empty without explanation and evidence was lost;

161.    For example, on September 3, 2004, OIDS sent an email to Mark Boese, then Director of the TPDFL requesting William Lee's blood in order to have it submitted for testing;

162.    In the email to the TPD property room, OIDS provided Lee's TPD case file number of 573348, the Complaint number 604809, and the property receipt AE8306. Nevertheless, OIDS was told the blood could not be located;

163.    That on October 29, 2013,  ADA Jimmy Dunn stated that Lee's blood could not be located in 2005, because it had been stored under the name "Lee William." However, what was allegedly William Lee's blood was produced, packaged in an envelope that was labeled "Two Tubes of Blood William M. Lee" with "case number AE8306" written on the envelope in bold red ink; the same case number provided by OIDS in 2005;

164.    Mark Boese is now deceased.  After ten (10) years as the Director of the TPDFL he was fired for gross misconduct and dereliction of duty.  During this same period of time another Tulsa County exoneree, Sedrick Courtney, was repeatedly and falsely being told his forensic hair evidence no longer existed;

165.    That on December 3, 2013, during a second inspection of the evidence in Ms. Murphy's criminal case,  ADA Dunn stated that we were "lucky" that William Lee's blood and semen had not been destroyed per court order;

166.    ADA Dunn provided a two page property receipt stamped "Disposed of per CJ-97-2172." Ms. Murphy attempted to verify this statement by viewing the court file in

CJ-97-2172 and found that the inventory list of destroyed property, described in the case file as "attachment A," was missing;

167. The court clerk then looked up the case file on microfilm and was surprised to discover that "attachment A" was missing from the microfilm as well;

168.  The repeated deception by members of the TPDFL indicates further culpability and collusion by the defendants who a decade later were still covering up their original fraud;

### LEE'S SUICIDE WAS AN OPPORTUNITY FOR TPD TO DO A SECRET TEST

169. One month after his testimony was transcribed at the preliminary hearing, on January 12, 1995, suspect turned star witness, William Lee, was found hanging in a garage with a bed sheet wrapped around his neck;

170. The medical examiner ruled Lee's death an auto erotic hanging because Lee's pants were off and a black light indicated semen on his thighs.  However, contrary to the pictures of the scene,  the lividity patterns on Lee's body indicated he was sitting, not standing as he would have to have been in order to commit suicide;

171. Det. Cook was the first TPD officer at the scene;

172. TPD requested serology samples from the medical examiner and TPD collected such samples in this case

173. Approximately two weeks after  William Lee died, and months before Ms. Murphy's trial, the TPD  property room received Lee's semen and blood samples from the Medical Examiner's Office;

174. Contemporaneously, Det. Cook submitted a lab request to type Lee's blood, along with a lab request to type the blood on the outside screen door in Ms. Murphy's

case. TPDFL, TPD, and TCDA claim these two lab requests "never made it to the lab;"

175. Lee's evidence log indicates that TPDFL criminalist Ann Reed checked out Lee's semen samples, labeled items 1-5, and 8, and returned them to refrigerated storage several months later. No report was ever produced of this testing;

176. Criminalist Ann Reed rushed the testing of Lee's sperm for Cook even though Lee's death was deemed a suicide and the medical examiner's office had already identified seminal fluid on Lee's thighs with a black light;

177. Neither TPD or TPDFL ever revealed Reed's test, never provided a report during pre-trial discovery, and never produced the results;

178. Det. Cook's request for Lee's blood to be tested, that was not acted upon, was given to defense counsel. This confirmed to defense counsel that blood typing would not be an issue at trial;

179. In 1994, the TPDFL had the ability to determine blood type from seminal fluid.

180. Upon information and belief Ann Reed performed a secret test which enabled TPD to know Lee's blood type without testing Lee's blood as requested by Det. Cook;

181. Oral requests for testing and oral production of results were routine at the time. The TPDFL policies, or more precisely, the lack thereof, enable individuals to secretly gain exculpatory information and not report it as required by law;

182. Ms. Reed did not report her testing on William Lee to the prosecutor as required by law;

183. At Ms. Murphy's trial, Cook testified that as far as he knew, Lee's blood was never tested. No mention was made of Lee's semen;

184. Defense counsel was misled into believing that no blood testing was being done.

185. Had Lee's blood type been timely and appropriately produced, it would have alerted defense counsel and eliminated Mr. Harris's ability to falsely tell the jury the AB blood was Michelle's blood;

**DOUG NOORDYKE DELIBERATELY FAILED TO COLLECT AND TEST EVIDENCE. SGT. ALLEN SANCTIONED, APPROVED AND ENDORSED THIS FAILURE**

