IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA


MICHELLE DAWN MURPHY )
Plaintiff )
 )
v. )          15 CV-528-GKF-PJC
 )
THE CITY OF TULSA )
Defendant )


**FIRST AMENDED COMPLAINT**

Michelle Dawn Murphy alleges and states as follows.

**Jurisdiction and Venue**

Plaintiff, Michelle Dawn Murphy, brings this action pursuant to 42 U.S.C. §
1983, to redress the deprivation, under color of law, of her rights under the Due

Process Clause of the Fourteenth Amendment to the Constitution of the United

States.

1.    This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331

      and 28 U.S.C. § 1343.

2.    Attorney fees for Plaintiff's successful prosecution of this case are authorized

      by 42 U.S.C. § 1988.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## Jury Demand

4. Pursuant to the Seventh Amendment to the Constitution of the United Sates, Plaintiff requests a jury trial on all claims and issues in this First Amended Complaint.

## Parties

5. Plaintiff, Michelle Dawn Murphy (hereafter "Michelle), is, and was at all times relevant to this First Amended Complaint, a citizen and resident of Tulsa, Oklahoma.

6. The City of Tulsa is a municipal subdivision of the State of Oklahoma, authorized to sue and be sued in its incorporated name.

## Overview

7. Michelle, then a 17 year old mother of two children, served 20 years of a sentence of life without parole, having been wrongfully convicted of all-but decapitating her three month old son, Travis.

8. Despite blood everywhere around Baby Travis, there was no blood on Michelle or on her clothes, and no murder weapon was ever found.

9. No physical evidence whatsoever linked Michelle to the murder.

10. A false confession was coerced from Michelle by Tulsa Police Department

(hereafter "TPD") Detective Mike Cook (hereafter "Cook").

11. Cook continued the prosecution of Michelle even though he knew the murderer was a 14 year old neighbor, William Lee, who committed suicide a month after his testimony at Michelle's preliminary hearing, and days before he was to be given a polygraph examination.

12. At Michelle's preliminary hearing, the trial judge summoned the lawyers into chambers at the conclusion of the State's case, and told the prosecutor he needed to find a lawyer for Lee because everybody in the courtroom, except perhaps the prosecutor, knew Lee was the murderer.

13. Michelle was given a polygraph examination by an expert from the Oklahoma State Bureau of Investigation, who said she passed the polygraph examination "conclusively," and did not commit the crime.

14. As a result of her wrongful conviction, Michelle lost parental rights to little Michelle, and the daughter (after 20 years of believing that her mother killed her baby brother) will not have anything to do with Michelle.

15. The deliberate indifference of the City of Tulsa to Michelle's Constitutional rights was a proximate cause of her wrongful conviction.

16. In 2014 Michelle was declared innocent in an agreed order entered by Tulsa County District Judge William Kellough.

17. The facts in this case are so horrific that no comparable reported case has been found.

## Background Facts

18. Around midnight on September 11, 1994, Michelle Dawn Murphy, age 17, was at home in her two-level apartment at Riverview Apartments in Tulsa. With her, asleep, were her two children, two year old "little" Michelle and three month old Baby Travis.

19. Michelle and the two children were asleep on the sofa downstairs, because it was a warm evening and the only air conditioner was in the living room downstairs.

20. When Michelle went to sleep, she turned out the lights and locked the front door and the back door located in the kitchen.

21. About 3 a.m. a 911 call was placed by a 14 year old resident of the apartment complex, William Lee, stating there was a domestic disturbance at Michelle's apartment. Within minutes, two TPD officers were at the front of Michelle's apartment. They observed a folding chair propped against the screen door and that the front door was open several inches. One officer stood at the front door, and the other stood at the nearby front window. Neither could see into the apartment without the aid of their flashlights.

22. The officers observed Michelle lying on the sofa, along with a curly haired toddler (little Michelle). One of the officers knocked on the door jamb with his flashlight, twice, each time loudly announcing "Tulsa Police." Michelle appeared to move her legs the second time, as if she were going to get up, but then put them back on the sofa. Michelle said nothing. The officers took no further action and left.

23. Shortly after 6 a.m., Michelle awoke. She noticed that Travis was not on the sofa, and the stool she had placed next to the sofa to prevent Travis from rolling off was moved away from the sofa. She went looking for Travis. She found him on the tile floor of the kitchen, lying in a large pool of blood. Baby Travis' head was all but decapitated.

24. Michelle grabbed little Michelle and ran out the back door to a neighbor's apartment. She banged on the door, hysterical, and shouted that her baby was dead.

25. The neighbors had Michelle into their apartment. A male occupant, William Green, went to Michelle's apartment and confirmed the baby was dead. Female occupants of the apartment then called 911.

26. Michelle told the neighbors her head hurt, and she appeared to them to be in shock.

27. TPD officers promptly arrived, secured Michelle's apartment, and gathered evidence.

28. Two EMSA attendants looked through the screen door into the kitchen, but did not need to enter in order to declare Travis dead.

29. About 7:15 a.m. Michelle was presented an authorization to search the apartment, which she willingly signed. Before she signed the document, she was read Miranda rights with respect to the search, which was routine procedure for persons consenting to a search of premises.

30. The two TPD officers who came to Michelle's apartment at 3 a.m. returned when the call came in about the death of Baby Travis. Both officers reported that Michelle had on the same clothes they saw when they looked into the apartment with their flashlights at 3 a.m.

31. There was no blood on Michelle and none on her clothes.

32. The two officers who came at 3 a.m. noticed a folding chair propped against the exterior of the screen door in the front, and that it was still there when they returned on the homicide call after 6 a.m. They also noticed that the front door, behind the screen door, was open the same few inches at the 6 a.m. time frame as it was at 3 a.m.

33. Officer Otterstrom made his police car available to Michelle, who conversed

with him and with a few neighbors, occasionally stepping out of the car to smoke a cigarette. Michelle told Otterstrom that she did not know what happened, that she wakened, did not find Travis on the sofa, looked for him, and discovered him on the floor of the kitchen.

34. Michelle was taken to the police station by Otterstrom, arriving about 8:50 a.m. Video footage shows that as she left the scene in the patrol car with Otterstrom, Michelle was in handcuffs.

35. Sergeant Wayne Allen was in charge at the scene of the crime. When Detective Mike Cook arrived, Sergeant Allen told him that he, Cook, would be the investigator on the case.

36. Sergeant Allen directed Detective Noordyke to collect evidence at the scene. The evidence he collected included a video and photographs.

37. Observation of the scene revealed that the water in the kitchen sink was on, and could not be turned off at faucet level. Only later was the water shut off, when the apartment complex manager turned it off underneath the sink.

38. The air conditioner was on according to Michelle, and the police observed at 6 a.m. that the air conditioner was on.

39. At the police station, Michelle was placed in the interrogation room, having arrived at 8:50 a.m. She was not provided food or drink, and thus had nothing

between the time she woke up and at least until after she gave a false and egregiously coerced confession at 2:49 p.m.

40.     Despite the presence at the police station of numerous other police officers and clerical personnel, Cook was permitted by Sergeant Allen, who was present in the station during Michelle's interrogation, to be alone in the interrogation room with Michelle.

41.     Cook's interrogation of Michelle was in violation of Oklahoma law requiring the presence of a parent or guardian when a juvenile is interrogated.

42.     Cook's preparation of an affidavit for arrest, and the arrest itself, was in violation of Oklahoma law because it used the confession of a juvenile obtained in violation of the statutory requirement of the presence of a parent or guardian when a juvenile is interrogated.

43.     During the interrogation, Michelle told Cook she had been hit on the head. Cook did not have Michelle examined medically or psychologically. Cook's notes reflect that he checked her head, but do not reflect the result thereof.

44.     Cook's interrogation of Michelle's head without a medical examination was improper and violated her Fifth Amendment rights.

45.     Cook did not examine Michelle for signs of concussion.

46.     Cook testified Michelle was not a suspect when he first interrogated her, but

this was a lie.

47.   Cook further testified that she was not a suspect even at 12:15 p.m. when he gave her a Miranda warning.  This was a lie in several respects, including the time he gave her that warning.

48.   During the entire time Michelle was "not a suspect," she was denied access to her daughter, little Michelle.

49.   Cook threatened Michelle that she would never get to see little Michelle again unless she confessed.

50.   Cook told Michelle that if she confessed she would get therapy and be able to go home.

51.   At no point during the interrogation did Cook or anyone else tell Michelle she had a right to have a parent or guardian present during her interrogation.

52.   At no point during the interrogation did Cook or anyone else tell Michelle she was free to go.  This, alone, vitiated her Miranda "consent."  She was taken to the station in handcuffs and placed in a room with Cook, and denied access to little Michelle.  Especially given her juvenile status and lack of any prior criminal history, she could not have been expected to know she was free to leave since she had been brought there in handcuffs.  Thus, the usage of her confession at trial in the face of her void Miranda waiver, all by itself deprived

her of her Fifth Amendment rights not to incriminate herself and the right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment.

53. At no point during the interrogation did Cook or anyone else tell Michelle about the chair leaning against the front screen door or about any other evidence.

54. At no point after Michelle was charged did Cook or anyone esle attempt to interrogate Michelle, except for the polygraph examination which "conclusively" established that she was not the killer, which examination Cook attended.

55. At no point during the interrogation or thereafter did Cook have Michelle or her clothes examined for the presence of blood.

56. During the interrogation, Cook threatened Michelle that she would never see little Michelle again unless she admitted to killing Travis, he yelled at her, and he put his hands on her bare thighs (she was wearing shorts) ostensibly to look for bruises Michelle said she had on her legs that were not there when she went to sleep that night.

57. Cook did not use a video camera or tape recorder during the interrogation, until at 2:28 p.m. he turned on a tape recorder until 2:49 p.m.

58. Approximately five years earlier, Cook interrogated an 17 year old in a murder

case, threatening and yelling at him (hereafter the "Earlier Case"). This interrogation produced a confession, even though the 17 year old had been interrogated earlier that day by other police officers and denied any involvement in 32 pages of transcribed statement. After 40 minutes in Cook's hands, he confessed. Cook denied, but the judge believed, Cook threatened the juvenile and used racial slurs and obscenities in the unrecorded portion of Cook's interrogation alone with the juvenile. Associate District Judge Bill Beasley suppressed the confession in 1994, noting how infrequently he did that. The *Tulsa World* ran a story on 8-31-94 concerning Judge Beasley's suppression of the confession, reciting the facts set forth just above. When the charge was dismissed, on 9-1-90, the *Tulsa World* ran another story reciting the same reasons for suppression of the confession. With the publication of those two articles, alone, the Final Policymaker for the TPD had constructive notice of Cook's improper interrogation techniques.

59.  The interrogation of Michelle was not continuous, as Cook stepped out of the room to go to another room and talk to Michelle's estranged husband, Eugene. Michelle had kicked Eugene out of the apartment shortly before the murder, because he would not work and support the family.

60.  The statement Michelle made during the 2:28 to 2:49 time frame is wholly

hallucinatory, like a very bad dream.  Cook admitted that what she describes in her statement could <u>not</u> have caused this crime.  In addition, Cook established that LaDonna, with whom Michelle said she had a fight that night, was not present in Michelle's apartment that night.

