## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MICHELLE DAWN MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-528-GKF-FHM |
| | ) | |
| THE CITY OF TULSA, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Defendant the City of Tulsa ("City") moves for Summary Judgment, pursuant to Fed. R. Civ. P. 56 on the grounds that Plaintiff Michelle Dawn Murphy's ("Murphy") 42 U.S.C. § 1983 action fails because: Murphy's Fifth Amendment claims are barred by collateral estoppel and waiver; Murphy cannot prove the City violated her constitutional rights; Murphy cannot prove any alleged constitutional violation was the result of the City's custom or policy; Murphy cannot prove the City failed to train its police officers; Murphy cannot meet the requirement of deliberate indifference; and Murphy cannot prove her conviction was caused by the City's alleged violation of her constitutional rights. The City is entitled to Judgment as a matter of law as no genuine dispute exists as to any material fact.

**David E. O'Meilia, OBA #6779**
**Gerald M. Bender, OBA #14471**
**T. Michelle McGrew, OBA #20279**
**CITY HALL, ONE TECHNOLOGY CENTER**
175 East Second Street, Suite 685
Tulsa, Oklahoma 74103
domeilia@cityoftulsa.org
gbender@cityoftulsa.org
mmcgrew@cityoftulsa.org
**ATTORNEYS FOR THE CITY OF TULSA**

**July 12th, 2017**

**TABLE OF CONTENTS**

**Page**

STATEMENT OF THE CASE…………………………………...………………………....1

UNDISPUTED MATERIAL FACTS…………………..…………………………………...…..2

    The Tulsa Police Department's Murder Investigation…………..………………….2

    Murphy's Confession And Probable Cause…………………………...………………6

    Murphy's Confession Was Given Knowingly and Voluntarily……...………………...7

    Causation and Waiver……………………………………...…………………9

    TPD Policies, Practices, Training and Supervision………………….…………………11

    The "Earlier" Case-LaRoye Hunter…………………………...……………………14

ARGUMENT AND AUTHORITIES………………………...……………………………16

I.    MURPHY'S FIFTH AMENDMENT CLAIMS AND ALL CLAIMS REGARDING HER CONFESSION FAIL AS A MATTER OF LAW…...………………………………………………..16

    A.  COLLATERAL ESTOPPEL BARS MURPHY FROM CLAIMING HER CONFESSION WAS COERCED…………………………………………………………16

        1.  THE OCCA DECISION ON MURPHY'S CONFESSION IS A FINAL JUDGMENT AND IS NOT AFFECTED BY THE TRIAL COURT'S ORDER VACATING MURPHY'S CONVICTION………………...………….….…………………………….18

        2.  MURPHY WAS PRECLUDED BY RES JUDICATA FROM CLAIMING HER CONFESSION WAS COERCED AND COLLATERAL ESTOPPEL BARS HER CLAIM HERE……………………………………………………………….23

        3.  THE SIXTH CIRCUIT'S *HATCHETT v. CITY OF DETROIT* OPINION …………………………………………………………...……24

    B.  MURPHY WAIVED HER RIGHT TO BRING ANY CLAIM THAT HER CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN SHE WAS QUESTIONED WHILE SHE WAS A MINOR..................................................................................26

II.    MURPHY HAS NO MALICIOUS PROSECUTION CLAIM…..……………………………29

III.      **MURPHY CANNOT PREVAIL ON HER 42 USC § 1983 CLAIM THAT THE CITY VIOLATED HER FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL**.....................................................29

    A.  NEITHER DETECTIVE COOK NOR ANY TPD OFFICER VIOLATED MURPHY'S CONSTITUTIONAL RIGHTS……………………………..………………………….30

    B.  MURPHY CANNOT PROVE THE CITY HAD A MUNICIPAL POLICY OR CUSTOM THAT WAS THE MOTIVATING FORCE BEHIND ANY ALLEGED CONSTITUTIONAL DEPRIVATION………………………………..…………………………….32

        1.  THE CITY HAD APPROPRIATE WRITTEN POLICIES AND PROCEDURES……..……..32
        2.  MURPHY CANNOT PROVE HER ALLEGED CONSTITUTIONAL VIOLATION WAS THE RESULT OF ANY UNWRITTEN WIDESPREAD CUSTOM OR PRACTICE…..……..33

    C.  MURPHY CANNOT PROVE THAT ANY FINAL POLICY MAKER MADE ANY DECISION OR RATIFIED ANY UNCONSTITUTIONAL CONDUCT…………….………………………….35

    D.  THE CITY DID NOT FAIL TO TRAIN OR SUPERVISE………………………………...35

    E.  THE CITY DID NOT CAUSE MURPHY'S ALLEGED INJURIES…………………………..37

        1.  DISTRICT ATTORNEY HARRIS' CONDUCT CAUSED MURPHY'S ALLEGED DAMAGES………………………………………………………….37
        2.  THE TRIAL COURT'S ADMISSION OF MURPHY'S CONFESSION WAS A SUPERVENING CAUSE………………………..…………………………..39

**MURPHY CANNOT PROVE HER CASE**………..…………………………………..……40

**FEDERAL AUTHORITY**

Cᴀꜱᴇ Lᴀᴡ

**United States Supreme Court**

*Allen v. McCurry,* 449 U.S. 90, 105, (1980)…………………………………….………16, 17, 20, 24

*Baker v. McCollan*, 443 U.S. 137, 145–46, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979) …...….30

*Board of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)…………......…………37

*Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)…………...………..…30

*Canton v. Harris*, 489 U.S. 378 (1989)……………………………………………...……………36

*City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, (1985)…………….…………32, 34

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915 …………………….…...….…………34

*Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)…...…..…………….…37

*Howlett v. Rose*, 496 U.S. 356 (1990)……………………………………………………………23

*Jackson v. Denno*, 378 U.S. 368 (1964)………………………………………….………………25

*Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327,
84 L.Ed.2d 274 (1985)………………….…...……………………………………….……………17

*Martinez v. California*, 444 U.S. 277, 285 (1980)……………...………………….……………...37

*Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 690-91 (1978)……………….…...………………30, 32

*University of Tennessee v. Elliot*, 478 U.S. 788, 794 (1986)…………...…………...……………23

*Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)………....…………28

**Federal Circuit Courts**

*Amrine v. Brook,* 522 F.3d 823 (8th Cir. 2008)……………………………….……………..30

*Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir.1998)……………….…...….……………..36

*Bennett v. Passic*, 545 F.2d 1260, 1263-64 (10th Cir. 1976)……………...….….………………40

*Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (2010)…………….…...………………32, 33, 34

*Cook v. Aagard,* 547 Fed.Appx. 857, 858-60 (10th Cir. 2013)……...………………….…….…..23

*Duncan v. Nelson*, 466 F.2d 939, 942-945 (7th Cir.), *cert. denied*, 409 U.S. 894 (1972)……...….39

*Green v. City of New York*, 465 F.3d 65, 81 (2nd Cir. 2006)……………………...…………..……….34

*Hand v. Gary*, 838 F.2d 1420, 1427-28 (5th Cir. 1988)……………...…………….…………….39

*Hatchett v. City of Detroit,* 495 Fed.Appx. 567 (6th Cir. 2012)(unpublished)……….…..……24, 25, 26

*Hizagy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007)…………………….…..……………38

*Hubbert v. City of Moore*, 923 F.2d 769, 772-73 (10th Cir. 1991)…………...…..……………17, 23, 29

*Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 759 (10th Cir.2014)……..……...…...29, 30

*Meade v. Grubbs,* 841 F.2d 1512 at 1527 (10th Cir. 1988)……………..……………..…...…..………36

*Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir.1998)……………30

*Schepp v. Fremont County, Wyo.*, 900 F.2d 1448, 1454 (10th Cir.1990)…………..………………35

*Townes v. City of New York*, 176 F.3d 138, 146-147 (2d Cir.), …………………….….………..39
*cert. denied*, 528 U.S. 964 (1999)

*Wilson v. Lawrence County, Mo.,* 260 F.3d 946 (8th Cir.2001)…………………….…………..30

*Zahrey v. Coffey*, 221 F.3d 342, 351 n.7 (2d Cir. 2000)…………………………….…..………38

**Federal District Courts**

*Hatchett v. City of Detroit,* 2010 WL 1754426, at *9 (E.D. Mich. April 30, 2010) (unpublished)……………………………………………………………………….………….24

**STATUTES**

Fed. R Civ. P. 56…………………………...………………………………….…….….16

28 U.S.C. § 1738………………………...………………………………………....……17, 20

42 USC § 1983………………………………...….……………………………….…..32

**OKLAHOMA AUTHORITY**

**CASE LAW**

**Oklahoma Supreme Court**

*Matter of W.D.*, 1985 OK 65 at ¶ 10, 709 P.2d 1037, 1040-41…………..…………….…………27

*Oklahoma Dept. of Public Safety v. McCrady,* 2007 OK 39, ¶ 7, 176 P.3d 1194, 1199…….…...…..…18

*Veiser v. Armstrong,* 1984 OK 61, ¶ 8, n. 9, 688 P.2d 796, 800, n. 9…………………..…….…..…….18

## Oklahoma Court of Criminal Appeals

*Alverson v. State,* 1999 OK CR 21, ¶ 6, 983 P.2d 498, 506……………..………………………..22

*Bias v. State,* 1997 OK CR 56, 561 P.2d 523 ………………………………………………..28

*Brown v. State,* 1998 OK CR 77, ¶ 10, 989 P.2d 913, 921……………………..…………………21

*Coddington v. State,* 2011 OK CR 21, ¶ 2, 259 P.3d 833, 835……………..……………......…20

*Humphreys v. State,* 1997 OK CR 59, ¶ 15, 947 P.2d 565, 572…………………..…………….22

*Jackson v. State,* 2001 OK CR 37, ¶ 9 n. 3, 41 P.3d at 395 n. 3.................................................20, 21

*Jackson v. State,* 2006 OK CR 45, 146 P. 3d 1149……….……..……………….....…………20, 21

*King v. State,* 2001 OK CR 22, ¶ 4, 29 P.3d 1089, 1090………………..…………………………20

*Logan v. State,* 2013 OK CR 2, ¶ 3, 293 P.3d 969………………………......…………………19, 23, 27

*Neill v. State,* 1997 OK CR 41, ¶ 7 n. 2, 943 P.2d 145, 148 n. 2.....................................................20

