# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MICHELLE DAWN MURPHY )
       **Plaintiff** )
        )       **15-CV-528 GKF-FHM**
**v.** )       **Re: Docket # 175**
        )
**THE CITY OF TULSA** )

## RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The City's Motion, Docket # 175, is replete with fatal holes, among which are:

1. *It ignores 537 pages of Cook and Murphy deposition testimony in 2017*, where:

A. Cook **does not deny framing her after her confession**, and *now disavows his trial testmony back in 1995; he never knew there were Constitutional limitations on interrogations;* and B. Ms. Murphy describes the circumstances of her false and/or coerced confession and the **criminal sexual abuse (so described by Ron Palmer, the Final Policymaker)** she suffered in the interrogation.

2. It ignores not one, but two **unconstitutional policies** of the City each of which the jury may find was the moving force of Ms. Murphy's deprivation of a Fair Trial under the Fourteenth Amendment. It ignores the lack of sexual harassment training, which Sgt. Allen said was inviting sexual harassment to happen in interrogations.

3. The Final Policymaker **concedes deliberate indifference.**

R. Thomas Seymour #8099
Seymour Law Firm
1811 South Baltimore
Tulsa, OK 74119
918-583-5791
rtseymour1@aol.com

Richard O'Carroll
O'Carroll & O'Carroll
2171 N. Vancouver Ave.
Tulsa, OK 74127
918-584-4192
troc@cox.net

## ATTORNEYS FOR MICHELLE MURPHY

July 28, 2017

# TABLE OF CONTENTS

I. Disputed City Material Facts.....................................................................................1

II. Without More, Summary Judgment Should Be Denied..............................................5

III. Plaintiff's Material Undisputed Facts (which further preclude summary judgment)..............................................................................................................5

IV. Argument

    A. The Jury May Find The Trial Violated the Fourteenth Amendment Right to a Fair Trial As the Result of (1) Cook's Presentation of a Confession He Knew Was False; and (2) A Reckless Investigation.....................................20

    B. The City's Failure to Train...................................................................................23

    C. The Jury May Find The Trial Violated the Fourteenth Amendment Right to a Fair Trial As the Result of Cook's Presentation of a Confession He Coerced.............................................................................................................25

        1. The Claim of a Coerced Confession Is Not Collaterally Estopped...............................................................................................25

        2. The Jury May Find That the Confession Was Coerced.....................28

        3. The Trial Usage of the Confession Was Not Harmless Beyond a Reasonable Doubt.........................................................................31

    D. The Jury May Find Causation and Culpability of the City Are Established For Cook's Knowing Presentation of (1) a Coerced Confession and (2) a False Confession, As the City Had Two Unconstitutional Policies.......................................................................................................31

    E. The Jury May Find That Failure To Supervise Caused (1) the False and/or Coerced Confession and (2) the Reckless Investigation Thereby Denied Ms. Murphy a Fair Trial.................................................................................33

    F. The Jury May Find That Lack of a Sexual Harassment Policy and Lack of Training Thereon Caused the False and/or Coerced Confession..............33

    G. Deliberate Indifference Of The Final Policymaker............................................34

    H.  The City's Causation Of The Denial Of A Fair Trial For Ms. Murphy...........37

V.  Conclusion.................................................................................................................39

# TABLE OF AUTHORITIES

## Cases

*Allen v. Muskogee,* 119 F.3d 837 (10th Cir. 1997)..................................................36

*Arizona v. Fulminante,* 499 U. S. 279 (1991)......................................................31

*Barney v. Pulsipher,* 143 F.3d 1299 (10th Cir. 1998)................................31, 34, 37

*Bd. Of Cty. Comm'rs v. Brown,* 520 U. S. 397 (1992)......................31, 34, 37, 38

*Brown v. Gray,* 227 F.3d 1278 (10th Cir. 2000)....................................................37

*City of Canton v. Harris,* 489 U. S. 378 (1980)................23, 24, 25, 32, 34, 35, 36

*City of Okla. City v. Tuttle,* 471 U. S. 808 (1985)................................................36

*Clanton v. Cooper,* 129 F.3d 1147 (10th Cir. 1997)...........................................30

*Graham v. Connor,* 490 U. S. 386 (1989).........................................................12

*Griffin v. Strong,* 983 F.2d 1540 (10th Cir. 1993).............................................30

*Hatchett v. City of Detroit,* 495 Fed. Appx. 567 (6th Cir. 2012)..........................28

*Jackson v. Denno,* 378 U. S. 368 (1964)...........................................................26

*Jackson v. State,* 2006 OK CR 45.....................................................................27

*Lopez v. LeMaster,* 172 F.3d 756 (10th Cir. 1999)...........................................32

*Myers v. Okla. Cty. Bd. of Cty. Comm'rs,* 151 F.3d 1313 (10th Cir. 1998)...........38

*Parent v. State,* 2000 OK CR 27......................................................................26

*People v. Walker,* 132 N. W. 2d 87 (Mich. 1965)................................................28

*Pierce v. Gilchrist,* 359 F.3d 1292 (10th Cir. 2006)...........................................21

*Robinson v. Maruffi,* 895 F.2d 649 (10th Cir. 1990)...........................................21

*Sacramento v. Lewis,* 523 U. S. 833 (1998)......................................................12

*Tice v. State,* 1970 OK CR 144.................................................................26

*United States v. Garot,* 801 F.2d 1241 (10th Cir. 1986).........................30

*United States v. Lopez,* 437 F.3d 1059 (10th Cir. 2002)........................28

*United States v. Toles,* 297 F.3d 959 (10th Cir. 2002).........................28

*Wilson v. Lawrence Co., Mo.,* 260 F.3d 946 (8th Cir. 2001)..................20

**Federal Rules of Evidence**

Rule 901.................................................................................................2

**Oklahoma Uniform Jury Instructions**

OUJI-CR-9-2..........................................................................................26

**I. Disputed City Material Facts**

1-28. The investigation was woefully inadequate, not "thorough" or "constitutionally sound" as asserted on p. 31 citing these facts. See Plaintiff Facts ## 15, 21, 22, 24-103 and 142-195. *See also* Expert Report of Michael Lyman (164, pp. 11-28)[1], and testimony of the scene investigator (148, pp. 16, 23, 25-27, 29, 31, 40, 46, 52, 65, 69). *See also* Plaintiff Fact ## 161-198, especially 195, for a plethora of reckless defects in the investigation.

11. There was glaring evidence of **unforced entry.** *See* (146), the first few frames of the video, which show the front of the apartment, with **open space** between the window air conditioner and the window sill. The scene investigator said that logically TPD should have considered somebody crawled through that window (148, p. 46). But TPD didn't.

13. No murder weapon was ever identified (154). The City admits it did not look in a dumpster near the apartment, Answer, ¶ 175, another reckless investigation indicator.

15. He overlooked many critical pieces of evidence, *see* ("1-28") just above, believing she was guilty because someone told him she was the only one there. Supremely critically, this caused him to think the chair propped against the outside of the front screen door was not part of the crime scene, so he did not try to take prints from it (148, pp. 25-27).

20. False and terribly misleading. *See* Facts ## 187, 188. Cook testified at trial he could not duplicate the circumstances, but as Noordyke's report (**which the City has hidden from the Court but is Plaintiff Exhibit 101**) shows, there was NO effort that night to look in the front window with all the lights off, shining a flashlight in. The patrol officer testified he could see the

---

[1] The Court is advised that all numbers in parentheses as cites refer to tabbed numbers of Plaintiff's Exhibits attached hereto. Fact ## refer to Plaintiff Material Facts, below.

entire couch at 3 a.m. only with flashlights and there was no baby on it, giving the lie to Lee's testimony that at 3 a.m. he looked in (with the lights off) and saw the baby on the couch. *See* Facts ## 154, 155.

22. The cited City Exhibit 6 says no such thing.

23. She was hysterical, in shock and very upset even during the interrogation. Facts ## 7, 8, 14.

25. The investigation was recklessly deficient. *See* Facts ## 20-45, 66, 70, 78, 80, 82, 87-96, 140, 143-190 and 195.

27. Cook lied to the prosecutor in the Prosecution Report, as shown in Facts ## 10, 13, 21, 22 and 45.

29, 30. While she was talking, Cook rewound the tape and started over (102). That makes the tape unauthenticated and not admissible (Rule 901, Fed.R.Evid.), thus these exhibits should be stricken. In addition, she was "guided" by Cook who made a Deal with her to say it was an accident. *See* Fact ## 13-26. Also, Cook now disavows his trial testimony (125), thus disputing all City cites to his trial testimony. *Cook does not deny sexual harassment during the interrogation (160), which Palmer branded **criminal** (118).*

32. Cook perjured himself when he signed the arrest affidavit under oath. *See* (5, 6 and 7). He did not believe guilt or "malice aforethought" (25).

37, 38. He determined "voluntary" only for admissibility purposes. Only the jury decides the fact of voluntariness in Oklahoma. *See* pp. 28-29, below, items A-L. *See Facts ## 17-28.*

39. Cook now disavows his trial testimony (125).

46. The OCCA opinion (35) says, p. 7, only that there was sufficient evidence to support the trial court ruling, which was on admissibility only, not the actual fact of voluntariness. In

Oklahoma only the jury decides whether the confession was voluntary.

47. A coerced confession was an issue discussed in the verified Application and Supplemental Application for Post-Conviction Relief. *See* (149, pp. 4, 44-47), (150, pp. 15, 29).

52, 53. The order says by clear and convincing evidence Ms. Murphy presented a *prima facie* case of actual innocence. That case was made in verified Application and Supplemental Applications for Post-Conviction Relief, and not opposed. The Oklahoma Department of Risk Management had the opportunity to appeal the *prima facie* actual innocence finding to a jury trial but did not do so, paying the $175,000. Thus, the court order became **final**.

55. This **inadmissible** exhibit establishes **nothing.** The document, prepared by goodness only knows who, is not part of discovery. ***The City has not produced a single page showing Constitutional limits of interrogations***. "Interviews and Interrogations" identified on p. 25 of City Exhibit 39[2], are dated **2004** and **1996**, long after the time frame in this case.

55-60. There is nothing about Constitutional limits of interrogations in these exhibits. They are hearsay on what other officers did and thus inadmissible evidence. Palmer says Homicide Detectives were not required to be trained in interrogations (52). ***Cook had no training on interrogations*** (55, 116). Palmer had two policies which authorized Constitutional violations, *see* pp. 31-32, below. Palmer admits that to protect Constitutional rights in interrogations, TPD should have had written policies setting forth at least the broad outlines of those rights (54), but it didn't have them, Fact # 118. Cook had no training that presenting a coerced confession at trial violated substantive due process rights (158). Cook never heard that coercion can be mental as

---

[2] This exhibit is not sponsored, not aduthenticated, therefore not admissible evidence, and must be stricken.

well as physical (159). _**He had no training that there were Constitutional limitations in interrogations**_ (162). *See* Facts ## 21, 22, 30, 34, 35, 45, 70, 93, 116, 195, 197 and 198.

55-71. Nothing in these exhibits reflects a training program that includes Constitutional limits on interrogations, reckless investigations, presentation of false and/or coerced confessions at trial, supervision of interrogations or sexual harassment. *See* "55-60" immediately above.

56. The affidavit goes only to him, in 1978. **Nowhere in the Affidavit does he say the training included the Constitutional limits of interrogations, or what that training said.** The Affidavit speaks only to his "I was assigned" four weeks of field training, not that all got it.

57. "All TPD officers" is rank hearsay. No bulletins on Constitutional limits in interrogations nor any other document produced by the City in this case.

61. Contradicted by Plaintiff's Expert Report, (148, pp, 11-28).

62. This exhibit says nothing about training concerning Constitutional limits on interrogations. Palmer said there was no requirement that Homicide Squad members have _**any training on interrogations**_ (52).

63. City Exhibit 44 does NOT say all TPD officers got such training.

67. _The testimony cited does NOT say there was training on this._ Investigators had "full authority" of TPD to ignore the Constitutional limits in interrogations, including threats, as a matter of policy. *See* Fact # 113, below. _**Palmer concedes deliberate indifference,**_ Facts ## 108, 114-121, 133, 136-138, either directly or so the jury may infer.

68. *See* Fact 17, below, where Palmer admits what should have been the policy. *See* Facts ## 113, 130, below, which are two TPD _**unconstitutional policies.**_

68, 70, 71. Palmer admits an officer would have to have been told what the Supreme Court says

about interrogations in order to know what the Constitution required, (44) (they weren't told), and that TPD should have had written policies setting forth at least the broad outlines of what the Constitutional rights are (54) (but in fact he had no such written policies). Fact # 118.

72, 73. Cook's history is unknown, other than LaRoye Hunter, because the City refused to allow access to **any** other homicide case files. Palmer testified only to what he had heard.

80. A whopper! The mother signed for the interview on 1-21-89. The interview with the taped statement occurred 12-5-89 and the mother did NOT sign. Plainly shown on the exhibits.

## II. Without More, Summary Judgment Should Be Denied

The genuine dispute of the City's facts in Part I above, precludes summary judgment.

## III. Plaintiff's Material Undisputed Facts (which further preclude summary judgment)

2. No murder weapon was ever found. City admission, Docket # 106, # 3, (154).

3. At her trial, Mike Cook presented a "confession" he obtained from her on 9-12-1994. City admission, Docket # 106, # 20, (155).

4. Around 6 a.m. on September 12, 1994, Ms. Murphy ran to the apartment of neighbors, along with her 2 ½ year old daughter, to report that her 3 ½ month old baby was dead. (106).

5. Ms. Murphy reported to the neighbors that she had wakened and discovered the baby lying in a pool of blood in the kitchen of her apartment (107).

6. The baby lay on his back in a large pool of blood, all-but decapitated.

7. TPD Officer Otterstrom testified at trial about her emotional state when he was among the first TPD officers to arrive, as "crying and looked to be pretty upset" (108). Also, that "she was in a pretty emotional state" when he first got there (109).

One of the neighbors to whom Ms. Murphy ran after discovering the baby testified she was

"hysterical," "crying," "screaming and crying and extremely upset," "beating on the door," and "repeating herself over and over and over again" (110). The neighbor further testified Ms. Murphy was "in shock," and "acting like you would expect a mother to act who had just found her child dead" (111).

Another neighbor testified that after the police arrived the neighbors and Ms. Murphy went outside to the playground, and when the police went into the apartment and came back out shaking their heads, Ms. Murphy "fell to the ground and lost it." (112).

8. Officer Otterstrom testified that when people would come up and talk to her while she was at the car, "she would get emotional and begin crying again" (114).

9. The jury may infer from Facts ## 21, 29 that Cook lied when he said "I don't remember," in his deposition, which then is a contest of these City facts: 17-19, 25, 27, 29, 30, 38, 39 and 77.

10. Ms. Murphy was taken to the police station in handcuffs, (1), and remained in handcuffs until "right before" the taped statement which began at 2:28 p.m. (2).

13. Ms. Murphy testified in her deposition that her statement was made because Cook "guided" her "to say it was an accident, that I accidentally did this" (4).

14. She testified that on 9-12-14 her world was "in a spin," she was "devastated," "my world is gone." At the interrogation all she was concerned about was "getting to my daughter" and "finding out who did this to Travis" (156). Cook testified at trial she got "markedly upset" describing finding the baby and she was not "in control" at one point (136, 137).

15. In his deposition, after having stated he "believed" Ms. Murphy killed the baby, (5), Cook recanted this testimony as "erroneous," (6), and said he used the words "malice aforethought" simply because he had to write out the murder charge "a certain way." (7).

16. ***Cook does not recall ever knowing there were Constitutional limitations on interrogations***

(162).

17. Cook admitted in his trial testimony that he specifically asked her to say she accidentally

caused the cut on the baby's neck (8).

19. In his deposition, Cook testified:

> Q. Now, you're asking her if she accidentally cut his throat. Correct?
> A. Uh-huh....
> Q. And her answer was "Yes." ...
> A. Yes.
> Q. All right. Now, if she accidentally cut his throat, how is that murder with malice aforethought?
> A. Hmm. I don't know (11).

20. In Cook's trial testimony, he admitted the baby did not die as she described (12).

21. ***Cook does not deny deliberately framing Ms. Murphy after her confession*** (13)[3].

22. Cook ran his hands up Ms. Murphy's legs to inside mid-thigh during the interrogation, (116),

with her wearing shorts, (117), which ***the Final Policymaker testified was a criminal offense,***

(118)**. His conduct "scared" her; she "didn't feel right about it." (119).** ***Cook's conduct***

***made her feel "ashamed."*** (120).

25. Ms. Murphy testified in her deposition that Cook made a "Deal" with her, that if she said the

death was an "accident," she would get therapy and go home. (121).

26. Ms. Murphy testified in her deposition that Cook told her that she would get to see her 2 ½

year old daughter again if she confessed. (122).

29. ***At his deposition, Cook disavowed testimony he gave at the 1995 trial, telling Plaintiff's***

---

[3] The jury may find he did frame her, because it defies logic and common sense that Cook can't say whether he **framed** her or not. *See* (147), showing his intelligence.

counsel *"if you don't trust my trial testimony, I don't either."* (125). *See also* (163).

30. Cook was alone when he interrogated Ms. Murphy, a female juvenile.

31. Cook described the interrogation room as 10 x 10 or 12 x 12 (126).

32. Cook did not record the entire interrogation; he had access both to a tape recorder and a video recorder, which he could have used to record the entire interrogation (127).

33. Ron Palmer was Chief of Police for TPD from 1990 through 2002 (41). The City admits Ron Palmer was the Final Policymaker for TPD.

34. The Final Policymaker testified that recording of the entire interrogation is particularly important for a juvenile (128).

35. Cook provided no medical examination or attention for Ms. Murphy, despite her statement that she was hit on the head several times, (129), and was hit in the leg, causing bruises, (130). One of the neighbors to whom Ms. Murphy ran after discovering the baby, testified she was "rubbing her head" (131). The Answer admits Cook did not examine her for concussion symptoms.

36. During the interrogation, Ms. Murphy was not allowed to see her 2 ½ year old daughter.

38. Ms. Murphy was taken to the station wearing a pair of shorts and barefoot (132).

39. Ms. Murphy had no blood on her person or on her clothes; no cuts; no physical evidence tied her to the crime; no murder weapon was ever found. She was not asked to provide a written statement.

43. Months after the interrogation, Ms. Murphy passed a lie detector test administered by an OSBI agent selected by the prosecutor, "conclusively" per the statement of the OSBI agent (133).

44. Cook admitted at the trial that the baby could not have died as the result of what Ms. Murphy

described in her recorded statement (134).

45. During the recorded statement, Ms. Murphy said something Cook didn't like, causing him to rewind the tape and start from the beginning (135).

48. Introduction of Ms. Murphy's confession at the 1995 trial was not harmless beyond a reasonable doubt (138).

52. Sgt. Allen testified she was a suspect when she went to the station in handcuffs (141).

53. *Sgt. Allen testified he expected "results" from interrogations, which he defined as "confessions and/or admissions"* (142). Sgt. Allen wrote Cook's fitness reports.

55. Ms. Murphy testified Cook got in her face close enough to smell his breath while she was handcuffed and Cook was yelling at her (143).

59. Ms. Murphy was 17 at the time of the interrogation, with an eighth grade education and no prior experience with the criminal justice system.

62. The Oklahoma Court of Criminal Appeals found that her custody began at approximately 6 a.m. on September 12, 1994 (16).

63. The confession was recorded between 2:28 and 2:49 on September 12, 1994.

64. Twice during the interrogation Ms. Murphy asked for her mother, during Cook "screaming at me" (17, p. 209). He yelled at her until she agreed to make a deal (the "Deal") (17, p. 240).

65. TPD well knew where her mother was, having contacted the mother twice before 8 a.m. on September 12, 1994 (18).

66. One neighbor who spoke with Ms. Murphy late evening of September 11, 1994 described her as "a lot happy," as happy as the neighbor had ever seen her (19).

70. In the recorded, unauthenticated and inadmissible "confession," Cook did not ask: A. What

time she committed the crime; B. How the chair got propped against the outside of the front screen door; C. What she did after the murder; D. Whether she got any blood on herself; E. Whether she washed off any blood; F. How the several spots of bdflood got on the curtain between the living area and the kitchen; G. What her motive was (9).

73. Cook testified the interview of Ms. Murphy began about 1020 a.m. (21).

74. The complete trial transcript after voir dire is (138).

78. The Prosecution Report (20) did not disclose that Ms. Murphy had been interrogated while in handcuffs until she agreed to the Deal with Cook.

79. Ms. Murphy was interrogated on five hours of sleep—from 0054 until about 6:00 when she ran to the neighbors declaring her baby was dead (138, p. 666).

80. Cook, the prosecutor and counsel for Ms. Murphy were present when the OSBI polygraph examiner selected by the prosecutor emerged from the examination room, telling the prosecutor, "I've got something to tell you that you won't want to hear," and that Ms. Murphy had passed the exam "conclusively" (24).

82. There was no evidence of child abuse of the dead baby, the Medical Examiner testified.

83. On hundreds of occasions during his deposition, Cook testified he did not remember the interview with Ms. Murphy or anything about the investigation (147, which lists 723 examples of not remembering), but he remembered enough to know he did not think she was guilty and that he used "malice aforethought" only because the form required it (5,6,7). The jury is entitled to have grave doubts about the truth of his "don't remembers."

87. **Five sets of fingerprints were taken at the scene** (27).

88. **Cook never had the fingerprints compared to anyone's** (28).

89. ***There could have been fingerprints on the baby's diaper, but Cook never had it tested, even though the scene investigator said he should have*** (29).

90. A chair was propped against the outside of the screen to the front door, which was seen by the same TPD officers at 3 a.m. and at 6 a.m. (30).

91. Cook testified he recalled no training, ever, that innocent people confess (31).

92. The Supervisor of the Homicide Squad, Cook's boss, testified there should have been an investigative report in the Murphy case, he believes he saw one, and he is greatly surprised and concerned that there is no such report, because that would be highly unusual (32).

93. Sgt. Allen testified that prior to interrogation, an interrogator should obtain and investigate as much as possible to know the facts of the case, and that Cook did not know all of the facts when he interrogated Ms. Murphy (33). *TPD had no training program teaching investigators to investigate thoroughly before interrogating, or to always investigate the truthfulness of alleged single eye-witnesses, or to avoid the mistakes Cook made as set forth in Facts ## 22, 25, 30, 31, 35, 45, 70, 78, 79, 87-94, 97, 98, 169-171, 173-187, 190.* Cook was not trained to get as many facts as you can before you interrogate (161).

96. Sgt. Allen testified she was a suspect when she went to the station (37).

97. There are no reports which Cook prepared, except the false Prosecution Report.

102. Cook recalls no training in interrogation (39).

106. Ron Palmer was responsible for the contents of the TPD Policies and Procedures Manual in effect on 9-12-94 (42). It was his job to see that officers were up to date on legal matters, including interrogations (43).

108. Palmer admits that an officer would have to have been told about what the Supreme Court

had said about interrogations in order to know what the Constitution required (44), but they weren't.

109. As the person responsible for the contents of the Manual, Palmer had the Manual set forth in three places what the Supreme Court said about Constitutional limitations in personal searches (45), describing *Sacramento v. Lewis* and *Graham v. Connor*.

111. Prior to 1994 the Supreme Court established principles regarding due process and interrogation of suspects (47, City Admission). *See also* (48).

112. Mike Cook, the person who interrogated Ms. Murphy, was a member of the TPD Homicide Squad in 1994.

113. ***The Final Policymaker, and the Supervisor of the Homicide Squad, Sgt. Allen, testified that when an interrogator went alone into the interrogation room, without a video or tape recorder going, that interrogator had the "full authority" of TPD to make his own decisions on how to conduct the interrogation, including what kind of threats to make*** (49, 50).

114. There were no policies in 1994 addressing the do's and don'ts of interrogations (51).

115. There was no requirement that Homicide Squad members have any training specifically in interrogations (52).

116. TPD records show no training of Cook in interrogations (53).

117. **The Final Policymaker admits that in order to protect the Constitutional rights of all persons, TPD should have had written policies setting forth at least the broad outlines of what those Constitutional rights are, including interrogation** (54).

118. None of the documents produced by the City contain written policies setting forth at least the broad outlines of Constitutional rights concerning interrogations. Cook had no training that

12

presenting a coerced confession at trial violated substantive due process (158). **He does not recall ever knowing there were Constitutional limits on interrogations** (162).

119. **The Final Policymaker admits a TPD officer would have to have been told what the Supreme Court said about interrogations in order for them to know what the Constitution required** (55).

120. None of the documents produced by the City set forth what the Supreme Court said about Constitutional limitations on interrogations[4].

121. **The Final Policymaker admits no discipline could be imposed for violations of Constitutional rights concerning interrogations when the officer does not know what such violations are** (56).

122. In 1994 the Homicide interrogators received no training that innocent people confess (57).

123. The Final Policymaker admits there was no policy in 1994 which prohibited an officer from interrogating alone (58).

124. The Final Policymaker, when asked if TPD homicide detectives believed the measure of their worth was getting a confession, said, "so be it" (59).

125. Sergeant Allen, the Homicide Squad Supervisor from 1989-1996, testified he had no training in interrogations after police academy (60).

126. Allen testified that if during Ms. Murphy's interrogation by Cook, that he yelled at her, threatened her with never seeing her daughter again unless she confessed, told her if she confessed she would go home and get therapy, and she did not have food or water for seven

---

[4] For purposes of this Brief, Plaintiff excludes anything having to do with Miranda warnings from the concept of training or policies on "interrogations" or Constitutional limits.

hours, no discipline was appropriate (61).

128. In his seven years as Homicide Squad Supervisor, Allen was never told of, nor did he ever ask about, tactics used by his interrogators in the interrogation room (63).

129. ***The 1934 TPD Policy Manual, (64), prohibits threats or promises in interrogations***.

130. **The Manual in effect in 1994 had a policy forbidding the use of threats or promises during interrogations of police officers, but no reference to what could or could not be done during interrogations of ordinary citizens** (65).

132. Cook testified that in 1994 he would have paid attention to what was in his training, and would not have consciously violated any provision of the TPD Manual (67).

133. ***Palmer admits that without training, it is obvious there likely will be violations of citizens' rights in interrogations: "Some areas are obvious to be likely to result in violations of citizens' rights unless police officers are trained on use of force, search and seizure, arrests and interrogations"*** (68).

136. Despite the TPD Policies and Procedures Manual in effect in 1994 having an entire page on what the Supreme Court has said about personal searches (71), Palmer replied "I don't know" to the question why he did not have the Manual set forth quite simply "During interrogations there shall be no threats and there shall be no promises" (72).

137. Interrogations were a recurring situation for TPD and for homicide investigators (105).

138. Palmer admits when an interrogator is alone with a suspect, there is no supervision of the interrogator (73).

139. If you are in handcuffs, you are in custody, Palmer testified (74).

140. Palmer admits recording of the interrogation is essential when the person interrogated is a

14

juvenile (75).

141.  Palmer's indifference to the lack of training and policies on interrogations is illustrated by his testimony that checks and balances are there after an investigation, which allow the court system to discredit and/or throw out whatever was done before in an investigation (76).

143.  At approximately 3:00 a.m. the morning of September 12, 1994 a call was made to 911, reporting a loud verbal fight at Ms. Murphy's apartment.

144.  William Lee, a 14 year old neighbor of Ms. Murphy, made the 911 call.

145.  TPD responded to the 911 call.  The two Responding Officers filed reports (77) showing: (1) They could not see into the living room without using flashlights; (2) They could not rouse Ms. Murphy; (3) A chair was propped against the outside of the screen on the front door; (4)  At approximately 6 a.m. they returned to the scene after neighbors called 911 to report the murder of the baby; (5) The chair was in the same position; (6) They noted seeing Ms. Murphy and her 2 ½ year old daughter on the living room sofa, with no reference to the baby (78); and (7) Ms. Murphy had on the same clothes at 6 a.m. that they had seen at 3 a.m.

154.  Lee gave a statement in which he said he saw the baby in the corner of the sofa on which lay Ms. Murphy and her 2 ½ year old daughter, just before his 3 a.m. 911 call.

155.  One of the Responding Officers who shined his flashlight at 3 a.m. (very shortly after the 911 call Lee made) said from the angle where he was at the front window, he could see anyone who would be laying on that couch (79).

156.  On September 12 and thereafter, Lee twice told Sgt. Allen he was home watching television the night of September 11 and early September 12 (80).

157.  After Lee's first statement as to his whereabouts as described immediately preceding, Sgt.

15

Allen took a statement from a neighbor's boyfriend who said he saw Lee about 3 a.m. running by, clad only in shorts, i.e., no shirt, no shoes (80).

158. Confronted with the statement from the boyfriend, Lee changed his story and said he had been out walking around at 3 a.m.; Sgt. Allen then took Lee to the station and turned him over to Cook to be interviewed (80).

160. After interviewing Lee for a period of time, Cook took Lee's recorded statement (138, p. 722).

161. Lee's statement contains numerous lies and gaping holes. A. Cook established that the father of the children was not there that night for the verbal fight with Michelle (138, p. 737). B. Lee said several times that the blinds in the kitchen window were "shut." C. William Green, a neighbor who heard Michelle say her baby was dead and went to her apartment to check, looked through the blinds and saw the baby on the floor, as he put in a written statement in the file (81). Cook falsified what Green said, by putting in the Prosecution Report that Green said he looked through the open door, when Green said he saw through the window (20). D. Cook and scene investigator Douglas Noordyke determined one week later that the blinds could be seen through (138, p. 742). E. Noordyke prepared a report on the visit to the scene a week later. F. Cook prepared no report on the visit to the scene a week later. G. Lee's statement says nothing about the chair propped against the front door's screen. H. Despite the content of the Responding Officers' reports on the chair propped against the front door's screen, Cook asked Lee nothing about the presence of the chair (138, p. 746). I. Lee said he heard Ms. Murphy turn the water on and off when she was in the kitchen, with the baby lying in a pool of blood on the floor. J. The water was on continuously when police arrived, and could not be shut off until the apartment

16

complex manager came and shut off the water via the valve underneath the sink (82). K. Lee spoke of being able to see in, whereas the Responding Officers said they could see nothing without using their flashlights (77). L. Lee said during the argument, he hid behind a bush when the father of the children looked his direction, City Exhibit 23, COT 8126-43. M. The video of the exterior and interior, done by scene investigator Doug Noordyke, shows there are no bushes (146). N. Lee said after he in-effect saw Ms. Murphy kill the baby, she went from the kitchen to the living room, where she lay down and went to sleep, *id.,* COT 8140, which defies common sense.

162. Lee said a neighbor told him the next morning what had happened, but the neighbor said this was not true. Answer, ¶ 147.

163. In his preliminary hearing testimony, Lee could not explain how the chair got where it was, unless it was "magic", to which  Allen said this Lee testimony should have been an item of concern about Lee's veracity (96). But it wasn't to Cook. The Prosecution Report (20) makes no reference to the chair, when Cook discusses the reports of the Responding Officers.

164. Cook never fingerprinted Lee, never looked for cuts, never searched Lee's apartment for bloody clothes or knives. Answer, ¶ 157

167. Lee's 911 statement referred to hearing the sound of a knife being thrown against the wall, which Cook said did not make sense (138, p. 738).

168. Despite making the 911 call at 3 a.m. when there was only a loud verbal fight, which Lee said was over, Lee made no 911 call after his in-effect description of the murder of the baby.

169. Despite the lies and holes in Lee's story, Cook only interviewed Lee once.

170. Cook only interviewed Ms. Murphy once.

171. Cook did not prepare a report of the interview of Lee or of Ms. Murphy.

172. Not long after his preliminary hearing testimony, Lee was found dead, hanging in his garage in what the Medical Examiner ruled an auto-erotic incident.

173. Lee was never a suspect (86), but it needed investigation, Allen testified (94).

174. **Cook testified he did not know Lee had a crush on Michelle** (83), **and claimed he never read Lee's preliminary hearing testimony, where Lee admitted to having a crush on Michelle** (84), **and admitted he watched her a lot** (85).

175. ***Cook testified he never considered that  Lee committed the murder*** (6).

176. Cook just assumed Lee was telling the truth about the murder; he never asked anyone who knew Lee what his reputation for truthfulness was (87).  He never questioned Lee's truthfulness (138, pp. 752-3).  He did not know some witnesses felt Lee was weird and chased them home and he did not not check out Lee at school (138, pp. 727-8).

181. **One of Lee's teachers said on September 12, 1994 the first thing Lee said when he came into the classroom was "the bitch will pay," referring to Ms. Murphy** (89).

182. Cook testified he did not suspect Lee of anything (90).

183. Sgt. Allen testified: **A.  There were plenty of areas of concern about Lee** (91).

**B.  There were questions about Lee's truthfulness** (92).  **C.  Lee's truthfulness should have been investigated by Cook** (93).  **D.  That Lee did it was a possibility that needed investigation** (94).  **E.  Lee's statement that the chair must have got propped against the screen on the front door by "magic" should have been an item of concern** (95).  **F.  The fact Lee lied about the neighbor telling him what had happened should have been an item of**

**concern about Lee's veracity** (96).

184. Cook testified he did not know the water would not turn off, (97) but that fact was in Noordyke's report in Cook's file (98).

186. Cook testified he was aware of what was in the TPD reports (99). But he clearly wasn't.

187. Cook testified he could not "duplicate the circumstances" of the Responding Officers looking into the living room with their flashlights (100). The officer at the window said he saw Ms. Murphy and her daughter on the couch, in contrast to Lee's lie that he saw into the apartment at 3 a.m. and saw the baby on the couch (77).

188. Cook's testimony in (100) was untrue, because Noordyke wrote a report saying when he looked into the living room at night it was not with the lights off and looking through the window with a flashlight, as the Responding Officer did (101).

189. ***During the interrogation, Ms. Murphy said something Cook did not like, so "[h]e rewound it [the tape recorder] and he started it all over"*** (102).