186. Detective Doug Noordyke was responsible for collecting and processing the forensic evidence at the scene of the crime;

187. As noted, Noordyke did not process the metal folding chair which would have been a prime location to recover fingerprints. In all, Noordyke only recovered five (5) sets of latent prints from the home. This seems implausible given the ordinary and daily use of a home;

188. However, the five (5) latent prints were all from the front door which would seem to be reasonable and helpful, had the prints been compared to any suspect;

189. There is no record of comparisons of the latent prints recovered from the home;

190. Four knives were introduced in trial. None of the knives tested positive for blood and none of the knives had latent prints on them;

191. No prints from the home were ever tested, because, upon information and belief, print comparison could only help the defense and hurt the prosecution;

192. Ms. Murphy, who lived in the home, would be expected to have finger prints in her home;

193. Alternatively, Lee's finger prints on the front door would be compelling evidence for the defense;

194. As previously noted, at the scene of the crime there was an open and obvious

bloody print on the drape separating the kitchen from the living room. This bloody print was not photographed at the scene and was not photographed until it was excised from the drape;

195. Watching Det. Noordyke's film the home, it appears he deliberately avoids filming this crucial evidence;

196. If no prints could have been discerned from the bloody prints on the drape, at a minimum, close scrutiny would allow one to discern  the size of the fingers, if a quality photograph had been obtained;

197. There were no fingerprints lifted from the decedent's diaper, the counter near the kitchen sink (washing up, the police did take the drain) or the back door;

198. Upon information and belief, the latent prints from the home were deliberately not tested because they could have exonerated Ms. Murphy;

199. Immediately next to Travis's body was a white gooey substance intermingled with a black substance exhibited in the video.  It is not mentioned in any reports and, by all indications, completely ignored;

200. No sample of the substance was obtained for future testing.  The substance was ignored and lost;

201. Det. Noordyke was remiss to the extreme in not documenting the significance of the blood trail at the scene.  It is difficult, if not impossible, to stab a person using an ordinary knife without inflicting injury on yourself;

202. In this instance there were drops of blood from the decedent to the draped hallway to the front door;

203. Other than a couple of drops, he dripping blood,  which was indicative of wound to

the assailant, was never collected, investigated or tested;

204. There were blood drops on the diaper that clearly dripped from the killer's hand or the killer's weapon which were never collected, investigated or tested;

205. In 2014, the diaper blood spot was too degraded to validly test;

206. Prior to trial, defense counsel repeatedly insisted to Mr. Harris that if Lee's story was credited, Lee would have left fingerprints on a window air conditioning unit;

207. Det. Cook waited seven (7) months after Ms. Murphy's arrest before he instructed Noordyke to go back to Ms. Murphy's apartment and try to get fingerprints off of the air conditioning unit;

208. Det. Noordyke claims tried to collect fingerprints from the air conditioning unit but was unsuccessful. The unit had been subject to the elements for months. It was then removed from the window and was sitting on the living room floor. The unit had been handled by people and exposed to moisture and weather conditions;

209. Det. Noordyke claimed he worked at Det. Cook's instruction. However, Noordyke knew or should have known that he had a clear duty to exonerate the innocent. Sgt. Allen, who was supposedly overseeing Cook and Noordyke had a similar duty;

210. These defendants, either deliberately, or with reckless disregard, ignored their obligations and their actions substantially contributed to Ms. Murphy to be wrongfully convicted;

### A PAID INFORMANT WAS RELEASED FROM THE MENTAL HOSPITAL IN ORDER TO TESTIFY AGAINST MS. MURPHY AND TPD WITHHELD THIS MENTAL HEALTH TREATMENT FROM THE JURY

211. Det. Cook used a paid informant in rebuttal who was mentally ill and had just been released from a mental health facility;

212.   Scott Dale Ritchie was the  rebuttal witness against Mr. Wood.  Ritchie had a lengthy criminal record for violent crimes and a history of mental health commitments;

213.   Scott Dale Ritchie had previously been a paid informant for TPD;

214.   William Lee had mentioned in his statement that a "Scott" had came by to visit  Mr. Woods.  Upon information and belief, Det. Cook identified this person as Scott Dale Richie, a paid informant for Cook and TPD;

215.   In December of 1994, nearly a year before trial, Ritchie was in custody when, upon information and belief, he contacted by Det. Cook;

216.   Richie offered to testify against Ms. Murphy. In exchange, Richie was released from custody and TPD housed Ritchie at the *Saratoga* Motel where, upon information and belief, Richie went back on the TPD payroll;

217.   Upon information and belief Cook or his agent, managed Richie from December in 1994 to the trial in November, 1995;