61. Cook decided Michelle was the murderer and did everything he could to psychologically bludgeon her into confessing.  Cook's belief that Michelle did it necessarily means that Cook had to think Michelle had severe mental, emotional, or psychological impairment because of the common sense certainty that no mother in her right mind could cause such a horrific death of her infant son     Thus, Cook was taking advantage of a person he knew to have a significant inability to process information as a normal person does.  This, alone, makes Michelle's confession involuntary.

62. During the preliminary hearing, testimony was presented by 14 year old William Lee, who said he was outside the front and back of Michelle's apartment at the time of the murder, seeing Michelle take a crying Baby Travis back to the kitchen, when the crying stopped.  Going around to the kitchen, Lee said he saw the baby on the floor with his throat cut and with a stab wound.

63.  Cook violated a duty to advise the preliminary hearing judge and Michelle's

counsel that he obtained a confession from Michelle in violation of Oklahoma statutes requiring the presence of a parent or guardian when questioning a juvenile, and in violation of her Due Process rights not to have a coerced confession used against her.

64. Cook violated a duty to advise the trial court and Michelle's counsel that he obtained a confession from Michelle in violation of Oklahoma statutes requiring the presence of a parent or guardian when questioning a juvenile, and in violation of her Due Process rights not to have a coerced confession used against her.

65. Cook's presentation of and testimony about Michelle's confession, coerced by him, violated principles clearly established many years before 1994 by the United States Supreme Court. That Court established that usage of a coerced confession automatically deprives a person of a Fair Trial in violation of the Due Process Clause of the Fourteenth Amendment, unless that usage is harmless beyond a reasonable doubt, which it assuredly was not in Michelle's case.

66. After the direct examination of Lee at the preliminary hearing, Judge Messler called the lawyers into his chambers and told the Assistant District Attorney he needed to get a lawyer for Lee because everybody in the courtroom knew

Lee had been the one who committed the crime. Judge Messler later observed that this case was the biggest tragedy he had seen in his career.

67. About one month after the preliminary hearing, and within a few days of Lee's scheduled appearance to be given a lie detector test, Lee hung himself in what the medical examiner determined was an auto-erotic incident. Lee's preliminary hearing testimony was read at the trial of Michelle.

68. Michelle was tried for and convicted of first degree murder. She received a sentence of life without parole.

69. Lee's hanging himself should have been viewed by Cook and TPD as an act of violence. This act, combined with Sergeant Allen's knowledge that Lee had lied to him, combined with Lee's records with TPD (including violence outside at the apartment complex as well as violence at the hospital with a blood alcohol level of .248 at *age 12)* should have caused, with appropriate supervision and/or through appropriate policies and training, Cook to compare Lee's preliminary hearing testimony to his statement to Cook, and a further investigation revealing all of the things Cook testified he did not know, as set forth elsewhere herein. Such proper police work, instead of the police work performed with deliberate indifference to Michelle's Constitutional rights, as set forth herein, would have produced a police report revealing that:

A.  Lee had a crush on Michelle;

B.  The morning of the day Baby Travis was discovered all-but decapitated, Lee said at school, "The bitch will pay;"

C.  Shortly before the murder, Michelle rebuffed a sexual advance by Lee;

D.  Lee had several TPD reports reflecting a violent past history;

E.  Lee was easily frustrated;

F.  Lee was, because of his propensity for violence, in a special class in the Tulsa Public School system;

G.  Lee's Tulsa Public School system instructors, who were in class with him the entire time, knew Lee to have a low reputation for truthfulness and to react violently when frustrated;

H.  Before the murder of Baby Travis, Lee decapitated a cat and left the head on the porch of apartment complex residents;

I.  Lee was known for scaring female apartment complex residents by stalking them;

J.  Lee watched Michelle's apartment "all the time," according to a neighbor;

K.  Lee had a low reputation for truthfulness at the apartment complex;

L.  Lee started a fire at the apartment complex a week before the murder;

M.  Lee carried a knife with him at the apartment complex;

N.  Lee threw rocks at Michelle's window the week before the murder, while she was out of town;

O.  Lee lied about Michelle and her estranged husband having an argument at 3 a.m. the day of the murder;

P.  *Lee used a pay phone blocks away to call 911 instead of using the phone he ran by, to avoid the person sitting nearby hearing what he had to say;*

70.  Q.  *Lee was seen running from his apartment, clad only in shorts, at 3 a.m., on his way to the phone.  Lee steadfastly denied the statement of a man who was sitting by the phone Lee ran by on his way to the phone much further away.  Lee maintained he was at home all night.  Thereafter, he radically changed his story.*

R.  In addition to lying about there being an argument between Michelle and her estranged husband, Lee's rendition of that story contained a startling lie, which was Lee's statement that during the argument he was afraid the husband would see him, so Lee hid behind a bush—but there were no bushes by Michelle's apartment;

S.  Five sets of prints were taken at the scene, but none were compared to Lee;

T.  The state of rigor mortis and the body temperature of Baby Travis was such that the murder had to occur much earlier than Lee said;

U.  Lee's statement, made twice to Cook, that he was "sitting there" looking in the kitchen window, trying to see in "real good," but couldn't because the blinds were shut, was an obvious lie.  There was no place to sit except the ground, and sitting there would have readily revealed where Baby Travis lay on the kitchen floor because of wide gaps at the bottom of the mini-blinds.

V.  Lee could not explain his failure to see the chair propped against the front screen door, which Lee would have had to see when he was peering into the front window and then went around—past the chair–to get to the back door, except to testify that the chair got there by "magic."  The chair was seen by the policemen who came to the apartment at 3 a.m. and again after the murder call came in at 6 a.m.

W.  Lee said when he was there at 3 a.m. he could see into the living room and saw both children, but the only way the two policemen who were there at 3 a.m. could see in was by using their flashlights;

X.  Lee said Michelle looked, at 3 a.m., to be puffy, as if punched, but no one else said her face gave that appearance, and her mug shot does not show it;

Y.  Lee denied seeing the police at the apartment complex after 6 a.m., but a neighbor said Lee did see them, and this was in a police report readily available to Cook;

Z. Lee said a neighbor told him that morning what had happened, but a police report shows the neighbor says she did not tell Lee this;

AA. Lee said he saw a stab wound on Baby Travis, but the only way the stab wound on the chest could be seen was at the morgue, after the medical examiner wiped blood off the chest;

BB. Lee said Michelle turned the water on and off in the kitchen sink, but the police found the water to be on when they arrived at 6 a.m., and the water could only be shut off by turning the valve underneath the sink;

AA. Lee said at the preliminary hearing he often peered into Michelle's window;

BB. Lee said at the preliminary hearing he was home 1 ½ hours after 3 a.m., which he knew because he missed the first half hour of a two hour movie on television. But his statement to Cook says he was home only 30 minutes before he went back to the apartment and became the "eyewitness" to the murder;

71. A police report setting forth the facts immediately above, together with the absence of any physical evidence linking Michelle to the crime, and the absence of any history of child abuse, would have caused the reader of that report to conclude Michelle did not murder Baby Travis, or, at worst, would

have triggered a fuller investigation which would have exonerated Michelle and resulted in the arrest of Lee.

72. Michelle passed a lie detector test given by an Oklahoma State Bureau of Investigation expert examiner. The test was administered at the request of the Assistant District Attorney, by a polygraph expert from the Oklahoma State Bureau of Investigation. The examiner declared that Michelle passed "conclusively," and was not the killer. Cook was in attendance during the polygraph examination and heard the "conc;usive" declaration. This did not cause any re-assessment by Cook or TPD or any corrections to the gaping deficiencies in the prior investigation.

73. Throughout her imprisonment, Michelle protested her innocence.

74. While imprisoned, Michelle attempted to escape. She spent two years in the Oklahoma County Jail in connection with this, and when she returned to prison, she spent many months in solitary confinement and lost privileges until her ultimate release. During her imprisonment, Michelle suffered a number of physical injuries that persist.

75. Little Michelle, now an adult, will have nothing to do with her birth mother. For 20 years she grew up believing her mother murdered her baby brother.

**A False Confession Coerced by the Lead Investigator**

76. Cook interrogated Michelle, a 17 year old female, all by himself, over a period of many hours, with no video camera or tape recorder running the entire time. The Oklahoma Statutes in effect in 1994 required that a parent or guardian be present during Michelle's interrogation. None was.

77. Cook threatened Michelle that she would not get to see her daughter ever again unless she admitted killing Travis.

78. Cook yelled at Michelle.

79. Michelle had no food or drink from 6 a.m. until at least after 2:49 p.m.

80. Michelle awoke that morning with her head hurting. She complained of this at the neighbors, who put a bag of ice on her head. She told Cook about her head hurting. She felt a knot on her head. Cook felt her head, where the knot was. Cook lied at trial, saying he felt her head and there was no knot. She was not examined by a doctor, before, during or after the interrogation. Needless to say, any blow to the head she received from the murderer of her baby could well have affected her ability to comprehend or think logically during the interrogation.

81. Michelle's neighbors, to whose apartment she fled upon discovering Baby Travis, and who knew her well, described her as being in shock.

82. During the interrogation by Cook, Michelle was hysterical.

83. Cook interrogated Michelle in a loud, threatening voice.

84. Cook shouted at Michelle, "you know you killed your baby."

85. Cook told Michelle to tell us what happened when you killed your baby, sign these papers, then you can see your daughter, we'll get you some therapy and you will be home soon.

86. The statement Michelle gave Cook was coerced by Cook through Unconstitutional methods, such that its usage at trial, all by itself, deprived Michelle of her right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment.

87. Michelle, when asked at the end of the interrogation if she had anything else to say, replied, "I love my baby."

88. When he interrogated Michelle, Cook knew she was 17, that he was violating Oklahoma statutes, that Michelle was severely impaired psychologically, emotionally and mentally if she had been the murderer. Cook also was charged with knowledge he was in violation of the precepts of interrogations as well established by the Supreme Court of the United States.

89. Cook, during the interrogation, continually fed Michelle what he alleged were facts, such that there was a maroon handled knife that had been found outside the apartment. No such maroon knife was found outside the apartment.

Michelle, in talking to Cook, referred to a maroon handled knife, but this was only because Cook said a maroon handled knife had been discovered. Later, when Cook saw how weak the case was against Michelle, he planted a maroon handled knife in the apartment, which he and Noordyke "discovered."

90. Cook cajoled, browbeat and harassed Michelle. He could see that she was hysterical, dazed, confused, scared, horrified, upset, desperately desirous of seeing her only remaining child, little Michelle, and vulnerable in the extreme. So, he kept suggesting "facts" to her, when he wasn't yelling at her and threatening her. Cook's failure to tape record or videotape the interrogation was the result of Cook wanting to hide his Unconstitutional interrogation.

91. Cook glided right over the fantastical, dream-like nature of Michelle's confession, and her statements such as "Oh, I couldn't have done that," referring to what happened to Baby Travis.

92. Cook also knew, as he did admit at trial, that what Michelle described in her "confession" that she did to Baby Travis could not have been the cause of his death.

93. Cook never interrogated Michelle after finding out that there was no fight that night between her and LaDonna. Neither did anyone else at TPD.

94. Cook well knew that juveniles do not think like adults and are far more

susceptible to saying things that are not true.