*Smith v. State,* 2002 OK CR 2, ¶ 7, 46 P.3d 136, 137 …………………..………..………………21

*Webb v. State,* 1992 OK CR 38, ¶ 6, 835 P.2d 115, 116……………..…..……….…..……………20

*Wilson v. State,* 1998 OK CR 73, ¶ 11, 983 P.2d 448, 456……………..……………………….21

## Other State Court Cases:

*People v. Walker,* 132 N.W.2d 87 (1965) ……………….………………………………....25

## STATUTES

22 O.S. § 1373.5………………………………………………………………………………11

22 O.S. § 1086 ……………….……………….…..…………………………………19, 20, 23, 27

10 O.S. 1991 § 1109 (a)……………………..………………..…………….………..…….27, 28

22 O.S. § 1087 ……………………………….…………………..………………..……………..19

10 O.S. 7001-1.3A (4) …………………………………………………….……………………..28

**T**REATISES

Restatement (Second of Torts) § 440 (1965) …………………………………………………..37, 38

**E**XHIBIT **L**IST

| | |
|---|---|
| Exhibit 1 | State's Motion To Confess |
| Exhibit 2 | 22 O.S. 1373.5 |
| Exhibit 3 | Officer BK Smith Preliminary Hearing testimony |
| Exhibit 4 | TPD Prosecution Report, COT 894-930 |
| Exhibit 5 | Preliminary Hearing, William Green testimony |
| Exhibit 6 | TRACIS, incident report 776 |
| Exhibit 7 | Lowther taped Statement COT 826-846 |
| Exhibit 8 | Carter taped statement, COT 906-914 |
| Exhibit 9 | Supplementary Offense Report, COT 878-879 |
| Exhibit 10 | Fields' taped statement, COT 862-871 |
| Exhibit 11 | S. Mann taped statement, COT 887-893 |
| Exhibit 12 | Cook's trial testimony |
| Exhibit 13 | 911 transcript –COT 873-876 |
| Exhibit 14 | Noordyke trial testimony |
| Exhibit 15 | OSBI Criminalists Examination Report |
| Exhibit 16 | TPD Scene Investigation Report, COT 935, 927 |
| Exhibit 17 | Crime Scene Photograph |
| Exhibit 18 | State's Exhibit No. 9 |
| Exhibit 19 | Trial Transcript, Vol II, Otterstrom Testimony, 297-299 |
| Exhibit 20 | TRACIS, Supplementary Offense Reports, COT 790-796 |
| Exhibit 21 | Preliminary Hearing Transcript, Otterstrom, p 38-45 |
| Exhibit 22 | Search Waiver |
| Exhibit 23 | 232 page TRACIS |
| Exhibit 24 | Statement of Scottie Dale Ritchie, COT 933-948 |
| Exhibit 25 | Conversations Between Peck and Murphy COT 847-859 |
| Exhibit 26 | Transcription of Murphy's statement |
| Exhibit 27 | Audio of Murphy's statement |
| Exhibit 28 | TRACIS, Arrest and Booking, Probable Cause Affidavit, COT 884, 885 |
| Exhibit 29 | Signed Probable Cause Affidavit |
| Exhibit 30 | Counsel appearances at Preliminary Hearing Page 1, 2, 3, 213, 310 |
| Exhibit 31 | Depo. Pete Messler, p. 10-16 |
| Exhibit 32 | Motions Hearing, pages 37-63 |
| Exhibit 33 | Excerpts of trial transcript  692:18-25-695:10 |
| Exhibit 34 | Certified copy of Jury Instructions, CF-94-4410, Instruction No. 16 |
| Exhibit 35 | OCCA opinion |
| Exhibit 36 | Order vacating conviction |
| Exhibit 37 | JE of Dismissal |
| Exhibit 38 | Excerpts of Deposition Transcript of Michelle Murphy |
| Exhibit 39 | Summary of Documents Produced in Discovery |
| Exhibit 40 | Affidavit of former homicide Det. Kenneth Mackinson |
| Exhibit 41 | Depo. Ron Palmer |
| Exhibit 42 | Excerpts of deposition transcript of Wayne Allen |
| Exhibit 43 | Affidavit and Report of John Ryan |

| Exhibit 44 | Affidavit of Deputy Chief of Police Dennis Larsen |
|---|---|
| Exhibit 45 | Juvenile Notification of Rights Waiver in LaRoye Hunter |
| Exhibit 46 | Plaintiff's Verified Answers to City's First Set of Ints, No. 14, 20, 21 |
| Exhibit 47 | Plaintiff's Responses to City's Request for Admissions, No. 24 |
| Exhibit 48 | Plaintiff's Responses To RFPOD No. 4 |
| Exhibit 49 | Deposition Transcript of L. Radford |
| Exhibit 50 | Hunter Docket Sheet |
| Exhibit 51 | Depo. M. Cook |
| Exhibit 52 | 22 O.S. § 1087 |
| Exhibit 53 | State's Motion To Dismiss With Prejudice |
| Exhibit 54 | *Jackson II v State* 2006 OK CR 45 |
| Exhibit 55 | 10 O.S. 7001-1.3 A (4) |

<u>**STATEMENT OF THE CASE**</u>

Murphy's eighty-nine page, four-hundred and eight paragraph Complaint can be distilled down to one basic claim: she alleges, pursuant to 42 U.S. § 1983, she was denied a fair trial and was wrongfully convicted of the murder of her three-month old son as a direct result of the City's violation of her Fifth and Fourteenth Amendment rights. Murphy cannot prove her case.

Murphy is unable to prove the City violated her Fifth Amendment right against self-incrimination because all issues regarding her confession have been finally determined and are barred by the doctrines of collateral estoppel/issue preclusion and waiver. Murphy cannot re-litigate these issues.

Murphy also alleges the City violated her Fourteenth Amendment due process rights by: failing to have adequate police policies, practices and procedures; failing to supervise its police officers and detectives; failing to adequately train its police officers and detectives; and allowing the custom and practice of coerced interrogations in violation of constitutional principles. [**Plaintiff's First Amended Complaint**, Doc. No. 36, ¶401.] Murphy's Fourteenth Amendment claims fail because she cannot prove a constitutional violation and or that a City custom or practice caused any constitutional violation.

Finally, the City is entitled to summary judgment because Murphy cannot prove that her alleged wrongful conviction was directly and proximately caused by any action taken by the City. It has been conclusively established that the Assistant District Attorney's misconduct was the cause of Murphy's allegedly unfair trial and conviction, legally constituting an intervening cause that supervenes any other earlier occurring proximate cause alleged by Murphy.

1.      At approximately 6:15 a.m. on Monday, September 12, 1994, EMSA and officers from the Tulsa Police Department ("TPD") arrived on scene at Michelle Murphy's apartment in response to a 911 call regarding the stabbing death of a baby.  Officer BK Smith and Officer Gary Neece were among the first to arrive. They were directed to the back door of the apartment, where Officer Smith observed Murphy's three-month old son, Travis Wood, dead, lying in a pool of blood. (**Ex. 3**,  BK Smith's Preliminary Hearing Testimony, p. 14, ln 1-20).

2.      Officers Smith and Neece entered Murphy's apartment through the back door to search for additional victims. They exited the apartment and set up a perimeter to protect the crime scene. Officer Smith then guarded the back door of Murphy's apartment until he was relieved by a day shift officer. (**Ex. 3**, p. 15-16, p. 18, ln 8-12).

3.      Ultimately, nine uniformed TPD officers and four detectives, including Det. Doug Noordyke, Scene Investigator, assisted in investigating the homicide of Travis Wood. (**Ex. 4**, TPD Prosecution Report, COT 894-930).

4.      TPD officers immediately separated the witnesses. Murphy and her neighbors Christina Carter and Christona Lowther were each placed in separate patrol cars. (**Ex. 5,** Preliminary Hearing, William Green testimony, 82:1-8; **Ex. 6**, TRACIS Incident Report COT 812, 813).

5.      TPD officers and detectives obtained written and recorded statements from Christina Carter, Christona Lowther, and William Green. (**Ex. 6**, COT 820-821; **Ex. 7**, Lowther taped statement, COT 826-846; **Ex. 8**, Carter taped statement, COT 906-914; **Ex. 9**, Supplementary Offense Report, COT 878-879).

6.      TPD officers and detectives also interviewed Murphy's other neighbors, James Fields, Kathy Evans, Steve Mann, LaDonna Summer, William Lee, Kervin Washington, Mike Jarnagan,

Pat Jarnagan, and the security guard for the apartment complex. They also interviewed Donny Ward's (one of Murphy's boyfriends) Probation Officer. (**Ex. 6**; **Ex. 10**, Fields' taped statement, COT 862-871; **Ex. 11**, S. Mann taped statement, COT 887-893; **Ex. 20**, COT 792-796).

7.     Sgt. Allen assigned the homicide investigation to Det. Corporal Mike Cook, a 20-year TPD veteran and a 13-year homicide detective. At the time, Cook had investigated hundreds of homicide cases. (**Ex. 12**, Cook trial testimony, Vol IV, p. 648, ln 25 – p. 649, ln 22).

8.     911 calls had been made by William Lee and Christona Lowther. As part of the investigation, TPD officers obtained copies of these calls. (**Ex. 13**, COT 873-876).

9.     Sgt. Allen assigned Det. Doug Noordyke, a 13 year TPD veteran, as the Crime Scene Investigator. Det. Noordyke's training included police academy training in crime scene processing, evidence recovery, and fingerprinting. He also attended specialized schools in blood stain pattern analysis and latent print examinations and had received training with senior SIU officers regarding crime scene processing. At the time of the Murphy investigation, Det. Noordyke had processed hundreds of crime scenes. (**Ex. 14**, Noordyke test., p. 358 – p. 360).

10.     When Det. Noordyke arrived at the crime scene, it had been taped off and preserved. His first duties were to document the scene with video, photographs, sketches, and narrative report. He also recovered physical evidence and processed the scene for prints. (**Ex. 14**, p. 359, ln 23 – p. 361, ln 16; Doc. No. 36, ¶36).

11.     There were no signs of forced entry into the apartment. (**Ex. 14**, p. 367, 21-25).

12.     Det. Noordyke collected the sheet/drape that separated the kitchen from the living room because it was stained with what appeared to be blood. (**Ex. 14**, p. 370, ln 1-11; **Ex. 15**, OSBI Criminalists Examination Report, p. 2). He also obtained samples from what appeared to be blood on the outside of the front screen door and near the body of the baby. (**Ex. 14** p 375 - 376).

13. Det. Noordyke recovered seven knives from Murphy's apartment, including a 9-inch dagger in the closet and a large knife with a 7 ¼-inch blade found between the couch cushions. (**Ex. 16**, TPD Scene Investigation Report, COT 935, 927; **Ex. 17**, Crime Scene Photograph; **Ex. 18** State's Exhibit #9).

14. The agent from the Medical Examiner's office arrived at the scene, examined the victim and found a "stab wound just below the neck and a deep large laceration across the throat that was close to being a full decapitation of the infant." (**Ex. 16**, COT 921, 924).

15. In addition to obtaining latent prints, video and crime scene photographs, Det. Noordyke collected 25 separate pieces of evidence on September 12, 1994. (**Ex. 16**, COT 931,932).

16. Det. Cook arrived at the crime scene between 7:30 a.m. and 8:00 a.m.. (**Ex. 12**, 650:13-22; see also Doc. No. 36, ¶35). As the detective assigned to the case, he was responsible for interviewing the witnesses and putting together the reports. (**Ex. 12**, p. 653, ln 21-15).

17. At approximately 8:40-8:45 a.m., Det. Cook went to the temporary detective division to talk to Murphy. (**Ex. 12**, p. 655, ln 1-10).

18. On September 12, 1994, Det. Cook interviewed Harold Eugene Wood (Murphy's common-law husband) and took a tape-recorded statement of Murphy. (**Ex. 12**, p. 668, ln 4-11; p. 673-695).

19. After obtaining Murphy's recorded statement, Det. Cook interviewed Murphy's neighbors William Lee and LaDonna Summer. (**Ex. 12,** p. 695, ln 18-15; p. 696, ln 1-3).