190. **Cook testified at trial there was no evidence at all that pointed the finger at Lee** (103).

192. Cook told Ms. Murphy over and over during the interrogation that if she said she did it, she would get to see her daughter (144).

193. Cook told her she would actually be able to leave if she said she did it (145).

194. The TPD scene video is (146).

195. The investigation conducted by Cook and Noordyke was woefully deficient. See First Amended Complaint ¶¶ 168-216, all of which are alleged as Plaintiff Facts but not set forth in full here for space limitations. Among these, the City admits ¶¶ 169, 170, 173, 174-177, 181, 183, 189 (first sentence), 190, 191, 195, 198, 199 (first sentence), 200-202, 205, 206, 208, 209

(first sentence), 212, 213 (first sentence), 215 (last sentence).

196. Sgt. Allen testified that without sexual harassment training "the police department was just setting itself up for an officer to go a little bit far...in the way of sexual harassment during an interrogation" (157).

197. Plaintiff's Expert says it was improper for Cook to interrogate Ms. Murphy when he did: "Any reasonable investigator would know that attempting to interrogate a victim under these circumstances was improper and would yield statements that would most likely be unreliable, even without any coercion." (164, p. 16). He also says Cook's promise that she could go home "clearly created a psychologically coercive environment that placed excessive pressure on Michelle to confess." (164, p. 18).

## IV. Argument

### A. The Jury May Find The Trial Violated the Fourteenth Amendment Right to a Fair Trial As the Result of (1) Cook's Presentation of a Confession He Knew Was False[5]; and (2) A Reckless Investigation[6]

Police officers may be held responsible for presenting false evidence to the prosecutor and to the court. Officers may not escape such responsibility on a claim of break of causal

---

[5] *Despite the First Amended Complaint's allegations of Cook obtaining a false confession, the Motion does not address the facts of the alleged Constitutional violation.*

[6] *Wilson v. Lawrence Co., Mo.*, 260 F.3d 946 (8th Cir. 2001), cited on p. 30 of the Motion, held that with an involuntary confession and no reliable corroborating evidence, "the proper standard to judge whether the officers' conduct violates substantive due process is recklessness." The court also noted that recklessness is the standard: "where state actors have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." *Id.* at 956. Ms. Murphy's case meets all of these criteria. Recklessness is amply demonstrated by the facts set forth in this subsection, *especially the fact Cook does not deny deliberately framing her after her confession.* Fact # 21.

20

connection by "subsequent, independent and intervening acts of the prosecutor, grand jury, state trial court and the New Mexico Supreme Court." *Robinson v. Maruffi*, 895 F.2d 649 (10th Cir. 1990)[7].

Ms. Murphy testified Cook made a deal with her, to just say it was an accident and she would get therapy and go home (13). Cook did not believe she was guilty (21), but signed the arrest affidavit under oath, declaring she committed murder with "malice aforethought," even though he used "malice aforethought" only because the form required it (25). In his deposition, he was unable to explain how an accident is "malice aforethought" (19). Ms. Murphy was in shorts, barefoot, and **sexually molested (22) [a "crime" said the Final Policymaker, Ron Palmer (118) ]**. Cook did not ask her to do a written statement (81). ***Cook does not deny deliberately framing her after her confession*** (21). ***The jury may find that Cook destroyed the investigative report which Allen believes he saw*** (32). Cook was there when the polygraph examiner emerged from the polygraph exam and said she passed "conclusively" (24). Cook did not investigate the open space in the living room window through which the killer could have crawled (146). The jury may find that in his 2017 deposition Cook eschewed all of his trial testimony, (29). Ms. Murphy had no blood on her person or her clothes. No murder weapon was ever found. The City admits TPD did not even search the dumpster near the back door of the

---

[7] "If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. *They cannot hide behind the officials whom they have defrauded." Id.* at 1292-3 (citations omitted) (emphasis added). **The concept of the liability of police officers regardless of what anybody up the chain does, is resoundingly reaffirmed in *Pierce v. Gilchrist*, 359 F.3d 1292 (10th Cir. 2006).** There are two keys to the cases cited on p. 39 of the Motion. First, they are not Tenth Circuit cases. Second, the cases are inapposite because the policemen, quite unlike Cook, did not mislead or defraud actors up the chain.

apartment. Answer, ¶ 175. There were five sets of prints from the apartment, but they were never compared to anyone (87, 88). Cook wrote a Prosecution Report which does not disclose the conditions of the interrogation or the Deal (20).

Lee gave Cook a statement, and testified at a preliminary hearing, that he in-effect saw her kill the baby (23). That put Lee's truthfulness center stage, all by itself. Sgt. Allen testified Cook should have investigated Lee's truthfulness (93). Lee said he called 911 at 3 a.m. because there was a verbal fight at the apartment between Ms. Murphy and the father (161A). But Cook established there was no such fight because the father was not there (138, p. 737).[8] Lee said he hid behind a bush at one point during the verbal fight, City Exhibit 23, COT 8130, but the TPD scene video, which includes the exterior, shows there is no bush (146). Lee lied twice to Sgt. Allen about his whereabouts that night, saying he was at home (80). Lee lied about not being able to see through the kitchen window except through small holes in the slats for the pull-up line in the blinds: he said he could not see through the blinds because they were "shut", City Exhibit 23, COT 8137, but Cook himself determined you could see through the blinds (138, p. 742). Lee said he heard her turn the kitchen sink water on and off (169), but the water was running continuously when the police arrived and could not be shut off except by the valve underneath the sink (82). Lee said that immediately after she killed the baby she went into the front room, lay down and went to sleep, Fact # 161N, which defies common sense. Lee said he heard the sound of a knife hitting the wall during the verbal fight, which Cook said made no sense (138, p.

---

[8] Plaintiff's Expert says: "one of the most crucial investigative discoveries made by Cook is learning that there was no verbal fight....This not only placed direct and immediate suspicion on Lee as the murderer but immediately redirected the focus of the investigation away from Michelle Murphy. A reasonable investigator would view this evidence as cause for a drastic shift in the investigative focus from Michelle Murphy to William Lee" (164, p. 24).

738). **Lee said he was in front of the apartment, walked to the back and then walked to the front, City Exhibit 23, COT 8136-8, which means he passed by the front screen door twice, but he never saw the chair propped against the front screen door, yet Cook never asked Lee about the chair (746). He said maybe the chair got there by "magic"[9]** (163). Despite these massive lies, Cook interviewed Lee only once (161), says he never questioned Lee's truthfulness (87), and never compared Lee's prints to the five sets of prints taken at the murder scene (87, 88). Cook did not have the chair examined for prints (168).

Cook admitted concern that Lee said he could see into the apartment when the police needed flashlights (138, p. 742). *Lee testified he watched Ms. Murphy a lot and he had a crush on her.[10] Fact # 134.* Cook wrote no reports during the investigation:

> "I have reviewed literally hundreds of homicide investigations across the nation over the last several decades and have never seen a homicide investigation like this one where there is a virtual void of documentation of critical evidence. The quality of Detective Cook's investigative work in this regard is abysmal." (164, p. 28).

Plaintiff's Expert excoriates the failures in Cook's investigation (164, pp. 11-28) .

The jury may find that Cook knew the confession was false. The jury also may find that Cook performed a monumentally reckless investigation. *See also* Fact # 93.

## B. The City's Failure To Train

*"In resolving the issue of a city's liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform."* City of Canton v.

---

[9] Cook claimed at trial he never read Lee's preliminary hearing testimony. If so, this was reckless as Lee died and thus his testimony became a part of the investigation.

[10] Here again Cook recklessly failed to read Lee's preliminary hearing testimony.

*Harris,* 489 U. S. 378, 390 (1980). **TPD's training program did not teach the Constitutional limits of interrogations.**[11] **The Final Policymaker testified it is** *obvious* **that there likely will be violations of citizens' rights in interrogations, without training (133).** Much worse, he had a policy that threats could be made with "full authority" of TPD. Most tellingly Palmer admitted the **program** for training on interrogations was non-existent when he testified: "There was no requirement [that members of the Homicide Squad have any training specifically in interrogations] that I'm aware of." Fact # 115, (52). There was no training that innocent people confess (122, 91).[12]

The non-existent training program on Constitutional limits in interrogations is underscored by: First. TPD Homicide Squad interrogators, from 1989-1996, were never asked what tactics they used by their supervisor, nor did he ask of them (128). Second. The TPD Manual forbade using threats or promises when interrogating police officers, but was silent about interrogating citizens (130). Third. Cook recalls no training in interrogations (102, 91); his training records reveal none (116). Fourth. The Supervisor of the Homicide Squad, 1989-1996, had no training in interrogations after police academy (125). Fifth. The Homicide Squad Supervisor [who wrote Cook's fitness reports] testified that apart from use of force, what he cared about in

---

[11] The 1934 TPD Manual forbade threats and promises, but not the 1994 Manual or any of its immediate predecessors. As shown below, threats and promises are critical factors in determining voluntariness.

[12] In the thousands of pages of documents produced by the City, not a single page addresses the Constitutional limitations on interrogations. City Exhibit 44, not discussed in the text of its Motion (and with good reason) indirectly admits there was no training in the Constitutional limitations on interrogations, by making the vacuous statement that "Constitutional law" was taught, but trying to elide the fact this did not cover Constitutional limitations for interrogations.

interrogations was "results," which he defined as "confessions and/or admissions" (127). The jury may find the facts show the **program** the City had for training concerning homicide interrogations (as well as all interrogations), by omitting training on Constitutional limits of interrogations, and by omitting training on investigations set forth in the preceding sentence, was improper and inadequate "to enable officers to respond properly to the usual and recurring situations with which they must deal." *City of Canton v. Harris,* 109 S.Ct. 1197, 1205 (1989)[13].

The City also had an inadequate program teaching investigators to investigate thoroughly before interrogating, or to always investigate the truthfulness of alleged eye witnesses, or to avoid mistakes made in Facts ## 16, 22, 25, 30, 31, 35, 45, 70, 78, 79, 87-94, 97, 98, 169-171, 173-187, 190. Fact # 93.

Cook testified that in 1994 he would have followed what was in his training (67). He also testified he would not have consciously violated any provision of the Manual (67).

## C. The Jury May Find The Trial Violated the Fourteenth Amendment Right to a Fair Trial As the Result of Cook's Presentation of a Confession He Coerced

### 1. The Claim of a Coerced Confession Is Not Collaterally Estopped

The Motion atrociously misrepresents the facts and the law concerning collateral estoppel in its effort to prevent litigation of the voluntariness of Ms. Murphy's confession.

Most notably, the Motion is just dead wrong in saying on p. 16 that the trial court and the OCCA "found her confession was voluntary." Both courts simply found evidence of

---

[13] The Court may find it extraordinary that the Motion's section on failure to train: (1) never once claims any training given on Constitutional limits of interrogations; (2) never mentions that Cook got no such training (162); and (3) never once describes training actually received. To train on "interrogations" does not necessarily include Constitutional limits, and the Motion makes no such claim.

voluntariness to be ***admissible, only.*** The Motion repeats this error on p. 17, saying that the

OCCA opinion found her confession voluntary and <u>thus</u> that opinion is a <u>"final determination</u>

<u>and precludes Murphy from raising the issue in her civil rights suit."</u> (Emphasis added). To the

contrary: the trial judge's ruling of "voluntary" was for the initial, limited and sole purpose of

**admitting the evidence,** and leaving it to the jury to decide the actual fact of voluntariness.

Oklahoma law could hardly be clearer:

1.  OUJI-CR-9-2 provides the jury is to be instructed:
Evidence relating to an alleged statement by a defendant outside of court and after a crime has been committed may be considered by you, but only with great caution and only if you determine that it was made and it was made voluntarily. Unless you are convinced beyond a reasonable doubt that the statement was voluntary, you should disregard it entirely.

2.  Notes on Use to OUJI-CR-9-2 say: "This instruction should be used if a defendant's statement is admitted into evidence so that the jury may determine whether it was made voluntarily."

3. As explained in *Parent v. State,* 2000 OK CR 27, ¶¶ 13, "The jury was properly instructed with both OUJI-CR 2d 9-12 and 9-13. These instructions outline the jury's role in deciding whether or not a statement or confession was voluntary. Under these instructions, jurors cannot even consider a statement or confession until they have determined beyond a reasonable doubt it was voluntarily given.
.....
...the trial judge **initially determines** the voluntary nature of that statement for purposes of admissibility in a *Jackson v. Denno* hearing. If the judge finds the statement voluntary and thus admissible, the jury is also given the opportunity to look at the issue of whether the statement was given voluntarily or involuntarily." *Id.* at ¶ 14 (emphasis added).

Oklahoma has long followed the "Massachusetts rule" and still does, post-*Jackson v. Denno. See*

*Tice v. State,* 1970 OK CR 144, ¶ 13, cited in *Parent, supra,* at ¶ 21.[14]

Because there was a general verdict, there is no way to know how the jury assessed

---

[14] This answers the Court's question raised on p. 8 of its opinion, Docket # 151.

voluntariness, because the jury could have brought back a guilty verdict even if they found involuntariness. We also do not know how the jury assessed any particular testimony or evidence in the case. Thus, there can be no preclusive effect for issues which were for the jury to determine as part of its assessment of guilt or innocence.

The *Jackson II* opinion, 2000 OK CR 45, does not help the City one bit. There was no issue of coercion in that case. All statements, admittedly, were voluntary. The trial court took the facts and applied the law on a "rescue exception" to determine that the admittedly voluntary statements were **admissible** despite no Miranda warning. The OCCA affirmed. *But here again, all that happened on collateral estoppel in that case was that the statements were admissible.* There, the issue of voluntariness was not at issue, just whether the statements could be admitted. Moreover, the opinion, ¶ 16, carefully noted that OCCA's prior admissibility findings "were not related to or dependent upon the specific crimes alleged,"[15] and that "the statements in the car were volunteered and not the product of custodial interrogation...." Thus, *Jackson II* is inapposite.

Since in Ms. Murphy's case there was no "final determination" of voluntariness because the jury, not the court, makes that determination in Oklahoma, the Tulsa County District Court did not "overrule" the OCCA. Moreover, it simply vacated the conviction and dismissed the case with prejudice. 22 O. S. § 1087, City Exhibit 52, provides that a final judgment under the Post-Conviction Relief Act may be appealed to the OCCA. There was no appeal of the final judgment of dismissal with prejudice.

---

[15] By contrast, Ms. Murphy's statement was directly related to the specific crime alleged and in her case the jury ultimately was the "decider-in-chief" on voluntariness.

The critical distinction between judicial decision on the admissibility of evidence on voluntariness and jury determination of the actual fact of voluntariness eviscerates the Motion's discussion of *Hatchett v. City of Detroit,* 495 Fed. Appx. 567 (6th Cir. 2012). In Oklahoma, as we have seen above, the jury decides the actual fact of voluntariness. **In Michigan, the judge's decision on voluntariness is final.** It is regrettable that the Motion did not tell the Court that Michigan's decision to proceed with judge-finality on voluntariness was established in the very case the Motion cites, n. 11, p. 25, *People v. Walker,* 132 N. W. 2d 87 (Mich. 1965).

Ms. Murphy's Application and Supplemental Application for Post-Conviction Relief referred to the issue of a coerced confession and ineffective assistance of counsel in dealing with it. *See* Fact # 47. A coerced confession may have been very important in the ultimate determination of clear and convincing evidence of a *prima facie* case of actual innocence.

## 2. The Jury May Find That the Confession Was Coerced

"The determination of voluntariness is based on the totality of the circumstances." *United States v. Lopez,* 437 F. 3d 1059, 1063 (10th Cir. 2002). "Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation." *Id.*

> Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.
> *Id. [citing United States v. Toles,* 297 F.3d 959, 965-966 (10th Cir. 2002)].

The "relevant circumstances" are these:

> A. She suffered the most horrific emotional and psychological blow a mother could imagine, seeing her 3 ½ month old baby decapitated in a pool of blood, a few hours before interrogation. Her neighbors testified she was "in shock," "hysterical," "fell to the ground" and "lost it" and acted like you would expect from a mother in the circumstances. The same neighbors who gave this testimony saw her the night before and

28

described her as "a lot happy" and as happy as they had ever seen her.  Cook admitted she was not "in control" and got "markedly upset."  *See* Facts ## 7, 8, 46, 47.

B.  She twice asked for the presence of her mother when Cook "was screaming at me." Fact # 64.

C.  She was ***"ashamed"*** by Cook's sexual assault, Fact # 24, which Cook does not deny (160).

D.  She was 17 years old, with an eighth grade education, no prior experience with the judicial system, and she had no cuts and no blood on her person or her clothes.  Fact ## 59, 49.

E.  She was not medically examined for the blow on the head she suffered.  Fact # 35.

F.  When Cook couldn't get her to admit she committed murder, ***Cook made a "deal" with her—say it was an accident, and you will get therapy and go home.  He yelled at her until she agreed to the Deal.***  Facts ## 17-19, 25, 26.

G.  She took Cook for his word that if she said it was an accident she would get therapy and go home.  Fact # 152.

H.  She was barefoot and in handcuffs until she agreed to the Deal to say it was an accident.  Fact # 78.

I.  Cook's conduct "scared" her; she "didn't feel right about it."  Fact # 24.

J.  She was interrogated on five hours of sleep.

K.  The interrogation was not recorded in the entirety, which the Final Policymaker says is especially important when interrogating a juvenile (but there was no TPD policy requiring that).

L.  During the taped statement, she said something Cook didn't like, so he rewound the tape and started over.  Fact # 189.

Tellingly, the Motion is dead silent as to the 2017 testimony of Cook and of Ms. Murphy,

about the circumstances of the confession[16]. **Cook now admits he did not believe she was guilty or that "malice aforethought" was applicable** (5-7). Cook's dozens of "I don't remember" (195) may be viewed as lies by the jury, to cover up his coercing the confession. Cook eschews his trial testimony (125) which itself presents a factual dispute with the Motion's citations to Cook's trial testimony about not coercing her. Her 2017 testimony set forth in the A-L factors, above, show coercion. The Deal itself was either a promise or a threat (as to threat, since she was told she would be able to leave if she said it was an accident, the threat of "you won't get out of here unless you say it was an accident" is an inference the jury may draw). Cook never heard that coercion can be mental as well as physical (159). He had no training that presenting a false confession at trial violated substantive due process (158).

The Tenth Circuit requirements on deciding a confession is coerced include:

A. "To be admissible a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." *Clanton v. Cooper,* 129 F.3d 1147, 1158 (10th Cir. 1997).

B. "Where a promise of leniency has been made in exchange for a statement, an inculpatory statement would be the product of inducement and thus not an act of free will." *Id.* at 1159, quoting *United States v. Garot,* 801 F.2d 1241, 1245 (10th Cir. 1986).

C. "A confession runs afoul of the Fifth Amendment when it is obtained by 'government acts, threats or promises that allow the defendant's will to be overborne.'" *Griffin v. Strong,* 983 F.2d 1540, 1543 (10th Cir. 1993).

The jury in this case before the Court may find that her confession was involuntary.

---

[16] ***Even more telling is the Motion's citation of only 4 pages of the 541 pages of deposition testimony of Cook (1 page–to say he doesn't remember a 1990 interview in another case) and Ms. Murphy (3 pages–to say the State paid her $175,000 under the actual innocence statutes).***

**3. The Trial Usage of the Confession Was Not Harmless Beyond a Reasonable Doubt[17]**

The complete trial record is (138). The Court may find the easiest yet most penetrating

analysis of whether introduction of the confession was not harmless beyond a reasonable doubt

by examining the prosecutor's closing argument. The prosecutor effectively wrote off the value

of the testimony of William Lee when he candidly told the jury William Lee's testimony had

"problems" (138, p. 1024) and asked them to "boil it down" to deciding that no mother of a

murdered child would implicate herself as Ms. Murphy did to Mike Cook. (138, pp. 1087,

1088).

**D. The Jury May Find Causation and Culpability of the City Are Established For Cook's Knowing Presentation of (1) a Coerced Confession and (2) a False Confession, As the City Had Two Unconstitutional Policies**

"The Supreme Court observed in *Brown* that when an official municipal policy itself

violates federal law, issues of culpability and causation are straightforward; simply proving the

existence of the unlawful policy puts an end to the question." *Barney v. Pulsipher,* 143 F.3d

1299, 1307 (10th Cir.1998)(*citing Bd. Of Cty. Comm'rs v. Brown,* 520 U. S. 397 (1992). In this

case, the City had not one unconstitutional policy concerning Constitutional limits on

interrogations, but two. First, the City gave "full authority" to its interrogators to conduct

------

[17] For coerced confessions to constitute a Fair Trial violation, their usage at trial must not be harmless beyond a reasonable doubt. *Arizona v. Fulminante,* 499 U. S. 279 (1991).

interrogations however they wanted to, including threats (113). That is, the Constitution be damned. Second, by prohibiting threats or promises when interrogating police officers but by saying nothing about citizens, the City effectively ***authorized*** threats and promises when interrogating citizens (130). That is, open season on citizen interrogations. ***Each of these policies authorized Constitutional violations, which is at least as reprehensible as ratification. "Full authority" to make it up yourself, don't worry about the Constitution.*** All that remains is the issue of deliberate indifference, which the evidence allows the jury to find here. *See Lopez v. LeMaster,* 172 F.3d 756, 763 (10th Cir. 1999), which holds that where a policy of understaffing the jail is unconstitutional, thereby it is the moving force of the injury, and the plaintiff need only prove deliberate indifference. Moreover, deliberate indifference is established where the final policymaker is responsible. *Id.*

Interestingly, the facts in Ms. Murphy's case are all but a clone of the facts in *City of Canton.* Cook was vested with the "full authority" of TPD to conduct the interrogation of Ms. Murphy however he wanted to do it, without Constitutional limitations, including the making of threats, just as "complete authority" was vested in the policeman in *City of Canton:*

> "The evidence, construed in a manner most favorable to Mrs. Harris, could be found by a jury to demonstrate that the City of Canton had a custom or policy of vesting **complete authority** with the police supervisor of when medical treatment would be administered to prisoners. Further, the jury could find from the evidence that the vesting of such *carte blanche* authority with the police supervisor, <u>without adequate training to recognize when medical treatment is needed, was grossly negligent, or so reckless that future police misconduct was almost inevitable or substantially certain to result.</u>"
> 489 U. S. 378, 382 (emphasis added).

Palmer admits an officer would have to have been told about what the Supreme Court said about interrogations in order to know what the Constitution required (55).

**E. The Jury May Find That Failure To Supervise Caused (1) the False and/or Coerced Confession and (2) the Reckless Investigation Thereby Denied Ms. Murphy a Fair Trial**

Cook, and all homicide interrogators, had the "full authority" of TPD to make their own decisions how to conduct interrogations, including threats. The policy of protecting the employment rights of police officers being interrogated (by the Manual prohibiting threats and promises), but not the Constitutional rights of citizens was a stark abandonment of the duty to supervise so as to prevent Constitutional violations in interrogations. Palmer admits that without recording equipment going on during all of an interrogation, **there is no supervision whatsoever.** But Palmer admitted recording is particularly important for a juvenile, yet abandoned his supervisory responsibility by not having any such requirement. Allen never asked any of his interrogators what tactics they used, and never asked—in 7 years. No TPD policy required report writing. Thus, there was no paper trail to allow for supervision. TPD's failure to train Allen on interrogations was:

> a clear and unequivocal failure to supervise and failure to train both Cook and Allen, which is attributable to the system of lack of supervision which Palmer allowed to occur.

> directly attribut[able] to Police Chief Palmer's failure to establish policies, operating procedures, proper training and supervision that would address the critical issue of conducting proper criminal investigations.
> (164, pp. 32, 33).

Without adequate supervision of investigations and interrogations, the jury may find it plainly obvious that Constitutional violations will occur, and that lack of supervision was closely related to Cook's Constitutional violations.

**F. The Jury May Find That Lack of a Sexual Harassment Policy and Lack of Training Thereon Caused the False and/or Coerced Confession**

33

The jury may find that Cook's sexual harassment of Ms. Murphy caused her false and/or coerced confession. *See* Fact # 22 on her feeling ashamed, afraid, unwilling to tell anyone. TPD had no sexual harassment policy as to citizens or training on same. Palmer was deliberately indifferent by saying TPD did not need such a policy (167). But his policy allowed touching (166). When touching is permitted, without a sexual harassment policy to define unacceptable behavior, it is plainly obvious that citizens will be sexually harassed. As Sgt. Allen testified, by not having sexual harassment training, TPD was just setting itself up for an officer to go a little bit far in the way of sexual harassment during an interrogation (157).

## G. Deliberate Indifference Of The Final Policymaker

A single incident of unconstitutional conduct by a police officer can give rise to a claim under § 1983:

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations. *Barney v. Pulsipher*, 143 F.3d 1299, 1308-091 (10th Cir. 1998) (citing *Board of County Comm'rs v. Brown*, 520 U. S. 397, ..... (1997); *City of Canton v. Harris*, 489 U. S. 390 n. 10 (1989).

*Board of the County Comm'rs of Bryan County, Okla. v. Brown*, 520 U. S. 397, 409 (1997) says:

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right.

Interrogations and investigations were part of routine TPD police work. Without adequate training on the Constitutional limits (of which there was none at TPD), and on proper conduct of

34

investigations, the jury may find the decision not to train Cook reflected "deliberate indifference" to the obvious consequence, violation of citizens' constitutional rights.

> ...[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations of deadly force, *see Tennessee v. Garner,* 471 U. S. 1 (1985), can be said to be "so obvious" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.
> *City of Canton, Ohio v. Harris,* 489 U. S. 378, 390 n. 10 (1989).

Phrased slightly differently, Justice O'Connor added emphasis, concurring in *Canton:*

> ...[A] municipality could fail to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. As the majority notes, 489 U. S. 390, n. 10 [the quotation just above in this brief], the constitutional duty of the individual officer is clear, and it is equally clear that failure to inform city personnel of that duty will create ***an extremely high risk that constitutional violations will ensue.*** *Id.* at 396 (emphasis added).

The Final Policymaker admitted it is obvious there likely will be violations of citizens' rights in interrogations, without training (133). TPD's training on Constitutional limits of interrogations was non-existent; on proper conduct of investigations, it was highly inadequate. Palmer admits (108) that an officer would have to be told what the Supreme Court said about interrogations in order to know what the Constitution required, but he offered no training or policies to do that.

Why didn't Palmer simply have a policy of "don't make promises or threats during interrogations"? Palmer testified, "I don't know." (136). Palmer admits no discipline could be imposed for Constitutional violations during interrogations when the officer does not know what such violations are (121). Palmer admits that in order to protect the Constitutional rights of all person, TPD should have had written policies setting forth at least the broad outlines of what

those rights are, including in interrogations (117), but he had no such written policies. Fact # 118. In 1994 Homicide interrogators were not trained that innocent people confess (122). He did not require that Homicide Squad detectives have specific training in interrogations (115). Palmer admits there were no do's and don'ts for interrogations (114). Palmer admits it was his job to see that officers were up to date on interrogations (43). "So, the failure to have proper policies, training and supervision on do's and don'ts of interrogation of innocent persons confessing were a direct cause of Michelle Murphy's coerced confession." Plaintiff Expert Report, p. 30. The wide-open, Constitution-be-damned conditions created by Palmer's decisions were put into even sharper focus by two of his deposition responses. First, when asked his reaction to homicide interrogators measuring their value by getting confessions, he replied, "so be it" (131). More ominously, he tried to downplay TPD Constitutional violations by saying "checks and balances" in "the court system" can discredit and/or throw out whatever (bad) was done in the TPD investigation (141). There was no sexual harassment policy or training, inviting sexual abuse, Sgt. Allen testified (157). There was no policy or training on medical attention for interrogatees. There were highly inadequate policies and training on conducting investigations. *See* Fact # 93. Additional indicia of deliberate indifference are found in (49, 50-52, 55, 75, 76, 123, 124, 130, 137, 138 and 196 and in Fact # 120.

Under the circumstances described in the preceding paragraph, the Tenth Circuit holds that neither *City of Oklahoma City v. Tuttle,* 471 U. S. 808 (1985) nor *City of Canton* require more than: (1) one incident where the failure to train caused the Constitutional injury; and (2) there is direct evidence of inadequate training. *Allen v. Muskogee,* 119 F.3d 837, 845-6 (10th Cir. 1997). There was one incident, the jury may find the failure to train caused Ms. Murphy's

36

Constitutional injuries, and there is direct evidence of inadequate training. The Tenth Circuit is quite clear that deliberate indifference does not require "the existence of a pervasive problem." *Brown v. Gray,* 227 F.3d 1278, 1289 (10th Cir. 2000). Moreover, the usual and recurring situation requirement "need not be frequent or constant. It must merely be of the type that officers can reasonably expect to confront." *Id.* at 1288. Failure to train in recurring situations presents an "obvious" potential which meets the "highly predictable" or "plainly obvious' standard. *Barney v. Pulsipher,* 143 F.3d 1299, 1307-08 (10th Cir. 1998). That "obvious potential" establishes deliberate indifference is underscored in *Allen v. Muskogee,* 119 F.3d 837, 842 (10th Cir. 1997):

> "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." (citing *Brown v. Board, supra* and *City of Canton, supra*).

Stunningly, the Motion concedes that a "single incident" can establish notice such that deliberate indifference may be inferred, on pp. 37-38 where it cites the case law on the doctrine, but then has no facts or argument to prove its vacuous one-liner that Murphy can't survive the City's motion for summary judgment.[18]

## H. The City's Causation Of The Denial Of A Fair Trial For Ms. Murphy

The jury may infer causation in many ways: First. A "high degree of predictability" of a specific Constitutional violation:

---

[18] The Motion, p. 36, fails to tell the Court that the *Barney* opinion says *notice* may be shown when there is a narrow range of circumstances where a violation of federal rights is "highly predictable" or "plainly obvious;" the Motion also fails to say the word "significantly" appears nowhere in the opinion. 143 F.3d at 1307.

The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymaker's choice—namely, a violation of a specific constitutional or statutory right. ***The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable.***

*Board of County Commrs v. Brown,* 520 U. S. 397, 409-410 (1997) (emphasis added).

Second. As we have seen in *Lopez, supra* and *Barney v. Pulsipher, supra,* having policies which are unconstitutional satisfies the moving force requirement. And TPD had two unconstitutional policies. Third. Failure to train. "...[S]ection 1983 plaintiffs can use a municipality's failure to train as one way to make the required showing that a municipal policy or custom was the 'moving force' behind an already established Constititutional violation." *Myers v. Okla. Cty. Board of Cty. Comm'rs,* 151 F.3d 1313, 1317 (10th Cir. 1998). The failure to have sexual harassment training which Sgt. Allen said was an invitation for sexual abuse in interrogations can be inferred as the moving force behind the confession. And the same for failure to have policies and training on presenting false or coerced confessions at trial. As for reckless investigation, the failure to adequately train and to have adequate policies on investigations may be found as a moving force.

As we saw on p. 35, above, Justice O'Connor noted that "failure to inform City personnel of that [constitutional] duty will create an extremely high risk that constitutional violations will ensue." There was no training on the do's and don'ts of interrogations, Palmer admitted (51), and it was his job to keep officers up to date on interrogations (43). Since Cook had no training on the Constitutional limits of interrogations, he did not know that interrogating her when he did, given her emotional state, was improper. *See* Fact # 197. And with no training on the

38

Constitutional limits of interrogations, he was not trained that coercive tactics can and do produce false confessions. *See* Fact # 198. Without proper training, and being told touching was OK, he did not have adequate training on sexual harassment.

Overall, we must remember Palmer's admission that without training, it is obvious that there will be violations of citizen's rights in interrogations. Palmer's indifference "led directly to the very consequence[s] that was [were] so predictable," as the Supreme Court noted in the quote on pp. 37-38, above.

## V. Conclusion

The City's Motion for Summary Judgment should be denied. There are many genuine disputes of the City's alleged Undisputed Material Facts.

Respectfully submitted,

/s/ R. Thomas Seymour

/s/ Richard O'Carroll

Attorneys for Michelle Murphy

R. Thomas Seymour #8099
Seymour Law Firm
1811 South Baltimore
Tulsa, OK 74119
918-583-5791
rtseymour1@aol.com

Richard O'Carroll #11947
O'Carroll & O'Carroll
2171 N. Vancouver Ave.
Tulsa, OK 74127
918-584-4192
troc@cox.net

**Certificate of Service**

R. Thomas Seymour states he filed electronically in the case file true and correct copy of the foregoing Plaintiff's Response to Defendant's Motion For Summary Judgment this 28th day of July, 2017, which automatically sends notice to:

David E. O'Meilia, OBA # 6779
Gerald M. Bender, OBA # 14471
T. Michelle McGrew, OBA # 20279
Stephan A. Wangsgard, OBA # 18312
City Hall, One Technology Center
175 East Second Street, Suite 685
Tulsa, Oklahoma 74103

/s/ R. Thomas Seymour
R. Thomas Seymour OBA # 8099
Seymour Law Firm
1811 South Baltimore
Tulsa, Oklahoma 74119
918-583-5791

1    you said that they had given you some analgesics, I

2    think you said maybe some Tylenol or something.  Did

3    they give you any ice for your head?

4         A    I don't think there was ice at the jail.

5         Q    Okay.  All right.  Let's talk about -- we're

6    going to talk about after your arrival at the red brick

7    police station, which was a temporary station.  And I'm

8    just going to refer to it as the red brick police

9    station because that's what you've told me it was.  Is

10   that -- is that all right with you?

11        A    Yes.

12        Q    Okay.  Great.  Do you know what time you

13   would have arrived at the police station?

14        A    I couldn't tell you the time.  I know that

15   the sun was out.

16        Q    All right.  And, again, you don't recall how

17   long you would have been in the police car at your

18   apartment after discovering Travis before you were

19   transported to the police station?

20        A    Like I said, I don't know.

21        Q    Okay.  All right.  And I want you to think

22   about this again, but when you arrived at the police

23   station, were you in handcuffs?