218.   Richie's record featured several armed robberies, a home burglary, a couple assault and batteries with a deadly weapon, mental health commitments and numerous other crimes;

219.   A NCIC report on Richie revealed his recent stay at *Parkside* so TPD and Cook knew or should have known that Mr. Richie was released from *Parkside Mental Hospital* thirty-five (35) days before he testified in this case. They suppressed this information which was obtained for the first time in 2014;

220.   Upon information and belief, all of Scott Richie's statements were false and Det. Cook knew them to be false;

221. The Richie *Giglio* evidence which was suppressed was crucial because the prosecution would have lost all credibility if the jury had known that the state's last witness was a career criminal who had just been released from a mental institution;

### TPD's Failed to Produce Evidence Lee Was Actual Killer Or, in the Alternative, *Giglio* Evidence to Impeach Lee

222. Defense Counsel was not allowed to introduce his theory of the crime, that had committed numerous bad acts and William Lee killed Travis. The trial court determined there was insufficient evidence to establish this theory;

223. Since William Lee died after preliminary hearing, Ms. Murphy could have used bad acts to impeach his transcript testimony used at trial;

224. TPD never produced William Lee's criminal history. In 2014, a few pages related to a record for burglary were produced by TPD;

225. These reports indicated that Officer Roy Hiem believed that Lee was a suspect in two (2) other murders. A TPD officer flew over the vicinity of where the other murders occurred in relation to Travis's murder in hopes of finding a discarded weapon along the foot paths;

226. TPD never produced Off. Hiem's reports to defense counsel. These reports were produced from the TPD for the first time in 2014;

227. In spite of a court order requiring production of exculpatory evidence, TPD also suppressed until December, 2014, previous law enforcement contacts with William Lee prior to Travis's murder, including one incident wherein Lee pointed a weapon at a police officer, and another incident wherein Lee was fighting, his blood alcohol limit was almost three times the legal limit, and another where he had to be restrained in the emergency room because he was "too violent" according to the

treating physician;

228.  TPD knew or should have known that Lee was not only a burglar, but an accomplished burglar who, according to his step-father, was practiced at sneaking undetected through a person's occupied home;

229.  Had this exculpatory evidence been introduced, it would have formed a factual basis which would justified defense counsel putting William Lee on trial or may have convinced the state to dismiss the case altogether;[2]

230.  As noted earlier, the body temperature of the decedent was too low to corroborate Lee's story;

231.  Sgt. Allen knew or should have known of Noordyke and Cook's refusal to investigate innocence.  He should have known of TPD's prevailing ethic not to produce exculpatory information;

232.  Sgt. Allen, upon information and belief, knew this ethic and, like everyone else, ignored their duty;

### THE CONCEALMENT OF EVIDENCE IS ONGOING AND RATIFIED AND ENDORSED BY CITY OF TULSA LAWYERS

233.  That on December 17, 2013, the undersigned, ADA Jimmy Dunn, city attorney Michelle McCrew and a D.A.'s investigator met at the property room to review William Lee's evidence stored under case number AE-8306;

234.  Upon information and belief, the meeting was audio recorded by Ms. McGrew;

---

[2] The record indicates that Mr. Harris had agreed to dismiss the case if Ms. Murphy passed a lie detector test by the state's examiner.  She did and was identified as truthful in response to whether she killed Travis or knew who killed Travis.  Mr. Harris changed his mind on his offer.

235.    Attached to William Lee's evidence log was a true and correct copy of Sedrick Courtney's Tort Claim to the City of Tulsa which was signed by Richard O'Carroll. Also attached to Lee's evidence was a memo from a city attorney;

236.    The log, with the attached Tort Claim and memo, was handed to the undersigned in the TPD property room to review;

237.    The undersigned stopped reading the memo when he saw it was labeled "Privileged." It was the undersigned's opinion and belief from looking at the memo that the purpose of this memo was to warn TPD and TPDFL that cooperation with Ms. Murphy would cause the city to be sued;

238.    That pursuant to Rule 4.4(b) of the *Rules of Professional Conduct*, on January 10, 2014, the undersigned informed the city attorney who authored the memo by email informing him that the memo had been produced. The city attorney replied and claimed the memo's purpose was for "preserving" evidence;

239.    On October 31, 2013, the Honorable William Kellough had signed an "Order Preserving Evidence" in Michelle Murphy's case. This Order, approved by ADA Dunn, was served on the TPDFL and the Chief of Police with a return filed of record in her criminal case  Judge Kellough's relevant Order was not attached to either Michelle's, or William Lee's, evidence log ;

240.    William Lee's death was deemed a suicide by the medical examiner. Maintaining his specimen samples only related to Ms. Murphy's case.  The city attorney's explanation that his memo and a tort notice from an unrelated case were attached to William Lee's evidence log in order to "preserve" evidence" is incorrect;