95.     Michelle, of course, had vulnerability and desperation to see her daughter written all over her face and manifest in her body language and her very being during the interrogation. Cook preyed on this, to obtain a confession so as to have one more notch on his belt.

96.     Cook was inordinately "proud" of his reputation in TPD for obtaining confessions. He would boast that he could round up any number of suspects and tell them that by the end of the day he would have a confession from one of them, and then prove his boast. And he was well known in the Homicide Bureau for these boasts.

97.     Cook testified at trial that he never considered Michelle's confession was false. His testimony was a lie because Cook determined that Michelle's recitation of a fight that night with LaDonna which resulted in Baby Travis' death was wholly fanciful. Indeed, Cook knew LaDonna was not even there that night. Moreover, Michelle's statement to Cook, "I could have been so angry I needed to take it out on somebody and ended up hurting my son," was made concerning what was the non-existent fight with LaDonna.

98.     Cook deliberately kept out of the interrogation room any other police officer, so that no one else could see the dazed, confused, horrified and scared

Michelle, let alone see and hear his abusive tactics.

99. Cook never had Michelle's clothes tested for the presence of blood.

100. Cook did not tell Michelle there was no physical evidence linking her to the crime.

101. Cook did not tell Michelle about the chair outside the front door, nor ask any questions which would have dealt with that subject.

102. Cook did not ask Michelle how she went through the drape separating the living room from the kitchen. Had he done so, he would have known she always went through the drape in the middle. From this knowledge, he would have been on high alert that she was not the killer, because the bloody handprint on the kitchen side of the drape was near the door jamb, meaning the killer did not go through the drape in the middle, but pulled it aside from near the door jamb.

103. Cook did not tell Michelle about the bloody handprint on the drape.

104. At no time did Cook tell Michelle she was free to leave.

105. Cook "accepted" Michelle's fantastical statement without any checking of any aspect of the story or considering any evidence he did not then know about.

106. Despite his ignorance of the facts, Cook swore to an arrest warrant in the afternoon of 9-12-94.

107. Cook's arrest affidavit in a "fill in the box" slot says that the crime occurred at 0300. The text of the affidavit says 0330.

108. The arrest affidavit quotes Michelle saying, "I could have been so angry I needed to take it out on somebody and ended up hurting up my son." This statement was made after Michelle's vivid description of a violent fight she had with LaDonna that night, but, that fight never occurred, that night or ever. Cook did not put this in the arrest affidavit.

109. The affidavit also states, "Suspect made audio statement in which she admits causing the knife wounds to the victim." The affidavit omits relating to the throat wound that Michelle said, "Oh, I'd never do that."

110. Cooked deemed Michelle's statement a confession, despite the following:

A. LaDonna was not there that night. Thus, no fight with LaDonna.

B. Michelle said she got a maroon handled knife which accidentally fell on Baby Travis, and that she threw the knife in the grating over the sewer. Michelle did not own a maroon handled knife. The concept of a maroon handled knife was a "fact" planted by Cook, who had been told, incorrectly, that a maroon handled knife had been found.

C. Michelle's apartment was thoroughly searched by TPD, and no maroon handled knife was found.

D.  The medical examiner testified in detail at trial that the wound inflicted on Baby Travis would have to have been inflicted by a knife that did not match any knife presented at trial.

E.  Michelle had no blood on herself or her clothes, and she had on the same clothes at the tine of discovery of the body as at 3 a.m. when the police officers came to Michelle's apartment.

111.  Before the early evening news, TPD announced Michelle had confessed to murdering Baby Travis.  At that point, Cook had done essentially no investigation, other than to interrogate Michelle.  As shown in this First Amended Complaint, there was a cornucopia of evidence to be considered by an adequately trained and supervised investigator, operating under adequate policies.  The public announcement of Michelle's confession put TPD and Cook in a reputational "box."  Any later arrest of anyone else for the murder of Baby Travis would have exposed Cook and TPD as (a) obtaining a false confession, (b) improperly harassing a mother whose child had just been all but decapitated, and © acting prematurely in a homicide investigation, without doing proper police investigative work.  Cook made sure he protected TPD, but more importantly to him, his own reputation as the "confession whisperer" for TPD.  Cook was not the only one who protected TPD, as the Final Policymaker

ratified Cook's actions and failures in Michelle's case, as discussed below in this First Amended Complaint.

112. Months after her interrogation, Michelle was given a polygraph examination by an examiner from the Oklahoma State Bureau of Investigation, at the behest of the Assistant District Attorney.

113. The prosecutor and Cook were present at the time of the polygraph, as well as Michelle's lawyer.

114. Cook wrote no report on the polygraph examination or the results thereof.

115. At the conclusion of the polygraph examination, the examiner came out of the examining room, and in the presence of Michelle's lawyer, the prosecutor, and Cook, said to the prosecutor, "I have to tell you something you don't want to hear," or words to that effect. Continuing, he said, "this girl is not guilty as charged here with this murder; she is not guilty of this murder. And furthermore, she doesn't know who committed this murder."

116. The examiner concluded his remarks by saying the positive results were "conclusive." Cook admitted hearing this statement.

117. Notwithstanding the results of the polygraph and the statements of the examiner, along with all of the other evidence casting doubt on the "confession" (as set forth in this First Amended Complaint), neither Cook,

Sergeant Allen nor any other TPD officer filled in the holes in the investigation or properly conducted the investigation from that point forward until the trial, thereby denying Michelle a Fair Trial.

118. Long before 1994 the United States Supreme Court established that trial usage of a confession which was obtained by overbearing the will of the suspect violates the Due Process right to a Fair Trial, unless it is harmless error.

119. In 1985, the United States Supreme Court, in *Miller v. Denton,* made the Due Process requirements crystal clear: "[T]he admissibility of a confession turns as much on the techniques for extracting the statement as, applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means, as on whether the defendant's will was overborne." This declaration of Constitutional law, alone, put the Final Policymaker on notice it was Constitutionally mandatory to have policies, training and supervision in place to comply with these requirements. He failed to do so. The failure to do so was the product of deliberate indifference on the part of the Final Policymaker and was a proximate cause of Michele being denied a Fair Trial.

120. Michelle's will was overborne, as evidenced by the fact she is innocent of murdering Baby Travis, and as evidenced by her prior testimony on the tactics

28

Cook used and her mental and emotional state during the interrogation.

121. Cook's tactics in obtaining the coerced, false confession and presenting it at trial violated Michelle's Constitutional right to a Fair Trial and were a proximate cause thereof.

122. The TPD tactics for extracting the false confession included no food or water from 6:30 a.m. to at least 3 p.m., yelling, threatening she would never see her daughter again unless she confessed, the absence of a parent or guardian as required by Oklahoma statutes, telling her if she confessed she would get therapy, and that she would be home soon if she confessed. These tactics were not compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means.

123. Cook's malice towards Michelle was particularly egregious, because of all of the steps he took to frame her, starting with, but not ending with, his obtaining a false confession from an innocent juvenile.

**Cook's Failure to Investigate the "Key" Witness**

124. William Lee was questioned on 9-12-94 as to his whereabouts in the early hours of that day. He said he was home. However, a TPD interview of a man who was outside at 3 a.m., sitting on a stump near a pay phone, said he saw Lee come running by from the direction of Michelle's apartment, clad only in

shorts, without shoes.  Confronted with this by Sergeant Allen, Lee repeated his statement about being home all night.

125.    On 9-14-94 Sergeant Allen interviewed Lee again.  At first, Lee repeated that he had been home all night.  Then he radically changed his story.  He admitted leaving his apartment in the middle of the night, saying someone hit the back of his apartment with a rock and he went outside to investigate.  Later in this second interview, Lee said he walked by Michelle's apartment, noticed the front door standing open, woke Michelle up and told her to close the door. Sergeant Allen asked Lee his address.  It was obvious to Sergeant Allen that Lee did not know his own address, which immediately made Sergeant Allen "more suspicious," as he related in a TPD report, because the 911 caller at 3 a.m. had provided an incorrect address for Michelle's apartment, which is in the same complex as Lee's.  Sergeant Allen then had Lee come to the station and had Cook interrogate him.  The result of that interrogation, conducted without the presence of a parent or guardian, in violation of Oklahoma statutes, was Lee's statement of his making the 911 call and his story about looking into Michelle's apartment while the murder was taking place.

126.    Lee's story had so many holes in it that proper Constitutionally adequate police work would have considered Lee a prime suspect.

127. Lee said he called 911 at 3 a.m. after he had gone outside his house, heard arguing at Michelle's and observed 30 minutes of an argument between Michelle and her estranged husband Eugene.

128. Cook established that Eugene was not there that night. He stayed overnight with friends who were interviewed. Thus, Lee profoundly lied in his statement to Cook.

129. Lee made the 911 call from a pay phone. There were two phones in the apartment complex. Lee ran by one of them, where the man who saw him was located. Lee said he did not use that phone because the man sitting there might be waiting for a call. Lee did not ask if that was the case. Instead, he went to a pay phone blocks away, where he could not be overheard.

130. Lee said that during the argument between Michelle and Eugene, Eugene turned around and therefore Lee had to go hide behind a nearby bush. There were NO nearby bushes.

131. The time of Lee's return to look into the apartment while the murder was occurring, according to him, was in the 4:30 to 5:30 range (this is an issue itself, discussed below). But the state of rigor mortis of Baby Travis showed the murder could not have taken place at the time Lee said it did.

132. **Lee's statement to Cook about how he looked into the kitchen and saw the**

**baby on the floor in a pool of blood was a palpable lie. Lee said the following to Cook about seeing Michelle in the kitchen:**

> And then I seen like Michelle there and all, and, well, actually I didn't....I seen the shadow of her. **‘Cause I was sitting there**....really hard trying to see in real good, but I couldn't. **‘Cause the blinds were shut.** So I walked back into the front, and Michelle walked back in.

133.    Not once, but twice, Lee said in his statement to Cook that he was "sitting" there trying to see into the kitchen. *The only thing Lee could have been "sitting" on was the patio, because there was nothing else to sit on. And if he was sitting on the ground, he would have been able to see through very large gaps in the blinds at the bottom of the window, and not look through any "holes" in the cords to the blinds.*

134.    Lee testified he went around and looked into the kitchen because Michelle was holding a crying Baby Travis in the living room, went though the drape into the kitchen, and then Baby Travis stopped crying. Lee further testified he was familiar with babies. Babies cry, babies stop crying. Nothing out of the ordinary about either of those events. That's normal baby business. Without more—and Lee offered nothing more—Lee's statement that he went around back to see why the baby stopped crying is, at best, suspicious. A baby

stopping crying means nothing, and hardly justifies going around back to see why the baby stopped crying.

135. But there is far more at play here than logical or common sense gaps in Lee's story. One week after Baby Travis' death, Cook and Detective Noordyke went back to Michelle's apartment. Noordyke's report on their visit says he and Cook looked through the kitchen window and the area of the floor where Baby Travis lay "is clearly visible through the holes and spacing of the mini-blinds." Thus, Cook knew Lee's statement to him that the blinds were "shut" and that he looked through the holes where the ropes control the mini-blinds was false. Cook also knew that Lee's statement he was "sitting there" trying to look through the holes was a lie, because of either of two reasons: (a) there was no place to sit except the ground, and it defies all common sense that Lee went around to the kitchen to see why Baby Travis quit crying and sat down on the ground to try to see into the kitchen; and (b) if Lee had been sitting on the ground, he would have been able to see through the gaps in the slats, which are quite large at the bottom of the mini-blinds. Photographic evidence shows the large gaps at the bottom of the mini-blinds.