20. Det. Cook and Det. Noordyke also returned to the scene two additional times. First, they went back to Murphy's apartment at night, on September 19, 1994 to see the field of view from the front door and front window as well as the from the back door and the back window. They checked the view during the daylight hours and returned after dark. They specifically wanted to

see if they could view where the body was on the floor, from outside the back window, looking through the mini blinds as fourteen-year old William Lee had described to police. William Lee's line of sight was confirmed. (**Ex. 14**, p. 382, ln 12-25; p. 383, 384; **Ex. 12**, p. 696, ln 4-21).

21.     In March of 1995, Det. Cook and Det. Noordyke were called back out to Murphy's apartment because the complex maintenance supervisor reported a possible break-in. The detectives discovered a box from her closet had been overturned onto her bed and a maroon-handled knife was next to overturned boxes on Murphy's bed. (**Ex. 14**, p. 386-388; **Ex. 12**, p. 696, ln 4-21).

22.     In the initial report, Murphy is listed as a victim, along with Travis Wood. (**Ex. 6**).

23.     Officer Gary Otterstrom was assigned to sit with Murphy in his patrol car until the detectives arrived. While Murphy was seated in the passenger seat of the patrol car, she stepped out of the vehicle several times to speak with neighbors and smoke cigarettes. (**Ex. 19**, Trial Transcript, Vol II, Otterstrom Testimony, 297-299; Doc. No. 36, ¶33).

24.     Sgt. Allen, the on-scene supervisor, instructed Officer Otterstrom to obtain a written Search Waiver from Murphy so that she could give permission for the officers to search her residence for evidence. At 7:17 a.m., September 12, 1994, Sgt. Allen witnessed Officer Otterstrom read Murphy her *Miranda* Warnings from a card and then observed Murphy willingly sign a Consent to Search form for her apartment. (**Ex. 20,** TRACIS Supp. Offense Report; **Ex. 21**, Preliminary Hearing Transcript, Otterstrom, p 38-45; **Ex. 19**, p. 301, ln 16-19; **Ex. 22**, Search Waiver; Doc. No. 36, ¶29).

25.     TPD investigated this homicide case and generated 232 pages of TRACIS documents. The investigation included: securing the crime scene; canvassing the area for potential witnesses; separating the witnesses at the scene; obtaining witness statements; documenting the crime scene

with video, photographs and diagrams; obtaining and processing evidence; obtaining DNA evidence and evidence from the Medical Examiner's office; having detectives re-visit the scene; and interviewing Murphy and obtaining her tape-recorded confession. (**Ex. 23**, 232 page TRACIS).

26.     On December 8, 1994, Det. Cook took a recorded statement of Scottie Dale Ritchie, a close friend of Harold Eugene Wood.  (**Ex. 24**, Statement of Ritchie, COT 933-948)

27.     As part of the TRACIS documents, Det. Cook prepared a Prosecution Report for the District Attorney's Office.  The report identified each witness and summarized their testimony. (**Ex. 4**).

28.     Det. Cook also obtained copies of the recorded conversations between Murphy and Earl Peck, one of her boyfriends, while she was in jail after her arrest. (**Ex. 25**, COT 847-859).

## Murphy's Confession And Probable Cause

29.     On September 12, 1994 at 2:29 p.m., Murphy gave a tape-recorded statement to Det. Cook and reaffirmed that she had been read her rights and had initialed the form. (**Ex. 12**, p. 692, ln 13-17; **Ex. 26**, transcription of Murphy's statement, p. 1; **Ex. 27**, audio of Murphy's statement).

30.     In her taped statement, Murphy confessed to cutting Travis Wood in the throat and then "dropping" the knife on him.  (**Ex. 26, Ex. 27**).

31.     After obtaining Murphy's tape-recorded statement, Det. Cook arrested her, placed her in handcuffs, and transported her to jail for booking.  (**Ex. 12**, p. 695, ln 14-17).

32.     On September 12, 1994, Det. Cook booked Murphy for first-degree murder and completed a Probable Cause Affidavit. (**Ex. 28**, Arrest and Booking, Probable Cause Affidavit,

COT 884, 885). The next day a judge of the Tulsa County District Court found probable cause to detain Murphy. (**Ex. 29**, Signed Probable Cause Affidavit).

33.     Murphy's Preliminary Hearing was held on November 14 and 15, 1994 before the Honorable J. Peter Messler.  Murphy was represented by private counsel. (**Ex. 30**, excerpts from the Preliminary Hearing transcript, p. 1 and 213)

34.     At the Preliminary Hearing, the State presented nine witnesses including William Lee and Officers Smith and Otterstrom.  Det. Cook did not testify and Murphy's taped confession was **not offered into evidence**. No blood evidence was offered by the State at the Preliminary Hearing. (**Ex. 30**, p. 1-3).

35.     At the end of the two-day Preliminary Hearing, Judge Messler denied Murphy's demurrer; found probable cause existed that first-degree murder had been committed; and found probable cause existed that Murphy committed the crime. He bound Murphy over for trial for first-degree murder. (**Ex. 30**, p. 310; **Ex. 31**, Depo. Messler p. 10-16).

36.     Judge Messler knew the purpose of the preliminary hearing, pursuant to 22 O.S. § 285, in effect in 1994, was to establish probable cause that (1) a crime was committed and (2) that the defendant committed the crime. (**Ex. 31**, p. 33, ln 8-25; p. 34, ln 1-15).

**Murphy's Confession Was Given Knowingly and Voluntarily**

37.     At a separate proceeding before the trial, on November 9, 1995, Judge E. R. (Ned) Turnbull conducted a *Jackson v. Denno* hearing to determine whether Murphy's statements were voluntary.  Murphy was represented by counsel at this hearing. (**Ex. 32**, Motions Hrg., p. 37-63).

38.     At the *Jackson v. Denno* hearing Det. Cook testified regarding Murphy's statement and the Notification of Rights Waiver were admitted without objection as State's Ex. 1. (**Ex. 32**, p. 39, ln 11-25; p. 45, ln 14).

39.     Det. Cook testified that he did not coerce Murphy in any way with any kind of punishment or promise; he did not threaten her in any way, either with physical force or mental intimidation; and he did not promise anything to get her to talk. Det. Cook also described the manner in which he read Murphy her *Miranda* rights and obtained the rights waiver. (**Ex. 32**, p. 39 - 43).

40.     Murphy admitted, under oath, that: Det. Cook never hit her; he never used any kind of physical force against her; she never told Det. Cook she needed to see a physician; and that she told him that she understood each and every one of her rights and waived them by signing and initialing the Waiver of Rights form. (**Ex. 32**, p. 61, ln 7 – p. 62, ln 12). She admitted under oath, at the hearing that she decided to voluntarily talk to Det. Cook. (**Ex. 32**, p. 62, ln 7-12).

41.     At her murder trial which began on November 16, 1995, Murphy's taped confession was played for the jury, copies of the transcript of the statement were given to the jurors, and the statement was admitted into evidence. (**Ex. 33**, Trial transcript, p. 692, ln 18 – p. 695, ln 10).

42.     William Lee died before Murphy's murder trial.  His Preliminary Hearing testimony was read to the jury at the trial. (Doc. No. 36, ¶67; **Ex. 35**, OCCA Opinion, p. 4).

43.     Jury Instruction No. 16 given by the trial court defined "voluntary confession" and instructed that "if you find that the confession was induced by coercion or by a promise of immunity or a lesser punishment than might otherwise be inflicted, or that the confession was made under threat of violence or force, you should disregard the confession in arriving at your verdict." (**Ex. 34**, Jury Instructions in CF-94-4410, Instruction 16).

44.     In November of 1995, Murphy was convicted of the first-degree murder of her infant son Travis Wood and sentenced to life without parole. [Doc. No. 36, ¶68].

45.     With separate appellate counsel, Murphy appealed her conviction to the Oklahoma Court of Criminal Appeals (hereafter "OCCA") alleging six propositions of error. Proposition I alleged that the trial court erred by refusing to suppress her statement to police. Murphy's other propositions had nothing to do with the City, Det. Cook or TPD. (**Ex. 35**, OCCA Op., p.7-12).

46.     The OCCA affirmed Murphy's conviction. The Court ruled Murphy's confession was voluntary and there was no evidence of coercion. The appellate court found Murphy:

> . . . admitted on cross-examination during the ***Jackson v. Denno*** hearing that Cook did not hit her or use physical force with her, that she never requested medical attention, that she was not under the influence of either drugs or alcohol at the time she gave the statement, that she initialed and understood each of the rights explained to her, and that she ***voluntarily*** spoke with Cook.

(**Ex. 35**, p. 6)(emphasis added).

### Causation and Waiver

47.     On September 5, 2013, Murphy filed a sixty-eight page Application for Post-Conviction Relief that blamed her trial and appellate counsel for their ineffectiveness and also blamed her "wrongful conviction" on DA Tim Harris' prosecutorial misconduct. Murphy, however, did **not** raise the issue of whether: her confession was coerced; the City violated her rights; or whether her "wrongful conviction" was caused by the City's conduct. [Murphy's Exhibit 21, Doc. No. 97].

48.     Sharisse O'Carroll, one of her attorneys, signed and attached a notarized "Petitioner's Acknowledgment" to Murphy's Application for Post-Conviction Relief, which states, in part…

> . . . I have read the foregoing application and assignment(s) of error to Ms. Murphy and **informed her there are no other grounds upon which she may wish to attack the judgment and sentence under which she is presently convicted. I further informed her that she cannot later raise or assert any reason or ground known to me at this time or which could have been discovered by her exercise of reasonable diligence.**
> . . .

Upon my oath, Ms. Murphy agreed to these conditions. I further verify that the facts in this application are true and correct to the best of my knowledge and belief.

[Doc. No. 97, Ex. 21 to the App. for Post-Conviction Relief, p. 58, 59].

49. On May 29, 2014, then District Attorney Tim Harris, filed a motion to confess the application for post-conviction relief based **solely** on 2014 DNA testing since, at Murphy's 1995 murder trial, he had erroneously "argued to the jury that the AB blood [found at the scene] was not the victim's" when, in fact, such "AB blood belonged to the victim, Travis Wood". (**Ex. 1**, State's Motion to Confess).

50. On May 30, 2014, Tulsa County District Judge William C. Kellough, vacated "the Petitioner's Judgment and Sentence entered by this Court on February (sic) 12, 1995,"[1] based solely on the reason that "[s]ubsequent DNA testing, not available at the time of trial …resulted in the finding that … [the] AB blood belonged to the victim, Travis Wood, which is contrary to the argument made at the time of trial" and that "had these material facts been known at the time of trial they could have materially affected the jury's deliberation and verdict." (**Ex. 36**). The Order does not reference Murphy's confession, the City, TPD or Det. Cook but was based on the Prosecutor's erroneous argument to the jury regarding the blood evidence. (**Ex. 36**, Order; **Ex. 1**, State's Motion To Confess).

51. After vacating Murphy's conviction, Judge Kellough retained jurisdiction to re-try Murphy, if necessary. (**Ex. 36**). He set an appearance bond and ordered her to reappear on June 24, 2014 at 9:00 a.m. for a status conference to "review the status of Petitioner's bond and set a date for hearing on the remaining unresolved issues in Petitioner's Application in order to determine the appropriate ultimate relief pursuant to the Oklahoma Post-Conviction Relief Act,

---

[1] Sentencing was held on December 11, 1995, and Judgment and Sentence was entered on December 12, 1995.