24             MR. O'CARROLL:  Asked and answered.

25             Answer if you know.

1          THE WITNESS:  I believe I was.

2      Q     (By Mr. Bender)  All right.  Tell me what

3  happened after you arrived at the police station in

4  handcuffs.  What did they do next or what did you do

5  next?

6      A     The tall officer set me -- I guess it would

7  be called a cubicle area and then I think he went and

8  got Mike Cook, because they came and got me and took me

9  to a smaller room.

10     Q     Okay.  Now, you said a cubicle.  Maybe a

11 waiting room or something when you first arrived or --

12     A     No, because there was like a little table and

13 then some like -- I would call it a cubicle, but I

14 don't know what they would.

15     Q     Okay.

16     A     A makeshift office.

17     Q     Okay.  And let me -- let me see if I can --

18 if I can help you or get some more detail from you.

19 This cubicle that they put you in or that the tall

20 officer put you in when you first arrived, did it have

21 four walls, complete walls from the floor to the

22 ceiling?

23     A     No, not at that moment.  It was kind of an

24 open space with little sectioned-off places.

25     Q     Okay.  Like a half wall kind of thing?

1      A      Yes.

2      Q      Did those handcuffs attach in any way to the

3    chair or table?

4      A      No, they were not.

5      Q      And wrists were both -- the handcuffs were on

6    your wrists and you were handcuffed in front of you?

7      A      Correct.

8      Q      All right.  No -- nothing on the table or the

9    chair where they would take one of the cuffs off of one

10   of your wrists and clip it to the table or the chair?

11     A      Not that I seen.

12     Q      Okay.

13     A      Not that I can remember.

14     Q      And as you recall or what you're telling me

15   is you were handcuffed.  Were you handcuffed the entire

16   time you were in that room?

17     A      Most of the time.

18     Q      Okay.  When would they have taken the

19   handcuffs off of you?

20     A      After Mike Cook and I, well, made a deal to

21   make this confession up.

22     Q      Okay.  And was it before or after the

23   recording was made?

24     A      Right before.

25     Q      So before the recording was made, Detective

 1          A    I didn't confess because I didn't do it.

 2          Q    Well, those are two different things.

 3               MR. O'CARROLL:  Well, let her finish the

 4     answer.  Let her finish the answer.

 5          Q    (By Mr. Bender)  Go ahead.

 6          A    I have made a statement that I was guided in

 7     making.

 8          Q    You were guided into a statement by?

 9          A    Mike Cook.

10          Q    Okay.  And what was that statement?

11          A    To say it was an accident, that I

12     accidentally did this.

13          Q    Okay.  And did -- tell me what Detective Cook

14     would have told you about your child that would have

15     made it -- made your statement that you were guided

16     into accurate about what had actually happened to him

17     or what he actually looked like?

18          A    I'm sorry, can you --

19          Q    You said that you were guided by Detective

20     Cook into a statement about it being an accident;

21     right?

22          A    Right.

23          Q    And what did Detective Cook tell you about

24     the condition of your child's body that he used to fill

25     in blanks for you so that you could say, This is what

1   was cut?

2        A     I don't know.  I didn't hear that testimony.

3        Q     Did you know he testified that the person who

4   did it probably cut themselves?

5        A     No, I didn't know that.

6        Q     So tell me what it is now that justified her,

7   in this statement, that justified her being arrested for

8   first degree murder.

9        A     The use of the knife.

10       Q     What use of the knife?

11       A     Where she said she dropped it on him and

12  accidentally cut his throat.

13       Q     Well, she didn't say how she cut his throat,

14  did she?

15       A     No.

16       Q     You didn't show her any pictures.  Right?  Is

17  that correct?

18       A     In my opinion, I would think that I had

19  thought she killed the baby and that's why I arrested her.

20       Q     So you believed that she killed the baby?

21       A     Yes.

22       Q     All right, sir.

23       A     Or I wouldn't have arrested her.

24       Q     So at that point, you were convinced she was

25  guilty?

1   not have the word "may" in front of it?

2           A       That was erroneous.

3           Q       Okay.  So now you remember giving it.  Is that

4   correct?

5           A       I know what I said before.  And what I'm

6   telling you now is I believed that she may have committed the

7   murder.  Because, well, that's what I'm going to say.

8           Q       Okay.  Over here on page 5, you asked her when

9   you went down, you accidentally cut his throat.  Is that

10  right?

11          A       Okay.  What now?

12          Q       You asked her, middle of the page:

13                          "Let me get, let me get this straight,

14                          okay?  When you went down, you

15                          accidentally cut his throat.  Is that

16                          right?

17                          Answer:  'Cause I was gonna on him and

18                          see if he was still there, you know."

19          Now, you're asking her if she accidentally cut his

20  throat.  Correct?

21          A       Uh-huh.

22          Q       (By Ms. McGrew) Yes?  You've got to answer

23  audibly.

24          A       Yes.

25          Q       (By Mr. Seymour)  And her answer was "Yes".

1    A      Okay.  I'm not sure but, I'm not even sure if

2  I remember right.  But I think we had to use a specific line

3  when we started out the elements or whatever, if I remember

4  right.  So that's why that's there, in those words.

5    Q      In those words?  You had to be telling the

6  truth when you wrote it, didn't you?

7    A      Well, I had to be, if I remember -- and I'm

8  not sure I even remember this right -- I had to write it out

9  for that charge in a certain way.  And that's all I remember.

10    Q      Sir, in order to write it out, you had to

11  believe that she --

12    A      I don't know.  I don't -- I don't know.  I

13  don't remember.  I think I had to use that terminology, I

14  think.

15    Q      Excuse me.  May I finish the question?

16    MS. McGREW:  Okay.  You're jumping all over

17  his answer.  So you let him finish the answer before you

18  start the question.  Then you wait for him.

19    MR. SEYMOUR:  No.

20    MS. McGREW:  You're both talking over each

21  other.

22    MR. SEYMOUR:  I'm trying to jump over his

23  answer because he has not let me finish my question.

24    Q      I will try not to jump over you, regardless of

25  the circumstances.  Okay?  I apologize.  Now, when you wrote

1 be more of a maroon red handled knife, and it had a

2 six to eight inches blade, then she told me hid it

3 in the grill thing between the swings and the

4 slide.

5 Q    Then what did you do after you made notations

6 of that information?

7 A    After that, I broke and I went out and relayed

8 the information on possible location of the knife

9 to the detectives of the scene so they could look

10 for it.

11 Q    Okay.  Then what did you do in regards to your

12 interview with the defendant?

13 A    When I came back in, I brought the tape

14 recorder and a blank tape and I asked her if we

15 could tape her statement about how she had

16 accidentally caused the cut on Travis' neck, and

17 she agreed to do a taped interview.

18 Q    Let me hand you what's been marked as State's

19 Exhibit Number 27 and ask you to take a look at

20 that.  Do you recognize State's Exhibit Number 27?

21 A    Yes, I do.  It is the tape of the interview.

22 Q    And how is it that you recognize that tape?

23 A    I recognize my writing and I've also initialed

24 and dated.

25 Q    Is this the actual and original tape of your

STATEMENT (TAPED)

STATEMENT OF: Michelle Murphy
REFERENCE: Case File #573-348, Homicide, 9-12-94
Victim--Travis Wood
2275 South Maybelle
QUESTIONED BY: Det. Cpl. M. S. Cook
DATE AND TIME: 9-12-94 - 1428 hours
PRESENT: Det. Cook and Michelle Murphy
LOCATION: TPD, Detective Division Interview Room
TRANSCRIBED BY: Barbara Gifford

Q: Michelle, would you state your full name for me.

A: Michelle Dawn Murphy.

Q: And what's your date of birth?

A: ███████

Q: 10-30 of '76? And your Social Security number?

A: ███████

Q: O.K. And before we started talking, you remember the paper that
we read that had your rights and everything on it that you
initialed?

A: Yes.

Q: O.K. To start out, why don't you tell me about what happened
early this morning to Travis.

A: Well, I woke up. There was somebody knocking on the door. I
went to answer it, and it was LaDonna. And me and her had an
argument like a week before, and she told me she was going to
get, get me back, you know.

Q: O.K. Go ahead.

A: And...

Q: Go ahead, I'm sorry.

573348

COT 7972

A:  And I opened the door, and she just walked in, and she just started yelling at me about (inaudible) argument, and somehow I got hit, and we started arguing and screaming, and it woke up my baby. So the next thing I remember I was trying to get him out of somebody's arms and he fell.

Q:  Where was this at?

A:  In the kitchen.

Q:  O.K.

A:  And then I seen when they grab him he wasn't moving. I thought I had lost him, and I just blacked out.

Q:  O.K. You told me earlier that, that you had gone upstairs.

A:  I had...I ran upstairs, 'cause I was scared. I always run up to the bathroom and lock the door whenever I get scared or if I have a bad dream about my past. When I (inaudible) wake up, I run upstairs and I lock myself in the bathroom.

Q:  O.K. Did you say that, that you and LaDonna were still argujing or fighting, and that you went upstairs?

A:  Um hum. She, she followed me. So I grabbed...I always kept a knife in my window in my hallway in case of...

Q:  Which knife?

A:  It's one of my kitchen knives. It has kind of like a, um, a maroon red handle on it.

Q:  O.K.

A:  And I always keep it there just in case somebody tried to break in, because I don't have anybody to, to take care of me, to stay with me and protect me. And I grabbed it, and I was chasing after her with it.

Q:  Chasing after LaDonna?

A:  I was just running down the stairs, 'cause I was (inaudible).

Q:  You were what?

A:  Infuriated, I guess.

COT 7973

Q: O.K.

A: I guess that's the word you use, isn't it? I mean, I, I was...I just blacked out.

Q: O.K. What hap...

A: And she ran out.

Q: She ran out the front door?

A: Yeah. So I went and I checked on my baby.

Q: Went into the kitchen?

A: And I went, yes, I went to go down to check on him (inaudible).

Q: You went to what?

A: To go...to bend down over him.

Q: To bend over?

A: And then get on my knees.

Q: O.K. You got on your knees.

A: I went...'cause I bend over...I've got a bad back.

Q: Uh huh.

A: And I went to bend over and check on him, and I wasn't paying any attention to how long the knife was, and I just...I went to bend over to check on him (inaudible) he was all right. I didn't see him breathing or anything. And it...and the knife was long, and it was (inaudible).

Q: What happened when you bent over with the knife?

A: I went down...I musta went down too fast, and I didn't pay any attention to how close I put my hands to...towards him, 'cause I didn't see him breathing. He wasn't making any noise. And when a baby falls like that, they're gonna cry. He didn't cry, he didn't move.

Q: So what happened when you bent over him with the knife?

COT 7974

A:  I was too close to him with the knife, and the knife was long
    and it cut him.

Q:  Where did it cut him?

A:  On the throat.

Q:  The throat?

A:  (inaudible) my baby.  I love you, Travis.

Q:  O.K.  You said earlier...

A:  Oh, I'd never do that.

Q:  ...you said, "I could've been so angry I needed to take it out
    on somebody and ended up hurting my son."  Can you explain that
    for me?

A:  You mean...I was...I blacked out.  I could've...I mean, I didn't
    know what I was doing.  It wasn't me.

Q:  What did you do?

A:  I've never blacked out like that.

Q:  What did you do when you ended up hurting your son?

A:  I was so mad, I guess I took it...I don't know.

Q:  Were you so mad....

A:  She could've (inaudible) when he drop...when, when he fell.
    When we dropped him.

Q:  Did you cut him because you were mad?

A:  No.  I went down to check on him, 'cause I didn't see him
    breathing, and it scared me.

Q:  You didn't see him breathing, and he...and it scared you, is
    that what you said?

A:  Yes, but I went down to make (inaudible) if I could get him
    started, 'cause I know some parts of CPR.

Q:  What did you do?

COT 7975

A:   I went to go down, and I had my hands too far, and it went...the
     knife went down on him.

Q:   How many times did it go down on him?

A:   I don't know.

Q:   Did you strike out at him more than once with the knife?

A:   No, I couldn't have.

Q:   Do you think he might've been cut more than once?

A:   No.

Q:   What did you...

A:   (inaudible) and I just dropped the knife, and it hit him.

Q:   So...

A:   (inaudible).

Q:   ...let me get, let me get this straight, O.K.  When you went
     down, you accidentally cut his throat?  Is that right?

A:   'Cause I was gonna check on him and see if he was still there,
     you know.

Q:   Uh huh.  And then when you stood up, you dropped the knife, and
     it went down on him again?

A:   Yeah.

Q:   O.K.  So there's two times?

A:   'Cause, see, I...you know when you go to bend down...

Q:   Uh huh.

A:   ...'cause I can't go down, you know...

Q:   I understand.

A:   ...without putting my hands.  I had to bend over and put my
     hands down, and I had my hands, you know, (inaudible), and I
     still had that knife in my hand, and it went down on him 'cause

COT 7976

A:   'cause. I had my hands too close together.  I (inaudible) check
     on my baby.  I didn't pay any attention to put the knife down.

Q:   O.K.

A:   I wanted to check on my baby because I love my baby so much,
     and...

Q:   What happened after you, after you stood back up and, and had
     the knife?  Where did you go?

A:   (inaudible) wanted, wanted to go get help and threw it in the...
     I don't know what it's called.

Q:   Threw what?

A:   The knife.  In the, the, the sewer (inaudible).

Q:   O.K.  Like in the, in the grating over a sewer?

A:   Yes.

Q:   O.K.  And this is in your backyard near the playground?

A:   Yes.

Q:   Where did you say it was on the playground?

A:   It's in between the two...in between...there's a, um, one deal
     that has a, um, a slide and then monkey bars on it, and then
     there's another one across from it that has swings in it.  And
     it's just right in between it.

Q:   I see.  Was there anyone else with LaDonna when all this was
     going on?

A:   I can't remember if there was or not.

Q:   Was there any...

A:   I got hit in the head so hard, it...I...

Q:   Do you remember if anybody else was in the house when you, when
     you used the knife on Travis?

A:   I didn't use it on him.

COT 7977

Q: Well, I mean...

A: It was an accident.

Q: ...that's...I, I understand, I mean, when that happened, was there anyone else in the house?

A: I don't think so. I don't know if there was anybody with her. But what I heard from everybody else out there whenever (inaudible) my baby...there was a lot of people there. (inaudible) couple of people with her, and I just don't remember everything. As...I felt like I got hit on the head a couple of times real hard, the...a steel bar or something, and I got knots on my head, and it hurts, and that could've been what caused me to black out.

Q: But you remember pretty clearly, though, that it was...

A: I went to check on my baby.

Q: ...accident?

A: Yes.

Q: So you can see that clearly in your mind?

A: Yes. (inaudible). I can't remember it. (inaudible) I finally remember parts of what happened (inaudible) my baby. (inaudible) my baby. I love my kids so much. That's the only things that keep me going is my babies.

Q: What was it that you and LaDonna had been arguing about?

A: She would be running around, and I had met this guy when I was trying to go to TJC for my GED, (inaudible) through a friend, and, uh, she, um, introduced me to her boyfriend, Mike, and Earl's his best friend, his roommate.

Q: O.K. Is that Earl Peck?

A: Yeah.

Q: O.K. How long ago was this?

A: Uh, Travis was only about a month, month-and-a-half old.

Q: O.K. So this hasn't been all that long ago then?

A:   Uh uh.

Q:   Just a month or so?

A:   Um.  And, I mean, you know, he was real sweet and everything,
     and, um, you know, I liked him, and then after that, Mike and
     Sheila had split up and everything, you know, and, you know, I
     was still friends with 'em, and I still went over and seen 'em,
     you know, and then me and my, um, common-law husband split up
     because I wanted him to go find a job, you know, straighten up,
     get up on his feet (inaudible).

Q:   O.K.  You're talking about Harold?

A:   Yeah.  I wanted him to prove to me that he cared about me and my
     kids and he was gonna support us.  So I told him, you know,
     leave.  I told him I didn't want him there anymore and that he
     could get a job and prove to me he could support us.

     And, anyway, I don't remember what I was saying...

Q:   We were talking about Earl.

A:   Um, and after a while, me and Earl, we, um, we started talking
     and we got good close friends, and we did something a couple of
     times, but then we went, you know, and I just couldn't really
     handle it, because I was still in love with Eugene...Harold.

Q:   By Eugene, you're referring to Harold Eugene Wood, your husband?

A:   Yeah.

Q:   O.K.

A:   But we were still, you know, I mean he could understand that,
     and we, we agreed just to be friends.

Q:   O.K.  Where does LaDonna come into the picture?

A:   Then, um, well, see I had met LaDonna, 'cause Eugene...Harold,
     he was working out on his car one day, and he was standing out
     there.  She walked...she was walking by from checking her mail,
     you know, and this is when we were still together, and, um,
     after a while, Eli, her husband, had, um, beat her up and
     everything, and he'd ran into her again and started talking to
     her, and, um, you know, we hit it off pretty good, we were good
     friends for a while.  And I introduced her to Mike, you know,

A:    (Cont'd)

    and then she's go...and then she start...I said, I was looking
at Travis one day, and I said, "Look at his eyes, you know, he's
got my eyes, and he looks exactly like me."  She goes, "Well,
you know who he really looks like?"  I said, "Who?"  She goes,
"Earl."  And I said, "Kinda," and I said, "but I didn't even
know him then."  She goes, "Yeah, uh huh."  And then she goes
and she starts telling all these other people that Earl was his
daddy, you know.  It may have been a joke, but still, I asked
her, "Don't be staying that stuff, because then it'll get back
to his daddy, and he, he won't believe that he's the daddy."

    And then she comes over one day, 'cause I...me and my mom
(inaudible) just got into an argument, you know, and I called
Earl, and I was talking to him to calm down, you know, and...

Q:    Why was he upset?

A:    Because I...

Q:    Because of what LaDonna was saying?

A:    Yeah, this, this little girl, she was, you know, a little black
girl, she's probably about 13 maybe, and she comes by, "Hey,
Earl look-alike," you know, and I mean, he heard it, and he
goes, "Who is that?"  I said, "Some little girl or, um, that
LaDonna told 'em that you were the daddy, and I don't even know
her."  And, um, and he got mad about that, you know, he didn't
get mad, he got upset, 'cause it wasn't the truth.  And I had
asked her several times not to be doing that.  I don't care if
it is a joke or not, you know, I take it too serious about that.

    And, um, he, after I got done talking to him, he called over
there, and I don't know what he said to her.  She was trying to
tell me he said a bunch of stuff, and it was, you know, a bunch
of lies that she was telling me.  And, um, she come over to my
house, to my back door, and she...I opened the door, you know...

Q:    Is this last night...

A:    No.

Q:    ...or a time before?

A:    This is a time before.

Q: How long ago was this?

A: It was probably about maybe a week and a half, two weeks ago.

Q: O.K.

A: And he, um, she starts yelling and screaming at me, telling me she's gonna kick my butt and telling me to come on outside and all this stuff, and I told her I wanted my charcoaler back, 'cause she went and and got it, and she didn't ask me if she could use it, and I was upset about that. I told her to bring it back. And she goes, "Well, I got it lit." So I said, "Well, whenever you get done with it, bring it back over here." And she said, "Well, I'll catch you outside when you're by yourself or whenever you're by yourself at your place, I'll get you, believe me, I'll get you." And all that happened.

Q: O.K. How did you...how did she come over or how did it get started last night with her?

A: I just opened the door.

Q: Had you been over to her place last night?

A: No.

Q: O.K.

A: I don't go over to her place anymore.

Q: O.K. What were you doing when she...did she knock at the door?

A: Yeah.

Q: What were you doing when she knocked on the door?

A: Sleeping.

Q: O.K. You and both your children were asleep there on the couch?

A: Yes.

Q: O.K. What happened then?

A: Um, I got up and I opened the door, and she just walks in and starts yelling and screaming at me.

Q: What was she....

A: I don't remember what she said. I mean, I guess the blows to my head just made me forget a lot of things. But, I mean...

Q: Do know what she...did she hit you in the head with something?

A: Either that or else it was when she pushed me and I hit the ice box that time.

Q: So you all were arguing in the kitchen, too?

A: Yeah.

Q: And you say she pushed you...

A: Um hum.

Q: ...in the kitchen? And you hit your head on the ice box?

A: Well, I mean, when I walk...was walking in there, 'cause I think I was gonna get Travis a bottle or make one. I was still half asleep, you know, I didn't know, didn't know what to do, you know.

Q: And she was in there then?

A: Yeah, yeah, and...

Q: Did you have Travis...were you holding onto Travis then? Or was he...

A: One of us was holding him, and either one...one of us was holding him, you know, and either we were fighting over him, or else she pushed me and he jerked out of my arms, 'cause he was crying, and when he cries, he (inaudible) kicks and swings his arms, and he, um, he fell. And that's when I thought I lost him. And then...

Q: O.K. What did he do when he fell?

A: Nothing.

Q: Didn't cry or move or anything?

A: He just stopped crying, yeah.

COT 7982

Q:   O.K.  What happened next?

A:   (inaudible).

Q:   O.K.  That's when you went upstairs, and she followed you and so forth?

A:   Yeah.

Q:   Can you think of anything else you want to add to this statement before we stop the tape?

A:   I just love my baby.

Q:   O.K.  The time is 1449 hours.  This'll end the statement.

COT 7983

1  not have the word "may" in front of it?

2      A      That was erroneous.

3      Q      Okay.  So now you remember giving it.  Is that

4  correct?

5      A      I know what I said before.  And what I'm

6  telling you now is I believed that she may have committed the

7  murder.  Because, well, that's what I'm going to say.

8      Q      Okay.  Over here on page 5, you asked her when

9  you went down, you accidentally cut his throat.  Is that

10  right?

11      A      Okay.  What now?

12      Q      You asked her, middle of the page:

13              "Let me get, let me get this straight,

14              okay?  When you went down, you

15              accidentally cut his throat.  Is that

16              right?

17              Answer:  'Cause I was gonna on him and

18              see if he was still there, you know."

19      Now, you're asking her if she accidentally cut his

20  throat.  Correct?

21      A      Uh-huh.

22      Q      (By Ms. McGrew)  Yes?  You've got to answer

23  audibly.

24      A      Yes.

25      Q      (By Mr. Seymour)  And her answer was "Yes".

1    Right -- in effect?

2         A    Yes.

3         Q    All right.  Now, if she accidentally cut his

4    throat, how is that murder with malice aforethought?

5         A    Hmm.  I don't know.

6         Q    That's a real puzzler, isn't it?

7         A    No.  But she said that she cut his throat.

8    How she justifies that in her mind is not my decision to

9    make.

10        Q    Can I cut your throat by taking a knife and

11   just barely making a small cut?

12        A    No, but you could slice my throat to my spine

13   and tell me it was an accident.

14        Q    Can I cut your throat by making just a very

15   small cut that doesn't bleed any?

16        A    I have no idea.

17        Q    You have no idea that a person can make a cut

18   on somebody else?

19        A    I don't have any idea.

20        Q    Do you know how people make cuts on

21   themselves?

22        A    I'm not going to speculate here under oath.

23        Q    Do you know how people make cuts on themselves

24   if they're cutting in the kitchen?  Sometimes they cut

25   themselves.  Right?

1  Q    It just came up here when she began to all of

2  a sudden just on her own just began to flow out

3  about all of this story that is --

4  A    When I confronted her about the 911 call,

5  that's when that began.

6  Q    Officer, you realize -- you would agree with

7  me that what is said here obviously isn't what

8  happened, would you agree with that?

9  A    No.

10  Q    You wouldn't?  Well, let's just start with

11  Ladonna.  You certainly interviewed Ladonna, did

12  you not?

13  A    Yes, I did.

14  Q    Have you made a determination in your mind as

15  to whether she went over there that night?

16  A    I determined she did not.

17  Q    She did not.  That part here is false, isn't

18  it?

19  A    Yes, I believe it to be.

20  Q    That baby didn't get his head cut off because

21  somebody accidentally dropped a knife on him, did

22  he?

23  A    No, sir.

24  Q    We know that, don't we?

25  A    That's true.

1 unsatisfactory performance review?

2      A     I don't know because I don't recall having

3 experienced that. So I don't know.

4      Q     You don't recall having experienced what?

5      A     That type of review.

6      Q     You don't recall having experienced any

7 performance review. Correct?

8      A     I don't remember a single review. I don't.

9      Q     Is it fair to say that whatever you did or did

10 not do in the Michelle Murphy case after she confessed was

11 motivated by your firm belief that she was guilty?

12      A     I don't, I don't know what I thought. I don't

13 remember. It's so far back, I absolutely don't remember.

14      Q     All right, sir. After she confessed, did you

15 deliberately frame her?

16      A     I don't remember anything about how I felt or

17 what I thought about after her confession.

18      Q     In any written material that you produced in

19 connection with the Michelle Murphy case, did you ever say

20 anything that was false?

21      A     I'd have to look at all the paperwork.

22 Something that I said then may not be true today. So I don't

23 know.

24      Q     Did you deliberately lie about anything in

25 anything you put in writing regarding the Michelle Murphy

expert witness was inadmissible.

Detective Michael Cook with the Tulsa Police Department testified as to the events surrounding the statement he procured from Appellant. He stated that while investigating the infant's death he questioned Appellant, but only after reading her rights and determining that she understood them. Prior to reading Appellant her rights the witness stated he determined what her education was (8th grade), asked if she was using any medication, if she had had anything to drink or was under the influence of drugs or alcohol. Appellant signed the waiver and initialed each of the rights listed on the waiver form. That notification was executed as 12:15 in the afternoon the day the baby was discovered murdered.[6] Cook further testified he did not make any promises to Appellant nor did he threaten, coerce or otherwise attempt to influence her in any manner. Appellant was placed in an office with a picture window, a television, a table and 3 chairs. Appellant watched T.V. during the time she was in the room, and was asked if she wanted something to drink (at which time the witness testified he brought her some water). Cook testified Appellant was not denied access to the rest room, nor did she request to see a doctor, although she did tell the detective she had some knots on her head and bruises on her leg.[7] He did not notice anything in her demeanor which led him to believe Appellant did not understand her rights.

---

[6] Appellant had been in police custody since approximately 6 a.m. that day, but Cook testified his first contact with her was about 10:20 a.m. Appellant's recorded statement was taken between 2:30 and 2:45 that afternoon. During that approximate 5 hour time period, Appellant and the officer "talked off and on."

[7] The witness felt for but did not find any knots on Appellant's head and did not see any bruises on her legs.

1      A    I don't believe I did.

2      Q    Did you ever ask to have your mother in the

3  room with you?

4      A    I did ask for my mother.

5      Q    You did.  Do you know where your mother was?

6      A    I assumed she was at home.

7      Q    Do you know whether your mother was ever at

8  the police station?

9      A    I don't know that.

10     Q    Okay.  Who did you ask to see your mother or

11  have your mother in the room?

12     A    Mike Cook.

13     Q    Did you ask anyone else that you -- tell

14  anyone else that you wanted your mother in the room?

15     A    I didn't see anybody else for most of that

16  day in that room.  The only person I seen was Mike

17  Cook.

18     Q    Okay.  At what point did you tell Mike Cook

19  that you wanted your mother in the room?

20     A    It was -- I believe I asked him a couple

21  different times during him screaming at me.

22     Q    Okay.  Let's -- let's do this.  I would like

23  to get as much detail as I can on the time that you and

24  Mike Cook were in the interview room.  So what I would

25  like you to do is -- let's just start with tell me the

# TRACIS

Tulsa Regional Automated Criminal Information System
STANDARDIZED REPORTING FORMAT TRF.456659

☐ INJURY DIAGRAM
☒ NARRATIVE SUPPLEMENTAL
☒ WORTHLESS DOCUMENT

COMPLAINT NUMBER _____

ATTENTION: _____

Sheet ____ of ____

| CRIME TYPE | Homicide | ORIGINALLY REPORTED | MO 9 | DAY 12 | YR 94 | MONTH MO | TIME | PREPARED | MO 9 | DAY 12 | YR 94 | DAYS MO | TIME 1230 |

| TPD / PID NUMBER | VICTIM NAME (LAST, FIRST, MIDDLE) WOODS TRAVIS EUGENE | LOCATION OF OCCURRENCE 2275 SOUTH MAYBELLE AVENUE |

WORTHLESS DOCUMENT COPY - FRONT

ON 9.12.94 AT ABOUT 0738 HOURS R/O WAS ASSIGNED TO ASSIST WITH A HOMICIDE INVESTIGATION AT THE ABOVE LOCATION. R/O WAS ASSIGNED TO ATTEMPT TO LOCATE A EUGENE WOODS WHO IS THE FATHER OF THE VICTIM. R/O WAS TAKEN TO 5802 SOUTH 65 W AVE BY MIKE JARNAGAN WHO LIVES AT 749 WEST 23 ST. IN AN ATTEMPT TO LOCATE MR WOODS. MR. JARNAGAN WAS AWARE THAT THIS IS THE RESIDENCE OF MR. WOODS COUSIN. R/O SPOKE WITH RENE DAVIS. MS. DAVIS STATED SHE DID NOT KNOW WHERE MR. WOODS WAS AT THIS TIME. SHE STATED THAT IT HAD BEEN ABOUT A WEEK SINCE SHE HAD SEEN AND SPOKEN TO MR. WOODS.

R/O RETURNED TO THE SCENE AND WAS ASSIGNED TO LOCATE MS. NOLNA MURPHY AT 717 SOUTH PHOENIX. MS. MURPHY IS THE GRAND MOTHER OF THE VICTIM. MS. MURPHY WAS CONTACTED AT 0815 AND TOLD ABOUT THE VICTIMS DEATH.

R/O RETURNED TO THE SCENE AND PUT BACK INTO SERVICE BY CPL. BAKER.

WORTHLESS DOCUMENT COPY - BACK

573348

| PROPERTY RECEIPT | PHOTO NO | LATENT NO |

| INTERVIEWING OFFICER Bob Jackson | ID NO J2388 | DIV UDSW | SUPERVISOR Cpl. S.P. Osom | ID NO 09975 | DIV UDSW |

COT 7988

| DISP | ITEM | CODE | QTY | TYPE | SERIAL NUMBER | BRAND | CALIBER/COLOR or LENGTH | | VALUE |
|---|---|---|---|---|---|---|---|---|---|

ON 091294 AT 06.55 HRS OFC ODELL WAS ASSIGNED DURING SQUAD
MEETING TO THE SCENE OF A HOMICIDE AT 2275 S. MAYBELLE

ON 091294 AT 0706 HRS, OFC. ODELL RELIEVED OFC. G.A. NEECE
WHO WAS SECURING THE FRONT DOOR AT 2275 S. MAYBELLE. OFC. ODELL
MAINTAINED SECURITY FOR THE FRONT DOOR UNTIL 1240 HRS 091294.

CHAPLAIN PELLOM ARRIVED AT THE SCENE ON 091294 AT 0645 RD.
CHAPLAIN PELLOM SPOKE TO MIKE GREEN AND "CHRISTINE" (NO LAST NAME)
AT THE SCENE AND ATTEMPTED TO PROVIDE COMFORT. CHAPLAIN PELLOM
ALSO WENT TO RESIDENCE OF NORMA CLYDENE MURPHY, 717 S. PHOENIX,
GRANDMOTHER OF IV-WOODS TO NOTIFY GRANDPARENTS OF THE DEATH. ED MURPHY,
GRANDFATHER OF IV-WOODS WAS ALSO NOTIFIED.

OFC. ODELL ALSO ASSISTED IN THE SECURING OF THE APT. AFTER IT WAS
PROCESSED BY OFC. NORDIKE

| PROPERTY RECEIPT | PHOTO NO | | LATENT NO | |
|---|---|---|---|---|

I ACKNOWLEDGE I AM THE VICTIM OR AGENT OF THE VICTIM OF THE CRIME DESCRIBED HEREIN, THE INFORMATION IS TRUE AND CORRECT, AND I WILL ASSIST IN THE PROSECUTION OF THOSE PERSONS RESPONSIBLE.

INTERVIEWING OFFICER: FCE ODELL 0595 379   ID NO   DIV   DATA ENTRY   ID NO   DATE

SUPERVISOR   ID NO   DIV   BY   ID NO   DATE

SIGNATURE OF PERSON REPORTING: R ODELL   DATE 091294

COT 7994

1 Q   And now, ma'am, I know this is an emotional

2 situation, and I don't want you to have any more

3 problem than necessary, but I want you to -- it is

4 not just black and white either.  When you say she

5 was happy that night, can you tell the jury, was

6 that just a little happy or a lot happy or how

7 would you describe that?

8 A   She was a lot happy.

9 Q   Would it be fair to say that she was as happy

10 as you had ever seen her?

11 A   Yes.

12 Q   Now, when you went to bed that night, and

13 again, let's show the jury, maybe they would know

14 but I was having a hard time.  This is -- which one

15 of these is Michelle's?

16 A   Here.

17 Q   This one?

18 A   Yes.

19 Q   Which one is yours?

20 A   Up there.

21 Q   This one?

22 A   Right there.

23 Q   This one?

24 A   Yes.

25 Q   So she's -- she's the fourth one down from you

# Tulsa Police Department
## PROSECUTION REPORT

File No:  573348

Victim:        WOOD, TRAVIS EUGENE
Address:       2275 S Maybelle
Phone:         NA

Crime Type:    Homicide
Location:      2275 S Maybelle
Date:          091294
Det Assigned:  Det Cpl M S Cook

Suspect Info:  MURPHY, MICHELLE DAWN          MOTHER:    NORMA MURPHY
               17 yoa, DOB 103076                        717 S Phoenix
               PID 342094
               DKT 704825                     FATHER:    ED MURPHY
                                                         5828 N Peoria

*REVERSE CERTIFICATION*

---

### WITNESSES

NAME:      Harold Eugene Wood
ADDRESS:   4630 S Darlington #76
PHONE:     None

WILL TESTIFY:

He is the victims father and estranged common-law husband of the
suspect Michelle Murphy. That he and the suspect have been
separated since Feb '94.