241.    The memo and the tort notice is evidence that the City of Tulsa still stonewalls

exculpatory evidence;

**TARA VALOUCH DEFIED A COURT ORDER WHICH
UNDERMINED THE VALIDITY OF ALL OF THE REMAINING EVIDENCE**

242.   On April 23, 2014, Ms. Murphy obtained a court order in her criminal case allowing her lawyers to inspect the evidence. The order explicitly stated that the evidence would only be handled in the presence of Ms. Murphy's agents until sealed;

243.   The order was properly served in anticipation of an inspection;

244.   Nevertheless, prior to Ms. Murphy's arrival to observe the packaging of evidence, TPD lab director Tara Valouch had already selected, and brought to the lab, items of evidence Ms. Valouch determined were relevant. These were the only items produced;

245.   Prior to Ms. Murphy's arrival, Ms. Valouch had already repackaged the evidence;

246.   Even after Ms. Valouch had repackaged the evidence in Ms. Murphy's absence, it was obvious the evidence has been previously mishandled, mislabeled, and misarranged;

247.   The interior labels were inconsistent with exterior labels and one had to speculate as to how the previous criminalist had handled the evidence;

248.   That during the packaging Ms. Valouch referred to the testing conducted in 2005, by *Reliagene*. The undersigned asked to see the evidence *Religene* returned to TPD after it completed its testing. Ms. Valouch informed the undersigned that *Reliagene* only returned extracts and they had been destroyed. *Reliagene* documents dispute this assertion;

249.   That during the packaging, Ms. Murphy observed that one envelope labeled item number 55, which, according to information provided by the state, supposedly

contained a split of items 25-28, (the supposed AB blood on the front screen door and the known samples from the victim Travis Woods), allegedly contained, item number 2, the AB blood from the kitchen floor, that the state had previously claimed no longer existed. This envelope was also labeled as containing swabs from Ms. Murphy. It did not;

250. That during the packaging of evidence on April 23, 2014, Ms. Valouch suggested that samples of evidence purported to be items number 2 and 25, be placed back in the empty envelopes labeled items number 2 and 25, even though the samples themselves were not labeled as being items number 2 and 25;

251. Ms. Murphy objected that placing these samples back in the empty envelopes would create a false impression that the samples were in fact those items. Accordingly, these samples were not placed in the empty envelopes as Ms. Valouch suggested and the envelopes remained empty;

252. Ms. Valouch's defiance of a court order suggests that nothing has changed in the TPD and the TPDFL. The culture of opposition and deception is still alive and well;

### SYSTEMIC VIOLATIONS AT THE TPD AND TPDFL

253. Ms. Murphy incorporates by reference all of the foregoing and further states and alleges:

254. The unconstitutional and tortuous acts of the defendant officers and criminalists were not isolated incidents. Upon information and belief, defendant City of Tulsa, by and through its final policymakers, had a custom, policy, pattern or practice of fabricating inculpatory evidence, failing to adequately investigate other leads, withholding material exculpatory or impeachment evidence from prosecutors, and

failing to properly train, supervise, or discipline defendants, Cook, Noordyke, Allen, Sugiyama, Valouch, Reed, Morris, Smith and Otterstom;

255. Specifically, upon information and belief, City of Tulsa, by and through its final policymakers at the Tulsa Police Department Forensic Laboratory, had a custom, policy, or pattern and practice of fabricating inculpatory evidence, withholding material exculpatory or impeachment evidence from prosecutors, and failing to properly train, supervise, or discipline analysts, specifically including Ann Reed, Ann Morris, Tara Valouch and Mr. Sugiyama concerning basic forensic investigation techniques, constitutionally adequate testing and reporting methods, and the obligation to disclose exculpatory or impeachment material to the prosecution;

256. The TPDFL had no written policies, procedures, or guidelines concerning the execution of lawful forensic investigations, constitutionally adequate testing and reporting methods, and the legal obligation to disclose exculpatory and impeachment material to the prosecution;

257. Although the City of Tulsa's final policymakers and defendants Jane Doe Supervisors #1–10 had actual or constructive notice of defendants Ann Reed, Ann Morris, Tara Valouch and Mr. Sugiyama's outrageous and pervasive misconduct, fabrication of inculpatory evidence, and mishandling of forensic evidence, they took no steps to train, supervise, or discipline them;