136. Cook made no report on the visit to Michelle's apartment he and Noordyke made on 9-19-94.

137. When Cook and Noordyke made their visit on 9-19-94, they took the mini-blinds down and turned them into the property room. Under all of the facts set forth herein, Cook wanted those blinds down so that no one, especially Michelle's lawyers, would go to the kitchen window and discover that Lee's statement to Cook about the blinds being shut was a lie.

138. Cook swore, at Michelle's trial, to tell the whole truth, and nothing but the truth. But he said nothing about Lee's statement that he was "sitting" there looking in, or that Lee's version of looking in simply was not true.

139. Lee testified at the preliminary hearing, which was conducted many months prior to the trial. Cook claimed at trial that he never knew what Lee had testified at the preliminary hearing. This was a lie. No Constitutionally adequate, proper lead investigator fails to read the preliminary hearing testimony of the eye witness, prior to giving his own testimony at trial, le alone when the eyewitness has committed suicide. Among other reasons, the investigator has to know about any differences between the eye witness' testimony at the preliminary hearing and the eye witness' statement to the investigator. Observers in the preliminary hearing courtroom were astounded at Lee's demeanor, and concluded that Lee was the killer. At the close of the State's evidence at the preliminary hearing, the judge called the lawyers into

his chambers and told the prosecutor he better get a lawyer for Lee, because everybody in the courtroom, possibly except the prosecutor, knew that Lee was the murderer.

140. No Constitutionally adequate, competent lead investigator fails to know what his eyewitness says at the preliminary hearing, when the testimony of the eyewitness is the only thing that can get the defendant bound over for trial. Cook did not himself testify at the preliminary hearing, and thus there was no evidence to bind Michelle over except Lee's testimony. Moreover, when Lee later commits suicide, days before his scheduled polygraph examination, the first thing a lead investigator would do is go back and check the eyewitness's testimony at the preliminary hearing, because that is the only way what the deceased said can be presented at trial.

141. At the preliminary hearing, Lee blandly described how Baby Travis could have been killed without the assailant getting any blood on them.

142. At the preliminary hearing, Lee said there was no chair propped against the screen door either at 3 a.m. or when he returned 4:30/5:30. But when asked to explain how that could be since the police officers saw the chair there at 3 a.m. and 6 a.m., Lee testified it was "magic."

143. Lee said at 3 a.m., when the lights were off, he could see into the living room

and saw Michelle and her two children.  The TPD officers, as shown above, said they could not see without the aid of flashlights.

144.  In the 911 call, Lee claimed he heard a sound like a knife being thrown against a wall and bouncing off.  How one who did not see it could come up with this is highly suspicious.

145.  There is no common understanding of the sound of a knife bouncing off a wall.

146.  Lee's reference to a knife hitting the wall, when he made the 911 call, was an effort to cause the police officers who would respond to the 911 call to investigate sufficiently to discover the dead Baby Travis.

147.  Lee testified he did not see the police there the next morning, but a neighbor in an interview said he did.

148.  Lee testified a neighbor told him what had happened, when he went out on 9-12, but the neighbor says she did not talk to Lee.

149.   Lee said he saw a stab wound on Baby Travis, but no stab would could be seen until the blood was washed off the baby's chest by the Medical Examiner.  Thus, only the killer would have known there was a stab wound there rather than just a blob of blood.

150.  Lee said Michelle turned the water on and off, but the water was running continuously when the police arrived.

151.	At the preliminary hearing Lee said he was home about 1 ½ hours after the 911 call, which he determined by saying he missed the first 30 minutes of a two hour movie. But in his statement to Cook, he said he was home 30 minutes before he went back, and later the Assistant D.A. asked a leading question of him being there 30 minutes to an hour, but nothing corrected Lee's definitive statement of it being 1 ½ hours because of missing the first 30 minutes of a two hour movie.

152.	Detective Cook testified he had no knowledge of:

A.  Lee's records of violence, anger and serious psychological problems at Children's Medical Center;

B. Lee's records of violence and anger at Tulsa Public Schools;

C.  Lee's reputation for untruthfulness at Tulsa Public Schools, with his two teachers who were with him throughout his school day;

D.  Lee's reputation for untruthfulness at the apartment complex;

E.  Women at the apartment complex thought Lee "weird" and ran away from him;

F.  Lee having a crush on Michelle;

G.  Lee having made a sexual advance on Michelle a week earlier, which was rebuffed;

H.  Lee having decapitated a cat at the apartment complex;

I.  Lee, on the morning of 9-12, the first thing in the morning when he arrived at school, said, "the bitch will pay;"

J.  Lee was suspended from school the preceding Friday.

K.  Lee's activity at the apartment complex a week before the murder, including setting a fire on the complex playground, throwing rocks at Michelle's window, talking to himself, and making a noose out of a rope.

L.  *Lee's admission at the preliminary hearing that he often peered into Michelle's apartment through the window.*  Lee made this admission during questioning by the Assistant District Attorney.  He steered clear of the admission when Michelle's lawyer followed up, claiming he would always stop and talk to Michelle. That later change of testimony is unavailing. Peering into Michelle's apartment is 100% consistent with the statement of a neighbor that Lee was looking over there at Michelle's apartment all the time.  A properly trained, Constitutionally trained, lead investigator would have leapt on Lee's admission of peering into Michelle's window often, and would have known of this admission made during testimony at the preliminary hearing.  That knowledge, alone, required an intense investigation of Lee.

153.   It does not take a rocket scientist to tie together the rebuffed sexual advance,

Lee throwing rocks against Michelle's window the week before the murder, Lee's remark "the bitch will pay," and Lee admitting to peering in Michelle's window. Investigation of Lee was both evident and paramount for Constitutionally adequate homicide investigations in general, and in particular in Michelle's case.

154. *There were five sets of fingerprints taken at Michelle's apartment. There was no comparison of Lee's fingerprints (which were never taken) to those prints. Those prints were never compared to anyone.*

155. There was no comparison of Lee's hand to the numerous bloody prints apparently from a hand, on the drape separating the living room from the kitchen.

156. Lee was not examined for cuts. The medical examiner testified that cutting the baby would likely have produced a cut on the assailant.

157. After Lee hung himself, Cook made a request for Lee's blood collected at the scene of his death, and for blood found at the front door, to be tested, but the TPD lab said it never got the request. If that be true, Cook never followed up to be sure the testing got done. If the blood type of the blood at the front door revealed it was the same type either as Baby Travis or Lee (type O), this would have been strong evidence that the murderer came from outside the apartment

and fled through the front door.

158. Lee's apartment was never searched for bloody clothes or the murder weapon.

159. TPD records show that TPD was summoned to the hospital where Lee was when he was 12, being belligerent and resisting restraints after he was taken there following consuming clear alcohol such that his blood alcohol level was .248.

160. TPD records show that in 1993 a police officer stopped and took a BB gun away from Lee after Lee pointed it at the officer's police car.

161. Cook testified he never considered that Lee was lying. But Cook testified he was concerned about Eugene not being there that night. And he testified he was concerned that Lee said he could see into the apartment at 3 a.m., when the police officers said they could not see in without their flashlights. Cook further testified that he could not understand what Lee meant when he said he heard a knife being thrown against the wall. These matters, alone, give rise to the inference that Cook was simply and abjectly lying when he said he never considered Lee was lying. And then when one adds in all of the other facts set forth herein which Cook was aware of (not least of which is Lee's lying about seeing into the kitchen window, as discussed above), Cook's testimony about never considering Lee was lying was the grossest part of Cook's perjury at

Michelle's trial. Cook **knew** Lee was the killer, but did everything he could to be certain that Michelle was framed for the murder.

162. Lee said he did not even look out to see if the cops came after he made the 911 call and went back to his apartment. This makes no sense. Moreover, the cops did not see Travis when they shined their flashlights. This suggests Lee had killed Travis before he made the 911 call, and he believed the 911 call would result in the cops discovering the murder. The state of rigor mortis of the baby supports this theory.

163. Cook said a later contradiction of what a witness told him would be important to his investigation. But he ignored holes in Lee's story which had the gale force wind of truth whistling through. And Cook did not bother to find out what Lee testified to at the preliminary hearing, or at least that is what Cook claims. Yet Cook admitted that he continued the investigation after the preliminary hearing.

164. Cook's failures to properly investigate Lee (not just the ones immediately above, but all of such set forth in this First Amended Complaint) vitiated probable cause against Michelle.

165. Cook's failures to properly investigate Lee and thereby to frame Michelle demonstrate his malice.

166. Cook's failures to properly investigate Lee demonstrate the lack of policies, the failure to train, the failure to supervise and the ratification of the practices of Cook that were the fault of the Final Policymaker and were a proximate cause of the wrongful conviction of Michelle obtained through denying her the right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment.

167. The failures of TPD, through the Final Policymaker with regard to the matters set forth herein, to have the proper policies, training and supervision which would have prevented the deprivation of Michelle's Due Process right to a Fair Trial, (a) concerned ongoing repetitive functions of TPD, i.e., homicide investigations, interrogations, interrogations of juveniles, supervision of homicide investigations, training and policies for the foregoing, where the absence of the supervision, training and policies would obviously lead to Constitutional violations of the Due Process right to a Fair Trial under the Fourteenth Amendment, or, alternatively, (b) concerned the acts and omissions of Cook, of whose improper interrogation techniques and lying in court the Final Policymaker was at least on constructive notice of four years earlier, in the Earlier Case, as well as the law established by the Supreme Court on Due Process and coerced confessions well before 1994, as discussed elsewhere herein, or, alternatively, © were specific ratifications and endorsements of the

42

actions of Cook which deprived Michelle of the right to a fair trial under the Fourteenth Amendment's Due Process Clause, and constituted malicious prosecution of Michelle.

## Deliberately Indifferent Collection and Processing of Evidence

168. Lee testified he heard Michelle turn the water on in the sink in the kitchen, after she killed Baby Travis. The sink was divided into two bins, the left side having dishes in a drainer, and the right side having the water on had a sponge *and a scrub brush.*

169. There was no luminol testing of the sink, for the presence of blood.

170. There was no luminol testing of the dishes in the sink.

171. No effort was made to determine the presence of blood on the sponge.

172. No effort was made to determine the presence of blood on the scrub brush.

173. The sponge was taken as evidence, but not the scrub brush.

174. There was no luminol testing in the bathroom.

175. No fingerprints were taken from the metal folding chair propped against the front screen door. Detective Noordyke, the evidence collector, said he did not know the chair was part of the case. The chair was mentioned in the reports of the officers who arrived at 3 a.m. and at 6 a.m., and was highly visible in the video of the crime scene. Cook, whose job was to compile reports and to serve

as lead investigator, did nothing about the chair.

176. There was a dumpster very near the back door of the apartment. There is no report of any search of the dumpster for the murder weapon or bloody clothes. There is no report of any search of other dumpsters in the apartment complex or nearby. No clothes of Michelle's with blood on them were ever found. And the officers who were there at 3 a.m. and 6 a.m. said she was wearing the same clothes both times.