22 O.S. § 1737.5[2]." Rather than retry Murphy, the State of Oklahoma filed a Motion to Dismiss the case with prejudice. (**Ex. 53**).

52.     After confessing Murphy's Petition for Post-Conviction Relief, the State did not oppose Murphy's request for a finding of a *prima facie* showing of actual innocence for the purposes of initiating a claim under the Oklahoma Governmental Tort Claims Act.  51 O.S. 151, *et. seq.*  (**Ex. 37**, Journal Entry of Dismissal).

53.     The State, in response to Murphy's Notice of Tort claim, paid Murphy the Governmental Tort Claim limits of $175,000.00 to settle the claim. (**Ex. 38**, Depo. M. Murphy p. 16, ln 19 – p. 17, ln 4).

54.     On December 15, 2015, Murphy filed an 89 page, 408 paragraph First Amended Complaint [Doc. No. 36], against sole defendant City of Tulsa, alleging a claim, pursuant to 42 U.S.C. § 1983, that the City deprived Murphy of a fair trial.

### TPD Policies, Practices, Training and Supervision

55.     The City produced hundreds of Bates-stamped and numbered pages of TPD policies, procedures and training documents in discovery.  These documents include but are not limited to: Latent Print Procedures 31-112D; Major Crime Scene Processing-31-112E; General Instructions for the Collection and Preservation of Physical Evidence; General Instructions for the Collection and Preservation of Serology and Trace Evidence;  Procedure for Investigation of Non-Traffic Deaths, approved November 29, 1990; Procedure 31-121 B, Juvenile Arrest & Detention, effective September 1, 1993; Procedure 31-121 C, Juvenile Felony Reverse

---

[2] The statute number from Title 22, Oklahoma Statutes cited in the District Court's order contains a transposed number and the correct statute is 22 O.S. **§ 1373.5,** part of the "Postconviction DNA Act" – Powers of Court When Testing Results are Favorable to Petitioner – Orders When Results Unfavorable. Section 1373.5 (attached hereto as **Exhibit "2,"** contains the Court's authority in (Subsection (A)(6)) to issue an order granting Petitioner additional discovery related to the DNA test results including documents pertaining to the original criminal investigation or identities of other suspects, as well as, the Court's authority in Subsection (A)(2) to grant Petitioner a new trial.

Certification, effective September 1, 1994; Procedure 31-114 C, Juvenile Violators, approved March 16, 1993; Youthful Offenders; Tips for Taping Interviews; Interviews and Interrogations; Major Scene Management; Crimes Scene Processing & Forensics Technology update; and a TPD Investigative Handbook, January 1994. (**Ex. 39**, Summary of Documents Produced in Discovery[3]).

56.     The basic training for the TPD officers, detectives and supervisors involved in the Murphy murder investigation was approximately 14 weeks at the TPD police academy which included a legal block on Constitutional rights, statutes and ordinances, as well as instruction on *Miranda* Warnings, Interviewing, Interrogations and Juvenile Law. (**Ex. 40**, Affidavit of former homicide Det. Kenneth Mackinson, ¶3). After graduation from the Police Academy, the officers received an additional four weeks of field training. (**Ex. 40**, ¶4).

57.     From at least 1978 to 2003, in order to maintain CLEET (Council on Law Enforcement Education and Training) certification, all TPD Officers were required to attend 40 hours of in-service training yearly that included current legal procedures and, every officer also received monthly legal bulletins regarding new ordinances, statutes, and court decisions. (**Ex. 40**, ¶¶5-6; **Ex. 41**, Depo. Ron Palmer, p. 13, ln 18 – p. 14, ln. 14).

58.     By 1988, all officers assigned to the Detective Division were required to complete 40 hours of training in Interrogations, Arrest Warrants, Search Warrants and Affidavits. Officers assigned to the Homicide Unit also completed this additional 40 hours of training. (**Ex. 40**, ¶¶8,9)

---

[3] The City produced hundreds of pages of training documents and manuals.  In an effort not to overburden the Court the City has produced a summary of the documents produced in discovery which identifies these documents.  If the Court would like all of these documents to be provided to the Court, the City would be willing to do so.

59.     Sgt. Allen, day shift supervisor of the Homicide Unit in 1994, testified that he received basic training in interrogation and investigation shortly after becoming an officer and received in-service and external training as a police officer. (**Ex. 42**, Depo. Wayne Allen, p. 16, ln 14-25).

60.     Det. Cook testified that he had attended several seminars as part of his training to become a homicide detective.  (**Ex. 12,** p. 649, ln 8-12).

61.     In 1994, TPD provided more training than the generally accepted practice in other police agencies at the time.  (**Ex. 43**,  Affidavit and Report of John Ryan, p. 40, ¶116).

62.     In 1994, the TPD had policies and procedures and trained its officers regarding crime scene investigation, interrogations, interviewing, *Miranda* rights, juvenile law, and juvenile offenders.  (**Ex. 44**, Affidavit of Deputy Chief of Police Dennis Larsen, ¶10-13).

63.     In 1994, the TPD had specific policies and procedures regarding obtaining Notification of Rights Waivers from Juveniles. All TPD officers were trained on these policies and procedures. (**Ex. 44**, ¶10-13; **Ex. 45**, Juvenile Notification of Rights Waiver).

64.     The Chief of Police, the Major of the detective division, the Lieutenant or Captain and Sergeant Wayne Allen all had responsibilities regarding developing the training curriculum. (**Ex. 41**, p. 12, ln 24 – p. 13, ln 6).

65.     One of the stated responsibilities of TPD was to protect the constitutional rights of all persons.  (**Ex. 41**, p. 16, ln 14-16).

66.     In 1994, it was TPD Chief Ronald Palmer's responsibility to put in place policy that reflected the most current court decisions regarding legal matters. (**Ex. 41**, p. 21, ln 9-13).

67.     Under the City's policy to protect the constitutional rights of all people, an investigator has no authority to make promises to persons or suspects being interviewed.  TPD officers were trained on this policy.  (**Ex. 41**, p. 21, ln 9-13; p. 31, ln 9-14).

68.     TPD policy was to follow the Constitution but it is impossible to write a policy for every facet or intricacy of the Constitution. (**Ex. 41**, p. 17, ln 9-18).

69.     In 1994, TPD officers were prohibited from improper touching of suspects or witnesses because such acts are prohibited by state statute. (**Ex. 41**, p. 39, ln 13 -- p. 40, ln 8).

70.     In 1994, TPD had in place general guidelines in regards to the Oath of Office and being a steward of the Constitution of the U.S., the laws of Oklahoma and the laws of the city of Tulsa. Investigators were required to apply these guidelines to interrogations. (**Ex. 41**, p. 32, ln 19-24).

71.     All TPD officers must take the OATH OF OFFICE that states in part "…do solemnly swear, that I will defend, enforce, and obey, the Constitution and the Laws of the United States, the State of Oklahoma and the Ordinances of the City of Tulsa." [Doc. No. 106-6].

### The "Earlier" Case-LaRoye Hunter

72.     Det. Cook did not have a history of "coercing" confessions. (**Ex. 40**, ¶11).

73.     Murphy has no evidence, transcripts, or orders regarding any confessions obtained by Det. Cook that were suppressed because they were "coerced". (**Ex. 46**, Plaintiff's Resp. to Ints, No. 14, 20, 21; **Ex. 47**, Plaintiff's Resp. to RFA, No. 24; **Ex. 48**, Plaintiff's Resp. To RFPOD No. 4).

74.     Prior to his deposition on February 21, 2017, former Chief of Police Ron Palmer had never heard that Mike Cook had ever coerced a confession. (**Ex. 41**, p. 94, ln 10-12).

75.     Murphy's theory that Det. Cook "coerced" a confession from LaRoye Hunter in a 1989 Arson/Murder case is not based on any transcript or order. (**Ex. 49**, Depo. L. Radford, p. 6, ln 7-22; p. 21, ln 18 – p. 22, ln 7; p. 29, ln 22 – p. 30, ln 20).

76. The docket sheet regarding the Hunter case states on July 31, 1990, "Defendant's Motion to Suppress Confession is sustained". No reason is given for the Court's ruling. (**Ex. 50**, Docket Sheet).

77. Det. Cook does not recall the Hunter interview. (**Ex. 51**, depo. M. Cook, p. 43, ln 1-18)

78. Murphy deposed Loretta Radford who represented LaRoye Hunter, who was charged, in 1989, with first-degree murder and first-degree arson in the death of his father. (**Ex. 49**, p. 8, ln 3-6).

79. Radford said police testified at Hunter's preliminary hearing that he admitted to pouring gasoline on his father and igniting it after the two argued. (**Ex. 49**, p. 8, ln 9 – p. 9, ln 1).

80. Before the detectives interviewed Hunter, who was 17, they obtained a Notifications of Rights Form for use with Juveniles. The form was signed by Hunter's mother, who authorized her son to "answer questions or make a statement". (**Ex. 45**).

81. Radford confirmed that she had Hunter tested for learning capabilities and a "psychologist stated he was borderline in terms of mental retardation." Ms. Radford said that Judge Beasley, who ruled on the suppression motion, did not disparage Det. Cook and confirmed that the Judge had knowledge of Hunter's mental disability. She believed he was referring to this knowledge when he allegedly said, "I have problems with the testimony". (**Ex. 49**, p. 14, ln 20 – p. 15, ln 19).

82. Radford testified she had been in the Public Defender's office from late 1988 through 1999 and, other than the LaRoye Hunter case, she did not know of any other confessions obtained by TPD that were suppressed. (**Ex. 49**, p. 4, ln 1-6; p. 73, ln 19-22).

83.     Radford admits that neither she nor anyone from the Public Defender's office ever made

any type of complaint about Det. Cook's conduct to the TPD, the Police Chief or the City of

Tulsa. (**Ex. 49**, p. 51, ln 3-8; p. 52, ln. 1-13; p. 55, ln 11-15; p. 56).

## ARGUMENT AND AUTHORITIES

Under Fed. R Civ. P. 56, summary judgment should be rendered to the moving party  if

the pleadings, the discovery and disclosure materials, and any affidavits show that there is no

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.

I.      **MURPHY'S FIFTH AMENDMENT CLAIMS AND ALL CLAIMS REGARDING HER CONFESSION FAIL AS A MATTER OF LAW**

A.      **COLLATERAL ESTOPPEL BARS MURPHY FROM CLAIMING HER CONFESSION WAS COERCED**

Murphy alleges the City violated her Fifth Amendment right against self-incrimination

because she claims her confession was coerced. Murphy, however, is precluded from re-

litigating this claim because she took full advantage of all her opportunities to litigate the issue

both in the trial court and on direct appeal to the OCCA.  Murphy lost both times as both courts

found her confession was voluntary.   The doctrine of collateral estoppel/issue preclusion has

preclusive effect and bars Murphy from asserting any issue or claim that her confession was

involuntary.