That he last saw the victim and suspect last week either on
Wednesday or thursday. That he was with the suspect and his two
children for approximately 30 to 40 minutes at 2275 S Maybelle. He
tries to see the children once a week and the suspect has always
been cooperative about his visits.

He will testify he has been staying with his cousin Fawn Ingram at
4630 S Darlington #76, Evergreen Apts, and was with her the day
before the homicide and all night. Further, that he was paged the
morning of the homicide by Melanie (Lnam unk) telling him about
his sons death. That he proceeded to the apartment and was

COT 8069

approached by Police and asked to go to the Det Div and give a statement.

He will testify he has never seen the suspect hurt the children and rarely punishes them other than verbal warnings. That she probably doesn't punish them as much as she should.

====================================================================

NAME:     Det Cpl M S Cook
ADDRESS:  TPD/DET
PHONE:    596 9206

WILL TESTIFY:

He was assigned the case 091294 and called to the scene from his residence approximately 0600 hrs.

That upon his arrival he was directed to 2275 S Maybelle and met with Det Sgt W Allen and SIU Det D Noordyke.

He observed the victim laying on the kitchen floor of the apartment with an obvious gash to the throat and stab wound to the upper chest.

That he was then directed to interview the victims father Harold Wood and the suspect Michelle Murphy.

He first interviewed Harold Wood who accounted for his whereabouts since approximately 1500 hrs 091194 until his arrival at the scene.

That he presented the suspect with the Notification of Rights Waiver. That he determined she had an eighth grade education and could read and write. Further that she was not currently under any medication or drugs of any kind. That she read aloud items 1 through 5 and initialed them stating she understood and signed the waiver.

That he then interviewed the suspect regarding the events leading up to her initial discovery of the victim. That she told him she and the children went to bed on the couch in the living room of the apartment between midnight and 0100 hrs. That prior to going to bed for the night she made sure both doors were secure as well as the windows. Further that the light in the living room was off, and the AC window unit by the couch was running. When she woke up at approximately 0600 hrs she noticed the front door was open and the living room light was on and she had heard nothing to awaken her during the night. She then realized the victim was not on the couch. She states she immediately began to search for the victim, went to the kitchen and as she turned on the light she saw the victim laying on the floor with his throat cut. She then ran from the apartment via the back door to friends apartment telling them her baby was dead and Police were called.

COT 8070

She was then told of the call which came in to the PD dispatch regarding a loud disturbance at her apartment at approximately 0300 hrs. It was at this point that she began to remember that she had an argument with Ladonna Sommers. She stated Sommers came to her apartment and confronted her regarding a dispute between them as to the father of the victim. She explained Sommers struck her in the head with an object although she could not remember what it was. That Sommers had somehow come to be holding the victim in the kitchen and remembers trying to take the victim from her as he was screaming at which time the victim was dropped to the kitchen floor and suddenly stopped screaming and appeared to lose consciousness. "I thought he was dead when he was dropped." She states she then ran upstairs with Sommers following her. She got a knife which she keeps upstairs for protection and chased Sommers downstairs and out the front door of the residence.

She stated "All I can remember is him being dropped, I remember a lot of people screaming. Did the Police come out there?"

She stated "It's possible I could have done it, had a knife and dropped it or something."

She also stated "I could have been so angry I needed to take it out on somebody and ended up hurting my son. I have a feeling that could have been what happened."

She stated after she chased Sommers out of the apartment she went into the kitchen to check on the victim with the knife in her hand and states she was going down so quick the knife "hit him on his neck." She states she then ran from the apartment and thinks she hid the knife in the drain grill in the playground behind her apartment. Further, that she then returned to her apartment and sat on the couch in the living room and blacked out.

Det Cook will testify he then asked the suspect if she would be willing to tell her story on audio tape and she agreed to do so.

Refer to transcript of taped interview for details.

=================================================================

NAME: Ofcr G Otterstrom
ADDRESS: UDSW
PHONE: 596 1100

WILL TESTIFY:

He was assigned to 2275 S Maybelle ref DOA stabbing at 9616 hrs. That he arrived 0625 hrs.

Conducted preliminary interview of suspect Michelle Murphy.

Advised suspect of her rights which and obtained a Consent to

Search Waiver which the suspect signed. Transported the suspect to the Detective Division.

Prepared the original offense report.

He will further testify that at approximately 0315 hrs he backed Ofcr B K Smith regarding a possible domestic violence call at 2275 S Jackson. (The call to dispatch indicated the apartment was that of Michelle Murphy although the address given was incorrect.) That he proceeded to 2275 S Maybelle to determine if the complainant may have given the wrong street name. That he looked through a window directly west of the front door and the interior of the apartment was dark. That he could only see in the apartment using a flashlight. That he observed a WF adult and a small child with dark curly hair on the couch. the child was propped up in the corner of the couch (NW corner). That Ofcr Smith knocked on the door and announced himself as a Police Officer however both seemed to remain asleep. That he and Smith cleared the call at 0326 hrs.

=================================================================

NAME:     Ofcr N C Cory
ADDRESS:  TPD/UDSW
PHONE:    596 1100

WILL TESTIFY:

He was assigned to the scene at 0616 hrs. That EMSA attendants were present at the scene upon his arrival as he observed the victim on the kitchen floor through the screen door. Entered the scene at the direction of his supervisor to determine if the attic access was secure which he did and returned to scene security. That he assisted in securing the scene.

=================================================================

NAME:     Ofcr B K Smith
ADDRESS:  TPD/UDSW
PHONE:    596 1100

WILL TESTIFY:

He assisted Ofcr on the 0315 hrs call to 2275 S Jackson, That he noticed that the outer screen door was closed however the wooden front door was partially open.

He was assigned to the homicide scene at 0616 hrs and upon his arrival to find EMSA personnel present outside the backdoor of the residence. That he approached the back door and observed the victim on the kitchen floor after which he and Ofcr Neece entered and searched the residence for additional victims or suspect. That he then assisted in securing the scene.

=================================================================

NAME:      Ofcr G A Neece
ADDRESS:   TPD/UDSW
PHONE:     596 1100

WILL TESTIFY:

He was assigned to the scene at 0616 hrs and was the first to
arrive with EMSA personnel following him to the scene.  That he
observed the victim lying on the kitchen floor with a pool of blood
near it's head.  EMSA observed the victim from the doorway without
entering and determined the victim was dead.

That he and Ofcr Smith cleared the apartment and then exited and
secured the scene.

========================================================================

NAME:      Ofcr S D Rogers
ADDRESS:   TPD/UDSW
PHONE:     596 1100

WILL TESTIFY:

he obtained a written witness statement from witness James Dean
Fields.

========================================================================

NAME:      Ofcr R A Russo
ADDRESS:   TPD/UDSW
PHONE:     596 1100

WILL TESTIFY:

Prepared a Protective Custody (CHINS) report, case file 573352, and
transported victims sister Michelle Dawn Murphy to the Laura Dester
Center for Protective Custody.

========================================================================

NAME:      C E Willliams
ADDRESS:   TPD/UDSW
PHONE:     596 1100

WILL TESTIFY

He was assigned at 0630 to 2275 S Maybelle for purposes of scene
control.  Upon his arrival he was asked to obtain a written witness
statement from Christy Carter which he did.  Further, that in
addition to the written statement Carter told him the suspect had
told her the victim had been sick quite a bit but didn't cry much
last night.

========================================================================

NAME:     Ofcr D M Knudson
ADDRESS:  TPD/UDSW
PHONE:    596 1100

WILL TESTIFY:

Obtained written witness statement from Chrisona Lowther.
Transported Lowther and James Fields to the Det Div.

==========================================================

NAME:     Det Cpl T Fultz
ADDRESS:  TPD/DET
PHONE:    596 9121

WILL TESTIFY:

He interviewed witnesses James D fields and Christina Carter.

Took additional statements from Carter and Christona Lowther.  In
these additional statements both state the suspect had asked them,
after the police had arrived, to go to her apartment and recover a
dagger out of the closet.  Both refused.

==========================================================

NAME:     Det Sgt W Allen
ADDRESS:  TPD/DET
PHONE:    596 9135

WILL TESTIFY:

Supervised investigation.

==========================================================

NAME:     SIU DET D Noordyke
ADDRESS:  TPD/DET
PHONE:    596 1220

WILL TESTIFY:

Prepared the Scene Investigation Report.
Photographed, located and recovered all evidence.
Turned all evidence to PR AE 4164.

==========================================================

NAME:     Det Sgt M T Huff
ADDRESS:  TPD/DET
PHONE:    596 9122

WILL TESTIFY:

Interviewed Steven A Mann and Kim Evans regarding their relationship with the suspect.

====================================================================

NAME:     Don Grove
ADDRESS:  State Medical Examiners Office
PHONE:    582 0985

WILL TESTIFY:

He is an agent with the State Medical Examiners Office. He was present in that capacity at the scene. That he conducted his investigation and took custody of the body which was transported to the Medical Examiners office.

====================================================================

NAME:     Dr Distefano
ADDRESS:  State Medical Examiners Office
PHONE:    582 0985

WILL TESTIFY:

Autopsy and Death Certificate.

Manner of Death: Stab wound to chest penetrated lung just missing the heart. Incised wound to neck, almost severed head severing cervical spine leaving the head attached by skin and musculature of back of neck only.

====================================================================

NAME:     Steven A Mann
ADDRESS:  2281 S Maybelle
PHONE:    ██████████

WILL TESTIFY:

He has never really known the suspect to be very affectionate to the child but especially more so since the suspect and child's father, Eugene Woods have broke up. That the mother would leave the child at their residence on many occasions, as she would go out and party and visit friends. That he never saw the child abused or any evidence of abuse but he did not see the victim ever being held by his mother or much affection from the mother to son. That this was not the case with the mothers two year old daughter, Michelle.

COT 8075

Since the suspect and Eugene Wood had broke up that the mother made comments that she couldn't deal with the baby and didn't want the baby;y around.

Further that she has never mentioned to him the loss of her apartment keys in the burglary. He has on numerous occasions observed the suspect with the same key ring she has always carried.

He will testify that at approximately 0230 hrs he heard a loud bump or noise coming from the direction of the victim's residence. He does however live one apartment from the suspect with a vacant apartment between.

=================================================================

NAME:      James Dean Fields
ADDRESS:   2247 S Maybelle
PHONE:     None

WILL TESTIFY:

He lives with his girlfriend Christona Lowther.
That he was awakened approximately 0600 hrs by Lowther who told him to get up that the suspect was outside yelling about her baby being dead. That he went downstairs with Lowther and observed the suspect with her oldest child repeating "my baby is dead." That he watched as Lowther and Christina Carter went to a pay phone and called 911.

=================================================================

NAME:      Christona Lowther
ADDRESS:   2247 S Maybelle
PHONE:     None

WILL TESTIFY:

That the suspect and children came by her residence approx 1800 hrs Sunday 091194 and stayed 45 minutes after which she said she was going home to clean house and go to bed. That she did not see the suspect again until approximately 0600 hrs the next morning when she was awakened by her sister-in-law, Christina Carter, telling her Michelle was there saying Travis was dead on the kitchen floor.

That the suspect told her "My baby's dead. Why did this have to happen to me? I wish I was dead instead."

She will further testify that prior to the arrival of Police the suspect asked her and Christina Carter to go to her apartment and get the dagger that was in the closet. That she and Christina refused and went to call the Police.

She will testify she has seen the dagger before when shown to her

by the suspect. Further that the suspect told her she had been given the dagger by Donald Ward.

For further refer to transcript of taped interview.

========================================================================

NAME: Christina Carter
ADDRESS: 2247 S Maybelle
PHONE: None

WILL TESTIFY:

She lives with Lowther and James Fields.

That approximately 0600 hrs she was awakened by the suspect knocking on her door crying her baby was dead. That she woke up Fields and Lowther and they all went downstairs and asked the suspect what happened. The suspect told them she woke up to find her baby dead on the kitchen floor with his throat cut. That they then had a friend, William Green, go see if the child was really dead. That Green returned confirming what the suspect had told them.

She will further testify that the suspect asked her and Lowther if they would go to her apartment and get a dagger from the closet for her. She and Lowther both refused after which they went to the phone and called Police.

For further refer to transcript of interview.

========================================================================

NAME: LaDonna R Summers
ADDRESS: 2297 S Maybelle
PHONE: ███████████

WILL TESTIFY:

She has known the suspect since January or February of this year. Further that she has been her babysitter.

She Lowther and Carter had joked with the suspect that the victim looked one of the suspects boyfriends, Earl Peck, that Harold Wood the victims father. That this upset both the suspect and Harold Wood as well as Earl Peck when he found out. That this occurred approximately three weeks ago.

That she went to the suspects apartment about a week ago to talk to the suspect and the suspect got very upset. That the next day she met with the suspect at a friends house and talked it out. That she thought the issue had been resolved and they were friends again.

COT 8077

She will testify the last time she saw the suspect was Thursday, 090894, walking her children.

She will testify she has been at her boyfriends house since appro ximately noon Friday 090994. That she did not return until 1000 hrs Monday 091294. It was at this time she heard of the victims death.

She will testify she was at 1401 N Rosedale with her boyfriend Eli Botello. It is the residence of his mother Esther Munoz. Also present was Israel Botello and Ruben Contreras.

She was at this location all night 091294 and states she was asleep between midnight and 0600 hrs.

For further details see transcript of taped interview.

==================================================================

NAME:     Mike Brown
ADDRESS:  2912 E King
PHONE:    ████████████

WILL TESTIFY:

He is employed by Burns International Security Services. that 090494 he was involved in an incident between the suspect and LaDonna Summers in his capacity as a security guard.

That while on patrol he observed Summers on the patio of the suspects apartment yelling and using abusive language to the suspect about the suspects boyfriend. That he observed Summers boyfriend Eli Botello standing in the yard off the patio and he left with Summers after he asked Summers to return to her apartment.

That he prepared an incident report of the disturbance.

==================================================================

NAME:     William Green
ADDRESS:  863 N Vancouver
PHONE:    ████████████

WILL TESTIFY:

That the suspect came to his back door, 2247 S Maybelle, telling him her baby is dead and asked him to walk over and see. He went to the back door and looked through the open door and observed the baby laying on its back. He then returned and called Police.

==================================================================

1   we wanted to talk to him as well, and I was helping

2   with that, and once he arrived, then I went in and

3   started talking with Michelle, and as I recall,

4   that was about 10:20.

5   Q    And approximately how long does it take to get

6   from the scene at the Riverview Park Apartments to

7   the detective division would you have estimated,

8   back then?

9   A    Depending on the traffic, anywhere between 20

10  and 25, 30 minutes maybe on the outside.

11  Q    Now, from the time that she got to the

12  detective division to you actually really started

13  talking to her at 10:20, how many different times

14  had you made contact with her in that interview

15  room?

16  A    I checked on her several times.  I couldn't

17  say exactly how many.

18  Q    In the times that you checked on her, could

19  you describe for the ladies and gentlemen of the

20  jury your observations of what she was doing?

21  A    Well, when I came in, she had turned on the TV

22  and was watching TV, and she seemed at ease.

23  Q    Do you remember anything about what she was

24  watching on the television?

25  A    I don't recall.  It was a game show, but I

1    at their residence?

2    A    Again, Donald's father Mike brought her home

3    at 3:00 o'clock Sunday afternoon.

4    Q    Now, at this portion of time, are you

5    consistently spending time with the defendant in

6    gaining this information or are there any breaks in

7    between you talking to her?

8    A    During the time I was speaking with her, there

9    were several times that I left the room because I

10   had Harold Eugene Wood in another interview room

11   and I was speaking to him as well.

12   Q    What was the purpose of, let's say, going from

13   one interview and then going to Mr. Wood's

14   interview and coming back, why did you do that?

15   A    Well, at that point in time we didn't have any

16   information as to what had happened.  I wanted to

17   talk to Harold, and then if he told me something, I

18   wanted to check back with Michelle to see if maybe

19   there was some difference in what they said which

20   might have led me to discover if Harold had some

21   involvement.

22   Q    Now, at that point in time did the defendant

23   begin to give you some specific information about

24   that evening at the scene?

25   A    It was at that point in time that we began

1   guys were speaking with him.

2           MR. PARKS:  That's all of this witness, Your Honor.

3           THE COURT:  Mr. Harris?

4           MR. HARRIS:  I have no questions.

5           THE COURT:  Officer Cook, you may step down.

6           MR. PARKS:  Your Honor, I'd like to testify

7   briefly.

8           THE COURT:  Okay.  You are an officer of this court,

9   also, Mr. Parks, have a seat.

10          MR. PARKS:  Thank you, Your Honor.

11          THE COURT:  That microphone is not on.

12          MR. PARKS:  Okay.  Your Honor, on --  I don't thi:

13  I need it.  Your Honor.

14          THE COURT:  I'm having a hard time hearing you.

15          MR. PARKS:  On April 19th of this year at the test

16  at the polygraph test that's been previously referred to, Jim

17  Otte of the OSBI upon administering the test to Michelle

18  Murphy came out of the room and told Tim that he was going to

19  have to tell him something that he didn't want to hear.  And

20  Tim responded to him that, well that's all right, that's why I

21  got you here, because I want to know the truth.  And Jim Otte

22  told him, he said this girl is not guilty as charged here with

23  this murder, she is not guilty of this murder.  And further

24  more, she doesn't know who committed this murder.  And he

25  proceeded to tell him that these test results in his opinion

1 were conclusive.

2   That's all I have to say for the record.

3    THE COURT: Okay. Step down.

4    MR. HARRIS: Well, Mr. Parks, would you agree that

5 if he produced a report, that his report would certainly be

6 the best evidence of his conclusions?

7    MR. PARKS: I would certainly agree that his report

8 would be the best, I don't know that it would be the best

9 results of what he told us, but it would certainly be the best

10 results as far as the test results. Do you have that?

11    MR. HARRIS: Yes, I do.

12    MR. HACKATHORN: Why do we not have that?

13    MR. HARRIS: Well because it's a letter directed to

14 me, since I was the one requesting the polygraph, counsel.

15    MR. PARKS: That is correct, that he -- you did

16 request the polygraph.

17    MR. HARRIS: Judge I don't have any objection to

18 this being marked and admitted.

19    THE COURT: Let her mark it, Curtis.

20    MR. PARKS: Your Honor, I have no objection to this

21 report and ask it be admitted for the purpose of this Motion.

22    THE COURT: State's Exhibit 2 will be admitted into

23 evidence.

24    MR. PARKS: Any further cross?

25    MR. HARRIS: No.

LATENT PROCESSING AT SCENE:          LATENT FILE NUMBER:  091294 N-3976*1

| (Item/Area Processed) | (Where Located) | (Latents) YES | NO | (Prop Rct Item No. |
|---|---|---|---|---|
| Kitchen counter and cabinets | Kitchen | | XXX | |
| Refrigerator | Kitchen | | XXX | |
| Desk | Kitchen/Eating area | | XXX | |
| Wall beside refrigerator | Kitchen | | XXX | |
| Inside front door | Livingroom | | XXX | |
| Outside front screen door | Livingroom        (lift 1-5) | XXX | | |
| Entry closet door | Livingroom bottom of stairs | | XXX | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

COT 8101

1   3:00 A.M. argument?

2          A       I have no idea.

3          Q       Did you have any concerns about Mr. Lee's

4   truthfulness?

5          A       I don't remember.

6          Q       If Sergeant Allen said there were concerns

7   about it, does that refresh your recollection?

8          A       No.

9          Q       Do you recall that five sets of fingerprints

10  were taken at the scene?

11         A       No.  I didn't work the scene.

12         Q       Well, you read the report.

13         A       I don't remember the report.

14         Q       Why didn't you have any of those sets of

15  prints compared to anybody?

16         A       I couldn't tell you because I don't remember.

17         Q       Why didn't you have them compared to William

18  Lee?

19         A       I don't remember.

20         Q       Do you remember that William Lee said at 3:00

21  A.M. there was a verbal fight between Michelle and the father

22  of the children?

23         A       No, I don't remember anything, any of the

24  interview that I had with him.

25         Q       Do you remember finding out that the husband

Q      Well, wasn't that part of your job as the scene investigator?  That diaper was part of the scene; isn't?

A      Once it has gone to the Medical Examiner's office, then all that evidence is turned to the property room and then he can request what he needs to have it processed further.

Q      Then detective Cook should have asked you to get ahold of the Medical Examiner and see if you can get prints off the diaper.  Correct?

A      He could have done that, yes.

Q      He should have done it.  Correct?

A      I don't know.

Q      Well, the diaper was part of the scene. Right?

A      Yes.

Q      And there was a possibility there were prints off the diaper.  Correct?

A      It's possible.

Q      And, therefore, he should have asked you to determine whether there were prints on the diaper by having you go out there.  Right?

A      Yes.

Q      Did it occur to you that the killer cut himself when he performed this carving of the neck of the

1 the couch, would that be the two-year-old

2 daughter?

3 A    I believe so.  There was an infant that had

4 dark curly hair.

5 Q    Older than a three-month-old?

6 A    Yes.

7 Q    Later on, did you see the deceased child?

8 A    No.

9 Q    You did not ever see him?

10 A    (Shakes head.)

11 Q    But in any event, the child you saw was two or

12 three years old, something like that?

13 A    A year and a half to two years old.

14 Q    Okay.  And those two people were the only two

15 people you saw on that couch at 3:15?

16 A    That is correct.

17 Q    And so now, did you see the chair propped up

18 against the door when you were there the first

19 time?

20 A    There was a chair up against the door.

21 Q    Well, Officer, wasn't it propped up against

22 the door?

23 A    There was a chair up against the door.

24 Q    Well, was it leaning against the door?

25 A    It was more pushed up against the door.

1  Q    Okay. Did you see it the second time you were

2  out there still up against the door in the same

3  manner?

4  A   Yes.

5  Q    Do you remember testifying at the preliminary

6  hearing in this matter about a year ago?

7  A   Yes, sir.

8  Q    And on page 38, counsel -- actually start on

9  37, line 24. Officer, were you asked this question

10  and did you give this answer: "When you saw it

11  later on that morning, did you make any independent

12  recollection as to the status of the front door as

13  in relation to when you had been out there

14  earlier? Answer: I didn't get a look at the front

15  door. I noticed the chair was still leaning up

16  against the screen door." Were you asked that

17  question and did you give that answer?

18  A   Yes, I did.

19  Q    To the best of your knowledge, was that a

20  correct answer?

21  A   At that time, yes, sir.

22  Q    Okay, and as a matter of fact, on page 45,

23  were you asked this question and did you give this

24  answer: Line 1: "And is that the screen door? It

25  had a chair propped up against it; is that right?

1      Q      Did you ever think anybody you interrogated
2  was guilty?

3      A      That was not my call.

4      Q      I understand it wasn't your call, sir.  My
5  question is:  Did you ever think?

6      A      No.

7      Q      Thank you.  How did Sergeant Allen measure
8  your success as an interrogator in 1994?

9      A      I have no idea.

10     Q      In your career, did you ever tell anyone "You
11 know you did it"?

12     A      I don't remember.

13     Q      Did you ever lie to anybody being
14 interrogated?

15     A      I don't remember.

16     Q      In 1994, when you got a confession, were you
17 the officer who testified about that confession at trial?

18     A      I probably did.  But I don't remember.

19     Q      In order for the confession to come in, you
20 would have had to offer it, because you were the one who got
21 it.  Correct?

22     A      I suppose.

23     Q      All right.  What training did you have in 1994
24 or prior thereto concerning presenting a confession at trial?

25     A      I don't recall having any.

1        A        I don't think so.

2        Q        Did you and Mike Huff get along?

3        A        We were like brothers.

4        Q        What kind of performance evaluations did he

5 give you?

6        A        I have no idea.

7        Q        Did he ever express any criticism of your work

8 as an interviewer or interrogator?

9        A        I don't know.

10        Q        Did you ever discuss the tactics you used with

11 him?

12        A        I don't know.

13        Q        Did he ever tell you never to interrogate

14 alone?

15        A        I have no idea.  I don't remember.

16        Q        Did anybody ever tell you never to interrogate

17 alone?

18        A        I don't know.

19        Q        In 1994 or before, you did not receive any

20 training which required that a video camera with sound or an

21 audio tape be going at all times during an interrogation.

22 Correct?

23        A        I don't know.  I don't remember.

24        Q        And you received no training in 1994 or before

25 about innocent people sometimes confess.  Correct?

1          MR. SEYMOUR: Okay. Maybe not.

2          THE COURT REPORTER: Do you want to see it?

3          MR. SEYMOUR: No. That's fine.

4          THE COURT REPORTER: Okay.

5    Q.  (BY MR. SEYMOUR) I've handed you what's

6 marked as Exhibit G. And this is taken from Mike

7 Cook's personnel file.

8         In '91 -- in '90, '91, 92, '94, and '95,

9 there are notations -- and there are some earlier --

10 about in-service training?

11    A.  Yes.

12    Q.  Do you know what those consisted of?

13    A.  No, sir.

14    Q.  Do you agree that prior to interrogation,

15 that an interrogator should obtain and investigate as

16 much as possible to know the facts of the case?

17    A.  In general, yes, sir.

18    Q.  That wasn't the situation when Mike Cook

19 interrogated Michelle, was it?

20    A.  Possibly that -- possibly he didn't know all

21 the facts at that time.

22    Q.  Well, he, in fact, didn't know all the facts

23 at the time, did he?

24    A.  I agree with that.

25    Q.  All right. I have handed you what has been

1  morning?

2  A    I told her that I was going to be asking her

3  some questions regarding the victim's death.

4  Q    Had you had any previous information relayed

5  to you by other officers as to anything the

6  defendant may have said at the scene or sometime

7  thereafter?

8  A    I had been told by -- and I don't recall

9  exactly who it was, it may have been Otterstrom, it

10  may have been Sergeant Allen, but she didn't know

11  anything about how the victim had come to be

12  killed.

13  Q    Okay.  When you first approached the defendant

14  in the interview room of the makeshift detective

15  division, was she a suspect?

16  A    No, she was not.

17  Q    Why wasn't she a suspect?

18  A    I had no reason to believe that she was a

19  suspect at that point in time.

20  Q    So after introducing yourself, what is the

21  next thing that happens between yourself and the

22  defendant?

23  A    Well, we were attempting to locate Harold

24  Eugene Wood who was her estranged, I believe

25  common-law husband at the time because, of course,

1     A.    That's correct.

2     Q.    Okay. Who made the decision to have Ms.

3 Murphy transported from the apartment complex to the

4 station where she was interrogated barefoot and in

5 handcuffs?

6     A.    Either me or Detective Cook.

7     Q.    Do you recall having made that decision

8 yourself?

9     A.    Not specifically.

10     Q.    When she left the apartment complex, was she

11 a suspect in the murder?

12     A.    I believe so.

13     Q.    All right. And on what basis do you say

14 that she was a suspect?

15     A.    Based upon what we knew at that time, she

16 had the motive and the opportunity to kill her baby.

17     Q.    And what was her motive?

18     A.    I don't recall.

19     Q.    And the opportunity was that she was there?

20     A.    That's correct.

21     Q.    She didn't have any blood on her; right?

22     A.    That's correct.

23     Q.    No physical evidence linked her to the

24 crime?

25     A.    Not that I can recall.

```
 1          A      I don't know.  I don't remember.

 2          Q      In 1994 and before, did you have any training

 3  about the unreliability of confessions that don't contain

 4  facts that only the perpetrator would know?

 5          A      I don't remember.

 6          Q      In 1994, or before, did you have any training

 7  on the effects of extreme emotional distress?

 8          A      I don't remember any training for that.

 9          Q      In 1994, did you have any training that

10  interrogations are to determine the truth and not just get

11  confessions and/or admissions?

12          A      I don't remember any training during that

13  year.

14          Q      Or before?

15          A      Or before.

16          Q      In 1994 or before, did you have any training

17  on the conduct of interrogations in the following

18  particulars?  And I'll do them one at a time.  Food to be

19  given to the interviewee.

20          A      This is just training.  Right?

21          Q      Yes, sir.

22          A      No, I don't remember.

23          Q      How about providing them water?

24          A      I don't remember.

25          Q      How about the length of the interrogation?
```

1    Q    How difficult would it be to flip a switch and

2    video the proceedings so that we would all know

3    without question what went on leading up to this

4    statement?

5    A    I didn't have a video camera.

6    Q    You had a tape recorder, didn't you?

7    A    Not in the room at the time, no.

8    Q    You couldn't go get one?

9    A    I could have, yes.

10    Q    At the point in time when suddenly you became

11    aware, which I believe you said was, what, about

12    12:15 when you got the message about this call at

13    3:00 a.m.?

14    A    That's correct.

15    Q    You could have gone and gotten a video camera

16    if you wanted to then, couldn't you?

17    A    Yes, sir.

18    Q    You could have gotten a tape recorder,

19    couldn't you?

20    A    Yes.

21    Q    You could have turned it on and we wouldn't be

22    having this conversation about what happened out

23    there, we would know, wouldn't we?

24    A    Yes.

25    Q    Like we would know what happened after you

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1        VIDEOGRAPHER:  We are now on the record for
2  the deposition of Mr. Ronald Palmer.  Today is February 21,
3  2017.  The time is approximately 8:41 A.M.  Would counsel
4  please identify themselves for the record.
5        MR. SEYMOUR:  Tom Seymour for the Plaintiff.
6        MR. O'CARROLL:  Richard O'Carroll for the
7  Plaintiff.
8        MS. McGREW:  Michelle McGrew for the City.
9        VIDEOGRAPHER:  Thank you.  The witness may be
10  sworn in.
11
12                **RONALD D. PALMER**
13  of lawful age, who having been first duly sworn to testify
14  the truth, the whole truth and nothing but the truth,
15  answered in reply to the questions propounded as follows:
16
17                **DIRECT EXAMINATION**
18  **BY MR. SEYMOUR:**
19        Q        State your name for the record, please.
20        A        Ronald Dale Palmer.
21        Q        What were the time periods when you were the
22  Tulsa Chief of Police?
23        A        I was hired in approximately September or
24  August of 1992 to September or August of 2002.  Hired again
25  from September 2006 through January-February of 2010.

1 Police Department policeman, and I have taken an oath to

2 uphold the constitutional rights of all citizens --

3     A      Correct.

4     Q      -- you as the Chief of Police certainly could

5 not have disciplined me if I was never told what the

6 constitutional rights of citizens were in interrogations.

7 Correct?

8     A      Well, I don't believe that happened.  But I

9 would be the person responsible for disciplining you, yes.

10     Q      Well, sir, it would not be appropriate for you

11 to discipline me if nobody ever told me what the

12 constitutional limits in interrogations were.  Correct?

13     A      That would be correct if they weren't told.

14 But I believe they were told.

15     Q      But you can't tell us where and when that

16 happened specifically.  Right?

17     A      I cannot.

18     Q      Now, as you sit here, do you know of anything

19 in the policies and procedures manual in 1994 that addressed

20 the subject of dos and don'ts of interrogations?

21     A      There were no policies addressing the dos and

22 don'ts of interrogations to the best of my knowledge in 1994.

23     Q      And we haven't found any.  And we haven't

24 found any training bulletins in 1994.  So is it fair to say

25 that, in 1994, there were no --

1  any interrogation training while he was supervisor of the

2  homicide squad.  Correct?

3        A     Again, I did require that he attend in-service

4  training as did CLEET.  The topics of those in-service

5  trainings are at this point unknown to me.  I don't recall

6  what they were.  So I can't say whether he had none during

7  that period of time.  But I'm sure that there were -- I won't

8  say I'm sure because I'm not sure -- I just don't know the

9  curriculum.  And it may include interrogations; it may not

10  have.

11        Q     But he would --

12        A     Can I finish, please, sir?

13        Q     Sure.

14        A     Thank you.  But he would have had in-service

15  training which included legal blocks during the period when I

16  was there -- and I don't know what happened prior to '92 --

17  but '92 through '94, he would have had in-service training

18  including legal blocks.

19        Q     If he said, and I'll represent to you that he

20  did, he had no training in interrogations, then it follows as

21  night follows the day, does it not, that you did not require

22  that he have such training and in fact he then got it?

23        MS. McGREW:  Object to the form.

24        A     If he said he didn't have it at that point, my

25  job to require it is making sure that people are up to date

1  in the legal matters -- which I think I did.  But if he said

2  he didn't have it, he didn't have it.  I can't question that.

3     Q    And is it also true that you did not require

4  that members of the homicide squad have any training

5  specifically in interrogations?

6     A    There was no requirement specifically that I'm

7  aware of.  I don't know exactly what the curriculum was for

8  them to come into the Detective Division, which would have

9  been covered under a policy manual that they may have

10  maintained.  It wasn't a department manual.

11    Q    In 1994, what would a police officer have to

12  do in an interrogation room to warrant discipline?

13         MS. McGREW:  Object to the form.

14    A    Well, in my opinion, they would have to strike

15  a person.  They would have to sexually assault a person.

16  Beyond that, I can't think of any other circumstances that

17  would warrant immediate discipline.

18    Q    How about non-immediate but down-the-line

19  discipline?

20    A    Well, if you become aware of it, possibly.

21  But I never became aware of any of it.

22    Q    Well, sir, that wasn't my question.

23    A    Well, I'm sorry.  I didn't mean to circumvent

24  the question.

25    Q    No, no.  Just in general, what would a police

1       Q     Do you recall there was a constitutional limit

2 on making promises?

3       A     There's none that I know of in interrogations

4 surrounding the Constitution.

5       Q     How about if the Supreme Court has said you

6 will not make promises?

7       MS. McGREW:  Object to the form.

8       A     I don't know what the Supreme Court said, sir.

9       Q     But it was your responsibility to know that,

10 correct, at that time?

11      A     It was my responsibility to put in place

12 policy that reflected the most current court decision

13 regarding legal matters, yes, sir.

14      Q     And therefore, it was your responsibility to

15 know what those restrictions were as stated by the Supreme

16 Court?

17      A     Perhaps I know them -- knew them, excuse me --

18 in 1994. As I sit here today, I do not know those.