258. In the aftermath of the exoneration of Timothy Edward Durham in January, 1994, after the TPDFL was put on actual or constructive notice of systemic break downs of custody and control of evidence, Brady violations, secret tests by private citizens and/or other outrageous misconduct in handling forensic evidence and reporting the

results of her analyses, the TPDFL took no steps to discipline lab supervisors or the malfeasant analysts, to train them on their constitutional obligations, and/or to conduct any meaningful review of their past and/or ongoing case work for similar misconduct;

259.  That the only supervision defendants Jane Doe Supervisors #1–10 actually provided for, or constructively condone, facilitate, or encourage the unconstitutional practices of defendants Reed, Morris, Sugiyama and Valouch;

260.  Furthermore, specifically, upon information and belief, the City of Tulsa, by and through its final policymakers at the Tulsa Police Department, had a custom, policy, or pattern and practice of fabricating inculpatory evidence, failing to adequately investigate other leads, withholding material exculpatory or impeachment evidence, and failing to properly train, supervise, or discipline officers, specifically including defendants Cook, Noordyke, Smith, Otterstrom and Allen concerning the execution of investigations, how to conduct a proper interview procedure and, the benefits of obtaining and preserving blood and fingerprint evidence, and the legal obligation to disclose exculpatory and impeachment material to the accused;

261.  The TPD had no written policies, procedures, or guidelines concerning the execution of of investigations, how to conduct a proper interview procedure and, the benefits of obtaining and preserving blood and fingerprint evidence, and the legal obligation to disclose exculpatory and impeachment material to the accused;

262.  Beyond the case of Timothy Edward Durham, other cases have been brought to the attention of the City of Tulsa, and its final policymakers at the TPD and TPDFL, including: the case of Arvin McGee, Jr., who was wrongfully convicted of rape,

kidnapping, sodomy, robbery by force, and unauthorized use of a motor vehicle in 1989. Mr. McGee was conclusively exonerated by DNA testing, and the conviction against him was vacated and dismissed on the basis of his actual innocence. Mr. McGee's conviction was based on the TPD officers' fabrication of the victim's identification of him. Following a trial in a civil rights suit brought by Mr. McGee alleging that the City of Tulsa's complete lack of policies on the proper execution of rape investigations and constitutionally adequate identification procedures was deliberately indifferent to his constitutional rights, a jury awarded Mr. McGee $14.5 million dollars. The City of Tulsa eventually settled that suit for $12.25 million;

263.    The City of Tulsa knew or should have known that the failure to adequately train and supervise Reed, Morris, Cook. Allen, Smith, Otterstrom. Sugiyama, Noordyke, Valouch and others in these procedures and obligations had the possibility of resulting in the unconstitutional and tortious acts set forth herein.

264.    These customs, policies, patterns or practices were in reckless disregard or deliberate indifference to the rights of Ms. Murphy;

### DAMAGES

265.    The unlawful actions of defendant officers and forensic analysts caused Ms. Murphy to spend nearly 20 years in prison for a brutal crime she did not commit;

266.    The unlawful actions of defendant officers, forensic analysts and Mr. Harris caused Ms. Murphy to lose consortium with her daughter, Little Michelle;

267.    As a direct result of defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Ms. Murphy sustained injuries and damages, including loss of his freedom for nearly 20 years, personal injuries,

pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression;

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

### COUNT I

### 42 U.S.C. § 1983 FOURTEENTH AMENDMENT VIOLATIONS:

### FABRICATION OF INCULPATORY EVIDENCE AND SUPPRESSION OF MATERIAL EXCULPATORY EVIDENCE IN VIOLATION OF *BRADY v. MARYLAND*

268.   Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

269.   As described more fully above, Defendants, all state actors, acting deliberately, recklessly, and/or intentionally, individually, jointly, and/or in concert or conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of her constitutional right to a fair trial.

   A.   **Fabricating False Inculpatory Evidence;**

      1.   Det. Cook coerced a false confession from Ms. Murphy and then corroborated it with a planted knife;

      2.   Ann Morris and Ann Reed, deliberately used faulty, testing, reporting

and/or custody procedures to enable Mr. Harris to make false statements in Court and wrongly convict Ms. Murphy;

3.      Defendants Long and Gibson deliberately used faulty testing and reporting procedures to enable  Mr. Harris to make false statements in Court and wrongly convict Ms. Murphy;

4.      Defendants Poplin and Unap gathered false and misleading information to wrongfully alienate Ms. Murphy's child from her mother;

**B.      Failure to Disclose Exculpatory and Impeachment Evidence:**

1.      In the manner described more fully above, the Defendants individually, jointly, and/or in concert and conspiracy, fabricated evidence, in police reports and lab reports, in conversations with prosecutors, in conversations with defense counsel and in pretrial testimony, which caused the conviction of Plaintiff; this includes coercing a confession fabricating and/or planting "evidence" implicating Ms. Murphy in the murder, specifically coercing a false confession, the secret test of William Lee's semen and then producing the request for the testing of Lee's blood while telling the defense counsel that all of the blood belonged to Travis; using a paid informant who was a career criminal, while withholding powerful *Giglio* evidence and wrongly convict Ms. Murphy not sending the articles ordered by the trial court to *Reliagene* in 2005; disobeying the trial court's order in 2014, by repackaging the evidence;