177. The garbage in Michelle's apartment was not taken as evidence.

178. The handle on the back door was not tested for prints.

179. The handle on the front door was not tested for prints. The inside of that door handle, taken as evidence, was not processed for prints. That inside of the door handle had a spot on it which TPD said was not blood, but was.

180. The kitchen faucet and faucet handles were not processed for prints.

181. The kitchen blinds were not processed for prints.

182. The inside of the kitchen window, by the baby, was not processed for prints.

183. The outside of the kitchen window was not processed for prints, even though Lee's statement talks of how much he was leaning in to see through that kitchen window.

184. The faucet and faucet handles in the upstairs bathroom were not processed for

prints.

185. The tub in the upstairs bathroom was not processed for prints.

186. The inside of the back door was not processed for prints (but this was done for the front door).

187. The outside of the back screen door was not processed for prints (but this was done for the front screen door).

188. The emphasis on the front door, where five sets of prints were taken from outside the front screen door, and the inside front door was dusted for prints, makes Noordyke's statement that he did not dust the folding chair for prints because it was not "part of the case" incredible.

189. The kitchen floor was not dusted for prints. Presumably the assailant had to place a hand on the floor at some point, in order to accomplish the murder.

190. No vessel in the kitchen which would hold water was processed for prints, even though the floor by the baby shows blood which has substantially been diluted, presumably with water poured from a vessel.

191. The scrub brush in the sink was not processed for prints.

192. The large bottle of liquid soap, adjacent to the kitchen sink, was not processed for prints.

193. The kitchen stove was not processed for prints.

194. The stroller in the living room, which an assailant moving around in the dark could well have tripped over, going in or coming out of the kitchen, was not processed for prints.

195. The air conditioner was not processed for prints (until six months later, by which point it was much too late).

196. The banister up the stairs (which of necessity is on the way to the upstairs bathroom) was not processed for prints.

197. The stool in the upstairs bathroom was not processed for prints.

198. Five sets of fingerprints were taken at the scene. There is no report of those fingerprints being compared to anyone.

199. There are substantial blood spots on the kitchen side of the drape that separated the living room from the kitchen. These blood spots were the most significant piece of evidence at the entire crime scene, except for the wounds on the baby. There never was any effort to see if the hand of Michelle or the hand of Lee appeared to fit the bloody prints.

200. There was blood on the front doorknob, but the TPD lab said it was not blood.

201. Once the reports were in from the two officers who were there at 3 a.m., saying the folding chair was propped against the front screen at 3 a.m. and after 6 a.m., there was no return to the scene to fingerprint the chair.

202. The baby's diaper, which was taken from the scene, was not fingerprinted.

203. TPD tested the blood of the baby for type, using the only test (of several available) which was guaranteed to produce a result which would not identify the blood type.

204. Cook says he asked that Lee's blood be tested and that the blood spot found on the door jamb between the front door and the front screen door be tested, but TPD says it never got the request, and Cook did not follow through to be certain the test was run.

205. The sponge taken from the scene was never tested for blood.

206. The scrub brush, not taken from the scene, never was tested for blood.

207. Lee testified he could see Michelle and the children on the sofa at 3 a.m. with the lights off in the apartment. The reports of the police officers said they could not see anything, through the screen door or the window (where Lee said he saw the children). There was no effort to duplicate the circumstances to test what Lee said. And this, in the face of Cook determining that Eugene was not there arguing with Michelle at 3 a.m., and this was of "concern" to Cook.

208. A somewhat large black and white substance was found on the floor near the baby. This was never tested.

209. No one checked on the veracity of Lee at the apartment complex or at Tulsa

Public Schools, despite Lee having twice lied to Sergeant Allen and lying about there having been an argument at 3 a.m. between Michelle and Eugene.

210. Cook testified his job as investigator was to compile reports. There were two TPD reports on Lee that Cook either did not look at or concealed the fact he looked at them.

211. A DHS report set forth Lee's crush on Michelle. Cook said he was unaware of the crush.

212. The TPD lab was never asked to test Michelle's clothes for blood.

213. There was blood on the diaper, but it was never tested. The Medical Examiner testified it was likely, from looking at the neck wound, that the assailant got cut during the assault.

214. With minor exceptions, all of the physical objects not properly tested, as discussed above, are quite visible in the video taken at the scene early on 9-12-94. This video was readily available to Cook (and to all of Cook's supervisors and others in the chain of command), but Cook never ordered any testing of these quite visible physical objects. The chair which the two officers who arrived at Michelle's apartment at 3 a.m. said was propped up against the outside of the front screen door is plainly visible in the video. The video shows the chair a few feet away from the front screen door. However, one of

Cook's self-described jobs was reviewing reports in the case. Each of the officers who came at 3 a.m. and again after 6 a.m., noted that the chair was propped against the screen door. In addition to having these reports available on an ongoing basis, Cook read them no later than 9-14-94, because he summarized those reports in a document he prepared outlining testimony to be presented at the preliminary hearing, and there is no reference to William Lee's testimony which resulted from Cook's 9-14-94 interrogation of Lee.

215. The chair being propped up against the outside of the front screen door, of course, gives rise to the high likelihood that Michelle did not put the chair there, and that the killer left the apartment after the murder, propping the chair in an effort to stop or at least slow down Michelle if she awoke and chased him. The chair could have yielded fingerprints or blood, or both.

216. As incredible as is the failure to follow up on the propped up chair, it is beyond comprehension that the video of the scene does not include the most damning piece of evidence in the entire case—a partial, but nonetheless significantly visible bloody handprint on the kitchen side of the drape that separated the kitchen from the living room. Moreover, there is an abrupt cutting away in the video just as one expects to see on the video in the next one or two seconds, the bloody handprint. This anomaly in what otherwise was a comprehensive

video, gives rise to a strong inference that the video was edited by somebody at TPD to omit the bloody handprint. Given all of the facts set forth in this First Amended Complaint, it may be inferred that either Cook or Noordyke did so edit the crime scene video, and most likely it was Cook. Alternatively, when the video was taken, the bloody print on the drape was deliberately omitted.

### Fabricated Evidence Planted by the Lead Investigator

217. In Michelle's fantastical "confession," she referred to visions of a maroon handled knife.

218. No maroon handled knife was found at the scene.

219. Michelle's apartment was searched at the time the police were there, and several knives were taken as evidence.

220. Six months after the murder, Michelle's boarded-up apartment is broken into.

221. Cook goes to Michelle's apartment.

222. Nordyke is summoned to Michelle's apartment.

223. Clothes from boxes are strewn around. Quite visibly sticking out from the clothes is a maroon handled knife.

224. Cook planted the maroon handled knife so as to have one (and the only) "validator" of Michelle's fantastical confession, as she referred to a maroon

handled knife (again, only because Cook planted the notion in her mind, after Cook was wrongly told that a maroon handled knife had been found outside).

225. The blood type of William Lee and of Baby Travis were never determined by the TPD forensic lab, according to what the TPD lab analyst testifed to at trial.

226. The TPD lab ran a test on Baby Travis' blood, and declared the blood type inconclusive because children his age do not have antigens. However, what the analyst did not testify to is the fact the particular test used was but one of several tests available to determine blood type, and was *the only* test which was guaranteed to produce no result because of the baby's age.

227. The failure of the TPD lab to determine Baby Travis's blood type is, by reasonable inference from all of the facts, the direct result of Cook either asking the technologist to use a test that would not yield the proper result, or Cook knowing from information from the analyst that the blood type was O, and Cook asked that a test be run which would yield no result.

228. The TPD lab reported that blood samples found on the floor of Michelle's apartment were type AB, when in fact they were type O. Given the ease with which blood typing can be done, it again is a fair inference that the TPD lab came up with the wrong information at the behest of Cook. Type AB blood sounds at least close to type A blood. Michelle had type A blood. In his

closing argument, the prosecutor referred to the AB blood as Michelle's blood. A fair inference is this was the result of collaboration between Cook and the prosecutor, after Cook had worked his magic with the TPD lab. It further is a fair inference that Cook's reputation throughout the TPD as a person who could conduct investigations as he saw fit was the reasoning behind the TPD lab going along with the false results concerning the blood type of Baby Travis and the blood type of the spots of blood on the floor of the living room of Michelle's apartment. The same can be said of the TPD lab determining that a red spot on the front door handle was not blood, when in fact it was blood.

229. When Lee hung himself, Cook submitted a request for the blood type of Lee. The TPD lab claimed it never got that request. Of course, Cook did not follow up, at least that he admitted to. Instead, the request laid there, and according to Cook, Lee's blood type was never determined. It is a fair inference, given all of the facts, that the TPD lab did determine Lee's blood type, and found it to type O. In fact, Lee's blood type was Type O. That Lee and Baby Travis had type O blood, and it was in fact type O blood that was on the floor of the living room and on the bloody handprint, were sufficient to show that Michelle was not the killer, since her blood type was A. But magically or otherwise, the TPD lab did not own up to any of these facts. At the time, the TPD lab did not

have a policy prohibiting verbal requests for blood typing or verbal responses on results. The inference is that Cook was told Lee's blood was Type O and he asked the TPD lab to bury that result, which it did.

230. In addition, the matters set forth in Paragraphs 225 to 229 were the product of the Final Policymaker failing to have adequate policies, training or supervision of the forensic lab of TPD. The need for policies to prevent the improprieties discussed in Paragraphs 225 to 229 was so obvious that the failure to have policies, training and supervision to prevent same was the result of deliberate indifference of the Final Policymaker. These failures were a proximate cause of Michelle being deprived of a Fair Trial under the Due Process Clause of the Fourteenth Amendment.

## Perjured Testimony of the Lead Investigator

231. Cook falsely denied threatening Michelle and yelling at her, saying he was "compassionate" and treated her as gently as possible.

232. Cook falsely stated Michelle was calm and remarkably at ease during the interrogation.

233. Cook falsely claimed he made no promises to Michelle.

234. Cook falsely claimed he got water for Michelle.

235. Cook falsely claimed he never considered Lee was lying. This, despite Cook's

"concerns" as outlined above and Cook's not understanding what Lee could have meant about a knife being thrown against the wall by Eugene. This, despite Cook's knowledge of the holes in Lee's story, including "sitting there" while looking through the kitchen window

236. Cook falsely claimed Michelle was not a suspect at the outset of the interrogation, but she had been brought to the station in handcuffs.

237. Cook falsely stated that while he had heard that people who did not do it falsely confessed, but it had never happened in his experience, when in fact four years earlier a confession he obtained was thrown out by a Tulsa County district judge because of Cook's barbaric tactics, the same barbaric tactics he used on Michelle.

238. Cook falsely testified at trial that as lead investigator he could have had Lee's blood tested for blood type, but he never saw fit to do that. In fact, Cook, after Lee's death, did ask that Lee's blood type be determined from the blood sample taken from his body, but the TPD lab says it never got the request. Cook, then, did see fit to have the blood tested.

239. Cook testified at trial, but claimed he had never seen what Lee had said at the preliminary hearing. This, in context, is not credible.

240. Cook testified he could not duplicate the circumstances of children being on

the sofa with the lights off at 3 a.m. and someone looking in the window and seeing them. This was patently false, as such could readily have been duplicated.

241. Cook falsely testified he had "no evidence at all that pointed the finger to Lee," other than Michelle's allegations.