Collateral estoppel, or issue preclusion, is available in actions under § 1983. *See Allen v.*

*McCurry,* 449 U.S. 90, 105, (1980). A litigant who was not a party in the first case can use

collateral estoppel "offensively" in a second suit against a Plaintiff who litigated and lost the

issue in the first case.  *Allen*, 449 U.S. at 95.  The key consideration is that the issue was raised

by the party sought to be precluded from raising it again, and that the party had a full and fair

opportunity to litigate the issue (even if he or she did not take advantage of it).

In determining the preclusive effect of a state court judgment, the full faith and credit statute, 28 U.S.C. § 1738, "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Marrese v. Am. Acad. of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985). This statute "embodies concerns of comity and federalism that allow the States to determine, subject to the requirements of the statute and the Due Process Clause, the preclusive effect of judgments in their own courts." *Id.*

Collateral estoppel "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen,* 449 U.S. at 94. Moreover, when the decision given preclusive effect is a state court decision, "collateral estoppel not only reduce[s] unnecessary litigation and foster[s] reliance on adjudication, but also promote[s] the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Id.* at 95–96.

In Murphy's murder case, at the trial court level, she claimed her confession was involuntary and coerced. The trial court ruled against her, finding her confession was voluntary. After her conviction, on her direct appeal to the OCCA, Murphy claimed she did not receive a fair trial because her confession was involuntary and coerced. The OCCA affirmed her conviction, ruled her confession was voluntary, and found no evidence of coercion. (Undisputed Material Fact Nos. 45-46).

The OCCA Opinion on the confession voluntariness and coercion issue remains a final determination and precludes Murphy from raising the issue in her civil rights case. See, *e.g.*, *Hubbert v. City of Moore*, 923 F.2d 769, 772-73 (10th Cir. 1991) (Prior finding of probable cause against a criminal defendant is binding on her subsequent civil rights claim against arresting officers because she had a "full and fair opportunity" to litigate that issue). The Oklahoma

17

Supreme Court has clearly stated the application of the collateral estoppel/issue preclusion rule: "For invocation of **issue** preclusion there need not be a prior adjudication on the merits (as is often the **case** with res judicata) **but only a final determination of a material issue common to both cases.**" *Oklahoma Dept. of Public Safety v. McCrady,* 2007 OK 39, ¶ 7, 176 P.3d 1194, 1199 (emphasis in original).

The doctrine of collateral estoppel or "claim preclusion," bars re-litigation of **issues** which were or could have been raised in a previous proceeding, finally **determined** on the merits, where there is an identity of parties in the former and latter actions, or the parties in the former and latter actions are in privity. *Veiser v. Armstrong,* 1984 OK 61, ¶ 8, n. 9, 688 P.2d 796, 800, n. 9. Notably, Murphy has admitted that the City is in privity with the State of Oklahoma in this case. In Murphy's Motion for Partial Summary Judgment [Doc. 97, at 12], Murphy presented her Proposition III, titled "The City is Collaterally Estopped By its Privity with The State of Oklahoma," in which she set forth legal arguments and authorities reflecting that privity. The City relies on Murphy's admission and, given space limitations, will not provide additional authority to support its claim of privity with the State.

> 1. **THE OCCA DECISION ON MURPHY'S CONFESSION IS A FINAL JUDGMENT AND IS NOT AFFECTED BY THE TRIAL COURT'S ORDER VACATING MURPHY'S CONVICTION**

The district court has no power, authority, or jurisdiction over the OCCA. After the State confessed Murphy's Application for Post-Conviction Relief, the district court vacated its *own* judgment and sentence, as well as the jury's conviction. An Oklahoma district court cannot overrule the OCCA in any case or on any issue. The district court had no authority or jurisdiction over, and took no judicial action, whatsoever with respect to, the OCCA's final determinations on Murphy's direct appeal of her conviction, which determined Murphy's confession was

voluntary and given free of coercion. The OCCA's Opinion and determination on issues raised by Murphy on direct appeal have never been vacated, modified or overturned, including the resulting *res judicata* and waiver consequences, as well as issues that could have been raised on Murphy's direct appeal but were not, and thus, are waived.

The state district court's vacation of Murphy's judgment and sentence based, not on her confession, but on an entirely different ground (Prosecutor's erroneous argument to the jury) has no effect on the OCCA determination that Murphy's confession was voluntary and not coerced. The district court's order vacating Murphy's murder conviction merely permitted the District Attorney to decide whether to re-try Murphy, or as occurred, decide to confess Murphy's post-conviction relief and file a motion to dismiss the case with prejudice.[4] The District Attorney's decision exposed him to a governmental tort claim for his erroneous argument to the jury at Murphy's trial. The State settled Murphy's tort claim for the tort claim limit of $175,000.00.

Had Murphy attempted to file suit in state court, she would have been barred from bringing a tort claim lawsuit asserting a coerced and involuntary confession claim against any government officer or official of the City of Tulsa. Oklahoma's post-conviction review statutes and the well-settled interpretation of those statutes by the OCCA give *res judicata* finality to rulings of that Court on direct appeal.

In *Logan v. State*, 2013 OK CR 2, ¶ 3, 293 P.3d 969, the OCCA again confirmed and clearly stated its well-settled interpretation of 22 O.S. § 1086 in the Oklahoma Post Conviction Relief Act, as follows:

---

[4] Because the District Attorney chose to confess her application for post-conviction relief and voluntarily dismiss the case with prejudice, admitting he made an erroneous argument to the jury, the District Attorney in essence waived the State's right to appeal the district court's post-conviction review decision to vacate Murphy's conviction to the OCCA based on his erroneous jury argument. See State's right to appeal to the OCCA from district court's "final judgment" adverse ruling on criminal defendant's post-conviction relief application, 22 O.S. § 1087 (Ex. 52, hereto).

Post-conviction review provides petitioners with very limited grounds upon which to base a collateral attack on their judgments. 22 O.S.2001, § 1086. Issues that were previously raised and ruled upon by this Court are procedurally barred from further review under the doctrine of *res judicata;* and issues that were not raised previously on direct appeal, but which could have been raised, are waived for further review. *See* 22 O.S.2001, § 1086; *King v. State,* 2001 OK CR 22, ¶ 4, 29 P.3d 1089, 1090; *Webb v. State,* 1992 OK CR 38, ¶ 6, 835 P.2d 115, 116, *overruled on other grounds, Neill v. State,* 1997 OK CR 41, ¶ 7 n. 2, 943 P.2d 145, 148 n. 2. Post-conviction review was neither designed nor intended to provide applicants another direct appeal. *Cf. Coddington v. State,* 2011 OK CR 21, ¶ 2, 259 P.3d 833, 835 ("The post-conviction process is not a second appeal.").

Based on the holding in *Logan* and the application of 22 O.S. § 1086 (**Ex. 52**), the OCCA's determination on Murphy's direct appeal that her confession was voluntary and not coerced is a final judgment and *res judicata* against her. Murphy was precluded from raising the confession issue again whether on a direct appeal, a writ, or post-conviction collateral attack. Murphy is collaterally estopped from raising the claim that her confession was coerced in this § 1983 case, pursuant to 28 U.S.C. § 1738; *Allen v. McCurry, supra,* and the other authorities cited herein.

This issue is analogous to the OCCA's holding in *Jackson v. State*, 2006 OK CR 45, 146 P. 3d 1149 (opinion attached as **Ex. 54** herewith). Jackson, *at his original trial* in 1998, had been convicted in Tulsa County of First-Degree Murder, First-Degree Arson and Injury to a Minor Child and sentenced to death. He appealed his 1998 convictions to the OCCA which vacated his convictions, affirming in part, and reversing and remanding in part, for a new trial ("*Jackson I*" [5]). Despite Jackson's arguments on appeal, the OCCA held that certain statements he made to police were voluntary and admissible. [6]

---

[5] See *Jackson v State*, 2001 OK CR 37, 41 P.3d 395 (*Jackson I*).

[6] The Court also ruled that other statements he made responding to police interrogation before he was given *Miranda* warnings were inadmissible. *Id.*

Upon remand to the district court, Jackson stood trial again in 2003. The statements Jackson made to police held to be voluntary by the OCCA during the previous appeal were again admitted into evidence by the trial court at his second trial.[7] Jackson was again convicted of First-Degree Murder and sentenced to death. He again exercised his right to direct appeal of his conviction and the OCCA affirmed the 2003 conviction and sentence.

In the second appeal (*Jackson II*) Jackson argued that the OCCA "should forego traditional rules of procedural bar and allow him to raise any claims, even if previously asserted [in his *Jackson I appeal*] …"[8] The Court in *Jackson II* held that the OCCA's opinion vacating his conviction and remanding the case for a new trial in *Jackson I* was "a valid and final judgment" and the collateral estoppel doctrine applied. In so finding, the OCCA, 2006 OK CR 45, at ¶ 16, 146 P. 3d, at 1157 [**Ex. 54**], stated:

> On the contrary, this Court made specific findings that were applicable to the admissibility of the statements that were not related to or dependent upon the specific crimes alleged, *i.e.,* statements in the car were volunteered and not the product of custodial interrogation and Jackson's post-*Miranda* statements were not tainted by his pre-*Miranda* statement. *Jackson,* 2001 OK CR 37, ¶ 9 n. 3, 41 P.3d at 397 n. 3. These findings are controlling. The doctrine of collateral estoppel precludes the relitigation of an ultimate issue by a party or his privies when the issue has been determined by a valid and final judgment. *Smith v. State,* 2002 OK CR 2, ¶ 7, 46 P.3d 136, 137.

The OCCA in *Jackson II* also cited additional Oklahoma case law supporting the collateral estoppel procedural bar to raising the issues previously decided in *Jackson I:*

> As this Court has previously decided [in *Jackson I*] that Jackson's voluntary statements in the car and his statements following *Miranda* warnings were admissible, the current claim is procedurally barred. *See, e.g., Brown v. State,* 1998 OK CR 77, ¶ 10, 989 P.2d 913, 921 (issue decided in extraordinary writ appeal before trial would not be reviewed on direct appeal based on collateral estoppel); *Wilson v. State,* 1998 OK CR 73, ¶ 11, 983 P.2d 448, 456 (same);

---

[7] Jackson's un-Mirandized statement that the OCCA in *Jackson I* held was improperly admitted in his first trial was <u>not</u> admitted into evidence at his second trial in 2003.

[8] *Jackson II*, 2006 OK CR 45, at ¶ 15 (attached as **Ex. 54** herewith).

> *Alverson v. State,* 1999 OK CR 21, ¶ 6, 983 P.2d 498, 506 (same); *Humphreys v. State,* 1997 OK CR 59, ¶ 15, 947 P.2d 565, 572 (challenges to evidence ruled admissible on direct appeal by this Court will not be reconsidered on retrial and any subsequent appeal based on *res judicata*).

*Id.*, 2006 OK CR 45, at ¶ 16, 146 P.3d, at 1157.

In the case presently before this Court, the District Attorney filed the State of Oklahoma's Motion to Confess Petitioner's Application for Post-Conviction Relief, (**Ex. 1**), hereto, on May 29, 2014, asking the district court "to set aside Murphy's judgment and sentence for the offense of Murder in the First Degree." Pursuant to the State's motion, the district court, based solely on the District Attorney's erroneous argument to the jury, granted the motion and "vacate[d] the Petitioner's Judgment and Sentence…" (**Ex. 36**).