19      Q     I understand, sir. But was it your

20 responsibility in 1994 to know what those were?

21      A     As I issued the policies and read the policies

22 and understood the policies at that point in time, it would

23 have been my responsibility to know that, yes, sir.

24      Q     Sir, I'm now going to read to you from a

25 portion of Sergeant Allen's testimony. And I'm going to ask

265. The City denies the allegations of Paragraphs 385(A)-(H) of the First Amended Complaint. In particular, the City denies that Detective Cook was found to have coerced a confession or lied to the court in the "Earlier Case."

266. In response to Paragraph 386 of the First Amended Complaint, the City admits that homicides occur in Tulsa, as do interrogations and confessions. The City denies the remaining factual allegations and legal conclusions of Paragraph 386 of the First Amended Complaint.

267. In response to Paragraph 387 of the First Amended Complaint, the City admits that the Supreme Court of the United States, prior to 1994, established principles regarding due process and interrogations of suspects. The City denies all other factual allegations and legal conclusions of Paragraph 387 of the First Amended Complaint. In particular, the City denies that the City failed to have adequate training, policies, supervision or customs; that the City failed to take action to prevent the denial of constitutional rights; that its final policymakers were deliberately indifferent; and that any action of the City was the proximate cause of Plaintiff's alleged denial of a fair trial. 

268. The City denies the factual allegations and legal conclusions of Paragraph 388 of the First Amended Complaint.

269. The City denies the factual allegations and legal conclusions of Paragraph 389 of the First Amended Complaint.

270. The City denies the factual allegations and legal conclusions of Paragraph 390 of the First Amended Complaint.

271. In response to Paragraph 391 of the First Amended Complaint, the City denies any allegation that its policies, training and supervision were inadequate.

272. The City denies the factual allegations and legal conclusions of Paragraph 392 of the First Amended Complaint.



> criminal activity. It is a questioning process likely or expected to yield incriminating statements... questioning in a fact-finding process is not interrogation... The United States Supreme Court has underscored the importance of police custody when ruling on the need for formal Miranda warning..."[63]
>
> "An interview conducted with a suspect when he [or she] is clearly not in police custody and it is free to end the conversation at any time does not require the formal Miranda Warning. The suspect should be advised, however, he does not have to answer questions and that his answers might be used against him."[64]

The professional literature in 1994 was clear in that the interview of a victim or witness or interrogation of the suspect is a highly important investigative endeavor and must be conducted with the utmost care observing applicable Constitutional law and nationally recognized policing standards.

***Constitutional standards of care known in 1994:*** In 1994, there were a number of constitutional protections addressing statements given by suspects that were made under pressure, duress or coercion. In these cases, such statements were improper and professional law-enforcement should have been trained as such. For example, Supreme Court cases included the following:"

Brown v. Mississippi 297 U.S. 278 (1936): This case held that confessions obtained as a result of coercion and brutality are not admissible in court.[65]

Miranda v. Arizona 384 U.S. 436 (1966): Among other things, this case held that evidence obtained by the police during custodial interrogation of a suspect is not admissible in court to prove guilt unless the suspect was given the Miranda warnings and there is a valid waiver.[66]

Lynumn v. Illinois 372 U.S. 528 (1963): This case found a confession to be involuntary, and thus a Constitutional violation, where the person had no previous experience with the criminal law and had no reason to believe that the police had ample power to carry out their threat to cut off financial aid for her infant children and to take the children from her if she did not cooperate.

Haynes v. Washington 373 U.S. 503 (1963): This case found a confession to be involuntary, and thus a Constitutional violation, where the person was threatened with continued incommunicado detention and was induced by the promise of access to his family. The case also noted that the person was alone, with no one to advise or aid him, and he had no reason not to believe that the police had ample power to carry out their threats. The case cited Lynumn.

Spano v. New York 360 U. S. 315 (1959): This case found a confession to be involuntary, and thus a Constitutional violation, where the interrogators threatened to get the suspect's close friend in trouble.

Rogers v. Richmond 365 U. S. 534 (1961): This case found a confession to be involuntary, and thus a Constitutional violation, where the interrogator threatened to take the suspect's wife into custody.

---

[63] International Association of Chiefs of Police and it's Training Key vol. 11 #263 - Taking Statements from Suspects, p. 135-136 (1978)

[64] International Association of Chiefs of Police and it's Training Key vol. 11 #263 - Taking Statements from Suspects, p. 136 (1978)

[65] Carmen, Rolando D.; Jeffrey T. Walker (2008). Briefs of the Leading Cases in Law Enforcement, 7th Edition. LEXIS-NEXIS Publisher, Newark, NJ, p. 217

[66] Carmen, Rolando D.; Jeffrey T. Walker (2008). Briefs of the Leading Cases in Law Enforcement, 7th Edition. LEXIS-NEXIS Publisher, Newark, NJ, p. 218-219

Arizona v. Fulminante 499 U. S. 279 (1991): This case is notable for reiterating, "coercion can be mental as well as physical," and for stating, "the defendants own confession is probably the most probative and damaging evidence they can be introduced against him."

These cases, as well as others, all known in 1994, make it clear that the circumstances surrounding a police interrogation must be approached carefully by the police investigator to avoid the possibility of a false or coerced confession. Specifically, incriminating statements made by the arrested person must be made in an environment that is not coercive or does not otherwise put pressure on the arrested person to say something that they would not ordinarily say if it were not for the coercive environment of the interrogation. Note that the City of Tulsa admits that the U.S. Supreme Court, prior to 1994, established principles regarding due process and interrogation of suspects. But these interrogation principles were not set forth in Tulsa Police Department policies, operational procedures or training.

*Professional standards of care known in 1994 (IACP):* These cases are also consistent with the professional standards and guidelines recognized in police training venues in 1994. For example, the International Association of Chiefs of Police stated,

"Officers must ensure they do not coerce the suspect into incriminating himself."[67]

In this case, Michelle Murphy was placed in the back of Officer Otterstrom's police vehicle while still in bare feet. This took place at approximately 6:00 a.m. on the morning the body of Travis Wood was discovered. Michelle remained in Otterstrom's vehicle and at some point she was placed in handcuffs. Michelle was then transported to the Tulsa Police Detective Division where Detective Cook began his interrogation of her at 10:20 a.m.[68]

It is my opinion that Michelle was in custody at the time the handcuffs were placed on her after she was placed in the back of Otterstrom's vehicle – occurring at approximately 6:00 a.m. Consequently, the questioning process undertaken by Detective Cook that began at 10:20 a.m. was clearly and unequivocally an "interrogation" opposed to a mere "interview." As such, not only was the Miranda warning required prior to any questioning by Cook whatsoever, but under Oklahoma State Law, before questioning began Michelle should have been accompanied by a parent, guardian, legal guardian or lawyer. There is no evidence in the record that any attempt was ever made by Cook or anyone else to do so.

Moreover, it is my opinion that the basis for Michelle's arrest at this early hour, before virtually any investigation had taken place, was premature, unsubstantiated and lacked the requisite probable cause. Rather than being viewed as the perpetrator of her child's brutal murder, Michelle Murphy should have been considered as a victim who was undergoing extreme trauma and grief at the loss of a child.

a. *Cook's failure to record the first part of the interrogation*: For example, the record shows that Cook's interrogation of Michelle Murphy began at 10:20 a.m. and lasted until 2:49 p.m.[69] It is concerning, however, that Cook didn't bother to turn on the tape recorder to document interrogation until 2:28 p.m. This means that the first four hours of the interrogation were completely undocumented and the only persons in the room were Detective Cook and Michelle Murphy.

When Michelle was asked if there was a tape recorder in the room she stated there was but when asked if Cook ever turned on the tape recorder prior to taking the recorded statement that was played in court, Michelle stated "No."[70] Therefore, the extent that Cook coerced,

---

[67] International Association of Chiefs of Police (1987). Incriminating Statements and Confessions. Training Key #357. Volume 15, 125
[68] Cook's trial testimony (COT 6279)
[69] Cook's trial testimony (COT 6279)
[70] Murphy's trial testimony (COT 3350)

1  interview, then that decision would have been taken out of

2  Sergeant Allen's hands.

3       Q     If Sergeant Allen knew about what Ms. Murphy

4  claimed and he did not do anything about it, he made the

5  policy for the Police Department that there would be no

6  discipline.  Correct?

7       A     He made a discretionary decision that there

8  was no violation of policy, yes, sir.

9       Q     And that, therefore, was itself policy.

10  Correct?

11       A     At that level, yes, sir.

12       Q     Sergeant Allen also testified that in 1994,

13  when an interrogator went alone into the interrogation room

14  with a suspect during any period of time when neither a video

15  camera nor a tape recorder was in use, that the interrogator

16  had the full authority of the Tulsa Police Department to

17  decide how that interrogation would proceed.  Do you agree

18  with that testimony?

19       A     Could you say what he said about the video?

20       Q     Yes, sir.

21       A     Is that your question or his answer, sir?

22       Q     No, sir, this was my question.  Well, no, this

23  was his testimony.

24       A     His testimony to what question, may I ask?

25       Q     You bet.  It was contained in the question.

1    But we'll find it here.

2            Same page.  No -- 15.

3                    "Question:  All right.  In 1994, when a,

4                    interrogator went alone into the

5                    interrogation room with a suspect, during

6                    any period of time when neither a video

7                    camera nor a tape recorder was in use, do

8                    you agree that the interrogator had the

9                    full authority of the Tulsa Police

10                   Department to decide how that

11                   interrogation would proceed?

12                   Answer:  At that time, yes.

13                   Question:  All right.  Did that change at

14                   some point?

15                   Answer:  I believe it did at some point.

16                   Question:  When?

17                   Answer:  I don't know.

18                   Question:  Before you retired?

19                   Answer:  Before I retired?  Yes, possibly

20                   before I retired."

21           A       Thank you.  The answer to your question as I

22   remember it was yes, the interrogator did have full authority

23   with the Police Department during that interrogation.

24           Q       And you agree with that?

25           A       Yes.

1      Q    Would you agree with me that, without a policy

2  in the policies and procedures manual on what can and can't

3  be done during interrogations, that somewhere along the line

4  you're going to have an interrogator who would violate the

5  constitutional rights of a person being interrogated?

6      A    I wouldn't necessarily agree with you that the

7  policy creates that opportunity.  That opportunity is created

8  with the individual interrogator at any time, whether a

9  policy exists or not.

10     Q    All right, sir.  I won't disagree with that.

11  But without a policy prohibiting it, that increases the

12  chance that it will happen, does it not?

13     A    Well, I think that the policy relating to the

14  application of the Constitution to rights of citizens pretty

15  much covers that as a policy, yes, sir.

16     Q    Well, how would they know what protecting the

17  rights of citizens meant during interrogations unless they

18  knew what the constitutional limits were?

19     A    Well, as we've discussed earlier, they were

20  subject to legal bulletins, they were subject to legal blocks

21  of training every year during their re-certification.  So

22  there was some knowledge, ongoing knowledge, about current

23  court decisions -- and that knowledge should have been

24  applied during their interrogations, absent a specific policy

25  that stated, as you put it, the dos and don'ts of

1    interrogation.

2         Q       In 1994, were there any training bulletins or

3    documents of any kind that dealt with the subject of

4    interrogations?

5         A       I don't know.

6         Q       Did you have training bulletins that went out

7    in 1994?

8         A       I believe we did, yes, sir.

9         Q       At some point, that practice stopped, did it

10   not?

11        A       I don't know if the bulletins stopped.  They

12   may have become digitized.  But the hard copy -- eventually,

13   the hard copy stopped, yes, sir.  I don't know when.

14        Q       We don't have any for the period 1994.  Does

15   that refresh your recollection?

16        A       No.

17        Q       Sergeant Allen further testified that the

18   interrogator had the full authority of the Tulsa Police

19   Department to decide what touching of the suspect would

20   occur.  Do you agree with that testimony?

21        A       I believe there were guidelines about no

22   sexual touching.  I mean, that would be a violation of law.

23   But touching a suspect is not specifically prohibited.

24        Q       Sergeant Allen further testified that an

25   interrogator had the full authority of the Tulsa Police

```
 1       A.    Not that I'm aware of, no.
 2       Q.    All right.  In 1994, when an interrogator
 3  went alone into the interrogation room with a suspect,
 4  during any period of time when neither a video camera
 5  nor a tape recorder was in use, do you agree that the
 6  interrogator had the full authority of the Tulsa
 7  Police Department to decide how that interrogation
 8  would proceed?
 9       A.    At that time, yes.
10       Q.    All right.  Did that change at some point?
11       A.    I believe it did at some point.
12       Q.    When?
13       A.    I don't know.
14       Q.    Before you retired?
15       A.    Before I retired?  Yes, possibly before I
16  retired.
17       Q.    All right.  And tell me how that changed.
18       A.    I -- I don't know.
19       Q.    In that scenario, where the interrogator is
20  alone and there's no tape recorder going full time and
21  no video camera going the full time, the interrogator
22  had the full authority of the department to decide
23  whether medical attention should be summoned; correct?
24       A.    I believe so, yes.
25       Q.    And the full authority -- pardon me.
```

1            Did the interrogator also have the full

2    authority to decide what kind of touching of the

3    suspect would occur?

4            A.    Yes.

5            Q.    Thank you.

6            The full authority to decide what kind of

7    promises to make?

8            A.    Yes.

9            Q.    And what kind of threats to make?

10           A.    Yes.

11           Q.    Do you know what training Mike Cook had to

12    be an interrogator?

13           A.    No, I do not.

14           Q.    Do you know what kind of training was

15    provided to members of the homicide squad about

16    interrogation in 1994 or before?

17           A.    My training would have been -- at that time,

18    it would have involved in-service training classes a

19    possibility, exterior classes outside of the police

20    department, and current law which -- which the

21    district attorney's office made -- made available to

22    us.

23           Q.    Were you -- did you have any training in

24    interrogation?

25           A.    Not other than basic investigative training

1  Police Department policeman, and I have taken an oath to

2  uphold the constitutional rights of all citizens --

3       A       Correct.

4       Q       -- you as the Chief of Police certainly could

5  not have disciplined me if I was never told what the

6  constitutional rights of citizens were in interrogations.

7  Correct?

8       A       Well, I don't believe that happened.  But I

9  would be the person responsible for disciplining you, yes.

10      Q       Well, sir, it would not be appropriate for you

11 to discipline me if nobody ever told me what the

12 constitutional limits in interrogations were.  Correct?

13      A       That would be correct if they weren't told.

14 But I believe they were told.

15      Q       But you can't tell us where and when that

16 happened specifically.  Right?

17      A       I cannot.

18      Q       Now, as you sit here, do you know of anything

19 in the policies and procedures manual in 1994 that addressed

20 the subject of dos and don'ts of interrogations?

21      A       There were no policies addressing the dos and

22 don'ts of interrogations to the best of my knowledge in 1994.

23      Q       And we haven't found any.  And we haven't

24 found any training bulletins in 1994.  So is it fair to say

25 that, in 1994, there were no --

1 in the legal matters -- which I think I did. But if he said

2 he didn't have it, he didn't have it. I can't question that.

3     Q     And is it also true that you did not require

4 that members of the homicide squad have any training

5 specifically in interrogations?

6     A     There was no requirement specifically that I'm

7 aware of. I don't know exactly what the curriculum was for

8 them to come into the Detective Division, which would have

9 been covered under a policy manual that they may have

10 maintained. It wasn't a department manual.

11     Q     In 1994, what would a police officer have to

12 do in an interrogation room to warrant discipline?

13           MS. McGREW: Object to the form.

14     A     Well, in my opinion, they would have to strike

15 a person. They would have to sexually assault a person.

16 Beyond that, I can't think of any other circumstances that

17 would warrant immediate discipline.

18     Q     How about non-immediate but down-the-line

19 discipline?

20     A     Well, if you become aware of it, possibly.

21 But I never became aware of any of it.

22     Q     Well, sir, that wasn't my question.

23     A     Well, I'm sorry. I didn't mean to circumvent

24 the question.

25     Q     No, no. Just in general, what would a police

Cook M.S.     09-16-76     ████ 9075     ████ 48

1986 Inservice Training     Session #23     Aug 12-14

1981 Inservice Training     Session 10     Feb. 16-20

1979 INSERVICE TRAINING     Sess #6     NOV 5-NOV 9

1986 Criminal Profiling School     May 7

1982 Firearms Inservice     Nov. 23

1980 Breathalyzer Requalification Sept 3

1977 Inservice Training     Mar 28 - Apr. 1

1988 - CPL IN-SERVICE SESSION 2     JAN 5, 6

1989 DNA SEMINAR     OCT 11, 1989

1989 IN SERVICE: JUVENILE LAW · SEPT 8

1989 IN SERVICE: COMPUTER TRAINING OCT 15

1990 - Infant Abduction Seminar - Sept. 26

1990 - Fall Inservice - Oct. 1 & 2

1991 - 6/6 CPR

1991 - INSERVICE 11/20 - 11/21

1992 - IN SERVICE .5/6 - 5/7

1992 - CIVIL Disturbance & WARRANT SERVICE     9/28 - 9/29

1994 - INSERVICE 3/22 - 3/24 24 hrs

1994 - Local Crime Trends 7/14     4 hrs

1994 - FALL INSERVICE 10/26 8 hrs

1995 - Cleet #95-3006 2/10 8 hrs

1995 - (FTS) SCHOOL OCT. 16-20 8 HRS

1995 - Cleet #95-3038 9/27 - 9/28 17 hrs

1995 - INSERVICE 10/30 8 hrs

**CONFIDENTIAL**                    COT 646

COUNCIL ON LAW ENFORCEMENT ** STATE OF OKLAHOMA
AGENCY TRAINING REPORT

SSN:<████-9075>  LAST:<COOK
DOB: █████48>  RACE: W  SEX: M  NCIC: <OK0720506>  FLAG:  0  TYPE: 11  I: S
STA: 10 E/DATE:          TRAINING YR: 1992 HRS:   8.00 LEVEL:  1 CODE: 10  FIRST: MICHAEL

| DATE | CODE | COURSE | HOURS | GRADE | CITY | AGENCY | STATUS | C1 | C2 |
|------|------|--------|-------|-------|------|--------|--------|----|----|
| 06/16/76 | 1580 | TULSA TRAINING | 540 | 0 | TULSA | TULSA P | | 0 | |
| 07/15/77 | 3030 | P. P. C. FIREAR | 8 | 0 | TULSA | PD | | 0 | |
| 11/05/79 | 4810 | ACCIDENT - INVE | 0 | 0 | TULSA | TULSA P | | 0 | |
| 05/07/86 | 4011 | CRIMINAL PROFIL | 8 | 0 | BROKEN | LETC | | 0 | |
| 11/20/91 | 6535 | COMMUNITY POLIC | 16 | 0 | TULSA | TPTC | MT | 0 | |
| 05/07/92 | 7119 | TAC OFFICER TRN | 8 | 0 | TULSA | T PD | MT | 0 | |

*** BA REVOLVER TRAINED ***
*** BASIC LEVEL ***
*** CERTIFIED BY MANDATE TRAINING ***

COURSES LISTED = 6  TOTAL HOURS = 580  VERIFIED BY: Velma A. Gehrke

CONFIDENTIAL

COT 647

# INFECTION CONTROL TRAINING LOG

AFTER ATTENDING THIS TRAINING, PLEASE COMPLETE THIS FORM AND RETURN
TO THE TULSA POLICE TRAINING DIVISION – IN-SERVICE TRAINING SECTION.

PLEASE PRINT:

Name: _M S COOK_    Job Title: _Det Cpl_

Division: _Det_    Shift: _Z_    Squad: _Homicide_

Instructor: _Bailey_

Date of Training: _102694_

Training Subject Content/Summary:   "_Bloodborne Pathogens_"

(Includes City Safety & Health Manual Sect. 305.22 to 305.944 and OSHA
Standard 29 CFR Part 1910.1030).

Length of Class:    1 hour

CONFIDENTIAL

COT 648

# INFECTION CONTROL TRAINING LOG

AFTER ATTENDING THIS TRAINING, PLEASE COMPLETE THIS FORM AND RETURN
TO THE TULSA POLICE TRAINING DIVISION – IN-SERVICE TRAINING SECTION.

PLEASE PRINT:

Name: _M S COOK_ Job Title: _Det Cpl_

Division: _DET_ Shift: _2_ Squad: _Homicide_

Instructor: _~~Hooper~~ J SGRIG_

Date of Training: _092795_

Training Subject Content/Summary: _"Bloodborne Pathogens"_

(Includes City Safety & Health Manual Sect. 305.22 to 305.944 and OSHA
Standard 29 CFR Part 1910.1030).

Length of Class:   1 hour

1  certainly.  Most critical?

2          Q       Are they among the most critical?

3          A       Among the most critical?  No.

4          Q       As a general rule, confessions are the single

5  most important piece of evidence in a homicide case, are they

6  not?

7          A       I would not agree with that.

8          Q       In 1994, did the Tulsa Police Department say

9  in writing it is the responsibility of the Tulsa Police

10  Department to protect the constitutional rights of all

11  persons?

12          A       I don't know if the policy stated that or not,

13  sir.  I'd have to see it.

14          Q       In 1994, that certainly was a responsibility

15  of the Tulsa Police Department, was it not?

16          A       I believe that to be true, yes, sir.

17          Q       Now, is it fair to say that, in order to

18  fulfill that responsibility, the Tulsa Police Department had

19  to have written policies that at least said what the broad

20  outlines were of those constitutional rights?

21          A       Could you repeat that?

22          Q       Yes, sir.

23          A       Thank you.

24          Q       Is it fair to say that, in order to fulfill

25  the responsibility of protecting the constitutional rights of

1 all persons, that the Police Department should have had

2 written policies setting forth at least the broad outlines of

3 what those constitutional rights are?

4      A     I would agree with that.

5      Q     And that would include interrogations.

6 Correct?

7      A     That would include interrogations as part of

8 constitutional rights, yes.

9      Q     And in areas where it would be possible to be

10 specific, that should have been set forth in those written

11 policies.  Correct?

12      MS. McGREW:  Object to the form.

13      A     I don't, I don't think you can be specific in

14 the application of the Constitution with every policy that

15 you have.  I mean, you can state certainly unequivocally that

16 officers should follow the Constitution and whatever is in

17 the Constitution.  To write a policy for every facet or

18 intricacy of the Constitution is impossible.

19      Q     I understand, sir.  In 1994, do you recall

20 that the policies and procedures of the Tulsa Police

21 Department identified specific Supreme Court cases and what

22 those cases held in the area of personal searches?

23      A     I don't recall that.

24      Q     Do you recall that in 1994, the policies and

25 procedures of the Tulsa Police Department set forth opinions

1 someone in an interrogation and do not contain the words "you

2 will not promise" anybody anything in an interrogation.

3 Correct?

4       A      To the best of my knowledge, yes, sir.

5       Q      All right. Those rules have come about as a

6 result of interpretations of the Constitution by the Supreme

7 Court of the United States. Correct?

8       A      I would agree with that, as well.

9       Q      Now, how is the officer going to know what the

10 constitutional rights of citizens in interrogations are as

11 enunciated by the Supreme Court of the United States unless

12 they are told about it in the policies and procedures manual

13 or they receive specific training on it?

14       A      Well, I think we've talked about that already.

15 The officers receive legal blocks of training on an annual

16 basis, to the best of my knowledge, and what was covered in

17 those, I don't know for certain with any degree of certainty.

18 But it could well have been regarding interrogations.

19       Q      Well, sir, I understand the "could have

20 been's". Do you agree with me that an officer would had to

21 have been told about what the Supreme Court had said about

22 interrogations in order for them to know what the

23 Constitution required?

24       A      They would have had to have been informed in

25 some way, yes, sir.

1               MS. McGREW: I was making an objection.

2       A        That wasn't an interruption; it was just me

3 not getting the full question.

4               MS. McGREW: Same objection.

5               MR. SEYMOUR: All right. Would you read it

6 back?

7               THE REPORTER: Sure.

8                   (Whereupon, the previous question

9 was read from the record by the Reporter: "Q)And the person

10 being interrogated most likely would not know that the

11 policeman was without authority with regard to a promise that

12 he had made. Correct?").

13               MS. McGREW: Same objection.

14       A        A lay person would not know that.

15       Q        In 1994, was it necessary for there to be a

16 statement of some kind that discipline could be imposed if an

17 interrogator violated the constitutional rights of the person

18 being interrogated?

19       A        There were general guidelines that surrounded

20 that in regards to oath of office and being a steward of the

21 Constitution of the United States, the laws of Oklahoma and

22 the laws of the City of Tulsa that an investigator adhering

23 to those oaths of office would apply those same rules to an

24 interrogation.

25       Q        Well, sir, if I'm an interrogator, I'm a Tulsa

1   Police Department policeman, and I have taken an oath to

2   uphold the constitutional rights of all citizens --

3         A      Correct.

4         Q      -- you as the Chief of Police certainly could

5   not have disciplined me if I was never told what the

6   constitutional rights of citizens were in interrogations.

7   Correct?

8         A      Well, I don't believe that happened. But I

9   would be the person responsible for disciplining you, yes.

10        Q      Well, sir, it would not be appropriate for you

11   to discipline me if nobody ever told me what the

12   constitutional limits in interrogations were. Correct?

13        A      That would be correct if they weren't told.

14   But I believe they were told.

15        Q      But you can't tell us where and when that

16   happened specifically. Right?

17        A      I cannot.

18        Q      Now, as you sit here, do you know of anything

19   in the policies and procedures manual in 1994 that addressed

20   the subject of dos and don'ts of interrogations?

21        A      There were no policies addressing the dos and

22   don'ts of interrogations to the best of my knowledge in 1994.

23        Q      And we haven't found any. And we haven't

24   found any training bulletins in 1994. So is it fair to say

25   that, in 1994, there were no --

1   it.  Right?

2           A        That would be right.

3           Q        In 1994, did you cause any person on the

4   homicide squad to have training about innocent people

5   confessing?

6           A        No.  There would have been no training about

7   that.

8           Q        Should a 17-year-old female who finds her baby

9   dead on the kitchen floor with its throat slashed ear to ear

10   in all but a decapitation have been interrogated within hours

11   of that event?

12           A        Yes.

13           Q        Why?

14           A        The closer the proximity the interrogation to

15   the event, the likelihood of the truth being told.

16           Q        Do you think that such a person could have

17   been in shock at the time of the interrogation?

18           MS. McGREW:  Object to the form.

19           A        I don't know her state of mind.

20           Q        Could that have been the case?

21           MS. McGREW:  Object to the form.

22           A        It could have been.  But I don't know.

23           Q        I didn't ask you if you knew; I just asked you

24   if that could have been.

25           A        I answered.

1    Q    And in this case, Ms. Murphy's lawyers at

2 trial and her different lawyer on appeal missed it.

3    MS. McGREW:  Is that a question?

4    MR. SEYMOUR:  No.  It's a statement, in

5 fairness to the witness.

6    Q    How can an interrogator be supervised in

7 respect of (sic) his interrogations without a video camera

8 with sound or a tape recorder going at all times during the

9 interrogation?

10    A    He can be supervised by the supervisors

11 sitting in on the interrogation if he so chooses.  That's not

12 possible all the time, obviously.  That's not possible to

13 video or audio at all times.  So the supervision of any one

14 individual in an interrogation is not continual.

15    Q    So that when a person is an interrogator and

16 they are alone with a suspect, there is no supervision of

17 that interrogation in those circumstances.  Correct?

18    A    That's correct.

19    Q    In 1994, there was no policy that prohibited

20 an interrogator interrogating alone.  Correct?

21    A    Not that I recall.

22    Q    I'll represent to you we have not found any.

23 In 1994, when an interrogator in the homicide squad got a

24 confession, should the interrogator have done a report

25 discussing that interrogation?

1    Q    Would it surprise you to know that homicide

2 interrogators believed the measure of their worth was getting

3 a confession?

4         MS. McGREW:  Object to the form.

5    A    Are you talking about all homicide

6 investigators or Tulsa PD homicide investigators?

7    Q    Tulsa PD homicide investigators, speaking

8 generally.

9         MS. McGREW:  Same objection.

10   A    I did not know that.

11   Q    Would there have been anything wrong in their

12 having that view?

13        MS. McGREW:  Object to the form.

14   A    If that was their view, so be it.

15        (Whereupon, Deposition Exhibit No. 8

16 was marked for identification).

17   Q    Sir, I have handed you the Tulsa Police

18 Department Duty Manual dated August 4, 1934.  And take

19 whatever time you would like to have a look at it.  Then I

20 would ask you to turn to page 39, which is in this double

21 side, it would be on your left-hand side.

22   A    Okay.

23   Q    In this section on confessions --

24   A    I have it. Do you have a question?

25   Q    Yes, sir.  I'm running to catch the caboose.

1          Did the interrogator also have the full

2    authority to decide what kind of touching of the

3    suspect would occur?

4          A.   Yes.

5          Q.   Thank you.

6               The full authority to decide what kind of

7    promises to make?

8          A.   Yes.

9          Q.   And what kind of threats to make?

10         A.   Yes.

11         Q.   Do you know what training Mike Cook had to

12   be an interrogator?

13         A.   No, I do not.

14         Q.   Do you know what kind of training was

15   provided to members of the homicide squad about

16   interrogation in 1994 or before?

17         A.   My training would have been -- at that time,

18   it would have involved in-service training classes a

19   possibility, exterior classes outside of the police

20   department, and current law which -- which the

21   district attorney's office made -- made available to

22   us.

23         Q.   Were you -- did you have any training in

24   interrogation?

25         A.   Not other than basic investigative training

1  that I may have received before I became a -- or

2  shortly after I became a police officer.

3      Q.   Did Mike Cook have any formal training at

4  all in interrogation?

5      A.   I -- I don't know.

6      Q.   Do you know what the content was of the

7  in-service training in 1994 about interrogations?

8      A.   No, I don't.

9      Q.   Is it a fact that in 1994, if a -- an

10  interrogator made any kinds of mistakes in

11  interrogating, that no discipline would follow?

12      A.   I would not say that's a fact, no.

13      Q.   Well, I'm not asking you if it, in fact,

14  happened.  I'm just saying, is that how things

15  operated in the police department?

16      MR. WOHLGEMUTH:  Objection as to form.

17      A.   Would you repeat the question?

18      Q.   (BY MR. SEYMOUR)  Sure.

19      If there was something improper that went

20  on -- well, what would have to go on in the

21  interrogation room in order for a police officer to be

22  disciplined because you did something in there you

23  weren't supposed to, and here it is.

24      What would the "here it is" be?

25      A.  Physical force.

1     Q.   Ms. Murphy says that during the

2  interrogation where she confessed, that Mike Cook

3  yelled at her, threatened her with never seeing her

4  daughter again unless she confessed, told her if she

5  confessed she would go home and get therapy, and she

6  did not have food or water for seven hours.

7      Now I will represent to you that I have not

8  found anything in the policies or procedures of the

9  Tulsa Police Department that would find anything wrong

10  with what I just identified to you that Ms. Murphy

11  said happened.  Okay?

12     A.   Okay.

13     Q.   Do you know of anything as you sit there in

14  the policies and procedures of the Tulsa Police

15  Department in force in 1994 which said there was

16  anything wrong with any of her allegations?

17      MR. WOHLGEMUTH:  Objection; lack of

18  foundation and object as to form.

19      You may answer.

20     Q.   (BY MR. SEYMOUR)  You may answer.

21     A.   No, I do not.

22     Q.   Was there any discipline that should have

23  been imposed on Mike Cook if any of the things I said

24  Ms. Murphy claimed he did during the interrogation

25  were true?

1    A.   Not that I'm aware of, no.

2    Q.   All right.  In 1994, when an interrogator

3 went alone into the interrogation room with a suspect,

4 during any period of time when neither a video camera

5 nor a tape recorder was in use, do you agree that the

6 interrogator had the full authority of the Tulsa

7 Police Department to decide how that interrogation

8 would proceed?

9    A.   At that time, yes.

10    Q.   All right.  Did that change at some point?

11    A.   I believe it did at some point.

12    Q.   When?

13    A.   I don't know.

14    Q.   Before you retired?

15    A.   Before I retired?  Yes, possibly before I

16 retired.

17    Q.   All right.  And tell me how that changed.

18    A.   I -- I don't know.

19    Q.   In that scenario, where the interrogator is

20 alone and there's no tape recorder going full time and

21 no video camera going the full time, the interrogator

22 had the full authority of the department to decide

23 whether medical attention should be summoned; correct?

24    A.   I believe so, yes.

25    Q.   And the full authority -- pardon me.

1  Department to decide what kind of threats to make. Do you

2  agree with that testimony?

3          A      They would have.

4          Q      And he testified that the interrogator had the

5  full authority of the Tulsa Police Department to decide what

6  kind of promises to make. Do you agree with that testimony?

7          A      No.

8          Q      And why do you disagree?

9          A      Because I would disagree with the word

10  "promises". An investigator can't promise. As I stated

11  earlier, the investigator can suggest outcomes, what might

12  happen. But the investigator has no authority to promise

13  what might happen in court or promise what might happen if

14  you say one thing or the other.

15          Q      Well, the interrogators were not told in the

16  policies and procedures that they had no authority to make

17  promises, were they?

18          A      I don't know.

19          Q      And the person being interrogated most likely

20  would not know that the policeman was without authority with

21  regard to a promise that he had made. Correct?

22          MS. McGREW:  Object to the form.

23          A      Could you repeat that? I'm sorry.

24          Q      Sir, you were interrupted. So let me try

25  again.