270.   By failing to disclose, concealing, and misrepresenting this information, defendant

police officers violated the Fourteenth Amendment, as interpreted by *Brady v. Maryland*, 373 U.S. 83 (1963), *Kyles v. Whitley*, 514 U.S. 419 (1995), and their pre-1995 progeny, which imposed a clear duty on the defendants not to conceal, suppress, and/or misrepresent obviously exculpatory evidence, and rather to report all material exculpatory and impeachment information to the defense;

271. Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been initiated, pursued, and/or continued, and Plaintiff would not have been wrongfully convicted;

272. Acting with recklessness, deliberate indifference, or intentionally by withholding this material exculpatory and impeachment evidence prior to trial, Defendants violated Ms. Murphy's clearly established Fourteenth Amendment right to due process of law as interpreted by the United States Supreme Court in *Brady v. Maryland* and its progeny, undermining confidence in the outcome of the trial, and directly and proximately causing Ms. Murphy to be wrongfully convicted and to suffer the injuries and damages described above;

273. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights;

**COUNT II**

42 U.S.C. § 1983: FOURTEENTH AMENDMENT VIOLATION:

**SUBSTANTIVE DUE PROCESS**

274. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

275. Although Defendants knew or should have known that Ms. Murphy was not involved in the murder of her child, they coerced a confession, fabricated evidence, including, without limitation, fabricating inculpatory forensic testing results and/or planting physical evidence and in police reports and lab reports, in conversations with prosecutors, and in pretrial testimony, and suppressed the exculpatory evidence that they had engaged in such wrongdoing, disregarding evidence indicating that Ms. Murphy was innocent and evidence pointing to other leads or suspects, as set forth above;

276. These fraudulent, outrageous, and egregious acts robbed Ms. Murphy's criminal trial of fundamental fairness to a degree that shocks the conscience, violating Ms. Murphy's clearly established constitutional right to substantive due process of law as guaranteed by the Fourteenth Amendment and causing her wrongful conviction and the injuries and damages set forth above, a magnitude of potential and actual harm that is truly conscience shocking;

## COUNT III

### 42 U.S.C. § 1983 FOURTH & FOURTEENTH AMENDMENT VIOLATION:

### MALICIOUS PROSECUTION

277. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

278. The Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made false statements to prosecutors with the intent of exerting influence and to institute and continue the judicial proceedings;

279. The Defendants caused Plaintiff to be illegally seized, charged with murder, and improperly subjected to judicial proceedings for which there was no probable cause. Plaintiff's arrest and the judicial proceedings against her were instituted and continued maliciously, resulting in damages as described more fully above;

280. Defendants fabricated evidence by coercing a false confession, falsely reporting forensic testing, withholding *Giglio* information. Statements of the Defendants regarding Plaintiff's culpability, the inculpatory nature of the forensic blood testing and comparison analysis, used against the Plaintiff were made with knowledge that said statements were false and perjured. Defendants were aware that, as described more fully above, the evidence implicating Plaintiff in this murder was neither true nor reliable: the inculpatory forensic evidence had been fabricated. Furthermore, Defendants intentionally withheld from and misrepresented to defense material exculpatory and impeachment information, specifically including but not limited to the facts of their intentional misconduct as described more fully above;

281. The misconduct described in this count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Plaintiff;

282. Plaintiff's conviction was vacated on May 30, 2014, and the prosecution terminated in her favor on September 12, 2014, when the criminal information against her was dismissed wherein William C. Kellough granted Ms. Murphy a certificate of actual innocence;

283. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, damages as set forth above, including pain and suffering.