242. Cook's other perjured testimony, together with his presentation of the wrongly coerced confession, the failure to properly investigate Lee, and Cook's fabrication of evidence against Michelle, give rise to the inference that Cook's testimony he asked for Lee's blood to be tested for its type but the TPD lab said it did not get the request is also perjured testimony. The other side of the coin of that inference is that the lab did test the blood and told Cook it was type O, which Cook suppressed so as to continue to frame Michelle.

243. Cook testified there were no blood splatters, the absence of which explained why Michelle had no blood on her. The video taken by Detective Noordyke shows a number of splatters.

244. When Cook testified about Michelle's "confession," he did not tell the jury or the judge that he obtained the confession in violation of the Oklahoma statutes and therefore the confession could not be used against her.

**Final Policymaker Ratification And Endorsement Of Cook's Actions In**

## Michelle's Case

245. The Final Policymaker had actual or constructive notice of the suppression of the confession in the Earlier Case.

246. Cook's actions in the Earlier Case involved lying to the court about the methods he used to obtain a confession in a homicide case. The Final Policymaker thereby knew he had an officer on his hands who would do anything to frame a person in a homicide case, not just lie in court. A police officer who lies in court and obtains confessions by Unconstitutional methods, by definition, has pronounced proclivities for the pusillanimous pursuit of power. In short, he is a power maniac. And if immediate termination is not required, then the closest possible supervision, extensive training, and thorough policies are required if that officer is allowed to work on homicide cases in the future. Cook being allowed to proceed in Michelle's case, and do the same thing he did in the earlier case, is a ratification and endorsement of Cook's conduct, without more.

247. But there is more. The Final Policymaker is charged with constructive notice of reports produced in the homicide bureau. He had many months between the murder and Michelle's trial to find out all of the facts and prevent future actions of Cook and correct his prior actions and inactions. Thus, in Michelle's

case, the Final Policymaker ratified and endorsed Cook's actions, errors and omissions in the following paragraphs.

248. Obtaining a false confession.

249. Interrogating Michelle in abject violation of Oklahoma statutes requiring a parent or guarding be present in the interrogation of Michelle;

250. Planting evidence.

251. Perjuring himself in Michelle's trial.

252. Presenting the confession at trial in violation of Oklahoma law.

253. Deliberately failing to investigate Lee.

254. Covering up what he knew about Lee.

255. Lying about what he knew concerning Lee.

256. Deliberately ignoring TPD reports on Lee's history of violence.

257. Suppressing Lee's blood type and lying about it by blaming the lab for never getting around to fulfilling his request.

258. Deceiving the judge in Michelle's case by failing to tell the court he obtained Michelle's confession in violation of Oklahoma law.

259. Failing to have the fingerprints compared to Lee or anyone.

260. Ignoring the chair propped against the front screen door.

261. Suppressing the importance of the state of rigor mortis of Baby Travis, alone

rendering Lee's statement a lie.

262. Deliberately failing to document Lee's reputation for lack of truthfulness at the apartment complex.

263. Finessing TPD reports from neighbors who said how weird Lee was, that he was looking over at Michelle's all the time, and threw rocks at her window the week before the murder, when she was gone.

264. Failing to correct the glaring deficiencies in his investigation when Michelle "conclusively" passed the lie detector test and was declared innocent by the Oklahoma State Bureau of Investigation.

265. Interrogating William Lee without a parent or guardian present, in violation of Oklahoma law.

### TPD's Lack Of Training And/Or Lack Of Supervision

266. The failure of the Final Policymaker to properly train and to supervise Cook includes matters below in Paragraphs 267 to 292. These same matters are alleged to have resulted as well from the lack of any policies in these areas, or in any event inadequate policies.

267. Allowing Cook to interrogate Michelle in violation of Oklahoma statutes.

268. Allowing Cook to testify at trial in violation of Oklahoma Statutes and law clearly established years before by the United States Supreme Court.

269. Allowing Cook to interrogate anyone, alone, after the suppression of the confession in the Earlier Case.

270. Allowing Cook to fail to have Michelle medically examined for her head injury during the interrogation.

271. Allowing Cook to interrogate Michelle without a video camera or tape recorder on at all times.

272. Allowing Cook to be alone with Michelle during her interrogation.

273. Not having another investigator properly investigate Lee.

274. Allowing Cook to proceed as lead investigator while never considering that Lee could have been the murderer.

275. Allowing Cook to conduct the investigation without producing full and complete reports as the investigation proceeded.

276. Allowing Cook to proceed as lead investigator while never considering that Lee was lying.

277. Allowing Cook to proceed as lead investigator while never investigating Lee's reputation for truthfulness.

278. Allowing Cook to proceed as lead investigator while not considering the holes in Lee's story as outlined herein and following up on them, including putting them in a report and seeking assistance and review by others.

279. Allowing Cook to be a homicide detective without having any formal training.

280. Not causing Lee's apartment to be searched for evidence of blood on his clothes, on a sink, or for the presence of a knife.

281. Not comparing Lee's preliminary hearing testimony to his statement to Cook.

282. Allowing Cook to interrogate Lee without a parent or guardian present (they were in a waiting room).

283. Allowing Cook to interrogate Lee without a tape recorder or video camera going at all times.

284. Allowing Cook to be alone while interrogating Lee.

285. Not comparing Lee's preliminary hearing testimony to his statement to Cook.

286. Insufficient and improper collection of evidence at the scene.

287. Improper processing of blood evidence and identifying the results of testing.

288. Usage of a blood typing test on Baby Travis' blood that was known to produce a negative result, and in the face of other tests that should have been used in lieu thereof, to say nothing of running those tests when the first one produced no result.

289. Allowing Cook to proceed on his own without proper peer review, proper supervisory review, and without Cook being required to write reports about all aspects of his investigation.

290. Failure to have knowledge of, or, alternatively, condoning, Cook's failures, acts, beliefs, and omissions concerning the murder of Baby Travis.

291. Failure to process evidence properly.

292. Failure to properly investigate Lee in light of the "conclusive" evidence of Michelle's innocence as the result of her polygraph examination.

293. The lack of training, failure to supervise and lack of proper policies set forth above also was the product of deliberate indifference of the Final Policymaker:

A. To how Mike Cook conducted murder investigations;

B. To how homicide detectives conducted murder investigations;

C. To how Sergeant Allen supervised homicide investigations;

D. To how Mike Cook conducted interrogations in murder cases.

294. The deliberate indifference of the Final Policymaker is manifested by his failure to require reports to himself, including reviewing comments up the chain of command, from the lead investigator in every murder case and/or in every murder case involving a juvenile and/or in every case involving reverse certification of a juvenile and/or in all cases where a confession was obtained where there was a claim of improper methods resulting in a forced confession and/or in every interrogation where a medical condition was referred to by the interrogatee. Failing to supervise so as to be in receipt of such reports was

reasonably foreseeable to result in denial of Due Process rights to a Fair Trial to Tulsa citizens, and the failure to so properly supervise was deliberately indifferent and was a proximate cause of Michelle's denial of her Due Process rights to a Fair Trial.

295. TPD had no written policy requiring the lead investigator to file reports on his investigation or its progress, thereby precluding any Constitutionally adequate supervision to prevent violations of the right to a Fair Trial and other Constitutional deprivations.

### TPD's Policy Deficiencies

296. Based on the City of Tulsa's representations to one of the undersigned counsel for Michelle TPD had **no written policies** concerning investigations or interrogations in 1994.

297. Policies, in writing, concerning investigations and interrogations are fundamentally necessary for the protection of the Constitutional rights of the citizens of Tulsa. The failure to have same is a guarantee of the reasonable likelihood that TPD will violate the Constitutional rights of the citizens of Tulsa, including, but not limited to, the Fifth Amendment and the right to a Fair Trial under the Fourteenth Amendment.

298. The City of Tulsa's failure to have TPD written policies concerning homicide

investigations and homicide interrogations is necessarily, reasonably and foreseeably, the result of the deliberate indifference of the City of Tulsa, acting through the Final Policymaker, to the Constitutional rights of the citizens of Tulsa. This failure was a proximate cause of Michelle being denied a Fair Trial.

299. Alternatively, the City of Tulsa did not have written policies adequate to prevent the errors and omissions outlined in this First Amended Complaint. The failure to do so is necessarily, reasonably, and foreseeably the cause of the violation of Michelle's Constitutional rights as set forth herein, and the result of the deliberate indifference of the Final Policymaker to the Constitutional rights of the citizens of Tulsa.

300. TPD had a plethora of policy failures set forth herein which were a proximate cause of Michelle's Constitutional right to a Fair Trial being violated.

301. It was reasonably foreseeable that these policy failures would deprive citizens of their Constitutional right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment.

302.  The Final Policymaker was deliberately indifferent to depriving Tulsa citizens of their Fourteenth Amendment right to a Fair Trial by having the policy failures set forth below in Paragraphs 303 to 368.

303.   No written policies on homicide investigations.

304.   No written policies on investigations.

305.   No written policies on homicide interrogations.

306.   No written policies on acceptable interrogation techniques.

307.   No written policies on homicide or other investigations, presuming innocence and assuring that a conviction will not be obtained by inquisitorial means.

308.   No written policies prohibiting interrogations without a video camera or tape recorder operating at all times.

309.   No "tolererance" written policy on officers lying in general or lying in court.

310.   No written policies requiring more than one officer to be present during a homicide interrogation.

311.   No written policies requiring compliance with Oklahoma statutes on interrogating juveniles.

312.   No written policies on reports to be produced by lead investigators and submitted up the line for review.

313.   No written policies on supervision of homicide investigations.

314.   No written policies on action to be taken when an Oklahoma State Bureau of Investigation polygraph examiner "conclusively" determines that a defendant

or suspect is innocent of a murder charge.

315. No written policies on superior or peer review of confessions.

316. No written policies prohibiting an interrogator who has had a confession suppressed from ever interrogating alone, and/or without a tape recorder or video camera going at all times.

317. No written policies on interrogation of juveniles.

318. No written policies on interrogation of persons with head injuries.

319. No written policies on the duties of the officer collecting evidence at the scene of a homicide.

320. No written policies requiring forensic collectors of evidence to act on their own initiative, and not being subject solely to the whims of the lead investigator.

321. No written policies on training for homicide investigators.

322. No written policies on training for homicide interrogators.

323. No written policies on the supervision of interrogations that are in progress.

324. No written policies on the vetting of homicide "eye witnesses."

325. No written policies on determining the reputation for truthfulness of eyewitnesses.

326. No written policies on comparing eye witness testimony at preliminary

hearings with their statements to TPD.

327. No written policies on the limits of cooperation with the prosecuting assistant district attorneys.

328. No written policies on interrogating persons without food or drink.

329. No written policies on medical exams for interrogatees who complain of a physical condition.

330. No written policies on investigative steps required when a confession is contrary to the physical evidence.

331. No written policies requiring an additional investigator when the eyewitness commits suicide before trial, and/or supervisory review of all aspects of the investigation to date.

332. No written policies on intense review and supervision of homicide investigations when the eye witness commits suicide.

333. No written policies on comparison of latent prints taken at the scene to those of eye witnesses.

334. No written policies requiring homicide investigators to vet confessions by assuming them to be false and investigating further on that premise.