In the 3½ months after the vacation of Murphy's judgment, the district court conducted several hearings and permitted additional discovery proceedings by the parties all while Murphy was on a $10,000 appearance bond. Then, after those hearings and discovery, on September 12, 2014, the District Attorney decided not to retry Murphy for the murder of her infant son. Instead, he filed a Motion to Dismiss with prejudice because he "believe[d] that [the State of Oklahoma] could not meet its burden of proof at a jury trial of "beyond a reasonable doubt" (**Ex. 53**). The district court entered a Journal Entry of Dismissal granting the District Attorney's motion to dismiss that same day (**Ex. 37).**

If the District Attorney had elected to retry Murphy, pursuant to the OCCA's holding in *Jackson II*, there would have been no further hearings or rulings on any Murphy allegation of involuntary or coerced confession, as procedurally, the OCCA' Opinion and determination of that issue is a final judgment on the issue of the admissibility of Murphy's confession. The district court would have been required to admit Murphy's confession into evidence in any re-

trial. The State's decision not to re-try Murphy cannot waive the City's collateral estoppel defense.

It is well-settled that federal courts will give the same preclusive effect to state court findings as will the state court. *University of Tennessee v. Elliot*, 478 U.S. 788, 794 (1986)[9] . The OCCA's final determination that the admission of Murphy's confession into evidence at her jury trial did not deny her right to a fair trial, nor did it invalidate her conviction. It is a final judgment. It must be given preclusive effect, and Murphy is collaterally estopped from basing a 42 U.S.C. §1983 claim of denial of her right to a fair trial on a claim that her confession was coerced.

> **2.    MURPHY WAS PRECLUDED BY RES JUDICATA FROM CLAIMING HER CONFESSION WAS COERCED; COLLATERAL ESTOPPEL BARS HER CLAIM HERE**

After Murphy's conviction was vacated, Murphy never asserted any claim of an involuntary and/or coerced confession in her post-conviction collateral attack on her conviction. The doctrine of *res judicata*, the statutory provisions of the Oklahoma Post-Conviction Relief Act, 22 O.S. § 1086, the controlling case precedent, *Logan v. State*, 2013 OK CR 2, 293 P.3d 969, *supra*, and the additional authorities cited therein by the OCCA barred any such claim.

This Court, in denying Murphy's motion for partial summary judgment [Doc. No. 151, at pp. 6-7], cited the Tenth Circuit authority in *Hubbert v. City of Moore, cited supra herein,* 923 F.2d at 773, and *Cook v. Aagard,* 547 Fed.Appx. 857, 858-60 (10th Cir. 2013) (state court ruling finding probable cause for detention, search and arrest, and that defendant's constitutional rights

---

[9] A state court has concurrent jurisdiction over federal 42 U.S.C. § 1983 claims. *Howlett v. Rose*, 496 U.S. 356 (1990). Although the City is unable to find any case law support, it seems of particular logical significance that a plaintiff is able to bring an action under the federal § 1983 statute in state courts, wherein state courts would utilize their state's procedural rules as to collateral estoppel and issue preclusion. It logically follows that a §1983 plaintiff cannot defeat the use of state collateral estoppel principles and procedures by choosing to file his or her claim in a federal court forum instead of state court.

were not violated by catheterization, was a final adjudication on the merits for purposes of issue preclusion) (unpublished) (applying Utah law), dealing with "an analogous issue, holding that, under Oklahoma law, where probable cause was fully and fairly litigated in a prior criminal proceeding, it could not be re-litigated in a civil action, despite the defendant's acquittal."

Murphy's attempt to assert this claim as a civil rights violation is collaterally estopped, pursuant to *Allen v. McCurry, supra.* Oklahoma law, and both United States Supreme Court and Tenth Circuit precedent applying the doctrine of collateral estoppel/issue preclusion conclusively preclude Murphy from making her Fifth Amendment claim in this § 1983 civil rights lawsuit.

### 3.     THE SIXTH CIRCUIT'S *HATCHETT V. CITY OF DETROIT* OPINION

In denying Murphy's motion for partial summary judgment [Doc. No. 151, at pp. 7-8], the Court addressed the City's citation of *Hatchett v. City of Detroit,* 495 Fed.Appx. 567 (6th Cir. 2012) (unpublished), affirming the district court's holding, denying on *collateral estoppel* grounds, plaintiff's § 1983 claim that his confession had been coerced. The reason Hatchett's conviction was overturned was based on DNA evidence[10]. The Sixth Circuit stated: "the reason this was done [conviction overturned] had nothing to do with the voluntariness of his confession being questioned" quoting from *Hatchett v. City of Detroit,* 2010 WL 1754426, at *9 (E.D. Mich. April 30, 2010) (unpublished).

In referencing *Hatchett* in its denial of Murphy's motion, this Court specifically determined not to decide "whether issue preclusion applies to voluntariness determinations by judges in states like Michigan which follow the 'Orthodox' or 'Wigmore' rule, but not in states like Oklahoma which follow the 'Massachusetts' or 'Humane' rule" (citations omitted).

---

[10] As this Court noted in its Opinion and Order denying Hatchett's Motion for Partial Summary Judgment: "Hatchett stated on appeal that his conviction had been set aside. 495 F.App'x at 570." [Doc. 151 at 7, n. 2].

After analyzing this Court's citation to authorities regarding the voluntariness determination "rule" Oklahoma follows, it is of greater significance that the procedure utilized in Murphy's case by the trial court is essentially the same utilized by the Michigan trial court in *Hatchett*. In Murphy's case, on November 9, 1995, the trial court, in a separate proceeding prior to trial, held a *Jackson-Denno* hearing to determine whether Murphy's confession was voluntary. (**Ex. 35**, p. 4-6). Both Detective Cook and Murphy testified under oath[11] and were cross-examined by the respective parties' counsel. The trial court, after hearing the evidence presented, ruled that Murphy's confession was <u>not</u> coerced and was a voluntary confession admissible at trial. (Undisp. Fact No. 46).

At her trial, the prosecution offered Murphy's confession into evidence and the trial court admitted it into evidence. Murphy, in her defense at trial, again testified about the circumstances under which she made her confession in an effort to convince the jury that her confession was involuntary and coerced by Det. Cook.

The trial court instructed the jury on the law as to confession evidence. (**Ex. 34**). Such instruction, in addition to instructing on what is a free and voluntary confession, as opposed to a coerced or under "duress" confession, provided the jury the opportunity to determine the voluntariness of the confession, and if the jury determined it to be voluntarily given, that the jury "may take it into consideration with all the other facts in evidence and give it whatever weight and credit you find it deserves." (**Ex. 34**). Likewise, the jury was instructed that "if you find that the confession was induced by coercion or by a promise of immunity or a lesser punishment that

---

[11] Notably, unlike Murphy, Hatchett did <u>not</u> testify at his "Walker" hearing provided by the trial court prior to his criminal jury trial to determine the voluntariness and admissibility issues regarding his confession (*Hatchett*, 495 Fed.Appx., at 570). Michigan's Supreme Court held in *People v. Walker*, 132 N.W.2d 87 (1965), that a "Walker hearing" in the Michigan trial courts comports with the holdings of the U.S. Supreme Court's *Jackson v. Denno*, 378 U.S. 368 (1964) decision.

might otherwise be inflicted, or that the confession was made under threat of violence or force, you should disregard the confession in arriving at your verdict."

In addition to the physical evidence presented at trial, the OCCA Opinion discussed in detail (**Ex. 35**, p. 3-4) the testimony of William Lee who testified at Murphy's "preliminary hearing, but died before the case came to trial. A tape recording of his testimony was played at Appellant's trial" (**Ex. 35**, p. 4). The appellate Opinion also discusses in detail, evidence introduced by Murphy at her trial. (**Ex. 35**, p. 13-14).

In Murphy's prosecution, as in the *Hatchett* case, the jury was not requested to provide the court any type of interrogatory answer as to their determination of voluntariness of a confession admitted into evidence, nor whether they considered the confession in arriving at their verdict, nor any information as to what weight may have been given to such confession, if they determined it was voluntary and did consider it in arriving at their verdict. Thus, the procedure utilized by the trial court in Murphy's case was identical to that utilized by the Michigan trial court in *Hatchett*. Moreover, mirroring Oklahoma law, the Sixth Circuit in *Hatchett,* 495 Fed.Appx., at 571, pointed out "under Michigan law, a determination of voluntariness is separate from a determination of guilt" (citation omitted).

After analyzing the Supreme Court cases and all cases, authorities and examples cited therein, it is not clear whether Oklahoma actually utilizes the "Massachusetts"/"Humane" Rule regarding admission of confessions and jury considerations thereof or some hybrid of this, and one or more of the other "rules." It is clear, however, that the procedure used in the *Hatchett* case is the same procedure used in the Murphy case, and collateral estoppel bars Murphy's claims that her confession was involuntary and coerced.

### B. MURPHY WAIVED HER RIGHT TO BRING ANY CLAIM THAT HER CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN SHE WAS QUESTIONED WHILE SHE WAS A MINOR.

Murphy waived any claim that her Constitutional rights were violated when she was questioned by TPD police officers, including Det. Cook, while she was a minor, in violation of a state statute. [Doc. No. 36, ¶41]. Murphy's claim is barred, pursuant to 22 O.S. § 1086 and its interpretation by the OCCA in *Logan v. State*, *supra*, 2013 OK CR 2, at ¶ 3, 293 P.3d, at 969, holding that:

> [i]ssues that were previously raised and ruled upon by this Court are procedurally barred from further review under the doctrine of *res judicata;* and issues that were not raised previously on direct appeal, but which could have been raised, are waived for further review.

Murphy failed to raise the issue on her direct appeal, thus, she waived any such claim.

Murphy's date of birth is October 30, 1976. On September 12,994 (the day she confessed to killing her infant son) she was just 48 days short of turning 18 years old. Murphy was 19 years of age (an adult under Oklahoma law) at the time of her murder trial in November of 1995. At the time of Murphy's trial, the Oklahoma Juvenile Code, 10 O.S. 1991 § 1109 (a) provided, in pertinent part:

> No information gained by questioning a child ***shall be admissible into evidence against the child*** unless the questioning . . . is done in the presence of said child's parents, guardian, attorney, or the legal custodian of the child, and not until the child and his parents, or guardian, or other legal custodian shall be fully advised of their constitutional and legal rights, . . ."      (emphasis added)

There are two reasons that any alleged Juvenile Code violation did not render Murphy's confession inadmissible. First, as the Oklahoma Supreme Court held in 1985, in the *Matter of W.D.*, 1985 OK 65 at ¶ 10, 709 P.2d 1037, 1040-41:

> We think it clear that §1109(a) governs the admissibility of information sought to be admitted against a child relating to an offense alleged to have been committed by the child, for it is only in connection with adjudication of juvenile delinquency charges or juvenile criminal certification proceedings that evidence may properly be admitted ***against a child.*** [1] (Emphasis by the Oklahoma Supreme Court).

And in the Supreme Court's Footnote 1 to the above quote from the *Matter of W.D.*, stated:

> Accordingly, Oklahoma cases construing this statute have been applied **only in delinquency or certification proceedings**. *See, e.g., Robinson v. Boley State School for Boys,* 554 P.2d 44 (Okl.Cr.1976); *J.T.P. v. State,* 544 P.2d 1270 (Okl.Cr.1975); *In the Matter of G.L.W.,* 580 P.2d 998 (Okl.Cr.1978).