CONFESSIONS : -

A confession is the voluntary declaration made by a person who has committed a crime or misdemeanor to another, acknowledging his agency or participation in the same. It is restricted to an acknowledgement of guilt made by a person after the offense has been committed. A confession of guilt by the accused is admissible in evidence against him when, and only when, it was freely and voluntarily made without having been induced by the expectation of any promise to benefit nor by the fear of any threatened injury. The fact that the accused was not represented by counsel or that counsel representing him was not present at the time of the confession does not affect its admissibility. It may be in the form of questions and answers. An appeal to a man's religious feelings or to his conscience to speak the truth which induces him to confess his guilt does not invalidate his confession. It is better and safer course, when the prisoner is about to make a statement, to warn him that it may be used against him, although this is not required by statute. A confession is inadmissible in evidence if induced by a promise, express or implied, that if accused would confess efforts would be made to mitigate his punishment, by a promise of immunity from prosecution or punishment by the promise of the prosecuting witness or the prosecuting officer to discontinue the prosecution, or by a promise of a pardon, but not otherwise. It is the better practice to take confessions in writing and have them executed by the accused, but oral confessions are admissible. The fact that accused was more or less intoxicated when he confessed does not exclude the confession; if he had sufficient mental capacity to know what he was saying. If confession implicates one or more other parties; in order to be admissible as evidence against the other parties it must be read and its truth attested to by the party who gave it in the presence of all parties concerned.

(B)  GENERAL PROCEEDURE

Officers shall devote all their working hours not actively spent in routine duties, to finding, questioning and investigating all possible suspicious persons. Each district will be free from crime in direct proportion to the officiency, energy and intelligence devoted to this task. No duty is of greater importance. In no task will the officer have a better opportunity of demonstrating his value as an officer and his ability as a detective. In no other way can he have the satisfaction of knowing that he has stopped a "hot" one, or that he has saved the city from being burnt up by some house prowler, stick-up or yegg. In stopping any person to question, the officer shall be always on the alert and always prepared to shoot instantly. At the same time care must be observed to avoid a needless display of firearms. If in a car at night, and the person to be questioned is also in a car, use a floodlight, because the occupants of the other car will not then be able to offer as an excuse for failing to stop or for shooting, that they thought they were being held up by bandits. And they will be unable to see how many officers are in the the car, or whether or not the officer has his gun drawn. When stopping a person on foot, if convenient, do so under a street light. If possible approach him on foot so that if he breaks and runs, valuable time will not be lost in getting from the car.

28.  **DUTY TO REPORT VIOLATIONS.**

All officers and employees have a duty to report infractions of prescribed conduct by officers and employees. Such conduct shall be brought to the immediate attention of the officer's or employee's supervisor. In the event that the supervisor is involved in the misconduct, the officer or employee shall bring it to the attention of the next highest non-involved person in the chain of command. In the event that the infraction is of a serious nature, the chain of command may be ignored, and the matter may be brought to the direct attention of the Chief of Police.

29.  **NOT TO SEEK OUTSIDE AID.**

An officer or employee shall not request the aid of any person outside the department to have him/her transferred to another assignment or beat, to have him/her restored to any assignment or beat from which he/she has been removed by a superior officer, or to have him/her promoted to a higher rank in the service; nor shall he/she knowingly permit any petition to be prepared or presented by citizens in his/her behalf requesting such transfer, restoration, or promotion.

30.  **POLICE OFFICER BILL OF RIGHTS:**

A.  The Chief of Police shall establish and put into operation a system for the receipt, investigation, and determination of complaints against Police Officers received by such Chief of Police from any person.

B.  Whenever an Officer is under investigation and is subject to interrogation by members of his agency, for any reason which could lead to disciplinary action, demotion, or dismissal, such interrogation shall be conducted under the following conditions:

1)  Interrogation:

When an Officer is under investigation by the Tulsa Police Department for a complaint received, and is to be interrogated in respect to such complaint by other members of the department when there is a logical possibility that suspension, demotion, or dismissal may result, such interrogation shall be conducted as follows:

a)  The Officer shall be informed of the name of all complainants, if known. The employee may request to be confronted by the complainants. This shall be allowed where deemed necessary by the employee and the investigating Officer.

COT 605

b) Preliminary discussions with supervisory personnel within the Police Department, in relation to a complaint received, shall not be considered as interrogation as used herein.

c) The Officer under investigation shall be informed of the rank, name, and command of the Officer in charge of the investigation, the interrogating Officer, and all persons present during the interrogation. All questions directed to the Officer under interrogation shall be asked by and through one interrogator at any one time.

d) The Officer under investigation shall be informed of the nature of the investigation prior to any interrogation.

e) Interrogating sessions shall be for reasonable periods and shall be timed to allow for such personal necessities and rest periods as are reasonably necessary.

f) The Officer under interrogation shall not be subjected to offensive language or threatened with transfer, dismissal, or disciplinary action. No promise or reward shall be made as an inducement to obtain testimony or evidence.

g) The Officer under interrogation shall be completely informed of all his rights pursuant to this procedure prior to the commencement of the interrogation and of his responsibility to answer all questions, and this notification shall be included on the tape recording or written record of the session.

h) At the request of any Officer under investigation, he shall have the right to be represented by counsel or any other representative of his choice who may be present at all times during interrogation.

i) Interrogation of Officers under investigation may be taped or recorded in written form at the discretion of the investigating Officer. Officers under investigation may record the proceedings with his own equipment or record at his own expense.



COT 606

1     was in your --

2         A      I have no idea what I would or wouldn't have

3     done in '94.

4         Q      Can I finish?

5         A      Go for it.

6         Q      You would have paid attention to what was in

7     your training. Right?

8         A      Yes.

9         Q      All right. And you in 1994 paid attention to

10     what was in the policies and procedures manual. Correct?

11         A      I'm sure I tried to.

12         Q      All right. And you would not have consciously

13     violated any provision of the policies and procedures manual

14     that dealt with interrogations. Right?

15         A      Consciously?

16         Q      Yes, sir.

17         A      I wouldn't think so.

18         Q      I'll represent to you that except for the

19     provision on interrogations of policemen, there isn't

20     anything in the policies and procedures manual that we've

21     been given for 1994 that directly deals with the subject of

22     interrogations. Do you know of anything that is contrary to

23     that?

24         A      Sitting here now, no, I don't.

25         Q      All right. Are the Judge and the Jury

1  policy when he tells his detectives the dos and don'ts of

2  interrogations.  Correct?

3       A    Yes.

4       Q    In 1994, when was a murder investigation over?

5       A    Prosecution of the case.  Death of the

6  suspect.  Some of them still continue today as open cases,

7  I'm assuming.  And they remain open until solving or other

8  evidence comes forth to create a prosecution.

9       Q    Sir, do you agree with this statement from the

10 International Association of Chiefs of Police, quote:  "Some

11 areas are obvious to be likely to result in violations of

12 citizens rights unless police officers are trained on use of

13 force, search and seizure, arrests, and interrogations",

14 closed quote.

15      A    I would agree with that.

16      Q    Ever hear the phrase "totality of the

17 circumstances" with regard to police work?

18      A    Yes.

19      Q    And what does that mean to you?

20      A    It means, depending on the situation, whether

21 it's a patrol situation or an interview situation or a policy

22 development situation or whatever it might be, you consider

23 all the factors that are known to you as kind of a bounds of

24 rationality of information available to you, and you consider

25 the totality of that or the entirety of that in making a

 

| | PROCEDURE | Page 1 of 2 | Procedure File No. 31-107A |
| POLICE DEPARTMENT | Subject Personal Searches | Supersedes No. 31-123A | Previous Date 7-29-87 |
| | Approved By Drew Diamond, Chief of Police | Date Approved February 1, 1990 | |

THIS POLICY STATEMENT AND THE PROCEDURES THEREUNDER ARE INTENDED FOR POLICE DEPARTMENTAL USE ONLY. THE POLICIES, PROCEDURES AND REGULATIONS ARE FOR INTERNAL POLICE DEPARTMENT ADMINISTRATIVE PURPOSES AND ARE NOT INTENDED TO CREATE ANY HIGHER LEGAL STANDARD OF CARE OR LIABILITY IN AN EVIDENTIARY SENSE THAN IS CREATED BY LAW. VIOLATIONS OF INTERNAL POLICE DEPARTMENT POLICIES, PROCEDURES, REGULATIONS OR RULES FORM THE BASIS FOR DISCIPLINARY ACTION BY THE POLICE DEPARTMENT. VIOLATIONS OF LAW FORM THE BASIS FOR CIVIL AND/OR CRIMINAL SANCTIONS TO BE DETERMINED IN A PROPER JUDICIAL SETTING, NOT THROUGH THE ADMINISTRATIVE PROCEDURES OF THE POLICE DEPARTMENT.

POLICY:    In accordance with the guidelines established by the United States Supreme Court, officers may conduct a preliminary search for weapons, or "frisk," whenever circumstances warrant such a search. The Supreme Court of the United States has held that a frisk is lawful when the following factors are present:

(1) "Suspicious activity" has been observed (and the officer is able to fully document the particular activity and explain why it is suspicious);
(2) there is reason to believe the suspect is armed;
(3) the search is limited to weapons.

The laws governing field searches are more liberal. Field searches may be conducted to discover concealed weapons, evidence, or objects that can be used as a means of escape. The field search is legally reasonable when it is:

(1) Based on a properly issued warrant;
(2) connected with a lawful arrest; or,
(3) made with the free consent of the person searched.



The Supreme Court of the United States has permitted a search of the personal effects of an arrested person as part of the routine administrative procedures at a police station house incident to booking and jailing the suspect. The reasons for allowing this type search include:

(1) Safekeeping of the property of the accused;
(2) Preventing false claims against the officer and the agency;
(3) Identifying the accused;
(4) Safety.

The Supreme Court of the United States has permitted visual body cavity searches on less than probable cause when the significant and legitimate security interests of the institution outweigh the privacy interests of the suspect.

Lower courts have interpreted this to mean that before persons accused of a misdemeanor or other minor crimes are subjected to strip/body cavity searches, there must be a reasonable suspicion that they are concealing weapons or other contraband.

COT 94

1    the United States has permitted visual body cavity searches

2    on less than probable cause when the significant and

3    legitimate security interests of the institution outweigh the

4    privacy interests of the suspect."  Now, sir, when the manual

5    sets forth on an entire page of what the Supreme Court of the

6    United States has said about personal searches, why didn't

7    you have the manual set forth quite simply "During

8    interrogations, there shall be no threats and there shall be

9    no promises"?

10          A      I don't know.

11                 (Whereupon, Deposition Exhibit No. 5

12   was marked for identification).

13          Q      I've handed you now what has been marked as

14   Deposition Exhibit Number 5.  And this is a Use of Force - OC

15   Spray policy and it went into effect on September 1 of 1993

16   Correct?

17          A      No.

18          Q      I'm sorry.  That was the previous date.  This

19   one was approved February 1, 1994.

20          A      That's correct.

21          Q      Thank you.  What is OC spray?

22          A      It's pepper spray.  Commonly known as pepper

23   spray.

24                 (Whereupon, Deposition Exhibit No. 6

25   was marked for identification).

1        Q      And in this case, Ms. Murphy's lawyers at

2  trial and her different lawyer on appeal missed it.

3               MS. McGREW:  Is that a question?

4               MR. SEYMOUR:  No.  It's a statement, in

5  fairness to the witness.

6        Q      How can an interrogator be supervised in

7  respect of (sic) his interrogations without a video camera

8  with sound or a tape recorder going at all times during the

9  interrogation?

10       A      He can be supervised by the supervisors

11  sitting in on the interrogation if he so chooses.  That's not

12  possible all the time, obviously.  That's not possible to

13  video or audio at all times.  So the supervision of any one

14  individual in an interrogation is not continual.

15       Q      So that when a person is an interrogator and

16  they are alone with a suspect, there is no supervision of

17  that interrogation in those circumstances.  Correct?

18       A      That's correct.

19       Q      In 1994, there was no policy that prohibited

20  an interrogator interrogating alone.  Correct?

21       A      Not that I recall.

22       Q      I'll represent to you we have not found any.

23  In 1994, when an interrogator in the homicide squad got a

24  confession, should the interrogator have done a report

25  discussing that interrogation?

1 final decision.

2    Q    In 1994, at what point did the Constitution
3 require that a suspect be given a Miranda warning?

4    A    I'm not sure when they were required.  I don't
5 know that for certain.

6    Q    Every custodial interrogation required that a
7 Miranda warning be given at the outset.  Correct?

8    A    I know that we were giving Miranda warnings in
9 the field when arrests were made.  And whether that led to
10 custodial investigation or not, sometimes it did, sometimes
11 it didn't.

12    Q    If a person is taken to the station in
13 handcuffs, is that person free to go?

14    A    No.

15    Q    They are in custody.  Correct?

16    A    That's correct.

17    Q    Sergeant Allen testified that in 1994, if
18 there was no training on sexual harassment during
19 interrogations, that a police department was just setting
20 itself up for sexual harassment to occur during the
21 interrogation.  Do you agree with that?

22    A    With his statement?

23    Q    Yes, sir.

24    A    No, because I don't believe necessarily that
25 sexual harassment pertains to interrogations.

1  juvenile suspect just confessed to a brutal rape-murder but

2  the worst thing he's done before is skipped school, then you

3  should take a step back and re-evaluate your evidence.

4          MS. McGREW:  Object to the form.

5      A    No, I would not agree with that.

6      Q    Do you agree with this statement:  Common

7  sense and what every parent knows recognizes developmental

8  differences between juveniles and adults.

9          MS. McGREW:  Object to the form.

10     A    May I ask a clarification?

11     Q    Yes, sir.

12     A    When you're talking about a juvenile, are you

13  talking about the age of that person?

14     Q    Well, you know what "juveniles" meant back in

15  1994, did you not?

16     A    Sure.

17     Q    And it was people under the age of 18.  Right?

18     A    That's correct.

19     Q    All right.  Do you agree that common sense and

20  what every parent knows recognizes developmental differences

21  between juveniles and adults?

22          MS. McGREW:  Object to the form.

23     A    I don't know every parent knows that.  But I

24  would agree with the rest of the statement.

25     Q    Do you agree with this statement:  Recording

1    is particularly essential when the person being interrogated

2    is a juvenile?

3          A      I would agree with that.

4          Q      Why, then, didn't you have a policy in 1994

5    that required all interrogations of juveniles be recorded in

6    their entirety?

7          A      I'm not sure we had the equipment to do that

8    in 1994, sir.

9          Q      I'll represent to you that, in the case of Ms.

10   Murphy in 1994, that equipment was available and detective

11   Cook so testified.  Now, given that, with regard to the

12   interrogation of Ms. Murphy, should that interrogation have

13   been recorded in its entirety?

14         A      If the equipment was available, yes, it should

15   have been.

16         Q      Do you agree with this statement:  When

17   significant and substantial contradictions exist between the

18   known facts about the crime and what the suspect describes in

19   his confession, extreme care must be exercised in the

20   assessment of the confession's validity.

21               MS. McGREW:  Objection to the form.

22         A      I would agree with that.

23         Q      Do you agree with this statement:

24   Authoritative opinion has cast formidable doubt upon the

25   reliability and trustworthiness of confessions by children.

1   was certainly not correct procedure.

2           Q       Why wouldn't an apology be appropriate?

3           A       Seems a little bit in arrears to do that at

4   this point.

5           Q       Well, apart from being in arrears, wouldn't it

6   be appropriate to do so?

7           A       Possibly.

8           MS. McGREW:  Object to the form.

9           A       Possibly.

10          Q       Prior to today, have you ever heard that Mike

11  Cook coerced a confession from anybody?

12          A       No.

13          Q       I think I know the answer to this.  But I have

14  to ask it, anyway.  In 1994, was it your view that a few

15  constitutional violations here and there were okay, because

16  any victims of such had lawyers that could take care of it?

17          MS. McGREW:  Object to the form.

18          A       That's not what I said.

19          Q       Oh, I know it's not what you said, sir; I'm

20  just asking if that was your view.

21          A       That's not my view in that the police, the

22  police need to conduct an appropriate investigation -- but

23  there are checks and balances after that that allow the Court

24  system to discredit and/or throw out whatever was done before

25  in regards to that investigation.

# TRACIS

Tulsa Regional Automated Criminal Information System
STANDARDIZED REPORTING FORMAT TUL-4605D

☐ INJURY DIAGRAM
☒ NARRATIVE SUPPLEMENTAL
☐ WORTHLESS DOCUMENT

COMPLAINT NUMBER

Sheet ___ of ___

ATTENTION: _____

| CRIME TYPE | Homicide | | ORIGINALLY REPORTED | MO | DAY | YR | DAWK | TIME | PREPARED | MO 09 | DAY 12 | YR 94 | DAWK mo | TIME 0800 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| TPO / PID NUMBER | VICTIM NAME (LAST, FIRST, MIDDLE) | LOCATION OF OCCURRENCE |
|---|---|---|
| | WOODS, TRAVIS EUGENE | 2275 S MAYBELLE |

AT 0310 HRS, 091294, I BACK OFFICER G.K. SMITH (5104)
INVESTIGATE A POSSIBLE DOMESTIC VIOL AT 2275 S JACKSON.

UPON ARRIVAL AT APPROX 0315 HRS I REALIZED ALL
SOUTH JACKSON ADDRESSES HAVE EVEN NUMBERS. WE DROVE
TO 2275 S MAYBELLE TO SEE IF THE COMPLAINANT MAY
HAVE GIVEN THE WRONG STREET NAME. 2275 S MAYBELLE
WAS QUIET. I LOOKED INTO THE APT THRU A WINDOW DIRECTLY
WEST OF THE FRONT DOOR (SOUTH WALL OF THE APT BUILDING)
THE APT WAS DARK. I COULD ONLY SEE IN WITH THE AIDE
OF MY FLASHLIGHT. I OBSERVED A WHITE ADULT AND A
SMALL CHILD ON THE COUCH. THE ADULT WAS LAYING ON THE
WESTERN MOST SECTION OF THE COUCH HEAD TO THE SOUTH. THE CHILD
WAS PROPPED UP IN THE CENTER OF THE COUCH (NW CORNER). THE CHILD
HAD DARK CURLY HAIR. BOTH THE ADULT AND THE CHILD
APPEARED ASLEEP. OFFICER SMITH KNOCKED AND ANNOUNCED OUR
PRESENCE. I THOUGHT THE ADULT GOT UP BUT WHEN I LOOKED
BACK IN THE ADULT WAS STILL ON THE COUCH. NEITHER APPEARED
TO BE IN DISTRESS.

I CHECKED WITH TPD DISPATCHER WHO ADVISED THE CALL CAME
IN ON THE PAY PHONE AT 2212 S JACKSON. THE CALLER
STATED THEY WERE NOT SURE WHAT ADDRESS THE DIST. WAS AT
THEN THOUGHT 2275 S JACKSON. THE DIST ATTEMPTED TO CALL
THE NUMBER BACK BUT 25 IS FOR OUTGOING CALLS ONLY.

OFFICER SMITH AND I CLEARED THE CALL AT 0306 HRS
BELIEVING THE ADDRESS GIVEN WAS BOGUS.

| PROPERTY RECEIPT | PHOTO NO | LATENT NO | | |
|---|---|---|---|---|
| INTERVIEWING OFFICER G.J. OTTERSTROM | ID NO 03626 | DIV 318 | SUPERVISOR Sgt W. Allen | ID NO | DIV |

COMPLAINT NUMBER 573 348

# TRACIS

☐ INJURY DIAGRAM
☑ NARRATIVE SUPPLEMENTAL
☐ WORTHLESS DOCUMENT

Tulsa Regional Automated Criminal Information System
STANDARDIZED REPORTING FORMAT TUL-450GB

**COMPLAINT NUMBER** 573 348

Sheet ____ of ____

ATTENTION:

| CRIME TYPE | Homicide | | ORIGINALLY REPORTED | MO 09 | DAY 12 | YR 94 | DO/WK mon | TIME 0616 | PREPARED | MO 09 | DAY 12 | YR 94 | DO/WK mon | TIME 0800 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| TPD / PID NUMBER | VICTIM NAME (LAST, FIRST, MIDDLE) | LOCATION OF OCCURRENCE |
|---|---|---|
| | WOODS, TRAVIS EUGENE | 2275 S MAYBELLE |

ON 091294(MON) AT 0511 HRS I WAS RADIO ASSIGNED TO 2275 S. JACKSON REF POSSIBLE DOMESTIC. DISPATCH STATED THEY RECEIVED A 911 CALL FROM PAY PHONE AT 2212 S JACKSON. DISPATCH ADVISED AN ANONYMOUS CALLER STATED THE PEOPLE AT 2275 S JACKSON WERE FIGHTING. R/O WAS 10-97 AT 0515 HRS AND QUICKLY DISCOVERED THAT 2275 S. JACKSON WAS A BAD ADDRESS. MY BACKUP OFC (OTTERSTROM) AND I THEN DROVE TO 2275 S MAYBELLE TO CHECK FOR A POSSIBLE CORRECT ADDRESS. WE BOTH OBSERVED A WHT FEMALE ADULT AND A SMALL CHILD LAYING ON THE COUCH. R/O KNOCKED ON FRONT DOOR AND STATED "TULSA POLICE" LOUDLY. R/O GOT NO REPLY SO I AGAIN STATED "TULSA POLICE" AND AGAIN KNOCKED LOUDLY. THE ADULT MOVED SLIGHTLY BUT DID NOT GET UP. BECAUSE THE HOUSE WAS QUIET AND APPEARED PEACEFUL BOTH OFFICERS LEFT THE SCENE AT 0526 HRS.

ADD-INFO:
THE SCREEN DOOR TO THE FRONT OF THE APT HAD A CHAIR LAYING AGAINST IT FROM THE OUTSIDE OF THE APT. THE WOODEN FRONT DOOR WAS OPEN ENOUGH THAT R/O COULD SEE INTO THE APT. BECAUSE IT WAS SO DARK R/O HAD TO USE HIS FLASHLIGHT TO SEE INSIDE OF THE APT.

AT 0616 HRS DISPATCH ADVISED OF A DOA/STABBING AT 2247 S. MAYBELLE. UPON ARRIVAL AT 0622 HRS R/O DISCOVERED THE CORRECT ADDRESS TO BE 2275 S. MAYBELLE. AS R/O APPROACHED THE REAR DOOR OF THE APT I WAS MET BY OFC MEACE AND EMSA PERSONNEL. EMSA STATED THE BABY WAS SIGNAL 30 AND THAT THEY HAD NOT ENTERED THE APT. R/O LOOKED THRU THE SCREEN DOOR AND SAW A SMALL CHILD LAYING IN A POOL OF BLOOD WITH ITS THROAT CUT. R/O AND OFC MEACE THEN ENTERED THE HOUSE TO CHECK FOR MORE VICTIMS. OFFICERS CLEARED THE APT WITHOUT LOCATING ANY OTHER VICTIMS. OFFICERS EXITED APT AND IMMEDIATELY SET UP A CRIME SCENE WHERE OFFICERS REMAINED UNTIL RELIEVED. R/O WAS RELIEVED BY OFC. G. BRISTOW G-202 AT 0710 HRS. WHILE R/O WAS IN CHARGE OF SCENE NO ONE ENTERED THE APT EXCEPT FOR OFC MEACE, OFC CORY AND R/O. OUR ONLY PURPOSE FOR ENTERING THE APT WAS TO CHECK FOR VICTIMS WHICH R/O DID ONCE WITH OFC MEACE & ONCE WITH OFC CORY. R/O ENTERED WITH OFC CORY TO CHECK AN ATTIC DOOR BUT FOUND IT SECURED.

| PROPERTY RECEIPT | PHOTO NO | | ID NO | DIV | LATENT NO | | |
|---|---|---|---|---|---|---|---|
| INTERVIEWING OFFICER RK SMITH 51509 319 | | | SUPERVISOR Sgt. Wayne Allen A205 | | | ID NO | DIV |

COMPLAINT NUMBER 573 348

COT 7962

TULSA POLICE DEPARTMENT
TULSA, OKLAHOMA

STATEMENT (TAPED)

STATEMENT OF:      William Michael Lee
REFERENCE:          Case File #573-348, Homicide, 9-12-94
                    Victim--Travis Wood
                    2275 South Maybelle
QUESTIONED BY:      Det. Cpl. M. S. Cook
DATE AND TIME:      9-14-94 - 1621 hours
PRESENT:            Det. Cook and William Lee
LOCATION:           TPD, Detective Division
TRANSCRIBED BY:     Barbara Gifford

Q:  William, state your full name for me, please.

A:  William Michael Lee.

Q:  And your date of birth?

A:  ███████████

Q:  And that makes you how old?

A:  Wait a second, I think I screwed (inaudible). Um, it's ████████

Q:  O.K. Rather than ████ it's ██████████.

A:  Yes.

Q:  O.K. And how old are you?

A:  Fourteen. I'm getting ready to turn 15.

Q:  I'm sorry?

A:  Fourteen and a half, getting ready to turn 15.

Q:  O.K. You turn...you turn 15 next month, as a matter of fact, is
    that right?

A:  Yeah.

COT 8126

Q: O.K. O.K., we've been talking about you were the one who made the call to the Police Department, is that right?

A: Yes.

Q: O.K. And that was around 3:00 on...in the morning on the 12th, which was...would be Monday morning or late, late Sunday night, however you want to look at it, right?

A: Yes.

Q: O.K. What I want you to do for me is to talk to me about where you were and what you were seeing that caused you to call 911 and report what you did.

A: Well, Michelle and her boyfriend, Gene...

Q: O.K. By that, are you referring Eugene Wood?

A: Yes.

Q: O.K.

A: They was arguing about Travis being his son and other things.

Q: O.K. By being his son, what do you, what do you mean?

A: By...he wanted to know, you know, why...if he wasn't, was he getting told that he was, and she...

Q: So he had some doubt as to whether it was his son or not?

A: Yes.

Q: O.K. Do you know what, what caused him to have those doubts?

A: No.

Q: O.K. What else were they saying? Do you remember anything specifically about what they were saying to each other?

A: Well, (inaudible) Michelle telling him to get out of her house.

Q: Were they yelling at each other? I mean was it a, a pretty good fight?

A: Yeah.

COT 8127

Q: Where were the children?

A: They was in the front room. Big Michelle...Michelle Murphy was holding the baby and...

Q: Travis?

A: Travis.

Q: Um hum.

A: And Little Michelle was in the corner of the couches, crunched up and looked scared.

Q: O.K. How did you come to be over there seeing this?

A: I had heard them hollering.

Q: O.K. Do you live nearby? Were you in your apartment when you heard it?

A: No, I'd walked outside. But it's pretty easy to hear stuff out there.

Q: O.K. Was their door open?

A: Yes.

Q: O.K. So from, from where you....where were you standing when you, when you started...when you went over to see if she was O.K. or for whatever reason you went up and looked?

A: I'd went over to the door and was looking in and listening and watching, mostly watching and listening.

Q: How close were you to the door? Were you up on the porch?

A: Yes.

Q: O.K. What else did you see?

A: Um, it looked like Michelle had been punched in the eyes, 'cause they was a different shade than skin color, and it looked like she'd been...her face had been hit on the side, 'cause it was red.

COT 8128

Q:   O.K.  What else did you see or hear?

A:   Gene...I seen (inaudible) looked as though he had a handle of
a knife in his back pocket.

Q:   O.K.  You think it was a knife, and you could see the handle?

A:   Yeah.

Q:   Was the handle protruding out of the pocket?  Out of the top of
the pocket?

A:   Yes.

Q:   Is that what you're saying?

A:   Yes.

Q:   Did he threaten her or anything that you could hear?

A:   I could not hear...well, I, I really wasn't listening for a
threat.  I was watching 'em to see what physical activity was
going on, and, no, I didn't hear him threaten her.

Q:   What was he saying?  Do you remember anything specifically?

A:   Mostly just what about it...why was this...him getting told that
Travis was his son if he wasn't.

Q:   Was he saying who, whose son he thought it might be?

A:   No.

Q:   What was Michelle saying?

A:   That he was his son, and she wanted to know why he was asking
this.

Q:   Did he tell her why he was asking her?

A:   That he'd heard a rumor that she'd been fooling around him when
Travis conceived.

Q:   He didn't say with who?  About how long did all this go on?

A:   About 30 minutes or so.

Q:  So you were standing out there watching it for about 30 minutes?

A:  Yeah.

Q:  Did any...either one of them ever lay hands on the other?  Were any blows struck or anything like that?

A:  Not when I was around there, no.

Q:  O.K.  O.K., what happened?

A:  They was arguing, and Michelle took and...looked upset...

Q:  Michelle did what now?

A:  Michelle looked upset--the baby--of all this going on.

Q:  What'd she do then?

A:  She just stays in that corner.

Q:  Oh, you mean Little Michelle was looking all upstet?  Was she crying and stuff?

A:  No, but...

Q:  What about Travis?  Was he crying?

A:  The baby started crying, but Michelle Murphy, the mom, took him...got him to be quiet.

Q:  How did she do that?

A:  By patting him on his back and basically comforting him and trying to get him to (inaudible) O.K.

Q:  Was he holding him the whole time that you were watching this?

A:  Yes.

Q:  O.K.  O.K.  What, what, what else happened?

A:  Well, that went on for a little while.  He went to turn around, and I don't know if he seen me or not, but I went and hid behind the bush that's by that house, or should I say by the neighbor's house, and he went to open the door and looked to see, I look out and...

COT 8130

Q:   You mean open the door further than it was already open?

A:   Yeah.

Q:   Was the door open or was it closed?

A:   It was open.

Q:   So you were watching through the screen door?

A:   Yeah.

Q:   O.K.  Did he leave it open when he...after he looked out?

A:   Yeah.

Q:   O.K.  What happened then?

A:   Then they went...they was arguing for a little bit longer, then
he left.

Q:   O.K.  Did you go back up to the screen door after that, or did
you stay where you were hiding?

A:   No, I didn't stay where I was hiding.  I kind...I got a little
bit closer, but I didn't get as close as I was then.

Q:   Could you still see inside or could you just hear?

A:   I could see still.

Q:   O.K.  Well, what happened then?

A:   Well, they was arguing for a little bit longer, then he left.

Q:   O.K.  Describe for me how he left?

A:   He walked towards West Oaks Apartment.

Q:   O.K.  When he left the apartment, what was the circumstances?

A:   I guess that, you know, he was tired of arguing, and he just got
up and left.

Q:   Well, did she throw him out?  Were they yelling at each other,
or did he just get up and casually walk out?

A:   More or less he just kinda casually walked out.

Q:   What did she do after he left?

A:   Sounded like she slammed the door, but it coulda just been the
     screen.

Q:   O.K.  What did you do then?

A:   I kept a decent eye on, you know, seeing how she was, and she
     seemed real upset.

Q:   What makes you think she was upset?

A:   Walked back.  She was...she was crying a little and just upset
     looked.

Q:   Did you ever go knock on the door or anything to check on her,
     to ask her if she was O.K.?

A:   No.

Q:   O.K.  What happened next?

A:   Uh, then I went and called the police (inaudible) went to the
     house.

Q:   Did you go back to your apartment first before you went to call
     the police?

A:   No.  I just went up to the pay phone by the office, 'cause the
     other one, it seemed like they was either waiting for a call or
     they was getting ready to use it.

Q:   So the first phone you went to you couldn't use?

A:   Yeah.

Q:   Which one was that?

A:   It was the one that's right there on the (inaudible) just walk
     out there, and the pay phone's out there.  It's, it's like on
     the four-way walkway.

Q:   Um hum.  O.K.  So when you finally got the phone, what did you
     do?

A: Called 'em, told 'em what all...

Q: What did you call? What number?

A: 911.

Q: O.K. Do you remember what you said?

A: Basically that it was a domestic violence thing, there was fighting, and it sounded like a knife had hit the wall or something.

Q: O.K. Tell me what you meant by it sounded like a knife had hit the wall.

A: Just sounded like somebody threw something, and it...like a knife.

Q: Well, do you...did you see someone throw something?

A: No.

Q: But you heard something that sounded like something hitting the wall?

A: Yeah.

Q: Why did you think it might have been a knife?

A: Well, it was about the only thing that...other than...that it sounded like.

Q: O.K.

A: You know, (inaudible) glass or something, it'd a broke, and it wouldn't have hit it and like bounced.

Q: O.K. You made the phone call. Then you went back to your apartment, right?

A: Yeah.

Q: O.K.

A: Well...

Q: Go ahead.

A:   Waiting to...and all, then I got...went and watched TV for a
     litle bit and then looked out.

Q:   O.K.  Before...let me back up a second.  There was something I
     wanted to ask you.  When, when Eugene left, did you see the
     baby, Travis, after that?

A:   Yeah.

Q:   I mean, was he O.K.?

A:   It looked as though...yeah.  Then...

Q:   I mean, was she still carrying him or what after Trav...after
     Eugene left?

A:   Yeah.  Then she sat him down, tried to sort through her head
     what all had gone on.

Q:   How...where did she sit him down at?

A:   On the couch.

Q:   O.K.  Was he moving and stuff?

A:   Yeah.

Q:   O.K.  So after the phone call to the police, then you went back
     to your apartment, and what, what happened?

A:   I stayed there for a little while.

Q:   How long do you think?

A:   30 minutes (inaudible).

Q:   And then you came back out again?

A:   Yeah.

Q:   About what time was that?  Do you have any idea?

A:   Oh, I didn't look at the clock then.

Q:   You did or you didn't?

A:   I didn't.

Q:    O.K.  But you think it was 30 minutes to an hour after you made
      the call?

A:    Yeah.

Q:    Did you see the police arrive at that apartment?

A:    No.

Q:    What happened after you went back out?

A:    I went, you know, and looked and all, watched to see what was
      all going on with Michelle.

Q:    Were you looking in the front door again?  Was it still open?

A:    Well, yeah.

Q:    Well, were you looking in the front door or something else?

A:    Well, the door wasn't completely shut.  You really couldn't see
      in, but I looked in through the window and...

Q:    Um, the window where the air conditioner is?

A:    Yeah.

Q:    O.K..

A:    I seen her take Travis into the kitchen, and...

Q:    O.K.  How did...where the...can you see into the kitchen from
      that window?

A:    No.

Q:    How come?