**COUNT IV:**

42 U.S.C. § 1983: SUPERVISORY LIABILITY

284. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

285. The unfair trial, wrongful conviction, and continued wrongful detention of Plaintiff were caused by the deliberate indifference and recklessness of supervisory defendants, including but not limited to Defendant Jane Does Supervisors #1-10, when they failed to adequately train and supervise the individual Defendant Officers and Criminalists, and/or when they created, promulgated, implemented, or continued operation of a policy, pattern, or practice of fabricating inculpatory forensic evidence; failing to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; suppressing from prosecutors material information favorable to criminal defendants; failing to follow the duties imposed by *Brady v. Maryland*; failing to conduct appropriate testing of forensic evidence; improperly handling, processing, analyzing, and storing forensic evidence; and improperly and inappropriately reporting the results of forensic analysis;

286. Specifically, these supervisory defendants were personally involved in the case against Plaintiff and knew or, in the absence of their deliberate indifference and recklessness, should have known of their subordinates' unconstitutional actions and related misconduct in this case;

287. Furthermore, these supervisory defendants failed to supervise the individual defendants in constitutionally adequate law enforcement and forensic laboratory practices, particularly those which concerned the processing of forensic evidence, the interviews of witnesses, and the production of exculpatory evidence, thereby

encouraging and/or permitting these employees and other defendants to fabricate false inculpatory evidence and to withhold exculpatory and impeachment evidence, which caused the constitutional deprivations suffered by Plaintiff;

288. These fabrications, interview techniques, failures in producing exculpatory evidence, and other investigative and testing procedures were contrary to accepted methods used by law enforcement and forensic laboratory agencies. The fact that the defendant supervisors failed to train and supervise their subordinates to ensure that they employed proper investigation procedures demonstrates deliberate indifference and reckless disregard for Plaintiff's constitutional rights;

289. The personal involvement of the defendant supervisors, through their actions and omissions, proximately and directly caused the constitutional deprivations and grievous personal injuries suffered by Plaintiff, including the above-mentioned injuries and damages;

290. The misconduct described in this Count was objectively unreasonable, and was undertaken intentionally, with malice, willfulness, and deliberate indifference to Plaintiff's clearly established constitutional rights.

### COUNT V:

### 42 U.S.C. § 1983: MONELL CLAIM

### UNCONSTITUTIONAL OFFICIAL POLICY AND FAILURE TO SUPERVISE AND TRAIN

291. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

292. The Defendant City of Tulsa, by and through its final policymakers, failed to ensure

through custom, policy and/or practice that officers would conduct constitutionally adequate investigations; never fabricate and/or plant inculpatory evidence; obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; disclose to prosecutors material information favorable to criminal defendants; follow the duties imposed by *Brady v. Maryland*; conduct appropriate testing and properly handle, process, analyze, and store forensic evidence; and properly and appropriately report the results of forensic analysis;

293. The Defendant City of Tulsa, and/or other final policymakers had actual or constructive notice of such failures to train, supervise and provide policy to its employees, and failed to provide training or supervision despite an obvious need that such training and supervision was required, where Defendants knew that it was foreseeable that officers would predictably confront these situations and as a result of the failure to train and supervise, constitutional violations would result;

294. The Defendant City of Tulsa, by and through their final policymakers, failed to adequately screen or discipline its employees, though it was foreseeable that constitutional violations of the type Ms. Murphy suffered would be a predictable result of such failures;

295. The Defendant City of Tulsa, by and through their final policymakers, had in force and effect at the time of the conduct complained of, a policy, practice or custom of fabricating inculpatory forensic evidence; failing to obtain probable cause to ensure that suspects would not be falsely arrested and maliciously prosecuted; suppressing material information favorable to criminal defendants; failing to follow the duties imposed by *Brady v. Maryland*; failing to conduct monitor interrogations and/or

coercive witness interviews; improperly handling, processing, analyzing, and storing forensic evidence; and improperly and inappropriately reporting the results of forensic analysis;

296. Such failures to supervise, train, discipline, and screen, and such unconstitutional municipal customs, practices and/or policies, amounted to deliberate indifference or intentional misconduct, and were the moving force behind Ms. Murphy's arrest, prosecution, and incarceration, and proximately and directly caused the injuries and damages set forth above;

297. The Defendant City of Tulsa, by and through their final policymakers, have previously ratified and have continued to ratify unlawful and unconstitutional acts of its agents and employees of both the TPD and the TPDFL thereby establishing a culture of deception which precludes the proper reporting of exculpatory evidence. the investigation of innocence and the disciplining of malfeasant officers and criminalists;

## COUNT VI

.. 42 U.S.C. § 1983: CIVIL CONSPIRACY TO VIOLATE CONSTITUTIONAL RIGHTS AGAINST ALL NAMED AND UNNAMED INDIVIDUAL DEFENDANTS

298. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

299. The Defendants, under color of law, entered an unlawful agreement with one another and with others for the unlawful purpose of depriving Ms. Murphy of her constitutional rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution and the right to due process of law and fair trial;

300. In furtherance of the conspiracy, each defendant committed unlawful overt acts in which he/she deprived Plaintiff of procedural and substantive due process by deliberately or recklessly fabricating evidence, including forensic hair comparison evidence and the probative details of Greer's identification of Plaintiff, failing to investigate and suppressing exculpatory evidence, and falsely arresting and maliciously prosecuting Ms. Murphy; all conduct that resulted in prejudice to plaintiff;