335. No written policies on homicide interrogations of persons.

suspected of mental, emotional or psychological impairment.

336. No written policies on homicide investigators following through to obtain test results on all blood type requests.

337. No written policies coordinating requests for blood type tests, to be certain the lab gets the request, does the test, and reports the results in writing.

338. No written policies prohibiting oral requests for blood types or oral reporting of results.

339. No written policies on tests to be used in determining blood type of infants.

340. No written policies requiring thorough vetting of eyewitnesses to homicides.

341. No written policies requiring case analysis on the basis that an eye witness is lying.

342. No written policies requiring the consent of the Final Policymaker before usage at trial of a confession where coercion was claimed.

343. No written policies requiring the consent of the Final Policymaker before Cook was allowed to testify about any confession he obtained.

344. No written policies requiring investigation reports in homicide cases, attaching all TPD reports on the accused, the scene, and all witnesses.

345. No written policies requiring that investigative reports be prepared for the Final Policymaker as to a homicide investigation, in all homicide cases, together with review notes and comments from the immediate supervisor or

supervisors of detectives who are leading a homicide investigation:

A.  In all homicide cases;

B.  In all homicide cases where a minor was interrogated and charged on the basis of the interrogation;

C.  In all cases where a minor was interrogated without a parent or guardian present.

D.  In all cases where a police officer intends to testify about a confession obtained in violation of Oklahoma statutes on interrogation of juveniles;

E.  In all cases where a confession was obtained in a homicide case and there was a claim of improper methods resulting in a forced confession;

F.  In all cases where an Oklahoma State Bureau of Investigation polygraph expert determines "conclusively" that an alleged confessed murderer did not commit the crime; and

G.  In all homicide cases where an alleged eyewitness commits suicide before trial.

346.  No written policies requiring reports for the Final Policymaker  in homicide cases, outlining evidence favorable to the accused, together with review notes and comments from the supervisors, the Head of the Homicide Bureau, and all others in the chain of command.

347. No written policies requiring the reports discussed in Paragraphs 344 and 345 to be prepared initially by two investigators, in homicide cases.

348. No written policies in homicide cases requiring the lead investigator to attend the preliminary hearing.

349. No written policies on reopening/continuing homicide investigations where the accused "conclusively" passes a polygraph examination administered by the Oklahoma State Bureau of Investigation.

350. No written policies requiring review by the Final Policymaker of all case files and TPD reports in homicide cases where the accused has "conclusively" passed a polygraph examination administered by the Oklahoma State Bureau of Investigation.

351. No written policies requiring the assignment of either an additional or a replacement investigator in all homicide cases where the accused "conclusively" passes a polygraph examination given by an expert from the Oklahoma State Bureau of Investigation.

352. No written policies requiring providing food and drink to persons being interrogated in homicide cases.

353. No written policies requiring obtaining assistance from the Oklahoma State Bureau of Investigation in cases where that organization's polygraph expert

has "conclusively" determined in a homicide case that the defendant is innocent.

354. No written policies requiring a separate investigator to investigate an alleged eye witness who has lied and/or who has changed his story in any significant way, either always, or at least in cases where there is no physical evidence linking the accused to the homicide crime.

355. No written policies requiring a confession review board in homicide cases.

356. No written policies requiring the Final Policymaker, the Head of the Homicide Bureau, or other supervisors of lead investigators in homicide cases, to review all arrests and investigations and interrogations in homicide cases where the defendant is a juvenile.

357. No written policies requiring that a person who is not as suspect must be told they are free to leave the interrogation at any time.

358. No written policies requiring that a juvenile interrogatee not under arrest be told they can leave at any time.

359. No written policies prohibiting threatening homicide suspects with loss of their children if they do not confess.

360. No written policies preventing yelling at a person being interrogated in a homicide case.

361. No written policies preventing intimidation and harassment of a person being interrogated in a homicide case.

362. No written policies preventing telling a homicide interogatee that they are guilty of a crime.

363. No written policies prohibiting interrogation of persons in homicide cases who are or have within four hours been in shock.

364. No written policies prohibiting interrogations in homicide cases of people claiming physical injury to the head, until after a doctor has examined the person.

365. No written "no tolerance" policy for lying or for committing perjury in court.

366. No written policies prohibiting withholding evidence from defendants or their counsel.

367. No written policy requiring immediate termination for planting evidence in a homicide case.

368. No written policy requiring an officer to report immediately an improper or illegal request from a fellow officer.

369. Alternatively, if there were written policies concerning the matters set forth in Paragraphs 298 to 368 they were inadequate to prevent the reasonably foreseeable Constitutional injury inflicted on Michelle, to-wit the denial of the

right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment. The Chief of Police recognized, as the years went by, the need for written policies. As late as 2005 the TPD announced it was applying for accreditation from CALEA because: "Accreditation standards give the Chief of Police a proven management system of written directives, sound training, clearly defined lines of authority and routine reports that support decision-making and resource allocation."

### The Final Policymaker ot TPD

370. The City of Tulsa is a municipality existing under the laws of the State of Oklahoma.

371. The Tulsa Police Department (hereafter "TPD") is the law enforcement arm of the City of Tulsa.

372. The term "Final Policymaker" used in this First Amended Complaint is a term of art. Every usage of the term Final Policymaker is defined as set forth in this section of the First Amended Complaint.

373. In an overall administrative, executive and non-operational sense, it is recognized that the Mayor of the City of Tulsa is the final policymaker for TPD.

374. It is alleged, however, that operational policies, functioning, operation,

supervision, training, customs and practices, and ratification which are the subject of this First Amended Complaint, were the responsibility of the Final Policymaker. It is noted that the current Chief of Police has testified under oath that the Chief of Police is the Final Policymaker for TPD, and that TPD publicly represents that the chain of command ends with the Chief of Police.

375. The current Chief of Police has testified under oath on more than one occasion that the Chief of Police is the final policymaker for TPD.

376. At least one other Chief of Police has testified under oath that the Chief of Police is the final policymaker for TPD.

377. In the alternative, tbe Mayor is alleged to be the Final Policymaker.

378. In the alternative, the Head of the Homicide Bureau is alleged to be the Final Policymaker, either through delegated authority or *de facto*.

379. In the alternative, the Chief of Police for some functions set forth herein is alleged to be the Final Policymaker and the Head of the Homicide Bureau is alleged to be the Final Policymaker for the remaining functions set forth herein.

380. In the alternative, persons below the Chief of Police and other than the Head of the Homicide Bureau are alleged to be the Final Policymaker.

381. In the alternative, it is alleged that the lack of policies, training and supervision

as described in this First Amended Complaint was so pervasive that Cook was permitted, *de facto* or otherwise, to serve as the Final Policymaker in Michelle's case. In particular, considering the constructive notice to the Final Policymaker of the judge's findings in the Earlier Case about Cook coercing a confession, Cook's being allowed to interrogate Michelle without appropriate policies, training or supervision to prevent Michelle being denied a Fair Trial under the Due Process Clause of the Fourteenth Amendment, makes Cook the Final Policymaker.

382. The actions of the Final Policymaker in failing to provide Constitutionally adequate policies, supervision, training and customs and practices, as alleged herein, in ratifying Cook's actions, and in maliciously prosecuting Michelle were the result of the Final Policymaker being deliberately indifferent to the need to have such in order to prevent citizens of Tulsa, of whom Michelle is one, from being deprived of their right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment.

383. The failures of the Final Policymaker set forth in the preceding paragraph were a proximate cause of Michelle's being denied a Fair Trial.

384. The Final Policymaker could reasonably foresee the substantial likelihood and probability that the Constitutional right to a Fair Trial would be denied to

citizens of Tulsa as the result of the failures identified in this First Amended Complaint as to policies, training, customs and practices and supervision. These failures include:

A. Interrogations without the usage of video taping or tape recording throughout the interrogation;

B. Interrogations with only one officer and the interrogated person present;

C. Interrogations of juveniles;

D. Interrogations with yelling and threatening a mother with loss of her then-only child, immediately following the murder of her other child;

E. Interrogations of persons complaining of head injuries;

F. Medical attention for persons being interrogated;

G. Collection of evidence;

H. Proper processing of evidence;

I. Perjured testimony;

J. Obtaining false confessions;

K. Obtaining coerced confessions in violation of Supreme Court of the United States standards;

L. Violation of Oklahoma statutes on interrogation of juveniles requiring the presence of a parent or guardian;

M.  Conducting murder investigations;

N.  Evaluating and checing the stories of self-proclaimed eye witnesses;

O.  Evaluating and processing the background of self-proclaimed eye witnesses;

P.  Evaluating the reputation for truthfulness of self-proclaimed eye witnesses;

Q.  Evaluating the testimony of self-proclaimed eye witnesses when

the suspect passes a lie detector test "conclusively" as established by a polygraph expert of the Oklahoma State Bureau of Investigation;

R.  Checking the preliminary hearng testimony of self-proclaimed eye witnesses against prior statements to police;

S.  Proper cooperation with the District Attorney;

T.  Supervision of lead investigators;

U.  Supervision of Mike Cook in murder investigations;

V.  Usage of Mike Cook at all as an interrogator;

W.  Usage of Mike Cook as an interrogator alone with an interviewee;

X.  Usage of Mike Cook as an interrogator of a juvenile;

Y.  Interrogations over many hours without food or drink for the interviewee;

Z.  Denying a mother the ability to see and/or be with her child when she is being held for hours but not a suspect as Cook testified;

AA.  Interrogations of non-suspects; and

BB.  Evaluating and following up on the motives of self-proclaimed eye witnesses.

385.  Cook's having been found to have coerced a confession and lied to the court in the Earlier Case should have insured that Cook:

A.  Was immediately fired;

B.  Never interrogated anyone ever again;

C.  Never interrogated any juvenile;

D.  Never interrogated anyone without a tape recorder or video tape going the entire time;

E.  Never interrogated anyone ever again unless another officer were present;

F.  Never interrogated a juvenile without a parent or guardian present;

G.  Never presented a confession in court in violation of the Oklahoma statutes; or

H.  Never presented a coerced confession in court.

386.  It was morally certain there would be homicides in Tulsa.  As a result, there necessarily would be interrogations and confessions.  The failure to have Constitutionally adequate training, policies, supervision and customs and practices was substantially likely and foreseeable to cause citizens of Tulsa to

be deprived of the right to a Fair Trial. The failure to take action to prevent the denial of a Fair Trial through Constitutionally adequate training, policies, supervision and customs and practices was deliberately indifferent on the part of the Final Policymaker, and was a proximate cause of Michelle being denied a Fair Trial.

387. The Supreme Court of the United States, prior to 1994, established broad principles of Due Process of Law and much more specific principles for the interrogation of suspects. These principles, alone, put the Final Policymaker on notice that the failure to have Constitutionally adequate training, policies, supervision and customs and practices was substantially likely and foreseeable to cause citizens of Tulsa to be deprived of the right to a Fair Trial. The failure to take action to prevent the denial of a Fair Trial through Constitutionally adequate training, policies, supervision and customs and practices was deliberately indifferent on the part of the Final Policymaker, and was a proximate cause of Michelle being denied a Fair Trial.