*Id.,* at 1041 (emphasis added).

Murphy's First Degree Murder trial was not a juvenile proceeding, and at age 19, she was not a "Child" at the time of her trial (**Ex. 55,** 10 O.S. 7001-1.3A (4)). Any such denial of the admissibility of Murphy's confession by the trial court on the ground that there was a violation of 10 O.S. 1991 § 1109 (a) would have been improper and error. The trial judge properly admitted Murphy's confession.

Second, Murphy's confession was admissible at her trial because a violation of that section of the Oklahoma Juvenile Code was **not** a violation of the United States Constitution. In *Bias v. State*, 1997 OK CR 56, <u>Order Denying Petition for Rehearing</u>, at ¶ 4, 561 P.2d 523, 538, addressing defendant's argument that "all evidence radiating from the illegal statement" taken in violation of 10 O.S. § 1109 (a) must be excluded as fruits of the poisonous tree, the OCCA found that the subject prohibition was merely a <u>statutory right</u> and **not** a <u>constitutional right</u>. The Court held, as follows:

> The defendant argues the exclusionary rule delineated in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), should exclude all evidence radiating from the illegal statement as fruits of the poisonous tree. But Wong Sun deals with a constitutional issue while the case at bar is concerned with a statutory right.

Detective Cook did not violate Murphy's constitutional rights when she confessed. Thus, Murphy's claim, pursuant to Section 1983, fails and the City is entitled to judgment as a matter of law.

## II. MURPHY HAS NO MALICIOUS PROSECUTION CLAIM

Murphy's First Amended Complaint does not assert a separate § 1983 malicious prosecution "action." Murphy, in her 89 page First Amended Complaint, references allegations of malicious prosecution against the City. [Doc. 36 at ¶167[12] and ¶ 382[13]]. In *Hubbert v City of Moore*, 923 F. 2d 769, 773 (10th Cir. 1991), the Tenth Circuit held that under Oklahoma law, a finding of "probable cause" to believe that a defendant committed the offense charged made after a preliminary hearing barred plaintiffs (even one who was later acquitted) from re-litigating the issue in a subsequent civil rights lawsuit. Any § 1983 malicious prosecution claim is clearly barred by Murphy's preliminary hearing finding of probable cause and cannot be re-litigated in this action by re-trying the entire criminal case. Further, although she had the right to appeal, Murphy has **never** challenged the finding of probable cause in any court proceeding. Accordingly, any claims for malicious prosecution fail.

## III. MURPHY CANNOT PREVAIL ON HER 42 USC § 1983 CLAIM THAT THE CITY VIOLATED HER FOURTEENTH AMENDMENT RIGHT TO A FAIR TRIAL.

To establish municipal liability under § 1983, a plaintiff must show: (1) the existence of a municipal policy or custom, (2) a direct causal link between the policy or custom and the constitutional injury alleged, and (3) the municipal action taken occurred "with 'deliberate indifference' to its known or obvious consequences." *Kramer v. Wasatch Cnty. Sheriff's Office*,

---

[12] In ¶ 164, alleges that such alleged failure to investigate the "'key' witness vitiated probable cause." Again ten witnesses testified at the preliminary hearing in which the Special Judge found probable cause and bound Murphy over for trial.

[13] Alleging that Detective Cook's "maliciously prosecuting" Murphy was the result of the Final Policy Maker ratifying such alleged malicious prosecution, and the City being deliberately indifferent to the need to have adequate policies, supervision, training and customs and practices "in order to prevent the citizens of Tulsa," including Murphy "from being deprived of their right to a Fair Trial under the Due Process Clause of the Fourteenth Amendment."

743 F.3d 726, 759 (10th Cir.2014); *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 690-91 (1978). Murphy can prove **none** of the elements required to establish liability under 42 USC § 1983.

Murphy alleges just four[14] Fourteenth Amendment claims against the City: 1) failure to have adequate policies; 2) failure to supervise; 3) failure to train; and 4) allowing the custom and practice of coerced interrogations in violation of Constitutional principles governing interrogations. [Doc. No. 36, ¶401]. All of her claims fail.

## A. NEITHER DETECTIVE COOK NOR ANY TPD OFFICER VIOLATED MURPHY'S CONSTITUTIONAL RIGHTS

A municipality cannot be held liable for an unconstitutional policy, custom or practice "if the jury finds that the municipal employee committed no constitutional violation." *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1316 (10th Cir.1998) Murphy cannot prove a constitutional violation.

The Eighth Circuit in *Wilson v. Lawrence County, Mo.,* 260 F.3d 946 (8th Cir.2001), stated that a § 1983 claim of reckless investigation is a substantive due process cause of action. *Id.* at 956 n. 8, *citing Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "The test for whether state officers' actions violate this protected liberty interest is whether those actions shock the conscience." *Amrine v. Brook,* 522 F.3d 823 (8th Cir. 2008) *(citations omitted).*

Further, "[m]ere negligent failure to investigate does not violate substantive due process." *Amrine,* 522 F.3d at 833. "Likewise, allegations of gross negligence do not give rise to a constitutional violation." *Id.* The Constitution does not require an officer to perform an error-free investigation, nor does it require officers to independently investigate every claim of innocence. *Baker v. McCollan*, 443 U.S. 137, 145–46, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)("Due

---

[14] Murphy attempts in her First Amended Complaint to state seven claims, however, three of the claims are redundant because they reference policies, supervision and training with and without "consideration of the earlier case".

process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.")

Murphy cannot prove that the City violated her constitutional rights as a result of TPD's murder investigation because she cannot prove that Det. Cook's and the other TPD officers' actions were *intentional or reckless such that they shock the conscience*. As set forth in Undisputed Facts Numbers 1 through 28 the officers and detectives who investigated the murder of Travis Wood conducted a thorough, constitutionally sound investigation.

Officers read Murphy her *Miranda* rights at two different points and obtained a Search Waiver. TPD officers conducted a thorough investigation of the crime scene. Nine TPD officers and four detectives investigated the murder. These officers canvassed the apartment complex looking for witnesses; obtained written and recorded statements from witnesses including Murphy's neighbors and interviewed at least 10 other witnesses. The officers obtained copies of the 911 calls and of the tape-recorded jail conversations between Murphy and one of her boyfriends, Earl Peck. The officers also obtained evidence, information and reports from the Medical Examiner's office. The TPD officers, detectives and supervisors generated 232 pages of TRACIS documents. (**Ex. 23**).

The officers and detectives conducted the investigation within the generally accepted policies, practices, training and legal mandates, as they existed in 1994. (**Ex. 43**, p. 44, ¶ 120). Murphy cannot prove any of the allegations in her First Amended Complaint. The law does not require the TPD to have conducted a perfect investigation. Murphy has not and cannot prove that Det. Cook or the other TPD officers' actions were *intentional or reckless such that they shock the conscience*, thus the City is entitled to judgment as a matter of law.

**B. MURPHY CANNOT PROVE THE CITY HAD A MUNICIPAL POLICY OR CUSTOM THAT WAS THE MOTIVATING FORCE BEHIND ANY ALLEGED CONSTITUTIONAL DEPRIVATION.**

The second element of a 42 USC § 1983 claim requires that the constitutional deprivation occurred pursuant to official policy or custom. *Monell supra*, at 694. A municipal policy or custom may take the form of:

> (1) "a formal regulation or policy statement"; (2) an informal custom "amount[ing] to 'a widespread practice, that although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions - and the basis for them - of subordinates to whom authority was delegated subject to these policymakers' review and approval"; (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Oklahoma City,* 627 F.3d 784, 788 (2010) (citations omitted). Further, the alleged policy or custom ***must be the "moving force"*** behind the alleged constitutional deprivation. *Monell*, 436 U.S. at 691; *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985) (emphasis added).

**1. THE CITY HAD APPROPRIATE WRITTEN POLICIES AND PROCEDURES**

Murphy cannot prove the second element of a 1983 claim because she cannot prove that the alleged constitutional violation occurred pursuant to an official policy or custom. The City had adequate policies in effect in 1994 regarding investigations and interrogations.

Although Murphy desperately clings to the mistaken belief that the City, in 1994, had no written policies concerning investigations and interrogations, the City located some of the remaining policies and training documents still in existence from that era. As set forth in Undisputed Facts 55 through 71, the City had sufficient policies and procedures in 1994, and hundreds of pages were produced in discovery. (**Ex. 39**).

These documents include policies and procedures on Crime Scene Processing; Evidence Collection; Investigation of Non-Traffic Deaths; Juvenile Offenders; Interviews and Interrogations; Taping Interviews as well as a TPD Investigative Handbook from January 1994. Undisputed Facts 55 through 71 defeat all the unsupported claims in Murphy's First Amended Complaint. As such, Murphy cannot prove her alleged constitutional violation was pursuant to any written policies, procedures or customs.

2. **MURPHY CANNOT PROVE HER ALLEGED CONSTITUTIONAL VIOLATION WAS THE RESULT OF ANY UNWRITTEN WIDESPREAD CUSTOM OR PRACTICE**

*Bryson v. City of Oka. City, supra,* a Tenth Circuit case, involved similar issues of municipal liability. In 1983, Bryson was convicted of a rape and kidnapping he did not commit. He was convicted, in part, based on the testimony of an Oklahoma City Police Department forensic chemist, Joyce Gilchrist, who, incorrectly, testified the hair and semen found at the scene were consistent with samples from Bryson. *Id.* at 787. Bryson served 17 years in prison before his conviction was vacated based on exculpatory DNA test results. He subsequently sued the City of Oklahoma City and Gilchrist, alleging a § 1983 claim. *Id.* The trial court granted the city's motion for summary judgment, finding no municipal liability. *Id.*

Bryson alleged the City had a custom and practice of encouraging forensic chemists to manipulate evidence in order to obtain convictions. Bryson's evidence included: testimony of a former Oklahoma City police chief that "forensic chemists, like everybody who is on the prosecution team, [will] testif[y] in a way that is the most incriminating" and a statement of another forensic chemist who criticized Gilchrist's testimony and said that her behavior "persists and is condoned by much of the criminal justice system in Oklahoma County." *Id at 790.*

The Tenth Circuit affirmed and found that the statements were not "sufficient to give rise to an inference of a widespread City practice of fabricating results and concealing evidence that

was 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Id* at 791 (quoting *Praprotinick,* 485 U.S. at 127). The Tenth Circuit specifically found that the other chemist's statements were limited to Gilchrist. "Although he asserted that the prosecutor and others condoned Ms. Gilchrist's misleading testimony, he did not suggest that any City chemists or employees besides Ms. Gilchrist were giving similarly inaccurate testimony."

Further, the United States Supreme Court addressed this issue in *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, (1985) and held:

> [p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident included proof it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker. Otherwise, the existence of the unconstitutional policy, and its origin, must be separately proved. But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish the requisite fault on the part of the municipality and the causal connection between the "policy" and the constitutional deprivation.