A:    'Cause she has like...she covers that way to the kitchen through
      like a sheet or something.

Q:    Oh, O.K.  So you saw her take Travis into the kitchen?

A:    Yeah.

Q:    O.K.  Go ahead.

A:  And...

Q:  Was he crying or anything or...

A:  He'd started, yeah.

Q:  He was crying when she took into the kitchen?

A:  Yeah.

Q:  Hum?

A:  Yes.

Q:  O.K.

A:  And then all of a sudden it was like quiet, there wasn't no
    sound or nothing.

Q:  Did you ever hear her yell at him or anything?

A:  No.

Q:  O.K.  Go ahead.

A:  And I walked into the back, trying to see, you know, what was
    all going on.

Q:  So you walked around the apartment building and to the, to the
    back window?

A:  Back window.

Q:  O.K.  Because you didn't hear anything coming out of there,
    and...

A:  Well...

Q:  ...you were just curious to see what was going on back there?

A:  Yeah.

Q:  O.K.  Go ahead.

A:  And then I seen like Michelle there and all, and, well,
    actually, I didn't...I seen the shadow of her, 'cause I was
    sitting there...really hard trying to see in real good, but I
    couldn't, 'cause the blinds were shut.  So I walked back into
    the front, and MIchelle walked back in.

Q:  Walked back in from the kitchen?

A:  Yeah.

Q:  O.K.  So she came through the, the sheet or curtain or whatever
    it is?

A:  Yeah.

Q:  O.K.

A:  And, um, it looked like she had spots of blood on her arm and
    all.

Q:  What was she wearing then?  The same thing that she was wearing
    when she came downtown?

A:  Yes.

Q:  O.K.

A:  And...

Q:  So were these, these spots or speckles that you think might have
    been blood, were they on both arms?

A:  Yeah.

Q:  Are you sure?

A:  Well, I seen one of the arms real good, but the other arm...

Q:  Which arm did you see real good?

A:  The left arm.

Q:  The left arm?  O.K., what happened then?

A:  And then I went and...

Q:  Oh, I meant to ask you, did she have a knife or any kind of a
    weapon or anything in her hands?

A:  No.

Q:  O.K.

A:  I went back...

Q:  By back, do you mean back around to...

A:  Yeah, I went back to the back window, and Michelle, who was in
    the front room, I was sitting there trying to look into the
    kichen through pieces of the hole on the blinds where the
    string...

Q:  O.K.   The little holes in the blind where the string goes
    through?

A:  Yeah.

Q:  O.K.

A:  And...

Q:  Was the light still on in the kitchen?

A:  Yeah.

Q:  O.K.

A:  And I seen a puddle of blood or an outline first and then Travis
    in a puddle of blood.

Q:  Where was the puddle in reference to him?

A:  It was spread out, you know, like maybe a half a foot or so away
    from him.  It...

Q:  On both sides of him?

A:  I think so.  I just seen the one that was closest.  His head was
    tilted back and looked as though his throat was slashed.

Q:  What else can you tell me about how he looked?

A:  He was on his back.  His hands was like in a fist.  All he was
    wearing was like a diaper.  That's it.

Q:  Where was he in the kitchen?

A:  Two or three foot away from the window.

Q:  Was the window by the door?

A:  Yeah.

Q:  O.K.  Where was he in the kitchen?  I mean...

A:  Well, he was like...

Q:  I mean, was he in a chair or on the table?

A:  No, he was on the floor?

Q:  Laying right on the floor?  What did you see next?

A:  Then Michelle walked in there, and I couldn't see what she was
    doing.

Q:  When she walked back in, did you notice if she still had the
    blood on her forearms or her hands or anything?

A:  Uh, no, but what I guess what she had done is when she walked
    back in there she'd probably wash it off in the sink or
    something.

Q:  And you never saw a knife?

A:  No.

Q:  So, you...if I understand this right from the vantage point
    that you had that you were looking through, you could see
    the...Travis pretty clearly.

A:  Uh, I could see him, you know, good enough to tell that he
    wasn't moving.

Q:  And you could see the blood clearly?

A:  Uh, that's one of the main things I could always see.

Q:  And that his throat was...had a wound?

A:   Yeah.

Q:   O.K.  But where Michelle was over by the sink...

A:   I couldn't see her after she got moved out from the...in front
of the window.

Q:   O.K.  While she was in there, did you hear her say anything, or
was she...

A:   Well, she was talking to herself, but it was like you really
couldn't understand her.

Q:   Was she crying talking to herself?  Yelling?  Or...

A:   Just talking to herself, but...

Q:   Like in a normal voice?  Or could you not hear well enough to
know one way the other?

A:   I really couldn't hear good enough.

Q:   But you could hear that she was saying something?

A:   Yeah.

Q:   Was she...did she stop by the baby or anything when she came in?
She just walked right past him?

A:   Yeah.

Q:   What did you do next?

A:   Well, then I left and went to the front and kinda looked, and
then...

Q:   What did you see when you looked in the front?

A:   Oh, I just basically like trying to see if Michelle was O.K.,
the little one.  She was, so I went ahead and left.

Q:   Where was she when you saw her?

A:   She was on the couch.  Looked like she had just went to sleep or
laying down.  I couldn't tell if her eyes was open or not.

Q:   Were you concerned about whether she had been hurt?

A:  I was wondering, but...

Q:  Did you see her move or anything?

A:  Well, yeah, I guess you could say I seen her move her leg a...

Q:  But you, but you, you could see that she was alive?

A:  Yeah.

Q:  Did you see Michelle come back into the living room?

A:  Yeah.  And after she got back in there, I just went ahead and left, 'cause I couldn't believe what I, I'd seen.

Q:  You didn't actually see Michelle...

A:  I seen....

Q:  ...hurt Travis, though?

A:  No.  It was just like right after she walked back in the front room and didn't have Travis that I was back wondering.

Q:  Wondering why she didn't bring him back from the kitchen?

A:  Yeah.

Q:  What did you do next?

A:  After that, I just basically went home and kept it to myself.

Q:  Why didn't you call the police again?

A:  I don't know.

Q:  Have you ever had any problems with Eugene or Michelle?

A:  Uh, Eugene, you know, uh, we really didn't get along too well, 'cause he was...'cause he'd always say stuff, you know, like...sounded like he'd make fun of the people that was nice to people and stuff, call 'em like they'd get pussy whipped or something.

Q:  What about Michelle?  Did you get along with her O.K.?

A:  Yeah.

COT 8141

Q: Never any problems with her?

A: No.

Q: O.K. Is what you're telling me the truth?

A: Yes.

Q: No one else was in the apartment other than Michelle, Travis, and Little Michelle?

A: That's all, unless later on after I left.

Q: But from the time you were watching when Michelle took Travis alive through the curtain into the kitchen, and from the time that you saw him laying on the floor injured obviously, no one else came in...was visible to you in the apartment?

A: No.

Q: After you got home, how long...do you know what time it was? WAs it still dark, wasn't it?

A: Yeah. It was still dark. Then I just basically stayed in the front room, trying to sort through my head what I'd seen, and tried to block it out so that if I got asked about it, you know, I could actually say, you know, I didn't see nothing, I don't know nothing.

Q: Why do you want to be that way that you didn't see nothing and didn't know nothing?

A: Most all my life, I, I just don't like, you know, telling on other people, you know, it's just not right, but something like this, it just got to me too much. I just didn't want to say anything, 'cause it's like since I didn't call the police the second time, they could say, you know, you was an accessory or something 'cause you didn't and you seen, you know, Travis dead.

Q: Did you ever go back over there after the...this happened or after the police came or anything?

A: No.

Q: Or the detectives and all the news media and everybody was over there? Did you ever go back over in the area again?

A:  Uh, you know, I'd walk by, you know, across the street or
    something, or was with my mom when she to ask the newpeople a
    few questions, but I never really went to the house again.

Q:  O.K.  Can you think of anything else to add to this statement
    that I might not have thought to ask you?  Anything that you
    might think is important?

A:  No.

Q:  That you feel like you need to say?  Hum?

A:  No.

Q:  O.K.  The time is 1647 hours.  This'll end the statement.

COT 8143

1   Q    Okay.  Would that keep somebody from the

2   inside from coming out unless they moved that

3   chair?

4   A    I don't know if it was positioned underneath

5   the door or not to prevent it from opening as far

6   as the handle on it, sir.

7   Q    In any event, you did testify at the

8   preliminary hearing that it was laying against the

9   screen door; is that right?

10  A    Yes, sir.

11  Q    And as you looked in, what did you -- you

12  observed this L-shaped couch?

13  A    Yes, sir.

14  Q    Now, from the angle you were at you, you could

15  see anyone that would be laying on that couch,

16  could you not?

17  A    Yes, sir.

18  Q    And what did you see laying on the couch?

19  A    I saw a white female with her head at the

20  south end of the couch, her feet at the north end.

21  At the point where the couches start forming the L

22  is where her feet were located, then her small

23  child was in the corner of the L part of the couch.

24  Q    Her small child, this was not a -- can you

25  have an approximate age for the child that you saw

**VICTIM:** Woods, Travis Eugene        **File No. 573348**

**ADDRESS:** 2275 S. Maybelle
**PHONE:**
**CRIME TYPE:** Homicide
**LOCATION:** 2275 S. Maybelle
**DATE:** 9-12-94
**REPORTING OFFICER:** Sgt. Wayne Allen
**DATE PREPARED:** 9-15-94

**SOURCE:** Kervin Washington, 1212 A Northeast, Ardmore Okla.
73401, telephone # ███████████

I spoke with Mr. Washington by telephone on 9-14-94 at the
above telephone number. Mr. Washington informed me that he
was in Tulsa visiting with his girlfriend Kim Washington at
2287 S. Maybelle. He informed me that he and Kim had got
into a argument in the middle of the night, during the early
morning hours of 9-12-94.

Mr. Washington told me that as a result of the argument he
went outside to be alone shortly before 3 a.m. Further that
he was sitting on a large tree stump located in the middle of
the complex. That at about 3 a.m. he observed a young white
male run from the front door of his apartment, run past
Kervin and in the direction of the office located in the 2200
block of S. Jackson. He described the young man as white
with a burr haircut. He stated that he knew of the young man
and knew his name to be 'Will'. He stated that Will was
wearing no shirt, no shoes and blue or black jean type
shorts.

Mr. Washington told me the young man ran out of his sight and
was gone for approximately one minute when he observed Will
running back in the same direction. That Will ran back to
the front door of his apartment and went inside said
apartment. Mr. Washington could not recall the address of
this apartment.

At 1440 hours on 9-14-94 I traveled to 737 S. Maybelle to
interview William Lee, white male age 15.
NOTE: I had briefly interviewed Mr. Lee on 9-12-94 at which
time he told me that he had not left his apartment all night
on 9-12-94.

Upon arrival I met Sharon St. John, who stated she was the

mother of William Lee. I informed her that I needed to speak
with William. Mrs. St John and I walked upstairs to
William's bedroom where we found him sleeping. Mrs. St.John
woke William and I began asking him questions. I asked
William why he had lied to me about leaving the apartment on
the night in question. He again stated that he did not
leave. After further questioning William admitted leaving
the apartment in the middle of the night stateing someone hit
the back of their apartment with a rock and he went outside
to investigate. He later stated that he walked by Michelle
Murphy's apartment and noticed the front door standing open.
He told me that he stopped, woke Michelle up and told her to
close her door.

At this point I ask William his address to which he replied
737 W. 26th and then ask his mother for help. It became
obvious to me that he did not know his address. Since I was
aware of the E911 call at approximately 3 a.m on the morning
of the murder in which the caller did not the proper address
I became more suspicious.

At this point I informed Mrs. St.John that William would need
to come to the Detective Division for a formal statement. I
transported William and his mother in my car to the detective
division while Mr. St.John followed in his personal auto.

Upon arrival at the detective division, I explained what I
had learned from William Lee to Detective Mike Cook. At this
point I turned William Lee to Detective Cook for a formal
interview.

COT 8080

# TRACIS
**WITNESS STATEMENT**

COMPLAINT NUMBER
**573348**

Sheet 7 of ____

ATTENTION: ____

Tulsa Regional Automated Criminal Information System
STANDARDIZED REPORTING FORMAT TUL-27/03

HOMICIDE
2275 S MAYBELLE

WOOD, TRAVIS E
091299  0614

## STATEMENT OF WITNESS

START WRITING HERE
MY NAME IS William M. Green     MY ADDRESS IS 863 W. Vancouver

MY PHONE NUMBER IS ▓▓▓▓     I WORK FOR Tulsa World

DETAILS Michelle came to my back door about 5:45 6:00 AM Holding her self, crying, saying my baby is dead, my baby is dead, she told me to walk over and see I got to her back door touch the handle then looked through her back window and seen they baby laying there on it's back with it head hooking up toward the ice box, and I ran back home woke up the other adults and had them call the police.

THIS IS MY TRUE AND VOLUNTARY STATEMENT IN MY OWN WORDS
AND I WILL ASSIST IN PROSECUTION.

SIGNATURE William M. Green

INTERVIEWING OFFICER | ID NO | ON | LOCATION 2247 | DATE | TIME

COMPLAINT NUMBER 573348

COT 7995

## BRIEF SYNOPSIS OF SCENE: (Include Authority For Search and County)

The scene of the above entitled incident is contained within a two bedroom, townhouse apartment in the Riverview Village Apartments, with a specific address of 2275 S. Maybelle. The crime scene investigation was conducted pursuant to a search waiver signed by Michelle Murphy, the resident of the apartment, obtained by Off. Otterstrom and Sgt. Allen.

The apartment building itself runs east and west and the townhouse in question faces the south and the backdoor faces the north. The building is of wood frame with facing consisting of a light brown brick and white vinyl siding, with trim painted brown. The townhouse is two-story with the two bedrooms and the bathroom upstairs and the kitchen and livingroom downstairs.

The victim was discovered laying on his back in a pool of blood on the kitchen floor, just inside of the backdoor. The kitchen walls and ceiling are painted white and the floor is covered with a white colored tile with a small brown print on it. The kitchen cabinets are painted white and are upper and lower cabinets running along the south and west wall of the kitchen and the counters are a white with gold specks in it formica. The refrigerator is on the south wall, the sink is on the west wall and the stove is on the north wall built into the cabinets. The back door and kitchen window are on the north wall of the room. In the northeast corner of the room on the east wall is a closet under the stairs and on the east wall is a single pedestal desk, that is painted a light blue and is covered with numerous miscelaneous bumper stickers. There is also a broken stereo speaker under the desk. The doorway into the livingroom is on the south wall of the room and it is covered by two sections of drapery, off-white in color and they are tacked up above the doorway. In the kitchen sink on the rightside is a sink full of water and dirty dishes. The faucet is running and there is a sponge in the sink. The water was turned off at the wall as the faucet was defective and the sink trap was recovered with the assistance of C.J. Collins, a maintenance man with T.H.A. On the counter to the left of the sink is a blue dish strainer with apparent clean dishes in it and a sharp knife and a butter knife laying beside it towards the front. Another knife was on the stove with a teaspoon, with a pan of water on the front right burner. On the counter to the right of the sink by the refrigerator is three canisters containing flour, sugar and misc. items. In front of the

cont.

1  time wearing only a pair of shorts, no shirt, no

2  shoes, just a pair of shorts?

3  A    Right, I remember that.

4  Q    Would that have been a relevant factor for you

5  to consider in this investigation?

6  A    In that neighborhood, not necessarily, no.

7  Q    I mean, did you ever consider the fact that

8  William might have been the one that did this?

9  A    No.

10  Q    You never considered that?

11  A    No, I didn't.

12  Q    Did it bother you that William placed a 911

13  call over a situation where he didn't hear anybody

14  get threatened, didn't see anybody lay hands on

15  each other, the person involved in the argument

16  left and the kids and the mother were there

17  apparently just fine, and he would go make a 911

18  call, did that ever concern you why he did that?

19  A    Not necessarily because in the call that he

20  made to the dispatcher, he indicated that there was

21  cussing and yelling.

22  Q    But that had ended before he made the call,

23  hadn't it?

24  A    Apparently so.

25  Q    And so did you question why he might have gone

1  ahead and made the call after the guy had left and

2  everybody was okay?

3          MR. HARRIS:  Judge, I am going to

4  object.  It calls for speculation.  It speaks for

5  itself.

6          MR. PARKS:  Your Honor, I think I can ask

7  him what he considered or if he took it into

8  consideration.

9          THE COURT:  You can ask if he took it

10  into consideration.  Don't ask him to speculate

11  about what the witness was thinking or doing, Mr.

12  Parks.  I'll sustain it.  Rephrase it.

13  Q    (BY MR. PARKS)  Did you take that into

14  consideration?

15  A    No.

16  Q    You didn't.  Particularly when you couple that

17  with the fact that after he observes a murder, he

18  doesn't bother to call, did you take that into

19  consideration?

20  A    I asked him about that, and he responded in

21  his statement.

22  Q    You just assume he was telling you the truth?

23  A    Yes.

24  Q    Did you ever ask anybody that knew William

25  what his reputation was for truthfulness?

1   ahead and made the call after the guy had left and
2   everybody was okay?

3          MR. HARRIS:  Judge, I am going to
4   object.  It calls for speculation.  It speaks for
5   itself.

6          MR. PARKS:  Your Honor, I think I can ask
7   him what he considered or if he took it into
8   consideration.

9          THE COURT:  You can ask if he took it
10  into consideration.  Don't ask him to speculate
11  about what the witness was thinking or doing, Mr.
12  Parks.  I'll sustain it.  Rephrase it.

13  Q    (BY MR. PARKS)  Did you take that into
14  consideration?

15  A    No.

16  Q    You didn't.  Particularly when you couple that
17  with the fact that after he observes a murder, he
18  doesn't bother to call, did you take that into
19  consideration?

20  A    I asked him about that, and he responded in
21  his statement.

22  Q    You just assume he was telling you the truth?

23  A    Yes.

24  Q    Did you ever ask anybody that knew William
25  what his reputation was for truthfulness?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1          THE WITNESS:  Yes.

2          THE COURT:    Answer only the question.

3    A    He was there early.  I said, what are you

4    doing here early?  He said, I have to be here.

5          THE COURT:  No, ma'am, that was not the

6    question.

7          Re-ask the question, Mr. Parks.

8    Q    (BY MR. PARKS)  Did he say something to you on

9    that date with regard to Michelle Murphy?

10   A    On the 13th?

11   Q    Yes.

12   A    I'm not sure if he made a remark about her.

13   It was to the effect of something that had

14   happened.

15   Q    And did he refer to a female that it happened

16   with?  If I may, ma'am, let me hand you your notes

17   on that.  Did you write that?

18   A    Yes.

19   Q    If you would read that.  Does that refresh

20   your memory as to what took place on that date?

21   A    Yes.

22   Q    What was it that William said on that date?

23   A    He said, the bitch will pay.

24   Q    And did he say that with regard to what?  What

25   else did he say about that?

1 Q     First we had the 911 call.

2 A     Then what you said earlier was true when he

3 said no, that was the end of it.

4 Q     That was it, you didn't question him.  Now,

5 when we get around to talking about the second

6 time, maybe I've asked and if I have, I will

7 withdraw it, did you concern yourself with the fact

8 that he didn't even call the second time?

9 A     He answered that.

10 Q     Well, he answered it:  Boy, I didn't call

11 because I thought they might suspect me of

12 something, didn't he?

13 A     That's what he said.

14 Q     But you didn't suspect him of anything, did

15 you?

16 A     No.

17 Q     He was mistaken about that, wasn't he?

18 A     About what?

19 Q     Now, were you called -- do you know Mr.

20 Hackathorn sitting over here?

21 A     Yes, I do.

22 Q     How many times after the preliminary hearing

23 would you say that he called you to try to get you

24 to do something out there at the scene?

25 A     I remember meeting him out at the scene once,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1  went to sleep.

2           Doesn't that sound odd?

3       A.   It's odd, yes.

4       Q.   He testified that he didn't know what the

5  glitch was that, as he put it, the cops found in his

6  story, which is why you took him down to see Cook.

7           Shouldn't that have suggested questioning

8  his veracity?

9       A.   Sorry.  Lee said he didn't know what the

10  glitch was?

11      Q.   Yeah.  He didn't know what glitch was found

12  in his story and why he got taken down to Cook.

13          You told him about Jernigan, did you not?

14      A.   I -- I don't recall.  I don't know, but --

15  there were plenty of areas of concern about Mr. Lee.

16      Q.   Why weren't they followed up on?

17      A.   I don't recall.

18      Q.   They should have been, shouldn't they?

19      A.   I don't know.

20      Q.   Well, if there were a lot of areas of

21  concern, logically they had to have been -- they

22  should have been followed up on, shouldn't they?

23      A.   I don't know.  They may have been.  I don't

24  know.

25      Q.   Well, if they weren't, should they have

1  that would be important to know, wouldn't it?

2      A.   I doubt that the -- that the state of rigor

3  mortis could be that exact, could be determined to be

4  that exact.

5      Q.   Well, that's what medical examiners do all

6  the time, isn't it?

7      A.   They give you parameters, yes.

8      Q.   Okay.  Did you know that Cook never

9  questioned Lee's truthfulness?

10     A.   No, I wasn't aware of that.

11     Q.   There always was question about Lee's

12 truthfulness, wasn't there?

13         MR. WOHLGEMUTH:  Object as to form.

14     A.   There were -- yes, there were questions.

15     Q.   (BY MR. SEYMOUR)  Okay.  Did you know that

16 shortly before this murder, that Lee had decapitated a

17 cat and left the head on a porch in the apartment

18 complex?

19     A.   I did not know it at the time, no.

20     Q.   Would that have been an important factor for

21 this investigation?

22     A.   I -- I don't know.

23     Q.   Well, you didn't have any evidence that

24 Michelle Murphy had ever decapitated a cat, did you?

25     A.   Not that I'm aware of.

1  witness?  Doesn't that make his veracity pretty

2  important?

3      A.    It makes his truthfulness important, yes.

4      Q.    All right.  And so the truthfulness should

5  have been investigated by Mike Cook; correct?

6      A.    Correct.

7      Q.    All right.  Cook testified that he did not

8  know that women in the apartment complex thought Lee

9  was weird.  He testified he did not know what people,

10  the teachers at the school, thought about Lee.  He

11  testified he did not know what the Children's Medical

12  Center records said about Lee.  He testified he did

13  not know that Lee had a crush on Michelle.  He

14  testified he never asked Lee about the chair.  He

15  testified he did not know about Lee's reputation for

16  truthfulness.  He did -- testified he did not know

17  that Lee said the -- he heard the water turned on and

18  off by Michelle in the kitchen -- and we'll come back

19  to that in a second.  And he said he didn't check out

20  Michelle saying she had lost her key to the apartment.

21          Should he have had knowledge of any of those

22  things?

23          MR. WOHLGEMUTH:  Object as to form;

24  compound.

25      A.    I don't recall.

1          Why did you care that Mr. Lee had lied to

2   you since you already had Ms. Murphy's confession?

3        A.   I don't recall.

4        Q.   Did it occur to you that maybe he'd done it?

5        A.   Not really.

6        Q.   Did it occur to you that that was a

7   possibility?

8        A.   It was a possibility, yes, sir.

9        Q.   That needed investigation.

10       A.   Yes.

11       Q.   All right.

12            MR. WOHLGEMUTH:  Whoops.  Excuse me.  Sorry

13   about that.

14            MR. SEYMOUR:  The whole thing.

15            THE COURT REPORTER:  Okay.

16            MR. SEYMOUR:  What are we up to?

17            THE COURT REPORTER:  F.

18       Q.   (BY MR. SEYMOUR)  I have handed you what is

19   marked as Exhibit F.  And I will represent to you that

20   this is what we have been given from Mike Cook's file,

21   and that they constitute performance evaluations

22   performed by you from 06/20/90 through the date of the

23   performance review that you did in 1996, which is

24   06/27/96.

25            Do you recall preparing these performance

1          MR. WOHLGEMUTH:  Objection as to form.

2     A.   I -- I really don't recall any of this.

3     Q.   (BY MR. SEYMOUR)  No.  But wouldn't that

4 concern you, that that --

5     A.   Not necessarily.  I -- I don't know.

6     Q.   Was it an item of concern for you that Lee

7 testified, "If there had been a chair on the front

8 porch, I would have seen it"?  But the policeman said

9 the chair was there at 3 o'clock and 6 o'clock?  Does

10 that concern you?

11     A.   Actually it doesn't.  Because I don't

12 remember the chair either, so --

13     Q.   All right, sir.  It shows in the video.

14     A.   Okay.

15     Q.   Doesn't show it leaning, but it shows it

16 right there by the door.

17          Does it concern you that Lee's -- Lee was

18 asked, "How can you explain the chair was there at 3

19 and 6 o'clock, but not there at 4:30 and 5:00 when you

20 say you were there?"  And he said, "Maybe it's magic."

21          Should that have been an item of concern?

22     A.   Yes.

23     Q.   Lee testified that the baby looked like his

24 throat had been cut and there was a spot on his chest

25 where it looked like the baby had been stabbed.  Okay?

1     A.    Not best I can tell.

2     Q.   (BY MR. SEYMOUR)  Did you know that Lee

3 testified that he watched Michelle a lot?

4     A.    I believe I've heard that.

5     Q.    Okay.

6     A.    I don't -- I don't recall him testifying

7 that, but I've heard that.

8     Q.    All right.  Should that have been an item of

9 concern?

10    A.    It was.

11        THE VIDEOGRAPHER:  Please stand by.

12        We're off the record for a tape change.

13              (RECESS.)

14        THE VIDEOGRAPHER:  We're on the record.

15     Q.   (BY MR. SEYMOUR)  Lee identified a neighbor

16 who he said told him the next morning about the

17 murder, and that's how he knew about it and that the

18 cops had come.  But that woman said she never talked

19 to Lee.

20        Should that have been an item of concern

21 about his veracity?

22    A.    Yes.

23     Q.    He also said after he saw the baby in the

24 kitchen and he went back around to the front and

25 looked in the living room that Michelle lay down and

1  Q    Do you know enough to know whether a knife is

2  sharp or not?

3  A    Well, I am not going to cut myself on it to

4  find out.

5  Q    I'm not going to ask you to cut yourself on

6  it.  I'm just going to ask you to feel of it like

7  this and tell me if you think this knife is sharp

8  or not in your opinion.

9  A    No, I wouldn't call it sharp.

10  Q    Do you think you would have a hard time

11  cutting through a grapefruit with that knife?

12  A    It would probably be tough.

13  Q    Probably be tough.  Did you ever think about

14  going to William Lee's apartment and checking it

15  for knives or blood or anything like that?

16  A    No, I didn't.

17  Q    That was never done, was it?

18  A    No, it wasn't.

19  Q    Now, did William Lee -- did you ever know or

20  did you take into consideration the fact that the

21  water in the sink would not turn off?  Do you know

22  the significance of that?

23  A    I didn't know the water wouldn't turn off.

24  Q    You didn't know that either?

25           MR. PARKS:  I don't have anything else,

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

BRIEF SYNOPSIS OF SCENE: (Include Authority For Search and County)

The scene of the above entitled incident is contained within a two bedroom, townhouse apartment in the Riverview Village Apartments, with a specific address of 2275 S. Maybelle. The crime scene investigation was conducted pursuant to a search waiver signed by Michelle Murphy, the resident of the apartment, obtained by Off. Otterstrom and Sgt. Allen.

The apartment building itself runs east and west and the townhouse in question faces the south and the backdoor faces the north. The building is of wood frame with facing consisting of a light brown brick and white vinyl siding, with trim painted brown. The townhouse is two-story with the two bedrooms and the bathroom upstairs and the kitchen and livingroom downstairs. The victim was discovered laying on his back in a pool of blood on the kitchen floor, just inside of the backdoor. The kitchen walls and ceiling are painted white and the floor is covered with a white colored tile with a small brown print on it. The kitchen cabinets are painted white and are upper and lower cabinets running along the south and west wall of the kitchen and the counters are a white with gold specks in it formica. The refrigerator is on the south wall, the sink is on the west wall and the stove is on the north wall built into the cabinets. The back door and kitchen window are on the north wall of the room. In the northeast corner of the room on the east wall is a closet under the stairs and on the east wall is a single pedestal desk, that is painted a light blue and is covered with numerous miscelaneous bumper stickers. There is also a broken stereo speaker under the desk. The doorway into the livingroom is on the south wall of the room and it is covered by two sections of drapery, off-white in color and they are tacked up above the doorway. In the kitchen sink on the rightside is a sink full of water and dirty dishes. The faucet is running and there is a sponge in the sink. The water was turned off at the wall as the faucet was defective and the sink trap was recovered with the assistance of C.J. Collins, a maintenance man with T.H.A. On the counter to the left of the sink is a blue dish strainer with apparent clean dishes in it and a sharp knife and a butter knife laying beside it towards the front. Another knife was on the stove with a teaspoon, with a pan of water on the front right burner. On the counter to the right of the sink by the refrigerator is three canisters containing flour, sugar and misc. items. In front of the

cont.

1   A    They may have done things, seen things,

2   whatever that they may not have related in their

3   reports.

4   Q    If they had put it in their reports, would you

5   have been aware of it?

6   A    Yes.

7   Q    Now, there was a report about this fellow that

8   was -- did he call you guys and say, hey, I got

9   something to tell you?

10  A    You mean William?

11  Q    No, somebody that saw -- how you got turned on

12  to William.  How did you --

13  A    Sergeant Allen, like I said.

14  Q    Who was it that Sergeant Allen talked to?

15  A    I don't recall his name.

16  Q    You never --

17  A    I didn't talk to him, no.

18  Q    Do you know what he told Sergeant Allen?

19  A    That he saw --

20       MR. HARRIS:  Objection, it is hearsay,

21  Judge.

22       THE COURT:  Sustained.

23       MR. PARKS:  Well, I didn't ask him what

24  he said, Judge.  I just asked him if he knew what

25  he told Sergeant Allen.

1  Q    Did it concern you or did you take into

2  consideration the fact that they didn't see the

3  little boy at that time?

4  A    I asked them if they could have missed him and

5  they said, yes, they could have easily missed him.

6  Q    Did you go back out and look through the view

7  that they had from 10 feet away where they were

8  shining both of their flashlights in a cross,

9  crisscross, did you ever really kind of check into

10 that?

11 A    Well, I couldn't -- I couldn't duplicate the

12 circumstances.  I don't know exactly where Travis

13 would have been lying.  I couldn't say exactly.

14 Q    Well, even William said he was laying at the

15 foot of the couch.  Didn't he say that in here?

16 A    Yes.

17 Q    If he was --

18 A    He said he was lying on the couch.

19 Q    If there was a baby laying on this couch,

20 well, you are saying you couldn't have duplicated

21 that?

22 A    I don't think so, no.

23 Q    So you didn't take that into consideration,

24 either?

25 A    Yes, we went out there and looked.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

SUPPLEMENTARY OFFENSE REPORT

FILE NO:        573-348
------------------------------------------------------------
VICTIM:         Woods, Travis Eugene
DESCRIPTION:    W/M, 052694
TPD/PID:        956331
ADDRESS:        2275 S. Maybelle
PHONE:          none

CRIME TYPE:     Homicide
LOCATION:       2275 S. Maybelle
DATE:           091294
TRACIS BY:      Off. G. Otterstrom

REPORT BY:      Det. D.A. Noordyke
DATE:           092094

------------------------------------------------------------
Details:

     On 091994, reporting officer and Det. M. Cook returned to the
sceneof the above entitled incident.  The apartment has been sealed
since the initial scene investigation.  Upon opening the inside front
door and looking through the screen of the storm door we could see the
livingarea, including the corner sectional seating area and ottoman in
the northwest corner of the room.  Almost all the west wall was visible
except for a small area in the extreme southwest corner of the room by
the front window.  Also visible was the round wood frame chair on the
south wall of the room.  The remainder of the room, the doorway into
the kitchen in the northeast corner of the room and what is in the
southwest corner of the room in front of the window is visible through
the front window of the apartment.  Det. Cook and I also looked through
the kitchen window.  The area of the kitchen floor where the the victim
was found laying is clearly visible through the holes and spacing of
the mini-blinds.  The blinds were also recovered and turned to property
receipt #AE-4164.

     Also on 091994, reporting officer returned to the apartment after
dark around 2015hrs.  I was able to observe the livingarea as described
above through the outside screen of the front storm door with greater
clarity with the light on in the livingarea.  The only light that I
observed in the living area is an overhead light on the ceiling that is
between the livingroom and entry area.

Investigation to continue.

COT 8047

1    was shut off at 2:49, so 10 minutes to 3 in the

2    afternoon.  You've told us that you really don't know

3    what time you got into that room that day; right?

4        A    That would be correct.

5        Q    All right.  Do you have any idea as you sit

6    here now, Ms. Murphy, how long you were actually in

7    that room with Mike Cook either in or coming in and out

8    of the room?

9        A    I was in that room from the point of arriving

10   there and I stayed in that room until right before the

11   tape began and we went to -- well, there was a female

12   he got to take me to the restroom, we came back and he

13   had me sit down, read me through what was supposed to

14   be my confession, started it, then stopped it, went

15   back and started it -- record -- went back as in

16   rewinding it and then started it again.

17       Q    Could you tell where he rewound the tape to?

18       A    He rewound it and he started it all over.

19       Q    Okay.  So you went through one round where

20   you're --

21       A    Not completely.  We had started and I guess I

22   said something that wasn't good enough for his --

23       Q    Okay.  Do you recall what you said that --

24   that immediately was followed by him rewinding the

25   tape?

1      A     Yes.

2      Q     That was part of his job.  Correct?

3      A     He should have been, as you suggest,

4 knowledgeable of all that.

5      Q     And conveyed that same information to the

6 people who worked in the homicide squad under him?

7      A     That's correct.

8      Q     In 1994, what written policies of the Tulsa

9 Police Department were in place that governed what would and

10 would not go on during interrogations?