301. These acts caused Ms. Murphy to suffer the injuries and damages set forth above.

## OKLAHOMA STATE LAW CAUSES OF ACTION

### COUNT VII
MALICIOUS PROSECUTION

302. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

303. The Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made false statements with the intent of exerting influence and to institute the judicial proceedings;

304. The Defendants caused Plaintiff to be illegally seized, charged with robbery and first degree burglary, and improperly subjected to judicial proceedings for which there was no probable cause. Plaintiff's arrest and the judicial proceedings against her were instituted maliciously, resulting in damages as described more fully above;

305. Defendants fabricated evidence by wrongfully reporting results. The defendants were aware that, as described more fully above, the evidence implicating Plaintiff in the murder was neither true nor reliable: the inculpatory forensic evidence had been fabricate.  Furthermore, the defendants intentionally withheld from and

misrepresented to prosecutors material exculpatory and impeachment information, specifically including but not limited to the facts of their intentional misconduct as described more fully above;

306. The misconduct described in this count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of Plaintiff;

307. Plaintiff's conviction was vacated on May 30, 2014, and the prosecution terminated in her favor on September 12, 2014, when the criminal information against her was dismissed wherein William C. Kellough granted Ms. Murphy a certificate of actual innocence;

308. As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, damages as set forth above, including pain and suffering;

## COUNT VIII
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

309. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

310. The acts and conduct of the defendants as set forth above were extreme and outrageous. The Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully described above;

311. As a direct and proximate result of the defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## COUNT IX
### NEGLIGENCE

312. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

313. All defendants are liable for negligence, having breached the duty of reasonable care they each owed to Ms. Murphy.

314. Specifically, without limitation and by way of example, defendants:

A. Despite their notice and knowledge, as described above, failed to explore obvious leads, to investigate the identity of other suspects; and properly report exculpatory evidence;

B. Mishandled important forensic evidence—deliberately and improperly reporting and overstating forensic results by claiming incorrect blood and DNA results, when they were in fact were exculpatory;

315. Defendants' negligence and gross negligence directly and proximately caused Ms. Murphy, an innocent man, to be falsely arrested, maliciously prosecuted, and wrongfully imprisoned for nearly twenty (20) years and to suffer the damages previously described.

## COUNT X
### RESPONDEAT SUPERIOR

316. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

317. In committing the acts alleged in the preceding paragraphs, each of the Defendant Officers and Criminalists were members of, and agents of, the Tulsa Police Department and/or the Tulsa Police Department Forensic Laboratory, acting at all relevant times within the scope of their employment and under color of law;

318. Defendant City of Tulsa is liable as principal for all torts committed by its agents.

## COUNT XI

### NEGLIGENT TRAINING, SUPERVISION, AND POLICIES

319. Ms. Murphy hereby incorporates by reference each paragraph of this Complaint as if restated fully herein and further alleges as follows:

320. Defendants Allen and Jane Doe Supervisors #1-10 were grossly negligent and negligent in their training, supervision, and discipline of the Defendant Officers and Criminalists;

321. Defendants Allen and Jane Doe Supervisors #1-10 knew or, but for their grossly negligent and negligent training, supervision, and discipline, should have known that defendants Reed, Morris, Cook. Allen, Smith, Otterstram. Sugiyama, Noordyke, Valouch and others engaged in misconduct, including fabricating forensic evidence, fabricating witness statements, and failing to document and disclose material exculpatory and impeachment evidence, and that they thereby caused Ms. Murphy to be falsely arrested and maliciously prosecuted;

322. As a proximate result of the gross negligence and negligence of defendants Allen and Jane Doe Supervisors #1-10, defendants Reed, Morris, Cook. Allen, Smith, Otterstram. Sugiyama, Noordyke, Valouch , and others engaged in the previously described misconduct and caused the previously set forth acts of malicious prosecution and intentional infliction of emotional distress inflicted on Ms. Murphy, which directly and proximately caused Ms. Murphy's wrongful conviction and incarceration, as well as the other grievous and continuing injuries and damages described above.

Respectfully submitted,

Richard O'Carroll, OBA 11947
***O'Carroll & O'Carroll***
2171 N. Vancouver Ave.
Tulsa, OK 74127
918 584 4192
troc@cox.net  and


 /S/ Joe White, Jr.
Joe E.  White Jr., OBA # 12930
Charles Weddle, OBA # 18869
***White and Weddle, P.C.***
630 Northeast 63rd Street
Oklahoma City, OK 73105
Phone: (405) 858-8899


**ATTORNEY LIEN CLAIMED**