388. Cook's being permitted to interrogate Michelle as he did, in the face of the court throwing out the forced confession he obtained in the Earlier Case, and in the face of established Constitutional law forbidding the use at trial of forced confessions, unless harmless beyond a reasonable doubt, was the result of it

being the custom and practice that Cook could, with unfettered discretion, without the decision of anyone else at the City, determine whether the interrogation produced a coerced confession, and whether that confession would be presented at trial by the City.

389.  Cook's actions in the Earlier Case, in lying under oath and trying to frame someone in a murder case, made it reasonably foreseeable that Cook would take other improper steps in murder cases, either in investigations or interrogations, or both, all to secure a conviction at any cost. From the Earlier Case forward, allowing Cook to act as a homicide investigator, let alone a lead investigator, either at all or without the most intense supervision all the way to the topmost level, was a virtual guarantee of a violation of the right to a Fair Trial of Tulsa citizens, and thereby of Michelle's such right. It may be inferred that an officer who will lie under oath to secure a conviction in a murder case, through framing the accused, will do almost anything and everything else to secure a conviction, and the Constitution of the United States be damned. And, the willingness to lie in court and thereby disregard his oath of office to protect and defend the Constitution of the United States shows his utter disregard for any and all Constitutional rights of suspects. Thus, the Final Policymaker's failures as set forth in this First Amended Complaint loosed upon society a

*Constitutional terrorist* of the first magnitude. Michelle was his victim through the same tactics as in the Earlier Case, as described herein.

390. After the Earlier Case, in light of Cook lying under oath in court, trying to frame someone in a murder case, and usage of techniques for interrogation long since banned by the United States Supreme Court, the need for action concerning Cook serving in the future as investigator, lead investigator or interrogator was "so obvious, and the inadequacy so likely to result in the violation of Constitutional rights, that the [Chief of Police and the Head of the Homicide Bureau] can reasonably be said to have been deliberately indifferent to the need."

391. Even without the Earlier Case, the need for adequate policies, training and supervision, given the moral certainty of homicides and therefore homicide investigations, was "so obvious, and the inadequacy so likely to result in the violation of Constitutional rights, that the [Chief of Police and the Head of the Homicide Bureau] can reasonably be said to have been deliberately indifferent to the need."

392. And without the Earlier Case, in light of Supreme Court pronouncements on Due Process and on interrogations, discussed elsewhere herein, of which the Final Policymaker had actual or constructive notice, the need for adequate

policies, training and supervision was "so obvious, and the inadequacy so likely to result in the violation of Constitutional rights, that the [Chief of Police and the Head of the Homicide Bureau] can reasonably be said to have been deliberately indifferent to the need."

393. The Final Policymaker was on constructive notice of Cook's violation of Michelle's Constitutional right to a Fair Trial because of the existence of TPD reports. To begin, Cook's affidavit for arrest shows Michelle's age as 17. TPD reports also show Michelle's case being "reverse certification" case, meaning she was a juvenile. Reports showed Cook interrogated Michelle, and did so without an adult or guardian present. Michelle herself signed the Miranda waiver, which a parent or guardian must do for a juvenile. Despite this constructive notice, the Final Policymaker did not prevent Cook's usage at trial of Michelle's coerced confession.

394. It also is a fair inference that when the Final Policymaker allowed Cook to continue as investigator, lead investigator and interrogator after having been found to lie to the court in a murder case so as to frame the defendant, and to use coercive interrogation techniques so as to frame the defendant, he provided Cook with a medal of (dis)honor which he proudly wore throughout TPD. This "medal" told others in TPD that however Cook handled an investigation or

interrogation was fine with the Final Policymaker. It may fairly be inferred that the Final Policymaker tolerating Cook's lying in court in a murder case was a neon sign advertising for all of TPD to see that Cook could do no wrong in a murder investigation or interrogation, whatever it was, since there can be no graver sin for a law enforcement officer than to lie in court in a murder case (save and except, of course, the officer murdering someone in cold blood).

395. In Michelle's case, officers who had far less involvement than Cook filed reports on their actions and their interrogations. Cook's supervisor, Sgt. Allen, filed one investigative report (i.e., not a supervisory report, as there were no supervisory reports in Michelle's case) that was more than two single spaced typed pages. Cook filed no reports, unless you want to call his 9-12-94 "Prosecution Report" a Cook report. That document directly contradicts his testimony in court, because it says Michelle was given Miranda warnings at the outset of her interrogation, and not at 12:15 as Cook testified. Other officers who performed interrogations on 9-12-94 wrote reports on their interrogations. Not Cook. Instead, he claimed he wrote notes during the interrogation, but they are not part of any report. Moreover, there are direct quotes in those notes that cannot have been taken down as they were spoken, because of their extensive nature. Thus, it is a fair inference that Cook made his five pages of

"notes" after the interrogation was over, a fact he concealed from the court, the jury and Michelle's attorney.

396. Cook's lack of reports, in contrast to Sgt. Allen's reports, and the detailed reports of other officers in Michelle's case, were a supervisory atomic bomb, as well as a prime indicator of how Cook was allowed to proceed as he chose, instead of conducting a thorough, reviewable investigation in accordance with proper procedures which ensure the right to a Fair Trial. It is intuitively obvious that there cannot be adequate or Constitutionally permissible supervision of homicide investigations in a police force of more than 500 officers without reports which can be reviewed. Overstaffing has never been a hallmark of TPD.

397. Other officers interrogating witnesses in Michelle's case on 9-12-94 taped interviews from start to finish. But not Cook. And Cook was allowed to get away with it.

### Damages

398. As a proximate result of being wrongfully convicted because of denial of her right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment, Michelle Dawn Murphy suffered personal injuries as well as pain and suffering, all from being wrongfully imprisoned for 20 years, and being

wrongfully imprisoned on a sentence of life without parole.

399. The damages for pain and suffering include being deprived of the care, custody and companionship of her daughter Michelle during all of the years since 1994.

## FIRST CLAIM FOR RELIEF

400. Paragraphs 1 through 399 are incorporated by reference.

401. Michelle is entitled to damages under 42 U.S.C. § 1983 and to attorney fees for being deprived of a Fair Trial under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States on any one of the following grounds, each of which is alleged to have occurred as the result of the deliberate indifference of the Final Policymaker and to be a proximate cause of this Constitutional deprivation:

A. Failure to have adequate policies, without consideration of the Earlier Case;

B. Failure to have adequate policies, including consideration of the Earlier Case;

C. Failure to supervise, without consideration of the Earlier Case;

D. Failure to supervise, including consideration of the Earlier Case;

E. Failure to train, without consideration of the Earlier Case;

F. Failure to train, including consideration of the Earlier Case;

G. Allowing the custom and practice of coerced interrogations in violation of

Constitutional principles governing interrogations;

402. Homicide investigations and interrogations in homicide cases are ongoing, repetitive functions of TPD. The need for policies, supervision and training so as to prevent Constitutional violations is intuitively obvious. In addition, the Supreme Court of the United States, prior to 1994, made it plain that law enforcement agencies were required to take steps to prevent Constitutional violations. Those steps, of necessity, had to come in the area of adequate policies, training and supervision. The failure of the Final Policymaker to put adequate policies, training and supervision in place to prevent Constitutional violations was the result of his deliberate indifference.

403. The Earlier Case put the Final Policymaker on notice that TPD needed policies, training and supervision, on a general basis, to prevent its interrogators from engaging in the conduct described by the suspect in the Earlier Case. That case also put TPD on notice of the necessity of videotaping or audio taping the entirety of an interrogation, at least in a first degree murder or other types of homicide cases, given their possible punishments. The Final Policymaker's failure to take action to put in place adequate policies, training and supervision, at least in first degree murder or other types of homicide cases was deliberately indifferent to the need to have same.

404. The Earlier Case put the Final Policymaker on notice that TPD needed to take appropriate action concerning Cook, as set forth above in this First Amended Complaint. Cook coerced the confession in that case. At the time of that confession, the Supreme Court's dictates were that the usage at trial of a coerced confession automatically violated the right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment, regardless of what the other evidence was. As a result, the Final Policymaker was on full notice of the importance of not permitting coerced confessions to occur. The only meaningful way to prevent coerced confessions was to require that they be videotaped or audio taped in their entirety, so that there could be supervision of what the TPD interrogators were doing. That truth was greatly magnified in the case of Cook, whose methods were rebuffed by Judge Beasley. In addition, Judge Beasley found Cook not to be believable about his interrogation technique and method in the Earlier Case. That means that the judge found Cook lied to him. The Final Policymaker was on actual or constructive notice of what happened in the Earlier Case, either through internal sources, from the prosecutor's office, or through the coverage in the local media discussed above in this First Amended Complaint. The failure of the Final Policymaker to have adequate policies, training and supervision in

place concerning Cook, assuming of course that he should not have fired Cook, was decidedly deliberately indifferent. The usage of Michelle's coerced confession at trial, by Cook, was not harmless beyond a reasonable doubt, and therefore the right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment was denied to Michelle.

405. Separately, ratification by the Final Policymaker of Cook's actions was the proximate cause of depriving Michelle of a Fair Trial under the Due Process Clause of the Fourteenth Amendment.

406. Separately, Michelle is entitled to relief under 42 U.S.C. § 1983 because her Fifth Amendment right not to incriminate herself was violated by Cook, and the product thereof was used at her trial, and such usage was not harmless error beyond a reasonable doubt. The failure of the Final Policymaker to have in place policies, training and supervision which would have prevented the foregoing was the product of deliberate indifference and was a proximate cause of Michelle being deprived of her Fifth Amendment rights.

407. Separately, Michelle is entitled to relief under 42 U.S.C. § 1983 because her Fifth Amendment right not to incriminate herself was violated by Cook, and the product thereof was used at her trial, and such usage was not harmless error beyond a reasonable doubt. The failure of the Final

Policymaker to have in place policies, training and supervision which would have prevented the foregoing was the product of deliberate indifference on the part of the Final Policymaker and was a proximate cause of Michelle being deprived of her right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment combined with the Fifth Amendment.

408.   The damages Plaintiff seeks exceed $75,000.

WHEREFORE, premises considered, Michelle Dawn Murphy seeks damages under 42 U.S.C. § 1983 and attorney fees under 42 U.S.C. § 1988 in excess of $75,000.

ATTORNEY'S LIEN CLAIMED

/s/ R. Thomas Seymour
R. Thomas Seymour OBA #8099
Seymour Law Firm
1811 South Baltimore
Tulsa, OK 74119
918-583-5791
rtseymour1@aol.com

/s/ Richard O'Carroll
O'Carroll & O'Carroll OBA #11947
2171 North Vancouver Ave.
Tulsa, OK 74127
918-584-4192
troc@cox.net

CERTIFICATE OF SERVICE

This will certify that on this 15th day of December, 2015, I electronically transmitted the foregoing document to the Clerk of Court, using the ECF system for filing and transmittal of a Notice of Electronic filing to the following ECF registrants:

Joel L. Wohlgemuth
Ryan A. Ray
Alix R. Newman
Norman Wohlgemuth Chandler Jeter Barnett & Ray, P.C.
401 South Boston Avenue
2900 Mid-Continent Tower
Tulsa, Oklahoma 74103-4023

David E. O'Meilia
Gerald M. Bender
T. Michelle McGrew
Legal Department
City Hall, One Technology Center
175 East Second Street, Suite 685
Tulsa, Oklahoma 74103