*Id at. 824.*

Murphy fails on all levels. She cannot prove a "widespread practice" regarding interrogations, interrogations of minors or investigations that was "so permanent and well settled as to constitute a custom or usage". Murphy offers no evidence of any "widespread practice" that constitutes a custom or practice of furthering constitutional violations by TPD. In fact, Murphy offers only the "Earlier Case" of LaRoye Hunter in support of her allegations. Murphy's "evidence" falls far short of the facts asserted in *Bryson.* Significantly, "evidence of one instance" in which municipal employees violated a citizen's rights is not enough to raise a jury question as to whether the conduct "constitute[s] a practice so manifest as to imply the constructive acquiescence of senior policy-making officials." *Green v. City of New York*, 465 F.3d 65, 81 (2nd Cir. 2006) (internal citation omitted).

As set forth in Undisputed Facts numbers 72 through 83, of the hundreds of homicide cases Det. Cook investigated before Murphy confessed, a trial court has suppressed only *one* confession, that of LaRoye Hunter. No evidence exists that Det. Cook coerced Hunter's confession. In fact, no evidence exists that, in 1994 or before, Det. Cook or any other detective or TPD officer violated anyone's constitutional rights in obtaining confessions or investigating homicide cases.

## C. MURPHY CANNOT PROVE THAT ANY FINAL POLICY MAKER MADE ANY DECISION OR RATIFIED ANY UNCONSTITUTIONAL CONDUCT

Prior to his deposition, taken February 21, 2017, former Chief of Police Ron Palmer, who was Chief of TPD in 1994, had never heard that Mike Cook had ever coerced a confession. (Undisp. Fact # 74). Murphy has failed to prove that the Mayor, the Police Chief or anyone with final decision-making authority made any decision or ratified any conduct that led to any unproven constitutional violation.

## D. THE CITY DID NOT FAIL TO TRAIN OR SUPERVISE

The Tenth Circuit treats allegations of failure to supervise the same as failure to train claims. *Schepp v. Fremont County, Wyo.*, 900 F.2d 1448, 1454 (10th Cir.1990). Murphy cannot prove any of her allegations that the City failed to train or supervise Det. Cook or any other TPD officer.

In 1994, TPD training standards were above and beyond that of most comparable police departments. (**Ex. 43**, ¶116). Undisputed Facts 55 through 71 and the referenced documents clearly support that at the time of the Plaintiff's allegations, TPD officers, including Det. Cook and the officers involved in this investigation received adequate and sufficient training. Murphy also cannot prove that the City failed to supervise Det. Cook or any other TPD officer involved in the Travis Wood murder investigation. Sgt. Allen was onsite at the crime scene, supervising

the detectives and officers. He had responsibilities for assigning work the various officers, was involved in various aspects of this investigation, and personally witnessed key aspects such as Murphy being read her *Miranda* rights. See Undisp. Fact # 7, 9, 24, 25. Murphy cannot prove that the City failed to train or supervise and or that the City acted with "deliberate indifference".

To withstand summary judgment, Murphy must prove deliberate indifference to the federal rights of persons with whom the TPD officers come into contact, and that there is a direct causal link between the constitutional deprivation and the inadequate training and/or supervision. See *Canton v. Harris*, 489 U.S. 378 (1989). "[M]unicipal liability based on a policy of inadequate training requires proof of the municipality's 'deliberate indifference' to its inhabitants—i.e., the failure to train must 'reflect [ ] a 'deliberate' or 'conscious' choice by a municipality.'" *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir.1998) (quoting *Canton*, at 389).

The deliberate indifference standard may be met when a municipality receives actual or constructive notice that its action or inaction is significantly "certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. Murphy has no evidence that the City had notice that its conduct was significantly certain to result in a constitutional violation and chose to ignore the risk of harm.

"A supervisor is not liable under § 1983 unless an affirmative link exists between the [constitutional] deprivation and ... the supervisor's '... failure to supervise'", *Meade v. Grubbs,* 841 F.2d 1512 at 1527 (10th Cir. 1988). ("[A]dequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.") *See Canton*, 489 U.S. at 391. A plaintiff may typically establish notice by showing a pattern of tortious conduct by the municipality. *Id.* "In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of

unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Id*. at 1307-08 (citing *Board of Cnty. Com'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997). Under this standard, Murphy cannot survive the City's motion for summary judgment.

E.   **THE CITY DID NOT CAUSE MURPHY'S ALLEGED INJURIES**

Murphy cannot establish a causal link between alleged damages and any City custom or policy. Even if she could, however, there is an intervening, superseding cause.

1.   **DISTRICT ATTORNEY HARRIS' CONDUCT CAUSED MURPHY'S ALLEGED DAMAGES**

Actions brought under § 1983 are reviewed like common law tort claims and require a proximate cause analysis. *See Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). The causal chain traced by a proximate cause analysis can be broken by an intervening or superseding cause, which Prosser and Keeton describe as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) of Torts § 440 (1965). It simply means that the negligent conduct of someone else, and not that of the defendant, is legally the proximate cause of the event.

The allegations in the Plaintiff's Amended Complaint clearly reflect that she wishes to retry her entire state criminal trial which was conducted almost 22 years ago. The Supreme Court has made clear that "not every injury in which a state official has played some part is actionable under [Section 1983]." *Martinez v. California*, 444 U.S. 277, 285 (1980).

Even if a § 1983 defendant's "'initial act is the "but for" cause of some ultimate harm (i.e., the harm would not have happened but for the initial act), [he] is not legally liable for the harm if an intervening act is a "superseding cause" that breaks the legal chain of proximate cause.'" *Hizagy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007) (quoting *Zahrey v. Coffey*, 221 F.3d 342, 351 n.7 (2d Cir. 2000) (citing Restatement (Second) of Torts § 440 (1965)).  Murphy alleges she has "suffered personal injuries as well as pain and suffering, all from being wrongfully imprisoned for 20 years, and being wrongfully imprisoned on a sentence of life without parole." [Doc. No. 36, ¶ 398]

On May 30, 2014, the Tulsa County District Court conclusively found the sole cause for ordering the vacation of Murphy's conviction was the erroneous argument of then-Assistant District Attorney Tim Harris to the jury regarding certain blood evidence found at the murder scene.  The District Court vacated Murphy's judgment and sentence, specifically because the "AB blood belonged to the victim, Travis Wood, contrary to the argument made at the time of trial"  and that "had these material facts  been known at the time of trial, could have materially affected the jury's deliberation and verdict."  This conclusive final order determined the proximate cause of Murphy's unfair trial in 1995, thus any harm suffered by Murphy as a result of that trial conviction was conclusively caused by the actions of the State and **not** the City.

Additionally, Harris' erroneous argument to the Jury in November 1995 is a legally superseding or intervening cause that broke the causal connection between any alleged Fifth Amendment violation in November, 1994, or any of the other alleged proximate causes of Murphy's asserted injuries arising from her conviction, judgment and sentence.  Murphy cannot claim otherwise.

## 2. THE TRIAL COURT'S ADMISSION OF MURPHY'S CONFESSION WAS A SUPERVENING CAUSE.

Even if Harris had not made his erroneous argument, an additional supervening cause obviating Murphy's allegations of an underlying constitutional violation regarding Detective Cook's interrogation of Murphy exists. Murphy alleges her confession was coerced as her primary underlying constitutional violation. In essence, Murphy is complaining that her unfair trial was **caused by** the introduction of her allegedly coerced and involuntary confession. If, in fact, her confession was coerced and involuntary, then the trial court admitting it at trial, committed an erroneous and improper act, **which is not the act of Det. Cook** or the City.

The erroneous rulings of judges denying suppression of evidence and admitting it into trials have been held by federal appellate courts to be supervening[15], intervening causes for which § 1983 defendants cannot be held liable for Fourteenth Amendment Due Process denial of fair trial claims. *Duncan v. Nelson*, 466 F.2d 939, 942-945 (7th Cir.), *cert. denied*, 409 U.S. 894 (1972); (court admitted confession, later ruled involuntary by appellate court – held a superseding cause); *Townes v. City of New York*, 176 F.3d 138, 146-147 (2d Cir.), *cert. denied*, 528 U.S. 964 (1999) ("The state trial court's exercise of independent judgment in deciding not to suppress the evidence, though later ruled to be erroneous, broke the chain of causation for purposes of § 1983 liability for the plaintiff's conviction and incarceration."); *Hand v. Gary*, 838 F.2d 1420, 1427-28 (5th Cir. 1988) (intervening acts of prosecutor, grand jury, judge, and jury).

No court has ever found, nor even implied, that a cause, let alone a proximate cause of Murphy's conviction, sentence and incarceration was a Fifth Amendment violation. In fact, it has already been determined by the highest court for criminal appeals in Oklahoma that Murphy's claim of a coerced confession does <u>not</u> invalidate her conviction and sentence.

---

[15] The case law use the terms "supervening", "superseding" and "intervening" cause interchangeably.

Murphy's claim cannot be a proximate cause of any due process claim of an unfair trial. Without the underlying constitutional violation by Detective Cook, the City cannot be liable for a constitutional violation.

Further, to the extent Murphy is alleging that Cook is liable for a constitutional deprivation due to his allegedly perjured or false testimony at trial or is liable for Lee's allegedly false or perjured testimony read at the trial, such claims must fail as a matter of law. *Bennett v. Passic*, 545 F.2d 1260, 1263-64 (10th Cir. 1976) ("[W]itnesses who testify at trial are not acting under color of state law.").

In *Bennett v. Passic,* all six defendants in the § 1983 civil rights suit were law enforcement officers who testified at Bennett's murder trial, the Tenth Circuit held, as follows:

> With respect to Bennett's claim that the defendants are liable in damages for testimony given by them in his murder trial, the court notes that witnesses who testify at trial are not acting under color of state law. (citations omitted). The trial judge and the trial judge alone had the duty and power to determine what portions of the witnesses' testimony should be admitted or excluded; thus none of these defendants in testifying could have violated plaintiff's civil rights and any claim that they did so by virtue of their testimony is frivolous.

The *Bennett* holding sounds in supervening cause.

Murphy fails to prove causation on all fronts. She cannot prove any alleged constitutional violation was the result of any City policy, practice or custom. She cannot prove any policy, custom or practice legally caused her alleged injury. She cannot prove the City caused any of her damages because the trial court's admission of her confession and Tim Harris' improper conduct are intervening, superseding causes of Murphy's injuries.

## MURPHY CANNOT PROVE HER CASE

Murphy cannot prove a constitutional violation. The City is entitled to Judgment as a matter of law as no genuine dispute exists as to any material fact.

Respectfully submitted,

/s/ T. Michelle McGrew
**David E. O'Meilia, OBA #6779**
**Gerald M. Bender, OBA #14471**
**T. Michelle McGrew, OBA #20279**
**City HALL, ONE TECHNOLOGY CENTER**
175 East Second Street, Suite 685
Tulsa, Oklahoma 74103
domeilia@cityoftulsa.org
gbender@cityoftulsa.org
mmcgrew@cityoftulsa.org

**ATTORNEYS FOR DEFENDANT,**
**THE CITY OF TULSA**

## CERTIFICATE OF SERVICE

This will certify that on this 12th day of July, 2017, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic filing to the following ECF registrants.

R. Thomas Seymour, Esq.
1811 South Baltimore
Tulsa, OK, 74119
Rtseymour1@aol.com

Thomas Richard O'Carroll
O'Carroll & O'Carroll
2171 N. Vancouver Ave.
Tulsa, OK 74127
troc@cox.net

/s/ T. Michelle McGrew
T. Michelle McGrew