11     A     I don't know.

12     Q     Is it fair to say that in 1994, the Tulsa

13 Police Department could not operate effectively or

14 efficiently without interrogations as needed in homicide

15 cases?

16     A     Well, it would be more fair to say that

17 interrogations were needed on beyond homicide cases but

18 homicide cases would be included in that.

19     Q     Yes, sir.  Since this case involves a homicide

20 squad, that's the only reason for that.  So I understand your

21 answer.

22        Would it be fair to say that decisions made by an

23 interrogator in a homicide case are among the most critical

24 decisions made by law enforcement officers?

25     A     I think those are important decisions,

1        MR. SEYMOUR:  But I do not recall ever

2   seeing a photo other than the video itself.

3        MR. BENDER:  It might have been video I

4   recall seeing.

5        Q    (By Mr. Bender)  Okay.  So we've got your

6   daughter Michelle by your side and you're going out the

7   back door.  From your back door to Christona's, do you

8   pick her up and carry her?  Does she follow you?  Tell

9   me where she is in relation to you as you're covering

10   that distance across the commons.

11        A    Like I said, I don't remember a lot of -- I

12   was trying to just -- I don't know.  I was freaked out.

13        Q    Okay.

14        A    Having seen my son that way.

15        Q    Okay.  And, again, I know this is hard, but I

16   need to ask this.  Did you touch Travis at all that

17   morning?

18        A    No.

19        Q    Didn't pick him up?

20        A    No.

21        Q    Didn't check to see if he was breathing?

22        A    No.

23        Q    In the time that you've talked about where

24   you're freaked out and you're moving from the curtain

25   to the back door, did you have time to assess just by

1    looking at him whether or not he was breathing?

2         A    All that blood told me enough.

3         Q    Okay.  All right.  Do you recall what

4    happened when you got to Christona's?

5         A    Not much.  It was -- it's all kind of hazy.

6         Q    All right.  I'm sorry, tell me what you

7    recall about who you would have interacted with, what

8    would have been said, anything like that.

9         A    I think Billy answered the door.  I remember

10   being in their apartment, in Christona's apartment.  I

11   remember the kids.  I think Christona, maybe Cristy

12   went to the phone and called for the police, 911.  I

13   don't -- I just remember crying and screaming.

14        Q    Do you recall what would have been said that

15   would have prompted them to call 911?

16        A    I -- all I can remember saying is, "My baby."

17   I don't --

18        Q    Those two words, my baby?

19        A    [Witness nodded head.]

20        Q    Is that a yes?  I know it's hard.  Okay.

21        A    Yes.

22        Q    Were you still wearing your Looney Tunes

23   shirt?

24        A    Yes.

25        Q    And shorts, some kind of shorts maybe?

1    Q    Did you recognize this residence from having
2    earlier been there?

3    A    Yes.  It was the residence that we had
4    responded to earlier.

5    Q    Did you have an opportunity to look into that
6    back kitchen area and make any observations?

7    A    No, I did not.

8    Q    What is the next thing that you did regarding
9    your duties at the scene?

10   A    I saw a group of people in a courtyard area
11   just to the north of the apartment.

12   Q    Could you point to where that would have been?

13   A    It would have been in this area right here.

14   Q    What is in that back yard area, can you
15   describe that for us?

16   A    It is like a children's playground.  It is
17   like swing sets and big toy slides type area, play
18   area for children.

19   Q    Okay.  Were those the only other people out
20   there other EMSA and police personnel at that time?

21   A    Other than what I noticed about them, one of
22   the people was crying and looked to be pretty
23   upset.  I assumed that would be related to the call
24   we were on.

25   Q    Okay.  Did you approach that group of people?

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT
COT 7013

1  A    Who?

2  Q    Okay.  Never mind.  From Michelle's apartment,

3  can you show me where the phone was where the phone

4  call was made?

5  A    Right here.

6  Q    All right, and are you aware that there is

7  other phones between here and there?

8  A    No, I'm not.

9  Q    On the premises here?

10 A    I'm not -- I don't know.

11 Q    Okay.  Now, would you agree that she was in a

12 pretty emotional state when you first got there?

13 A    Yes.

14 Q    About what you would anticipate under the

15 circumstances?

16 A    Yes.

17 Q    Now, from the time that you were with her

18 from, what, about 6:30, would that be about a fair

19 statement, in the morning, until -- what time did

20 you leave her, 10:30?

21 A    It was about 9:30 or 10:00.

22 Q    During that entire time, did she have anything

23 to eat or drink?

24 A    When she went to a rest room I believe there

25 is a water fountain there.  She could have stopped

1  A   Yes.

2  Q   Was she crying?

3  A   Yes.

4  Q   So when you say she came over and said her

5  baby was dead, that didn't convey what you heard

6  out there that night, did it?

7  A   No.

8  Q   She was screaming and crying and extremely

9  upset, wasn't she?

10  A   Yes, beating on the door.

11  Q   Repeating herself over and over and over

12  again, wasn't she?

13  A   Yes.

14  Q   In fact, when you went -- just from listening

15  to her, when you went in to tell your sister, you

16  were crying and shaking, weren't you?

17  A   Yes.

18  Q   Because you knew from what she conveyed to you

19  that it was bad?

20  A   Yes.

21  Q   Now, you say that Mr. Harris asked what she

22  did.  You said she went over and sat on the couch

23  and put her arms around her legs, describe for this

24  jury how she appeared when she went over and sat on

25  that couch?

1  A    In shock.

2  Q    Was she crying?

3  A    Yes.

4  Q    Was she upset?

5  A    Yes.

6  Q    Was she acting like you would expect a mother

7  to act who had just found her child dead?

8  A    Yes.

9  Q    Now, the first time you talked to the police,

10 you say you did not tell them about the dagger?

11 A    No.

12 Q    You thought about it and did you want to tell

13 the truth?

14 A    Not at first.

15 Q    And why didn't you want to tell the truth at

16 first?

17 A    Because --

18 Q    You thought you would get your friend in

19 trouble?

20 A    Yes.

21 Q    But you decided you better tell the truth; is

22 that right?

23 A    Yes.

24 Q    So whether it got your friend in trouble or

25 not, you went down and told the truth?

1   requesting?

2   A    I told them that we needed some police

3   officers out here real quick because my friend's

4   baby had got killed.

5   Q    Did you tell them who you were?

6   A    I think they asked me.  I can't really -- I

7   was hysterical at that point.

8   Q    And did you direct them to the Riverview Park

9   Apartments?

10  A    Yes, I did, to my apartment and also hers.

11  Q    Where were you when the police arrived?

12  A    We were all standing out in front of my

13  apartment, and whenever they arrived, we all

14  walked -- Michelle, my boyfriend James and I, we

15  all, Christi was in the house with the kids,

16  Christina and Billy, and we all walked around and

17  was standing in the playground when they went in

18  and they went in and they just shook their heads

19  and they come back out, and, I mean, Michelle fell

20  on the ground and lost it.

21  Q    And at that point in time, did police officers

22  approach you and divide you up and take statements?

23  A    Yes, sir, they took us to the police station

24  over on 11th and was questioning all of us.

25  Q    Did you individually talk to individual

1   Q     That is way out east?

2   A     Yes.

3   Q     It was not the one out south?

4   A     That is correct.

5   Q     Okay.  Now, would it be fair to say that

6   during that time that you were there with her at

7   the apartment location, that from time to time

8   people would come up to her, a couple of times

9   while she was in the car and then maybe several

10  more times when she was outside smoking, would that

11  be a fair statement?

12  A     Yes.

13  Q     There were four or five maybe different

14  people, particularly one couple in particular that

15  you noticed?

16  A     One couple in particular that I remember.

17  Q     When they would come up and talk to her, she

18  would get emotional and begin crying again; is that

19  right?

20  A     Yes.

21  Q     Now, this chair, by the way, that was propped

22  up, that had to be done by somebody from the

23  outside, didn't it?

24  A     Yes.

25  Q     It couldn't have been done by anybody from

1          MR. O'CARROLL:  Okay.

2          MR. BENDER:  -- that it was sexual, so it is

3     at issue in this litigation, Richard.  You cannot --

4     you cannot tell me that you're going to plead -- that

5     you're going to plead it time and time again, Richard,

6     and then tell us that she's -- that she can't

7     demonstrate it.

8          MR. O'CARROLL:  One moment.

9          (Whereupon, a discussion was held off the

10    record.)

11         MR. O'CARROLL:  You can ask her to describe

12    what part and at what distance.  That has not been

13    asked and it's a conclusion that -- it's a jury

14    question anyway.

15         Q     (By Mr. Bender)  In detail, please, describe

16    for us how Mike Cook touched your legs that day.

17         A     It was -- he was standing up behind me and --

18         Q     So did you stand up?

19         A     Yes, he had me stand up.

20         Q     Okay.

21         A     Ran his hands from the outside to the center

22    -- to the inside of my legs and run them up midthigh.

23         Q     Okay.  And where were the bruises located?

24         A     More my shins, the front of my lower leg.

25         Q     Okay.  So the area that he was touching was

1    not the area that you had indicated the bruises were

2    located?

3         A    Correct.

4         Q    And the area that he actually ended up

5    touching was up on the inside of both thighs?

6         A    Correct.

7         Q    Okay.  And you were wearing a pair of shorts;

8    right?

9         A    Yes.

10        Q    Okay.  Now, you've told me that you didn't

11   feel right about that.  How many police officers did

12   you tell that afternoon that Mike Cook had touched you

13   that way?

14        A    I didn't tell anybody.

15        Q    How many jailers did you tell that day that

16   Mike Cook had touched you that way?

17        A    I didn't tell anybody for a long time.

18        Q    Why not?

19        A    I was ashamed about it.

20        Q    Okay.  When was the first time -- the

21   absolute first time you told anyone that Mike Cook had

22   touched you that way?

23        A    I believe I told Sharisse O'Carroll whenever

24   she came to assess me for my case.

25        Q    So you never told anyone, never told the

1  Murphy. She told Officer Cook according to her testimony
2  that she had bruises on her legs that were not there the
3  night before when she went to sleep. And he, in his effort
4  to determine whether that was true or not, ran his hands up
5  and down her legs. Now, does that constitute sexual
6  harassment?
7          A      In my estimation, it includes improper
8  touching, which is a criminal offense.
9          Q      Was that improper touching?
10         A      Yes, it would have been.
11         Q      All right. How about if he ran his hands up
12 and down her arms while standing behind her chair?
13         A      Not necessarily so.
14         Q      In 1994, what policies were in place about how
15 long a person under age 18 could be kept in custody without
16 charges being filed?
17         A      I don't know.
18         Q      Should there have been a policy on that
19 subject?
20         A      I think there was a policy, well, I just don't
21 know if there was a policy or not. I think there was a
22 policy regarding that prisoners would be afforded necessary
23 breaks in regards to restroom and whatever they needed. I'm
24 not sure to answer your question specifically if there was a
25 policy that stated it as you stated it.

1          A      It was like he ran his hands up my legs.

2          Q      All right.  And what was your impression of

3    why he was doing that?

4          A      I thought he was checking to see the bruises

5    and knots.  I didn't -- I was kind of scared about it.

6          Q      Were you offended?

7          A      I wouldn't say offended.

8          Q      Did -- did you believe that there was any

9    sexual connotation to what he was doing?

10         A      I didn't feel right about it.

11         Q      Okay.  And, again, try to -- try to target

12   closer to my question.  Did you believe that there was

13   some sexual -- attempt to do something sexual with you?

14                MR. O'CARROLL:  Asked and answered and I'm

15   instructing you not to answer.

16         Q      (By Mr. Bender)  Do you know whether the door

17   was locked?

18         A      I don't know if it was locked or pushed shut.

19         Q      Okay.  Ms. Murphy, we're going to -- because

20   we're on videotape, what I want you to do to the best

21   that you can is I want you to show us using your own

22   hands, no one else is going to touch you, but I want

23   you to show me and show the videotape how Detective

24   Cook touched you in the -- touched your legs that day

25   at the police station.

1    not the area that you had indicated the bruises were

2    located?

3        A    Correct.

4        Q    And the area that he actually ended up

5    touching was up on the inside of both thighs?

6        A    Correct.

7        Q    Okay.  And you were wearing a pair of shorts;

8    right?

9        A    Yes.

10       Q    Okay.  Now, you've told me that you didn't

11   feel right about that.  How many police officers did

12   you tell that afternoon that Mike Cook had touched you

13   that way?

14       A    I didn't tell anybody.

15       Q    How many jailers did you tell that day that

16   Mike Cook had touched you that way?

17       A    I didn't tell anybody for a long time.

18       Q    Why not?

19       A    I was ashamed about it.

20       Q    Okay.  When was the first time -- the

21   absolute first time you told anyone that Mike Cook had

22   touched you that way?

23       A    I believe I told Sharisse O'Carroll whenever

24   she came to assess me for my case.

25       Q    So you never told anyone, never told the

1    Q    I'm sorry, ma'am?

2    A    It was one of the gentlemen.  I couldn't be

3  sure if it was -- well, call Mike Cook a gentleman,

4  sorry, but Mike Cook or the other officer.

5    Q    When they cuffed you that time, did they cuff

6  you in front or did they cuff you in back?

7    A    I believe I was handcuffed in front.

8    Q    All right.  When they said that you're under

9  arrest, did they say anything else, you're under arrest

10  for this or that?

11    A    I couldn't quote them.

12    Q    All right.  So there are -- there are two

13  people in the room when you're being handcuffed and

14  told that you are under arrest; correct?

15    A    At -- after he went and got the other guy,

16  yes.

17    Q    At that point, did you tell the other

18  officer, Hey, coerced this, he dictated this to me, he

19  told me what to say?  Did you ever tell any other

20  police officer what you're telling us Mike Cook did

21  with you?

22    A    I didn't tell them at that point because we

23  had had a deal, that if I had -- would say that it was

24  an accident, that I could go home -- I would get

25  therapy and I would to go home to my daughter.

1    if I just -- if I said I did it, if I would admit that

2    I did this, I would get to see my daughter, and that

3    went on for hours.

4         Q    So he said that to you more than once?

5         A    Yes.

6         Q    Over and over?

7         A    Yes.

8         Q    Over the course of hours?

9         A    Yes.

10        Q    And what was your response?

11        A    I didn't do it.

12        Q    Did you ask him why he wouldn't let you see

13   your daughter unless you confessed?

14        A    No.

15        Q    Why not?

16        A    Because I didn't do it and he's police.  I

17   thought that he was one of the good guys.

18        Q    So what you're telling me is that -- well,

19   strike that.

20             Do you believe that you ever confessed to the

21   crime of killing your son?

22             MR. O'CARROLL:  Say again, please, Mr.

23   Bender.

24        Q    (By Mr. Bender)  I said, do you believe you

25   ever confessed to the crime of killing your son?

1          Q      (By Mr. Bender)   -- 1449 hours in the

2     afternoon?

3          A      I believe it was played at my trial.

4     That's --

5          Q      Okay.   Do you remember whether or not

6     Detective Cook was yelling or was his voice calm?

7          A      When?

8          Q      On the tape.

9          A      I believe it was more calm on the tape.

10         Q      Okay.   Prior to starting the tape, had he

11    been yelling at you up to that point?

12         A      Yes.

13         Q      So you --

14         A      Until I agreed to make a deal with him.

15         Q      Okay.   So he yells at you until you agree to

16    make the deal, and then how much time elapses until the

17    tape starts?

18         A      Long enough for me to go to the bathroom and

19    come back.

20         Q      All right.   So he goes from yelling at you to

21    having a calm voice?

22         A      Yes.

23         Q      Have you told me about all of the physical

24    contact by Mike Cook with you with regard -- you told

25    me about the knot on your head and your legs.   Was

1    there any other times when Mike Cook had any physical

2    contact with you?

3         A    I don't believe he -- he did not touch me

4    again, but he got in my face.

5         Q    When would --

6         A    To scream at me.

7         Q    Was that early on?

8         A    Yes, whenever I was still handcuffed and he'd

9    get in my face and scream at me.

10        Q    Okay.  When you say he got in your face, how

11   close was he?

12        A    He would lean on the chair, like one hand on

13   the back and lean in.

14        Q    All right.

15        A    So I could smell his breath, yes.

16        Q    Okay.  And yelling all the time?

17        A    Yeah.

18        Q    All right.  My last question is a difficult

19   one, but I think if this case has to go to trial, a

20   juror is going to want to know.  Why didn't you pick up

21   your baby?

22        A    I didn't know what to do.  The blood scared

23   me and with that amount of blood, I don't -- he was so

24   little.

25             MR. O'CARROLL:  Is that your last question,

1 concerned about is what went on before we heard

2 that tape.

3 A    I answered you.

4 Q    You never said anything to her such as: You

5 know, we know you did this.  The sooner you tell us

6 about it, the better you are going to feel.  Did

7 you ever say that to her?

8 A    No.

9 Q    Did you ever tell her, the sooner that she

10 told you what happened out there, the sooner she

11 was going to get to see her little girl?

12 A    No.  She asked me where her little girl was,

13 and I told her.

14 Q    Did you tell her when she got out of there she

15 was going to get to see her little girl?

16 A    She asked me, and I said that wasn't for me to

17 decide.

18 Q    Again, we would know for sure if we had a

19 tape, wouldn't we?

20 A    That's true.

21 Q    Officer, did you ever threaten her in any

22 way?

23 A    No, I did not.

24 Q    You talked to her just like we are talking

25 now?

1  couldn't say exactly which one it was.

2  Q    Now, what was her emotional condition at that

3  time?

4  A    She seemed calm and remarkably at ease.

5  Q    How many different times did you check on her

6  before you actually began any kind of interview

7  with her?

8  A    Probably two or three times.

9  Q    Now, when you decided it was time to begin to

10 obtain some information, as much as she knew, did

11 you begin the conversation or did she?

12 A    I began the conversation when I entered the

13 room.

14 Q    What did you say to her?

15 A    I just told her that we needed to talk about

16 what happened and I was hoping that something might

17 come to mind that could lead us to developing some

18 idea as to who or what happened to Travis.

19 Q    At that time, I know police use lots of kind

20 of interview techniques, what kind of demeanor do

21 you remember yourself to be in at that time?

22 A    Well, I was compassionate, I would think.  At

23 that point in time, it was a mother whose child had

24 just been brutally killed.  I was trying to be as

25 gentle as I could at that point in time.

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT

1  assuming anything?

2       A    No, I'm just saying because it's there.

3       Q    Therefore, what?

4       A    Therefore, that's what you're thinking.

5       Q    Okay.

6       A    That's what you're assuming.

7       Q    Not therefore, it's accurate?  Just therefore,

8  it's there?

9       A    That's what you're assuming, so --

10      Q    I'm not assuming it's accurate or inaccurate.

11      A    Okay, then, I'll go with you:  I'm not

12 assuming it's accurate or inaccurate, either.  Because if you

13 don't trust it, I don't, either.

14      Q    Well, I don't trust it.

15      A    Okay.

16      Q    So we're in agreement.  Right?

17      A    I won't say that.

18      Q    You testified you tried to find out from

19 Mr. Lee in his statement why he said a knife was thrown

20 against the wall, but you were unable to.  Do you recall that

21 testimony?

22      A    No.

23      Q    You didn't drill him on that statement, did

24 you?

25      A    I don't remember.

1  Q    What kind of a room were you in when you first

2  made contact with the defendant?

3  A    It was probably -- it is what we use for the

4  interview room.  Previously it had been an office

5  of some sort.  It had a picture window along the

6  south wall.  It had a table along the -- I'm not

7  sure which wall it was on, but there was a table

8  and several chairs and a TV that was sitting on

9  about a four foot high stand, and the room itself

10  was probably 10 by 10, 12 by 12, something of that

11  size.

12  Q    And for the record and the ladies and

13  gentlemen of the jury, is Michelle Murphy present

14  here in open court?

15        MR. PARKS:  We will stipulate, Your

16  Honor, that he can identify the defendant.

17        THE COURT:  The record will reflect the

18  identification.

19        MR. HARRIS:  Thank you.

20  Q    (BY MR. HARRIS)  When you first identified

21  yourself to the defendant, what you did you tell

22  her?

23  A    I identified myself as Detective Cook with the

24  Tulsa Police Department.

25  Q    What did you tell her was going to happen that

1 Q    How difficult would it be to flip a switch and

2 video the proceedings so that we would all know

3 without question what went on leading up to this

4 statement?

5 A    I didn't have a video camera.

6 Q    You had a tape recorder, didn't you?

7 A    Not in the room at the time, no.

8 Q    You couldn't go get one?

9 A    I could have, yes.

10 Q    At the point in time when suddenly you became

11 aware, which I believe you said was, what, about

12 12:15 when you got the message about this call at

13 3:00 a.m.?

14 A    That's correct.

15 Q    You could have gone and gotten a video camera

16 if you wanted to then, couldn't you?

17 A    Yes, sir.

18 Q    You could have gotten a tape recorder,

19 couldn't you?

20 A    Yes.

21 Q    You could have turned it on and we wouldn't be

22 having this conversation about what happened out

23 there, we would know, wouldn't we?

24 A    Yes.

25 Q    Like we would know what happened after you

1  juvenile suspect just confessed to a brutal rape-murder but

2  the worst thing he's done before is skipped school, then you

3  should take a step back and re-evaluate your evidence.

4         MS. McGREW:  Object to the form.

5    A    No, I would not agree with that.

6    Q    Do you agree with this statement:  Common

7  sense and what every parent knows recognizes developmental

8  differences between juveniles and adults.

9         MS. McGREW:  Object to the form.

10   A    May I ask a clarification?

11   Q    Yes, sir.

12   A    When you're talking about a juvenile, are you

13  talking about the age of that person?

14   Q    Well, you know what "juveniles" meant back in

15  1994, did you not?

16   A    Sure.

17   Q    And it was people under the age of 18.  Right?

18   A    That's correct.

19   Q    All right.  Do you agree that common sense and

20  what every parent knows recognizes developmental differences

21  between juveniles and adults?

22         MS. McGREW:  Object to the form.

23   A    I don't know every parent knows that.  But I

24  would agree with the rest of the statement.

25   Q    Do you agree with this statement:  Recording

1  is particularly essential when the person being interrogated

2  is a juvenile?

3          A       I would agree with that.

4          Q       Why, then, didn't you have a policy in 1994

5  that required all interrogations of juveniles be recorded in

6  their entirety?

7          A       I'm not sure we had the equipment to do that

8  in 1994, sir.

9          Q       I'll represent to you that, in the case of Ms.

10 Murphy in 1994, that equipment was available and detective

11 Cook so testified.  Now, given that, with regard to the

12 interrogation of Ms. Murphy, should that interrogation have

13 been recorded in its entirety?

14         A       If the equipment was available, yes, it should

15 have been.

16         Q       Do you agree with this statement:  When

17 significant and substantial contradictions exist between the

18 known facts about the crime and what the suspect describes in

19 his confession, extreme care must be exercised in the

20 assessment of the confession's validity.

21                 MS. McGREW:  Objection to the form.

22         A       I would agree with that.

23         Q       Do you agree with this statement:

24 Authoritative opinion has cast formidable doubt upon the

25 reliability and trustworthiness of confessions by children.

1   of your ability in your hand?

2   A    Yes.   Then she said something to the effect, I

3   remember a lot of people screaming.   Then she

4   asked, and I put this in quotes, did the police

5   come out there?

6   Q    That was her question back to you?

7   A    Yes.

8   Q    Then what did you ask her?

9   A    Well, I let her keep talking.   And she said

10  that she -- feel like I got hit hard.   I had that

11  in quotes, and I must have buried it deep.   I also

12  have that in quotes.

13  Q    At that point in time had she complained to

14  you of any injury?

15  A    Not at that point in time, no.

16  Q    At some point in time did she, in fact,

17  complain of any injury?

18  A    Yes, she said she had been struck on the head

19  several times and that she had been pushed into the

20  ice box in her kitchen and struck her head.

21  Q    Is that later on in the interview?

22  A    Yes.

23  Q    Now, when she says, I must have buried it

24  deep, did you ask her to give you any more

25  surrounding circumstances with that statement?

1  A    I don't remember any other comments regarding

2  that, but it indicated to me at the time by having

3  said buried it deep that it was in her mind that

4  she had buried it deep.

5  Q    What did she continue to tell you then?

6  A    She said that somebody had to hit me in the

7  leg because the bruises weren't there when I went

8  to bed, and it was at that point in time that I

9  asked her about exactly what had happened, she was

10 talking about the -- having been attacked more or

11 less, and I wanted her to describe to me who it was

12 and what exactly happened.

13 Q    Okay.

14 A    Then she again was making the statements of --

15 it was buried deep and that she had blacked out,

16 and by blacking out, my understanding of it was,

17 not necessarily that she had been unconscious, but

18 that she had -- blacked out to where she didn't

19 know what was happening or going on around her or

20 what she was doing, that sort of thing.

21 Q    At any point in time during this interview

22 process after you read her her rights and she

23 continued to talk to you, did you take breaks and

24 allow her to compose herself and think or do

25 anything like that?

1   A     No.

2              MR. PARKS:  Judge, I think she needs to

3   speak up.  We have some --

4              THE COURT:  Can you hear, Mr. Born?

5         JUROR BORN:  No.

6         THE COURT:  No?  Okay.

7      Ma'am, try and speak up, okay?

8         THE WITNESS:  I'm sorry.

9         THE COURT:  That's okay.

10     If you can't hear, just tell me.

11        JUROR BORN:  Okay.

12  Q   (BY MR. HARRIS)  While you were out there that

13  morning waiting for the police to come and you were

14  in the presence of Michelle Murphy, did she ever

15  complain about her head to you?

16  A     No, not that I can remember.  I remember her

17  rubbing her head, but I never heard her say nothing

18  about it.

19  Q     She never asked you to go get her a doctor,

20  did she?

21  A     No.

22  Q     Did she ever tell you she needed medical help?

23  A     No.

24  Q     Did she ever pass out on you?

25  A     No.

COI 7261

1    whirlwind and then it was just like slow-mo --

2        Q    Okay.

3        A    -- on movement.

4        Q    And, again, I asked this earlier.  You're

5    wearing a watch today.  You wouldn't have been wearing

6    a watch during this time frame we're talking about?

7        A    I rarely wear a watch.

8        Q    Do you remember what the building looked like

9    that you were taken to that morning by the police

10   officer?

11       A    I think it was red brick.

12       Q    Okay.  And before you were transported from

13   -- from your apartment complex to downtown, did anyone

14   get you a pair of shoes?

15       A    No.

16       Q    All right.  So when you got to the red brick

17   police building, did you -- were you walked inside the

18   building barefoot?

19       A    Yes.

20       Q    Okay.  When you were transported from your

21   apartment complex to the red brick police building,

22   were you in handcuffs?

23       A    I was.

24       Q    Okay.  Were you handcuffed in front of your

25   body or were you handcuffed behind your body?

1    not the area that you had indicated the bruises were

2    located?

3         A    Correct.

4         Q    And the area that he actually ended up

5    touching was up on the inside of both thighs?

6         A    Correct.

7         Q    Okay.  And you were wearing a pair of shorts;

8    right?

9         A    Yes.

10        Q    Okay.  Now, you've told me that you didn't

11   feel right about that.  How many police officers did

12   you tell that afternoon that Mike Cook had touched you

13   that way?

14        A    I didn't tell anybody.

15        Q    How many jailers did you tell that day that

16   Mike Cook had touched you that way?

17        A    I didn't tell anybody for a long time.

18        Q    Why not?

19        A    I was ashamed about it.

20        Q    Okay.  When was the first time -- the

21   absolute first time you told anyone that Mike Cook had

22   touched you that way?

23        A    I believe I told Sharisse O'Carroll whenever

24   she came to assess me for my case.

25        Q    So you never told anyone, never told the

1   guys were speaking with him.

2          MR. PARKS:  That's all of this witness, Your Honor.

3          THE COURT:  Mr. Harris?

4          MR. HARRIS:  I have no questions.

5          THE COURT:  Officer Cook, you may step down.

6          MR. PARKS:  Your Honor, I'd like to testify

7   briefly.

8          THE COURT:  Okay.  You are an officer of this court,

9   also, Mr. Parks, have a seat.

10         MR. PARKS:  Thank you, Your Honor.

11         THE COURT:  That microphone is not on.

12         MR. PARKS:  Okay.  Your Honor, on --  I don't think

13  I need it.  Your Honor.

14         THE COURT:  I'm having a hard time hearing you.

15         MR. PARKS:  On April 19th of this year at the test,

16  at the polygraph test that's been previously referred to, Jim

17  Otte of the OSBI upon administering the test to Michelle

18  Murphy came out of the room and told Tim that he was going to

19  have to tell him something that he didn't want to hear.  And

20  Tim responded to him that, well that's all right, that's why I

21  got you here, because I want to know the truth.  And Jim Otte

22  told him, he said this girl is not guilty as charged here with

23  this murder, she is not guilty of this murder.  And further

24  more, she doesn't know who committed this murder.  And he

25  proceeded to tell him that these test results in his opinion

1   were conclusive.

2          That's all I have to say for the record.

3          THE COURT:  Okay.  Step down.

4          MR. HARRIS:  Well, Mr. Parks, would you agree that

5   if he produced a report, that his report would certainly be

6   the best evidence of his conclusions?

7          MR. PARKS:  I would certainly agree that his report

8   would be the best, I don't know that it would be the best

9   results of what he told us, but it would certainly be the best

10  results as far as the test results.  Do you have that?

11         MR. HARRIS:  Yes, I do.

12         MR. HACKATHORN:  Why do we not have that?

13         MR. HARRIS:  Well because it's a letter directed to

14  me, since I was the one requesting the polygraph, counsel.

15         MR. PARKS:  That is correct, that he -- you did

16  request the polygraph.

17         MR. HARRIS:  Judge I don't have any objection to

18  this being marked and admitted.

19         THE COURT:  Let her mark it, Curtis.

20         MR. PARKS:  Your Honor, I have no objection to this

21  report and ask it be admitted for the purpose of this Motion.

22         THE COURT:  State's Exhibit 2 will be admitted into

23  evidence.

24         MR. PARKS:  Any further cross?

25         MR. HARRIS:  No.

1  Q    It just came up here when she began to all of

2  a sudden just on her own just began to flow out

3  about all of this story that is --

4  A    When I confronted her about the 911 call,

5  that's when that began.

6  Q    Officer, you realize -- you would agree with

7  me that what is said here obviously isn't what

8  happened, would you agree with that?

9  A    No.

10  Q    You wouldn't?  Well, let's just start with

11  Ladonna.  You certainly interviewed Ladonna, did

12  you not?

13  A    Yes, I did.

14  Q    Have you made a determination in your mind as

15  to whether she went over there that night?

16  A    I determined she did not.

17  Q    She did not.  That part here is false, isn't

18  it?

19  A    Yes, I believe it to be.

20  Q    That baby didn't get his head cut off because

21  somebody accidentally dropped a knife on him, did

22  he?

23  A    No, sir.

24  Q    We know that, don't we?

25  A    That's true.

1    was shut off at 2:49, so 10 minutes to 3 in the

2    afternoon.  You've told us that you really don't know

3    what time you got into that room that day; right?

4         A    That would be correct.

5         Q    All right.  Do you have any idea as you sit

6    here now, Ms. Murphy, how long you were actually in

7    that room with Mike Cook either in or coming in and out

8    of the room?

9         A    I was in that room from the point of arriving

10   there and I stayed in that room until right before the

11   tape began and we went to -- well, there was a female

12   he got to take me to the restroom, we came back and he

13   had me sit down, read me through what was supposed to

14   be my confession, started it, then stopped it, went

15   back and started it -- record -- went back as in

16   rewinding it and then started it again.

17        Q    Could you tell where he rewound the tape to?

18        A    He rewound it and he started it all over.

19        Q    Okay.  So you went through one round where

20   you're --

21        A    Not completely.  We had started and I guess I

22   said something that wasn't good enough for his --

23        Q    Okay.  Do you recall what you said that --

24   that immediately was followed by him rewinding the

25   tape?

1   Q     Okay.  What was her emotional condition

2   throughout the time that you were gaining this

3   preliminary information?

4   A     She -- the only time that she would appear to

5   get upset, markedly upset was when she talked about

6   when she got up, saw that Travis was missing from

7   the couch and then discovered him in the kitchen.

8   Q     What was it that you observed that made you

9   think she's getting markedly more upset or her

10  emotions are changing?

11  A     Well, the way she was talking.  Her pitch

12  would go up and she would speak a little faster.

13  Q     Okay.  Now, did she begin to give you more

14  information about Donald at that period of time

15  then?

16  A     Right.  When I came back in, she said that --

17  we talked again about Donald, and I don't remember

18  if I initiated it or if she did, or she just

19  started telling me or if I questioned her, I don't

20  recall, but she said that she had been staying at

21  Donald's and that she started staying there last

22  Tuesday, and she had stayed there every night since

23  that Tuesday through Saturday night and had been

24  staying with Donald and his parents Mike and

25  Sharon.

1 her emotional condition?

2 A   She seemed all right.  She appeared to have

3 gotten control again, and I started asking her some

4 more questions.

5 Q   So at least during this period of time, you

6 formed an opinion that she had gained her

7 composure?

8 A   Right.

9 Q   What did you continue to ask her then?

10 A   Well, I asked her to describe to me -- I was

11 having a little trouble understanding exactly what

12 it was that happened with the dropping of the knife

13 and that sort of thing.  I wasn't sure that if she

14 had meant that she had dropped the knife and he had

15 already been injured or that she felt like she had

16 injured him when she dropped the knife, so I tried

17 to clarify that.

18 Q   Okay.  How did you do that?

19 A   Well, she said that when she came back into

20 the kitchen and saw Travis lying on the floor, that

21 she had the knife in her hand and that she ran to

22 him and went down to see how he was, and as she did

23 that, she put her hands down on the floor beside

24 him to brace herself as she lowered herself down to

25 her knees, and she said that as she did that, she

DISTRICT COURT OF OKLAHOMA - OFFICIAL TRANSCRIPT