IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

MICHELLE DAWN MURPHY )
           Plaintiff )
            )       15-CV-528-GKF-FHM
            )       Re: Docket # 175
            )
THE CITY OF TULSA )

## AMENDED RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

The City's Motion, Docket # 175, is replete with fatal holes, among which are:

1. *It ignores 537 pages of Cook and Murphy deposition testimony in 2017,* where:

A. Cook <u>does not deny framing her after her confession,</u> and *now disavows his trial testimony back in 1995; he never knew there were Constitutional limitations on interrogations;* and B. Ms. Murphy describes the circumstances of her false and/or coerced confession and the criminal sexual abuse (so described by Ron Palmer, the Final Policymaker) she suffered in the interrogation.

2. It ignores not one, but two unconstitutional policies of the City each of which the jury may find was the moving force of Ms. Murphy's deprivation of a Fair Trial under the Fourteenth Amendment. It ignores the lack of sexual harassment training, which Sgt.
Allen said was inviting sexual harassment to happen in interrogations.

3. The Final Policymaker concedes deliberate indifference.

               **KEESLING LAW GROUP, PLLC**

               <u>/s/ David R. Keesling</u>
               David R. Keesling, OBA No. 17881
               Timothy S. Kittle, OBA No. 21979
               11114 South Yale Avenue, Suite B
               Tulsa, Oklahoma 74137
               T: (918) 924-5101
               F: (918) 512-4888
               Email: David@KLGattorneys.com
                     Tim@KLGattorneys.com

ATTORNEYS FOR MICHELLE MURPHY

October 5, 2017

# TABLE OF CONTENTS

I. Disputed City" Material Facts.......................................................................... 1

II. Without More, Summary Judgment Should Be Denied............................ 5

III. Plaintiff's Material Undisputed Facts (which further preclude summary judgment)...................................................................................................... 5

IV. Argument.............................................................................................24

    A. The Jury May Find The Trial Violated the Fourteenth Amendment Right to a Fair Trial As the Result of (1) Cook's Presentation of a Confession He Knew Was False; and (2) A Reckless Investigation....................................24

    B. The City's Failure to Train...........................................................................27

    C. The Jury May Find The Trial Violated the Fourteenth Amendment Right to a Fair Trial As the Result of Cook's Presentation of a Confession He Coerced............................................................................................................ 29

        1. The Claim of a Coerced Confession Is Not Collaterally Estopped...........................................................................................29

        2. The Jury May Find That the Confession Was Coerced....................31

        3. The Trial Usage of the Confession Was Not Harmless Beyond a Reasonable Doubt............................................................................ 34

    D. The Jury May Find Causation and Culpability" of the City" Are Established For Cook's Knowing Presentation of (1) a Coerced Confession and (2) a False Confession, As the City" Had Two Unconstitutional Policies........................................................................ 34

    E. The Jury May Find That Failure To Supervise Caused (1) the False and/or Coerced Confession and (2) the Reckless Investigation Thereby Denied Ms. Murphy a Fair Trial.......................................................35

    F. The Jury May Find That Lack of a Sexual Harassment Policy and Lack of Training Thereon Caused the False and/or Coerced Confession ............. 36

    G. Deliberate Indifference Of The Final Policymaker........................................... 36

    H.  The City's Causation Of The Denial Of A Fair Trial For Ms. Murphy ........... 40

**V.  Conclusion**...............................................................................................................**41**

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Muskogee,* 119 F.3d 837 (10th Cir. 1997)......................................... 39

*Arizona v. Fulminante,* 499 U. S. 279 (1991) .............................................. 34

*Barney v. Pulsipher,* 143 F.3d 1299 (10th Cir. 1998).........................................34, 37, 39, 40

*Bd. Of Cty. Comm'rs v. Brown,* 520 U. S. 397 (1992)...................... 34, 37, 39, 40

*Brown v. Gray,* 227 F.3d 1278 (10th Cir. 2000) ........................................ 39

*City of Canton v. Harris,* 489 U. S. 378 (1980)...................................27, 28, 35, 37

*City of Okla. City v. Tuttle,* 471 U. S. 808 (1985).......................................39

*Clanton v. Cooper,* 129 F.3d 1147 (10th Cir. 1997) ..................................... 33

*Graham v. Connor,* 490 U. S. 386 (1989)........................................ 14

*Griffin v. Strong,* 983 F.2d 1540 (10th Cir. 1993)........................................33

*Hatchett v. City of Detroit,* 495 Fed. Appx. 567 (6th Cir. 2012)............................31

*Jackson v. Denno,* 378 U. S. 368 (1964) ............................................30

*Jackson v. State,* 2006 OK CR 45 ............................................. 30

*Lopez v. LeMaster,* 172 F.3d 756 (10th Cir. 1999)........................................34, 35, 40

*Myers v. Okla. Cty. Bd. of Cty. Comm'rs,* 151 F.3d 1313 (10th Cir. 1998) ...........................40

*Parent v. State,* 2000 OK CR 27........................................29, 30

*People v. Walker,* 132 N. W. 2d 87 (Mich. 1965)........................................31

*Pierce v. Gilchrist,* 359 F.3d 1292 (10th Cir. 2006)...............................25

*Robinson v. Maruffi,* 895 F.2d 649 (10th Cir. 1990)..............................24

*Sacramento v. Lewis,* 523 U. S. 833 (1998) ........................................ 14

*Tice v. State,* 1970 OK CR 144 ............................................................... 30

*United States v. Garot,* 801 F.2d 1241 (10th Cir. 1986) ........................................ 33

*United States v. Lopez,* 437 F.3d 1059 (10th Cir. 2002) ........................................ 31

*United States v. Toles,* 297 F.3d 959 (10th Cir. 2002) ........................................ 32

*Wilson v. Lawrence Co., Mo.,* 260 F.3d 946 (8th Cir. 2001) ................................... 24

**Statutes**

Okla. Stat. 22, § 1087 ............................................................... 31

**Federal Rules of Evidence**

Rule 901 ............................................................................................. 2

**Oklahoma Uniform Jury Instructions**

OUJI-CR-9-2 ......................................................................................... 29

## I.    Disputed City Material Facts

1-28.  The investigation was woefully inadequate, not "thorough" or "constitutionally sound" as asserted on p. 31 citing these facts.  See Plaintiff Facts ## 15, 21,22, 24-103 and 142-195[1].  *See also, Plt. Ex. 178, Expert Report of Michael Lyman, pp. 107-124; Plt. Exh. 148, Transcript of Noordyke, p. 16, ll.22-24, p.23, ll. 1-3, p. 25, ll. 2-12, l. 26, ll. 2-6, p. 27, ll 7-12, p.31, ll. 3-16, p. 40, ll. 2-7, p. 46, ll. 4-15, p. 52, ll. 4-8, p. 65, ll. 1-24, p. 69, ll. 3-8.*

11. There was glaring evidence of **unforced entry**.  *See Plt. Exh. 148, Transcript of Noordyke, p. 46, ll.4-15*.

13. No murder weapon was ever identified (***Pl. Exh. 15, ¶ 3***).  The City admits it did not look in a dumpster near the apartment, Answer, ¶175, another reckless investigation indicator.

15. He overlooked many critical pieces of evidence, *see* ("1-28") just above, believing she was guilty because someone told him she was the only one there.  Supremely critically, this caused him to think the chair propped against the outside of the front screen door was not part of the crime scene, so he did not try to take prints from it (***Pl. Exh. 148, Transcript of Noordyke, p. 25, l. 13- p. 27, l.10***).

20. False and terribly misleading.  *See* Facts ## 187, 188.  Cook testified at trial he could not duplicate the circumstances, but as Noordyke's report **(which the City has hidden from the Court but *is Plt. Ex. 101, TPD Supplemental Response*)** shows, there was NO effort that night to look in the front window with all the lights off, shining a flashlight in. The patrol officer testified he could see the entire couch at 3 a.m. only with flashlights and there was no baby on it, giving the lie to Lee's testimony that at 3 a.m. he looked in (with the lights off) and saw the baby

---

[1] The Court is advised that all numbers in parentheses as cites refer to tabbed numbers of Plaintiff's Exhibits attached hereto. Fact ## refer to Plaintiff Material Facts, below.

on the couch.  *See* Facts ## 154, 155.

22.   The cited City Exhibit 6 says no such thing.

23.   She was hysterical, in shock and very upset even during the interrogation.  Facts ## 7, 8, 14.

25.   The investigation was recklessly deficient.  *See* Facts ## 20-45, 66, 70, 78, 80, 82, 87-96,

140, 143-190 and 195.

27.   Cook lied to the prosecutor in the Prosecution Report, as shown in Facts ## 10, 13, 21, 22

and 45.

29, 30.   While she was talking, Cook rewound the tape and started over (See ***Plt. Ex. 102,***

***Deposition of Det. Cook, p. 238, ll. 10-15***).   That makes the tape unauthenticated and not

admissible (Rule 901, Fed. R. Evid.), thus these exhibits should be stricken.   In addition, she was

"guided" by Cook who made a Deal with her to say it was an accident.  *See* Fact ## 13-26.  Also,

Cook now disavows his trial testimony (***Plt. Ex. 125, Deposition of Det. Cook***), thus disputing

all City cites to his trial testimony.   *Cook does not deny sexual harassment during the*

*interrogation (**Plt. Exh. 160, Deposition of Det. Cook, p. 217, ll. 16-18), which Palmer*

*branded criminal (**Plt. Exh. 118, Deposition of Ronald D. Palmer, p. 40, ll. 1-10***).

32.   Cook perjured himself when he signed the arrest affidavit under oath.  *See **Plt. Ex. 5,***

***Deposition of Det. Cook, p. 200, ll.12-24; Plt. Ex. 6, Deposition of Det. Cook, p. 204, ll.12-24;***

***Plt. Exh. 7, Deposition of Det Cook, p. 208, ll. 1-9***).   He did not believe guilt or "malice

aforethought" (***Deposition of Det. Cook, p. 207, l.39-p. 208, l. 9***).

37, 38.   He determined "voluntary" only for admissibility purposes.   Only the jury decides the

fact of voluntariness in Oklahoma.  *See* pp. 28-29, below, items A-L.  *See* Facts ## 17-28.

39.   Cook now disavows his trial testimony (***Plt. Exh. 125, Deposition of Det. Cook, p. 282, l. 9-***

***p. 283, l. 14***).

46. The OCCA opinion says at p. 7, only that there was sufficient evidence to support the trial court ruling, which was on admissibility only, not the actual fact of voluntariness. In Oklahoma only the jury decides whether the confession was voluntary.

47. A coerced confession was an issue discussed in the verified Application and Supplemental Application for Post-Conviction Relief. See (*Plt. Exh 149, Application for Post-Conviction Relief, pp. 4, ¶D, 44, 45, 46, 47; Plt. Exh. 150, Application for Post-Conviction Relief, pp. 15,29*).

52, 53. The order says by clear and convincing evidence Ms. Murphy presented a *prima face* case of actual innocence. That case was made in verified Application and Supplemental Applications for Post-Conviction Relief, and not apposed. The Oklahoma Department of Risk Management had the opportunity to appeal the *prima facie* actual innocence finding to a jury trial but did not do so, paying $175,000. Thus, the court order became **final.**

55. This **inadmissible** exhibit establishes **nothing**. The document, prepared by goodness only knows who, is not part of discovery. **The City has not produced a single page showing Constitutional limits of interrogations**. "Interviews and Interrogations" identified on p. 25 of City Exhibit 39[2], are dated **2004** and **1996,** long after the time frame in this case.

55-60. There is nothing about Constitutional limits of interrogations in these exhibits. They are hearsay on what other officers did and thus inadmissible evidence. Palmer says Homicide Detectives were not required to be trained in interrogations (*Plt. Exh. 52, Deposition of Ronald Palmer, p. 37, ll. 3-10*). **Cook had no training in interrogations. (*Plt. Exh. 162, Deposition of*

---

[2] This exhibit is not sponsored, not authenticated, therefore not admissible evidence, and must be stricken.

***Det.*** **Cook, p. 55, ll. 5-8**). Palmer had two policies which authorized Constitutional violations, *see* pp. 31-32, below. Palmer admits that to protect Constitutional rights in interrogations, TPD should have had written policies setting forth at least the broad outlines of those rights (***Plt. Exh. 54, Deposition of Ronald Palmer, p. 16, l. 8-p. 17, l. 8***), but it didn't have the, Fact. #118. Cook had no training that presenting a coerced confession at trial violated substantive due process rights (***Plt. Exh. 158, Deposition of Det. Cook, p. 290, ll. 5-13***). Cook never heard that coercion can be mental as well as physical (***Plt. Ex. 159, Deposition of Det. Cook, p. 247, ll. 12-15***). **He had no training that there were Constitutional limitations in interrogations** (***Plt. Exh. 162, Deposition of Det. Cook, p. 55, ll. 5-8***). See Facts ## 21, 22, 30, 34, 35, 45, 70, 93, 116, 195, 197 and 198.

55-71. Nothing in these exhibits reflects a training program that includes Constitutional limits on interrogations, reckless investigations, presentation of false and/or coerced confessions at trial, supervision of interrogations or sexual harassment. *See Paragraph 55-60 above.*

56. The affidavit goes only to him, in 1978. Nowhere in the Affidavit does he say the training included the Constitutional limits of interrogations, or what that training said. The Affidavit speaks only to his "I was assigned" four weeks of field training, not that all got it.

57. "All TPD officers" is rank hearsay. No bulletins on Constitutional limits in interrogations nor any other document produced by the City in this case.

61. Contradicted by Plaintiff's Expert Report, (***Plt. Ex. 148, Expert Report of Michael Lyman***).

62. This exhibit says nothing about training concerning Constitutional limits on interrogations. Palmer said there was no requirement that Homicide Squad members have *any training on interrogations* (***Plt. Ex. 52, Deposition of Ronald Palmer, p. 37, ll. 3-10***).

63. City Exhibit 44 does NOT say all TPD officers got such training.

67. *The testimony cited does NOT say there was training on this*. Investigators had "full authority" of TPD to ignore the Constitutional limits in interrogations, including threats, as a matter of policy. *See* Fact # 113, below. **Palmer concedes deliberate indifference**, Facts ## 108, 114-121, 133, 136-138, either directly or so the jury may infer.

68. *See* Fact 17, below, where Palmer admits what should have been the policy. *See* Facts ## 113, 130, below, which are two TPD *unconstitutional policies*.

68, 70, 71. Palmer admits an officer would have to have been told what the Supreme Court says about interrogations in order to know what the Constitution required, (***Plt. Exh. 44, Deposition of Ronald Palmer, p. 50, ll. 9-25)*** (they weren't told), and that TPD should have had written policies setting forth at least the broad outlines of what the Constitutional rights are (***Plt. Exh. 54, Deposition of Ronald Palmer, p. 21, ll. 1-23***) (but in fact he had no such written policies). Fact # 118.

72, 73. Cook's history is unknown, other than LaRoye Hunter, because the City refused to allow access to **any** other homicide case files. Palmer testified only to what he had heard.

80. A whopper! The mother signed for the interview on 1-21-89. The interview with the taped statement occurred 12-5-89 and the mother did NOT sign. Plainly shown on the exhibits.

## II.  Without More, Summary Judgment Should Be Denied

The genuine dispute of the City's facts in Part I above, precludes summary judgment.

## III.  Plaintiff's Material Undisputed Facts (which further preclude summary judgment)

2. No murder weapon was ever found. City admission, Docket # 106, # 3, (154).

3. At her trial, Mike Cook presented a "confession" he obtained from her on 9-12-1994. City admission, Docket # 106, # 20, (155).

4. Around 6 a.m. on September 12, 1994, Ms. Murphy ran to the apartment of neighbors,

along with her 2 *1/2* year old daughter, to report that her 3 *1/2* month old baby was dead. (***Plt. Exh. 106, Deposition of Plaintiff, p. 162, ll. 5-10***).

5. Ms. Murphy reported to the neighbors that she had wakened and discovered the baby lying in a pool of blood in the kitchen of her apartment (***Plt. Exh. 107, Deposition of Plaintiff, p. 163, ll. 1-21***).

6. The baby lay on his back in a large pool of blood, all-but decapitated.

7. TPD Officer Otterstrom testified at trial about her emotional state when he was among the first TPD officers to arrive, as "crying and looked to be pretty upset" (***Plt. Exh. 170, 1995 Trial Transcript, (p. 50), Transcript at p. 295, ll 21-24***). Also, that "she was in a pretty emotional state" when he first got there (***Plt. Exh. 170, 1995 Trial Transcript, (p. 78), Transcript at p. 323, ll. 11-13***).

One of the neighbors to whom Ms. Murphy ran after discovering the baby testified she was "hysterical," "crying," "screaming and crying and extremely upset," "beating on the door," and "repeating herself over and over and over again" (***Plt. Exh. 173, 1995 Trial Transcript, (p. 6), Transcript at p. 551, ll. 2-13***). The neighbor further testified Ms. Murphy was "in shock," and "acting like you would expect a mother to act who had just found her child dead" (***Plt. Exh. 173, 1995 Trial Transcript (p. 7), Transcript at p. 575, ll. 12-20***).

Another neighbor testified that after the police arrived the neighbors and Ms. Murphy went outside to the playground, and when the police went into the apartment and came back out shaking their heads, Ms. Murphy "fell to the ground and lost it."

8. Officer Otterstrom testified that when people would come up and talk to her while she was at the car, "she would get emotional and begin crying again" (***Plt. Exh. 173, 1995 Trial Transcript, (p. 76), Transcript at p. 321, ll. 17-20***).

9. The jury may infer from Facts ## 21, 29 that Cook lied when he said "I don't remember," in his deposition, which then is a contest of these City facts: 17-19, 25, 27, 29, 30, 38, 39 and 77.

10. Ms. Murphy was taken to the police station in handcuffs (*Plt. Exh. 1, Deposition of Plaintiff, p. 198, l. 21-p. 199, l. 9*), and remained in handcuffs until "right before" the taped statement which began at 2:28 p.m. (*Plt. Exh. 4, Deposition of Plaintiff, p. 193, ll. 9-22*).

13. Ms. Murphy testified in her deposition that her statement was made because Cook "guided" her "to say it was an accident, that I accidentally did this" (*Plt. Exh. 4, Deposition of Plaintiff, p. 193, ll. 6-22*).

14. She testified that on 9-12-14 her world was "in a spin," she was "devastated," "my world is gone." At the interrogation all she was concerned about was "getting to my daughter" and "finding out who did this to Travis" (*Plt. Exh. 156, Deposition of Plaintiff, pp. 20-25*). Cook testified at trial she got "markedly upset" describing finding the baby and she was not "in control" at one point (*Plt. Exh. 174, 1995 Trial Transcript, (p. 25), Transcript at p.670, ll. 1-7; Plt. Exh. 174, 1995 Trial Transcript (p. 43), Transcript at p. 688, ll. 204*).

15. In his deposition, after having stated he "believed" Ms. Murphy killed the baby, (*Plt. Exh. 5, Deposition of Det. Cook, p. 200, ll. 20-21*), Cook recanted this testimony as "erroneous" (*Plt. Exh. 6, Deposition of Det. Cook, p. 204, ll. 207*), and said he used the words "malice aforethought" simply because he had to write out the murder charge "a certain way." (*Plt. Exh. 7, Deposition of Det. Cook, p. 208, ll. 2-14*).

16. ***Cook does not recall ever knowing there were Constitutional limitations on interrogations*** (*Plt. Exh. 162, Deposition of Det. Cook, p. 55, ll. 5-8*).

17. Cook admitted in his trial testimony that he specifically asked her to say she accidentally caused the cut on the baby's neck (*Plt. Exh. 174, 1995 Trial Transcript, (p.475), Transcript at*

*p.692, ll. 5-17).*

19. In his deposition, Cook testified:

> Q. Now, you're asking her if she accidentally cut his throat. Correct?
> A. Uh-huh....
> Q. And her answer was "Yes." ...
> A. Yes.
> Q. All right. Now, if she accidentally cut his throat, how is that murder with malice aforethought?
> A. Hmm. I don't know (*Plt. Exh. 11, Deposition of Det. Cook, p. 204, l. 19-p.205, l. 5*).

20. In Cook's trial testimony, he admitted the baby did not die as she described (*Plt. Exh. 174, 1995 Trial Transcript, (p. 70), Transcript at p.] 715, ll. 20-25*).

21. *Cook does not deny deliberately framing Ms. Murphy after her confession* (*Plt. Exh. 13, Deposition of Det. Cook, p. 37, ll. 14-17*)[3].

22. Cook ran his hands up Ms. Murphy's legs to inside mid-thigh during the interrogation, (*Plt. Exh. 116, Deposition of Plaintiff, p. 27, ll. 15-22*), with her wearing shorts, (*Plt. Exh. 117, Deposition of Plaintiff, p. 228, ll. 7-9*), which *the Final Policymaker testified was a criminal offense*, (*Plt. Exh. 118, Deposition of Ron Palmer, p. 40, ll. 1-10*). **His conduct "scared" her; she "didn't feel right about it."** (*Plt. Exh. 119, Deposition of Det. Cook, p. 225, ll. 1-10*). *Cook's conduct made her feel ashamed."(Plt. Exh. 120, Deposition of Plaintiff, p. 228, ll. 15-19*).

25. Ms. Murphy testified in her deposition that Cook made a "Deal" with her, that if she said the death was an "accident," she would get therapy and go home. (*Plt. Exh. 121, Deposition of Plaintiff, p. 204, ll. 17-25*).

---

[3] The jury may find he did frame her, because it defies logic and common sense that Cook can't say whether he **framed** her or not. *See* (*Plt. Exh. 147, Deposition of Det. Cook, p. 4, l, 409; p. 8, ll. 3-11; p. 9, ll. 6-9; p. 24, ll. 3-19; p. 225, ll. 5-25*), showing his intelligence.

26. Ms. Murphy testified in her deposition that Cook told her that she would get to see her 2 ½ year old daughter again if she confessed. (***Plt. Exh. 122, Deposition of Plaintiff, p. 192, ll. 1-9***).

29. ***At his deposition, Cook disavowed testimony he gave at the 1995 trial, telling Plaintiff's counsel "if you don't trust my trial testimony, I don't either. "*** (*Plt. Exh. 125, Deposition of Det. Cook, p. 283, ll. 7-15 ). See also **Plt. Exh. 163, Deposition of Det. Cook, p. 112, ll. 5-18**.*

30. Cook was alone when he interrogated Ms. Murphy, a female juvenile.

31. Cook described the interrogation room as 10 x 10 or 12 x 12 (***Plt. Exh. 174, 1995 Trial Transcript, (p. 11), Transcript at p.656, ll. 1-11***).

32. Cook did not record the entire interrogation; he had access both to a tape recorder and a video recorder, which he could have used to record the entire interrogation (***Plt. Exh. 174, 1995 Trial Transcript, (p.601), Transcript at p.705, ll. 6-24***)).

33. Ron Palmer was Chief of Police for TPD from 1990 through 2002 (***Plt. Exh. 41, Deposition of Ronald Palmer, p. 3, ll. 21-25***). The City admits Ron Palmer was the Final Policymaker for TPD.

34. The Final Policymaker testified that recording of the entire interrogation is particularly important for a juvenile (***Plt. Exh 128, Deposition of Ronald Palmer, p. 75, l. 25-p. 76, l.3***).

35. Cook provided no medical examination or attention for Ms. Murphy, despite her statement that she was hit on the head several times, (**Plt. Exh. 174**, *1995 Trial Transcript, (p. 34), Transcript at p. 679, ll. 9-22*), and was hit in the leg, causing bruises, (**Plt. Exh. 174**, *1995 Trial Transcript, (p. 35), Transcript at p. 680, ll. 6-12*). One of the neighbors to whom Ms. Murphy ran after discovering the baby, testified she was "rubbing her head" (**Plt. Exh. 172**, *1995 Trial Transcript, (p. 98), Transcript at p. 543, ll. 12-18*). The Answer admits Cook did not examine her for concussion symptoms.

36. During the interrogation, Ms. Murphy was not allowed to see her 2 ½ year old daughter.

38. Ms. Murphy was taken to the station wearing a pair of shorts and barefoot (*Plt. Exh. 132, Deposition of Plaintiff, p. 188, ll. 16-19; p. 228, ll. 7-9*).

39. Ms. Murphy had no blood on her person or on her clothes; no cuts; no physical evidence tied her to the crime; no murder weapon was ever found. She was not asked to provide a written statement.

43. Months after the interrogation, Ms. Murphy passed a lie detector test administered by an OSBI agent selected by the prosecutor, "conclusively" per the statement of the OSBI agent (*Plt. Exh, 133, Hearing Transcript (COT6305-6306), pp. 73-74*).

44. Cook admitted at the trial that the baby could not have died as the result of what Ms. Murphy described in her recorded statement (**Plt. Exh. 174,** *1995 Trial Transcript, (p. 70), Transcript at p. 715, ll. 20-25*).

45. During the recorded statement, Ms. Murphy said something Cook didn't like, causing him to rewind the tape and start from the beginning (*Plt. Exh. 135, Deposition of Plaintiff, p. 238, ll. 9-18*).

48. Introduction of Ms. Murphy's confession at the 1995 trial was not harmless beyond a reasonable doubt (See, *Plt. Exh. 174, 1995 Trial Transcript excluding Voir Dire*).

52. Sgt. Allen testified she was a suspect when she went to the station in handcuffs (*Plt. Exh. 141, Deposition of Sgt. Allen, p. 22, l. 2-16*).

53. *Sgt. Allen testified he expected "results" from interrogations, which he defined as "confessions" and/or admissions"*(*Plt, Exh. 142, Deposition of Sgt. Allen, p. 22, l. 14-p. 23, l. 7*). Sgt. Allen wrote Cook's fitness reports.

55. Ms. Murphy testified Cook got in her face close enough to smell his breath while she was

handcuffed and Cook was yelling at her (***Plt. Exh. 143, Deposition of Plaintiff, p. 241, ll. 3-17***).

59. Ms. Murphy was 17 at the time of the interrogation, with an eighth grade education and no prior experience with the criminal justice system.

62. The Oklahoma Court of Criminal Appeals found that her custody began at approximately 6 a.m. on September 12, 1994 (***Plt. Exh. 16, OCCA Opinion, p. 5, ll.6***).

63. The confession was recorded between 2:28 and 2:49 on September 12, 1994.

64. Twice during the interrogation Ms. Murphy asked for her mother, during Cook "screaming at me" (***Plt. Exh. 17, Deposition of Plaintiff, p. 209, ll. 18-21***). He yelled at her until she agreed to make a deal (the "Deal") (***Plt. Exh. 123, Deposition of Plaintiff, p. 240, ll. 10-14***).

65. TPD well knew where her mother was, having contacted the mother twice before 8 a.m. on September 12, 1994 (***Plt. Exh. 18, TRACIS, Bates No. COT7988, COT7964***).

66. One neighbor who spoke with Ms. Murphy late evening of September 11, 1994 described her as "a lot happy," as happy as the neighbor had ever seen her (**Plt. Exh. 173,** ***1995 Trial Transcript, (p. 3), Transcript at p. 548, ll. 1-11***).

70. In the recorded, unauthenticated and inadmissible "confession," Cook did not ask: A. What time she committed the crime; B. How the chair got propped against the outside of the front screen door; C. What she did after the murder; D. Whether she got any blood on herself; E. Whether she washed off any blood; F. How the several spots of blood got on the curtain between the living area and the kitchen; G. What her motive was (***Plt. Exh. 9, Transcript of Plaintiff's Statement***).

73. Cook testified the interview of Ms. Murphy began about 1020 a.m. (**Plt. Exh. 174,** ***1995 Trial Transcript, (p. 13), Transcript at p. 658, ll. 11-17***).

74. The complete trial transcript after voir dire is (138).

78. The Prosecution Report (***Plt. Exh. 20, Prosecution Report***) did not disclose that Ms. Murphy had been interrogated while in handcuffs until she agreed to the Deal with Cook.

79. Ms. Murphy was interrogated on five hours of sleep--from 0054 until about 6:00 when she ran to the neighbors declaring her baby was dead (**Plt. Exh. 174,** ***1995 Trial Transcript, (p.21), Transcript at p. 666, ll. 15-23***).

80. Cook, the prosecutor and counsel for Ms. Murphy were present when the OSBI polygraph examiner selected by the prosecutor emerged from the examination room, telling the prosecutor, "I've got something to tell you that you won't want to hear," and that Ms. Murphy had passed the exam "conclusively" (***Plt. Exh. 24, Transcript of Jackson-Denno Hearing, p. 73, ll. 15-p. 74, l.2***).

82. There was no evidence of child abuse of the dead baby, the Medical Examiner testified.

83. On hundreds of occasions during his deposition, Cook testified he did not remember the interview with Ms. Murphy or anything about the investigation (***Plt. Exh. 147, Index to Deposition of Det. Cook)***. Plaintiff's Exhibit 147 lists 723 examples of not remembering, but he remembered enough to know he did not think she was guilty and that he used "malice aforethought" only because the form required it (***Plt. Exh. 5, Deposition of Det. Cook. p. 200, ll. 6-15; Plt. Exh. 6, Deposition of Det. Cook, p. 204, ll. 12-24; Plt. Exh 7, Deposition of Det. Cook, p. 209, ll, 1-9***). The jury is entitled to have grave doubts about the truth of his "don't remembers."

87. **Five sets of fingerprints were taken at the scene** (***Plt. Exh. 27, TPD Homicide Scene Investigation Report, Bates No. COT8101***).

88. **Cook never had the fingerprints compared to anyone's** (***Plt. Exh. 28, Deposition of Det. Cook, p. 127, ll. 9-16***).

89. ***There could have been fingerprints on the baby's diaper, but Cook never had it tested, even though the scene investigator said he should have*** (***Plt. Exh. 29, Deposition of Noordyke, p. 65, ll. 8-23***).

90. A chair was propped against the outside of the screen to the front door, which was seen by the same TPD officers at 3 a.m. and at 6 a.m. (***Plt. Exh. 170, 1995 Trial Transcript (p. 66), Transcript at p. 311, ll. 17-23***).

91. Cook testified he recalled no training, ever, that innocent people confess (***Plt. Exh. 31, Deposition of Det. Cook, p. 51, ll. 23-25***).

92. The Supervisor of the Homicide Squad, Cook's boss, testified there should have been an investigative report in the Murphy case, he believes he saw one, and he is greatly surprised and concerned that there is no such report, because that would be highly unusual.

93. Sgt. Allen testified that prior to interrogation, an interrogator should obtain and investigate as much as possible to know the facts of the case, and that Cook did not know all of the facts when he interrogated Ms. Murphy (***Plt. Exh. 33, Deposition of Sgt. Allen, p. 110, ll. 14-24***). *TPD had no training program teaching investigators to investigate thoroughly before interrogating, or to always investigate the truthfulness of alleged single eye-witnesses, or to avoid the mistakes Cook made as set forth in Facts ## 22, 25, 30, 31, 35, 45, 70, 78, 79, 87-94, 97, 98, 169-171, 173-187, 190.* Cook was not trained to get as many facts as you can before you interrogate (***Plt. Exh. 161, Deposition of Det. Cook, p. 62, ll. 13-16***).

96. Sgt. Allen testified she was a suspect when she went to the station (***Plt.. Exh. 37, Deposition of Sgt. Allen, p. 42, ll. 10-12***).

97. There are no reports which Cook prepared, except the false Prosecution Report.

102. Cook recalls no training in interrogation (***Plt. Exh. 39, Deposition of Det. Cook, p. 60, ll, 9-***

*13)*.

106. Ron Palmer was responsible for the contents of the TPD Policies and Procedures Manual in effect on 9-12-94 (***Plt. Exh. 42, Deposition of Ronald Palmer, p. 33, ll. 4-22***).   It was his job to see that officers were up to date on legal matters, including interrogations  (***Plt. Exh. 43, Deposition of Ronald Palmer, p. 36, l. 14-p. 37, l. 2***).

108. Palmer admits that an officer would have to have been told about what the Supreme Court had said about interrogations in order to know what the Constitution required , but they weren't.

109. As the person responsible for the contents of the Manual, Palmer had the Manual set forth in three places what the Supreme Court said about Constitutional limitations in personal searches, describing *Sacramento v. Lewis* and *Graham v. Connor.*

111. Prior to 1994 the Supreme Court established principles regarding due process and interrogation of suspects (***Plt. Exh. 47, COT Answer*** ¶267).   *See also* (***Plt. Exh.*** 48, Excerpt from Layman Report, p. 13).

112. Mike Cook, the person who interrogated Ms. Murphy, was a member of the TPD Homicide Squad in 1994.

113. ***The Final Policymaker, and the Supervisor of the Homicide Squad, Sgt. Allen, testified that when an interrogator went alone into the interrogation room, without a video or tape recorder going, that interrogator had the 'full authority'of TPD to make his own decisions on how to conduct the interrogation, including what kind of threats to make*** (*Plt. Exh. 49, Deposition of Ronald Palmer, p. 27, l. 12-p. 28, l. 25; Plt. Exh. 50, Deposition of Sgt. Allen, p. 15, l. 19-p. 16, l. 10*).

114. There were no policies in 1994 addressing the do's and don'ts of interrogations (***Plt. Exh. 51, Deposition of Ronald Palmer, p. 33, ll. 21-22***).

115. There was no requirement that Homicide Squad members have any training specifically in interrogations (*Plt Exh. 52, Deposition of Ronald Palmer, p. 37, ll. 3-10*).

116. TPD records show no training of Cook in interrogations (*Plt. Exh. 53, Documents regarding Det. Cook's training, Bates Nos. COT646-COT649*).

117. **The Final Policymaker admits that in order to protect the Constitutional rights of all persons, TPD should have had written policies setting forth at least the broad outlines of what those Constitutional rights are, including interrogation** (*Plt. Exh. 54, Deposition of Ronald Palmer, p. 16, l. 8-p. 17, l. 8*).

118. None of the documents produced by the City contain written policies setting forth at least the broad outlines of Constitutional rights concerning interrogations. Cook had no training that presenting a coerced confession at trial violated substantive due process (*Plt. Exh. 158, Deposition of Det. Cook, p. 290, ll. 5-13*). He does not recall ever knowing there were Constitutional limits on interrogations (*Plt. Exh. 162, Deposition of Det. Cook, p. 55, ll. 5-12*).

119. **The Final Policymaker admits a TPD officer would have to have been told what the Supreme Court said about interrogations in order for them to know what the Constitution required** (*Plt. Exh. 55, Deposition of Ronald Palmer, p. 50, ll. 20-25*).

120. None of the documents produced by the City set forth what the Supreme Court said about Constitutional limitations on interrogations.[4]

121. **The Final Policymaker admits no discipline could be imposed for violations of Constitutional rights concerning interrogations when the officer does not know what such violations are** (*Plt. Exh. 56, Deposition of Ronald Palmer, p.32, l. 15-p. 33, l. 13*).

---

[4] For purposes of this Brief, Plaintiff excludes anything having to do with Miranda warnings from the concept of training or policies on "interrogations" or Constitutional limits.

122. In 1994 the Homicide interrogators received no training that innocent people confess (***Plt. Exh. 57, Deposition of Ronald Palmer, p. 62, ll. 3-7***).

123. The Final Policymaker admits there was no policy in 1994 which prohibited an officer from interrogating alone (***Plt. Exh. 58, Deposition of Ronald Palmer, p. 85, ll. 19-21***).

124. The Final Policymaker, when asked if TPD homicide detectives believed the measure of their worth was getting a confession, said, "so be it" (***Plt. Exh. 59, Deposition of Ronald Palmer, p. 104, ll. 1-14***).

125. Sergeant Allen, the Homicide Squad Supervisor from 1989-1996, testified he had no training in interrogations after police academy (***Plt. Exh. 60, Deposition of Sgt. Allen, p. 16, l. 23-p. 17, l. 2***).

126. <u>Allen testified that if during Ms. Murphy's interrogation by Cook, that he yelled at her, threatened her with never seeing her daughter again unless she confessed, told her if she confessed she would go home and get therapy, and she did not have food or water for seven hours, no discipline was appropriate</u> (***Plt. Exh. 61, Deposition of Sgt. Allen, p. 22, ll. 5-21***).

128. In his seven years as Homicide Squad Supervisor, Allen was never told of, nor did he ever ask about, tactics used by his interrogators in the interrogation room (***Plt. Exh. 142, Deposition of Sgt. Allen, p. 22, ll. 5-21***).

129. ***The 1934 TPD Policy Manual (Plt. Exh. 64, TPD 1934 Manual) prohibits threats or promises in interrogations.***

130. **The Manual in effect in 1994 had a policy forbidding the use of threats or promises during interrogations of police officers, but no reference to what could or could not be done during interrogations of ordinary citizens (*Plt. Exh. 65, TPD Regulation Excerpt, Bates Nos. COT605-COT-606*).**

132. Cook testified that in 1994 he would have paid attention to what was in his training, and would not have consciously violated any provision of the TPD Manual (***Plt. Exh. 67, Deposition of Det. Cook, p. 260, ll. 6-17***).

133. ***Palmer admits that without training, it is obvious there likely will be violations of citizens' rights in interrogations: 'Some areas are obvious to be likely to result in violations of citizens' rights unless police officers are trained on use of force, search and seizure, arrests and interrogations"*** (***Plt. Exh. 68, Deposition of Ronald Palmer, p. 79, ll. 9-15***).

136. Despite the TPD Policies and Procedures Manual in effect in 1994 having an entire page on what the Supreme Court has said about personal searches (***Plt. Exh. 71, TPD Procedures Excerpt, Bates No. COT94***), Palmer replied "I don't know" to the question why he did not have the Manual set forth quite simply "During interrogations there shall be no threats and there shall be no promises" (***Plt. Exh. 72, Deposition of Ronald Palmer, p. 72, ll. 4-10***).

137. Interrogations were a recurring situation for TPD and for homicide investigators (***Plt. Exh. 105, Deposition of Ronald Palmer, p. 15, ll. 22-18***).

138. Palmer admits when an interrogator is alone with a suspect, there is no supervision of the interrogator (***Plt. Exh. 73, Deposition of Ronald Palmer, p. 85, ll. 15-18***).

139. If you are in handcuffs, you are in custody, Palmer testified (***Plt. Exh. 74, Deposition of Ronald Palmer, p. 80, ll. 12-16***).

140. Palmer admits recording of the interrogation is essential when the person interrogated juvenile (***Plt. Exh. 75, Deposition of Ronald Palmer, p. 75, l. 25- p. 76, l. 3***).

141. Palmer's indifference to the lack of training and policies on interrogations is illustrated by his testimony that checks and balances are there after an investigation, which allow the court system to discredit and/or throw out whatever was done before in an investigation (***Plt. Exh. 76,***

*Deposition of Ronald Palmer, p. 94, ll. 21-25*).

143. At approximately 3:00 a.m. the morning of September 12, 1994 a call was made to 911, reporting a loud verbal fight at Ms. Murphy's apartment.

144. William Lee, a 14-year-old neighbor of Ms. Murphy, made the 911 call.

145. TPD responded to the 911 call. The two Responding Officers filed reports (***Plt. Exh. 77, TPD TRACIS Report, Bates No. COT7953, COT7762***) showing:

(1) They could not see into the living room without using flashlights; (2) They could not rouse Ms. Murphy; (3) A chair was propped against the outside of the screen on the front door; (4) At approximately 6 a.m. they returned to the scene after neighbors called 911 to report the murder of the baby; (5) The chair was in the same position; (6) They noted seeing Ms. Murphy and her 2 ½ year old daughter on the living room sofa, with no reference to the baby; and (7) Ms. Murphy had on the same clothes at 6 a.m. that they had seen at 3 a.m.

154. Lee gave a statement in which he said he saw the baby in the corner of the sofa on which lay Ms. Murphy and her 2 1/2 year old daughter, just before his 3 a.m. 911 call.

155. One of the Responding Officers who shined his flashlight at 3 a.m. (very shortly after the 911 call Lee made) said from the angle where he was at the front window, he could see anyone who would be laying on that couch (***Plt. Exh. 170, 1995 Trial Transcript, (p. 22), Transcript at 267, ll. 14-17***).

156. On September 12 and thereafter, Lee twice told Sgt. Allen he was home watching television the night of September 11 and early September 12 (***Plt. Exh. 80, TPD Supplemental Report, Bates No. COT8079***).

157. After Lee's first statement as to his whereabouts as described immediately preceding, Sgt. Allen took a statement from a neighbor's boyfriend who said he saw Lee about 3 a.m. running by,

clad only in shorts, i.e., no shirt, no shoes (***Plt. Exh. 80, TPD Supplemental Report, Bates No. COT8080***).

158. Confronted with the statement from the boyfriend, Lee changed his story and said he had been out walking around at 3 a.m.; Sgt. Allen then took Lee to the station and turned him over to Cook to be interviewed (***Plt. Exh. 80, TPD Supplemental Report, Bates No. COT8080***).

160. After interviewing Lee for a period of time, Cook took Lee's recorded statement (***Plt. Exh. 174, 1995 Trial Transcript, (p. 77), Transcript at 722, ll. 14-16***).

161. Lee's statement contains numerous lies and gaping holes. A. Cook established that the father of the children was not there that night for the verbal fight with Michelle (***Plt. Exh. 174, 1995 Trial Transcript, (p. 92), Transcript at 737, ll. 10-14***). B. Lee said several times that the blinds in the kitchen window were "shut." C. William Green, a neighbor who heard Michelle say her baby was dead and went to her apartment to check, looked through the blinds and saw the baby on the floor, as he put in a written statement in the file (***Plt. Exh. 81, William Green Witness Statement, Bates No. COT7995***). <u>Cook falsified what Green said, by putting in the Prosecution Report that Green said he looked through the open door, when Green said he saw through the window</u> (***Plt. Exh. 20, Prosecution Report, Bates No. 8078***). D. Cook and scene investigator Douglas Noordyke determined one week later that the blinds could be seen through (***Plt. Exh. 174, 1995 Trial Transcript, (p. 97), Transcript at 742, ll. 17-21***). E. Noordyke prepared a report on the visit to the scene a week later (***Plt. Exh. 101, Noordyke Supplemental Report)***. F. Cook prepared no report on the visit to the scene a week later. G. Lee's statement says nothing about the chair propped against the front door's screen. (***Plt. Exh. 78, Statement of William Lee, Bates Nos. COT8126-COT8143***) H. Despite the content of the Responding Officers' reports on the chair propped against the front door's screen, Cook asked

Lee nothing about the presence of the chair (***Plt. Exh. 175, 1995 Trial Transcript, (p. 1), Transcript at 746, ll. 13-15***). I. Lee said he heard Ms. Murphy turn the water on and off when she was in the kitchen, with the baby lying in a pool of blood on the floor. J. The water was on continuously when police arrived, and could not be shut off until the apartment complex manager came and shut off the water via the valve underneath the sink (***Plt. Exh. 82, Homicide Scene Investigation Report, Bates No. COT8093***). K. Lee spoke of being able to see in, whereas the Responding Officers said they could see nothing without using their flashlights (***Plt. Exh. 77, TPD TRACIS Report, Bates Nos. COT7953, COT7962***). L. Lee said during the argument, he hid behind a bush when the father of the children looked his direction, City Exhibit 23, COT 8126-43. M. The video of the exterior and interior, done by scene investigator Doug Noordyke, shows there are no bushes. N. Lee said after he in-effect saw Ms. Murphy kill the baby, she went from the kitchen to the living room, where she lay down and went to sleep (***Plt. Exh. 78, Transcript of Statement of William Lee, Bates No. COT 8140)***, which defies common sense.

162. Lee said a neighbor told him the next morning what had happened, but the neighbor said this was not true. Answer ¶147.

163. In his preliminary hearing testimony, Lee could not explain how the chair got where it was, unless it was "magic", to which Allen said this Lee testimony should have been an item of concern about Lee's veracity (***Plt. Exh. 96, Deposition of Sgt. Allen, p. 125, ll. 15-22***). But it wasn't to Cook. The Prosecution Report makes no reference to the chair, when Cook discusses the reports of the Responding Officers.

164. Cook never fingerprinted Lee, never looked for cuts, never searched Lee's apartment for bloody clothes or knives. Answer, ¶157.

167. Lee's 911 statement referred to hearing the sound of a knife being thrown against the wall, which Cook said did not make sense (*Plt. Exh. 174, 1995 Trial Transcript, (p. 93), Transcript at 738, ll. 9-17*).

168. Despite making the 911 call at 3 a.m. when there was only a loud verbal fight, which Lee said was over, Lee made no 911 call after his in-effect description of the murder of the baby.

169. Despite the lies and holes in Lee's story, Cook only interviewed Lee once.

170. Cook only interviewed Ms. Murphy once.

171. Cook did not prepare a report of the interview of Lee or of Ms. Murphy.

172. Not long after his preliminary hearing testimony, Lee was found dead, hanging in his garage in what the Medical Examiner ruled an auto-erotic incident.

173. Lee was never a suspect (*Plt. Exh. 174, 1995 Trial Transcript, (p.6), Transcript at 751, ll. 7-11*), but it needed investigation, Allen testified (*Plt. Exh. 94, Deposition of Sgt. Allen, p. 96, ll. 1-10*).

174. **Cook testified he did not know Lee had a crush on Michelle, and claimed he never read Lee's preliminary hearing testimony, where Lee admitted to having a crush on Michelle** (COT Exh. 23), **and admitted he watched her a lot** (COT Exh. 23).

175. *Cook testified he never considered that Lee committed the murder* (*Plt. Exh. 175, 1995 Trial Transcript, (p. 6), Transcript at 751, l. 7-11*).

176. Cook just assumed Lee was telling the truth about the murder; he never asked anyone who knew Lee what his reputation for truthfulness was (87). He never questioned Lee's truthfulness (*Plt. Exh. 175, 1995 Trial Transcript, (pp. 7-8), Transcript at 752, l. 24-p. 753 l. 8*). He did not know some witnesses felt Lee was weird and chased them home and he did not check out Lee at school.

181. **One of Lee's teachers said on September 12, 1994 the first thing Lee said when he came into the classroom was "the bitch will pay," referring to Ms. Murphy (*Plt. Exh. 176, 1995 Trial Transcript (p.8), Transcript at 853, ll. 15-23*).**

182. Cook testified he did not suspect Lee of anything.

183. Sgt. Allen testified: **A. There were plenty of areas of concern about Lee (*Plt. Exh. 91, Deposition of Sgt. Allen, p. 126, l. 15*). B. There were questions about Lee's truthfulness (*Plt. Exh. 92, Deposition of Sgt. Allen, p. 69, ll. 11-14*). C. Lee's truthfulness should have been investigated by Cook (*Plt. Exh. 93, Deposition of Sgt. Allen, p. 107, ll. 4-6*). D. That Lee did it was a possibility that needed investigation (*Plt. Exh. 94, Deposition of Sgt. Allen, p. 96, ll. 1-10*). E. Lee's statement that the chair must have got propped against the screen on the front door by "magic" should have been an item of concern (*Plt. Exh. 95, p. 123, ll. 17-22*). F. The fact Lee lied about the neighbor telling him what had happened should have been an item of concern about Lee's veracity (*Plt. Exh. 96, p. 125, ll. 15-22*).**

184. Cook testified he did not know the water would not turn off (***Plt. Exh. 175, 1995 Trial Transcript, (p. 23), Transcript at 768, ll. 19-23***) but that fact was in Noordyke's report in Cook's file (***Plt. Exh. 98, Homicide Scene Investigation Report, Bates No. 8093***).

186. Cook testified he was aware of what was in the TPD reports (***Plt. Exh. 154, 1995 Trial Transcript, (p. 2), Transcript at 747, ll. 4-6***). But he clearly wasn't.

187. Cook testified he could not "duplicate the circumstances" of the Responding Officers looking into the living room with their flashlights (***Plt. Exh. 175, 1995 Trial Transcript, (p. 9), Transcript at 754, ll. 6-2***). The officer at the window said he saw Ms. Murphy and her daughter on the couch, in contrast to Lee's lie that he saw into the apartment at 3 a.m. and saw the baby on the couch (***Plt. Exh. 77, TPD TRACIS Report, Bates Nos. COT7953, COT7962***).

188. Cook's testimony (*Plt. Exh. 175, 1995 Trial Transcript (p.9), Transcript at 754, ll. 6-22*) was untrue, because Noordyke wrote a report saying when he looked into the living room at night it was not with the lights off and looking through the window with a flashlight, as the Responding Officer did (*Plt. Exh. 101, TPD Supplemental Report, Bates No. COT8047*).

189. *__During the interrogation, Ms. Murphy said something Cook did not like, so "[h]e rewound it [the tape recorder] and he started it all over"__* (*Plt. Exh. 102, Deposition of Plaintiff, p. 238, ll. 5-18*).

190. **Cook testified at trial there was no evidence at all that pointed the finger at Lee**.

192. Cook told Ms. Murphy over and over during the interrogation that if she said she did it, she would get to see her daughter (*Plt. Exh. 144, Deposition of Plaintiff, p. 191, l. 4-p. 192, l. 9*).

193. Cook told her she would actually be able to leave if she said she did it (*Plt. Exh. 145, Deposition of Plaintiff, p. 205, ll. 11-20*).

194. The TPD scene video is (146).

195. The investigation conducted by Cook and Noordyke was woefully deficient. See First Amended Complaint ¶¶ 68-216, all of which are alleged as Plaintiff Facts but not set forth in full here for space limitations. Among these, the City admits ¶¶ 169, 170, 173, 174-177, 181, 183, 189 (first sentence), 190, 191, 195, 198, 199 (first sentence), 200-202, 205, 206, 208, 209 (first sentence), 212, 213 (first sentence), 215 (last sentence).

196. Sgt. Allen testified that without sexual harassment training "the police department was just setting itself up for an officer to go a little bit far...in the way of sexual harassment during an interrogation" (*Plt. Exh. 157, Deposition of Sgt. Allen, p. 51, l. 22-p.52, l. 7*).

197. Plaintiff s Expert says it was improper for Cook to interrogate Ms. Murphy when he did: "Any reasonable investigator would know that attempting to interrogate a victim under these

circumstances was improper and would yield statements that would most likely be unreliable, even without any coercion." (***Plt. Exh. 178, Layman Report, p. 112***).  He also says Cook's promise that she could go home "clearly created a psychologically coercive environment that placed excessive pressure on Michelle to confess." (***Plt. Exh. 178, p. 113***).

## IV. Argument

**A.  The Jury May Find The Trial Violated the Fourteenth Amendment Right to a Fair Trial As the Result of (1) Cook's Presentation of a Confession He Knew Was False[5]; and (2) A Reckless Investigation[6]**

Police officers may be held responsible for presenting false evidence to the prosecutor and to the court.  Officers may not escape such responsibility on a claim of break of causal connection by "subsequent, independent and intervening acts of the prosecutor, grand jury, state trial court and the New Mexico Supreme Court." *Robinson v. Maruffi,* 895 F.2d 649 (10th Cir. 1990)[7].

---

[5] *Despite the First Amended Complaint's allegations of Cook obtaining a false confession, the Motion does not address the facts of the alleged Constitutional violation.*

[6] *Wilson v. Lawrence Co., Mo.,* 260 F.3d 946 (8[1] Cir. 2001), cited on p. 30 of the Motion, held that with an involuntary confession and no reliable corroborating evidence, "the proper standard to judge whether the officers' conduct violates substantive due process is recklessness." The court also noted that recklessness is the standard: "where state actors have the opportunity to deliberate various alternatives prior to selecting a course of conduct, such action violates due process if it is done recklessly." *Id.* at 956. Ms. Murphy's case meets all of these criteria. Recklessness is amply demonstrated by the facts set forth in this subsection, *especially the fact Cook does not deny deliberately framing her after her confession.* Fact # 21.

[7] "If police officers have been instrumental in the plaintiff s continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him. *They cannot hide behind the officials whom they have defrauded."Id.* at 1292-3 (citations omitted) (emphasis added). **The concept of the liability of police officers regardless of what anybody up the chain does, is resoundingly reaffirmed in *Pierce v. Gilchrist,* 359 F.3d 1292(10th Cir. 2006)**. There are two keys to the cases cited on p. 39 of the Motion. First, they are not Tenth Circuit cases. Second, the cases are inapposite because the policemen, quite unlike Cook, did not mislead or defraud actors up the chain.

Ms. Murphy testified Cook made a deal with her, to just say it was an accident and she would get therapy and go home. Cook did not believe she was guilty, but signed the arrest affidavit under oath, declaring she committed murder with "malice aforethought," even though he used "malice aforethought" only because the form required it. In his deposition, he was unable to explain how an accident is "malice aforethought". Ms. Murphy was in shorts, barefoot, and **sexually molested [a "crime" said the Final Policymaker,** Ron Palmer.] Cook did not ask her to do a written statement. ***Cook does not deny deliberately framing her after her confession. The jury may find that Cook destroyed the investigative report which Allen believes he saw.*** Cook was there when the polygraph examiner emerged from the polygraph exam and said she passed "conclusively". Cook did not investigate the open space in the living room window through which the killer could have crawled. The jury may find that in his 2017 deposition Cook eschewed all of his trial testimony. Ms. Murphy had no blood on her person or her clothes. No murder weapon was ever found. The City admits TPD did not even search the dumpster near the back door of the apartment. Answer, ¶175. There were five sets of prints from the apartment, but they were never compared to anyone. Cook wrote a Prosecution Report which does not disclose the conditions of the interrogation or the Deal.

Lee gave Cook a statement, and testified at a preliminary hearing, that he in-effect saw her kill the baby. That put Lee's truthfulness center stage, all by itself. Sgt. Allen testified Cook should have investigated Lee's truthfulness. Lee said he called 911 at 3 a.m. because there was a verbal fight at the apartment between Ms. Murphy and the father. But Cook established there was no such fight because the father was not there.[8] Lee said he hid behind a bush at one point

---

[8] Plaintiff s Expert says: "one of the most crucial investigative discoveries made by

during the verbal fight, City Exhibit 23, COT 8130, but the TPD scene video, which includes the exterior, shows there is no bush. Lee lied twice to Sgt. Allen about his whereabouts that night, saying he was at home. Lee lied about not being able to see through the kitchen window except through small holes in the slats for the pull-up line in the blinds: he said he could not see through the blinds because they were "shut", City Exhibit 23, COT 8137, but Cook himself determined you could see through the blinds. Lee said he heard her turn the kitchen sink water on and off but the water was running continuously when the police arrived and could not be shut off except by the valve underneath the sink. Lee said that immediately after she killed the baby she went into the front room, lay down and went to sleep, Fact #161N, which defies common sense. Lee said he heard the sound of a knife hitting the wall during the verbal fight, which Cook said made no sense. **Lee said he was in front of the apartment, walked to the back and then walked to the front, City Exhibit 23, COT 8136-8, which means he passed by the front screen door twice, but he never saw the chair propped against the front screen door, yet Cook never asked Lee about the chair. He said maybe the chair got there by "magic"[9].** Despite these massive lies, Cook interviewed Lee only once, says he never questioned Lee's truthfulness, and never compared Lee's prints to the five sets of prints taken at the murder scene. Cook did not have the chair examined for prints.

Cook admitted concern that Lee said he could see into the apartment when the police

---

Cook is learning that there was no verbal fight…This not only placed direct and immediate suspicion on Lee as the murderer but immediately redirected the focus of the investigation away from Michelle Murphy. A reasonable investigator would view this evidence as cause for a drastic shift in the investigative focus from Michelle Murphy to William Lee.

[9] Cook claimed at trial he never read Lee's preliminary hearing testimony. If so, this was reckless as Lee died and thus his testimony became a part of the investigation.

needed flashlights. ***Lee testified he watched Ms. Murphy a lot and he had a crush on her[10].***

***Fact # 134.*** Cook wrote no reports during the investigation:

> "I have reviewed literally hundreds of homicide investigations across the nation over the last several decades and have never seen a homicide investigation like this one where there is a virtual void of documentation of critical evidence. The quality of Detective Cook's investigative work in this regard is abysmal."

Plaintiff's Expert excoriates the failures in Cook's investigation.

The jury may find that Cook knew the confession was false. The jury also may find that Cook performed a monumentally reckless investigation. *See also* Fact # 93.

## B.  The City's Failure To Train

*"In resolving the issue of a city's liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform. "* **City of Canton v. Harris,** 489 U. S. 378, 390 (1980). **TPD's training program did not teach the Constitutional limits of interrogations.[11] The Final Policymaker testified it is *obvious* that there likely will be violations of citizens' rights in interrogations, without training.** Much worse, he had a policy that threats could be made with "full authority" of TPD. Most tellingly Palmer admitted the **program** for training on interrogations was non-existent when he testified: "There was no requirement [that members of the Homicide Squad have any training specifically in interrogations] that I'm aware of." Fact # 115, (52). There was no training that innocent people confess.[12]

---

[10] Here again Cook recklessly failed to read Lee's preliminary hearing testimony.

[11] The 1934 TPD Manual forbade threats and promises, but not the 1994 Manual or any of its immediate predecessors. As shown below, threats and promises are critical factors in determining voluntariness.

[12] In the thousands of pages of documents produced by the City, not a single page addresses the Constitutional limitations on interrogations. City Exhibit 44, not discussed in the text of its Motion (and with good reason) indirectly admits there was no training in the

The non-existent training program on Constitutional limits in interrogations is underscored by: First. TPD Homicide Squad interrogators, from 1989-1996, were never asked what tactics they used by their supervisor, nor did he ask of them. Second. The TPD Manual forbade using threats or promises when interrogating police officers, but was silent about interrogating citizens. Third. Cook recalls no training in interrogation; his training records reveal none. Fourth. The Supervisor of the Homicide Squad, 1989-1996, had no training in interrogations after police academy. Fifth. The Homicide Squad Supervisor [who wrote Cook's fitness reports] testified that apart from use of force, what he cared about in interrogations was "results," which he defined as "confessions and/or admissions". The jury may find the facts show the **program** the City had for training concerning homicide interrogations (as well as all interrogations), by omitting training on Constitutional limits of interrogations, and by omitting training on investigations set forth in the preceding sentence, was improper and inadequate "to enable officers to respond properly to the usual and recurring situations with which they must deal." *City of Canton v. Harris,* 109 S.Ct. 1197, 1205 (1989).[13]

The City also had an inadequate program teaching investigators to investigate thoroughly before interrogating, or to always investigate the truthfulness of alleged eye witnesses, or to avoid mistakes made in Facts ## 16, 22, 25, 30, 31, 35, 45, 70, 78, 79, 87-94, 97, 98, 169-171, 173-187, 190. Fact # 93.

---

Constitutional limitations on interrogations, by making the vacuous statement that "Constitutional law" was taught, but trying to elide the fact this did not cover Constitutional limitations for interrogations.

[13] The Court may find it extraordinary that the Motion's section on failure to train: (1) never once claims any training given on Constitutional limits of interrogations; (2) never mentions that Cook got no such training (162); and (3) never once describes training actually received. To train on "interrogations" does not necessarily include Constitutional limits, and the Motion makes no such claim.

Cook testified that in 1994 he would have followed what was in his training. He also testified he would not have consciously violated any provision of the Manual.

**C.     The Jury May Find The Trial Violated the Fourteenth Amendment right to a Fair Trial As the Result of Cook's Presentation of a confession He Coerced**

**1.     The Claim of a Coerced Confession Is Not Collaterally Estopped**

The Motion atrociously misrepresents the facts and the law concerning collateral estoppel in its effort to prevent litigation of the voluntariness of Ms. Murphy's confession.

Most notably, the Motion is just dead wrong in saying on p. 16 that the trial court and the OCCA "found her confession was voluntary." Both courts simply found evidence of voluntariness to be *admissible, only.* The Motion repeats this error on p. 17, saying that the OCCA opinion found her confession voluntary and <u>thus</u> that opinion is a "final determination and precludes Murphy from raising the issue in her civil rights suit." (Emphasis added). To the contrary: the trial judge's ruling of "voluntary" was for the initial, limited and sole purpose of **admitting the evidence,** and leaving it to the jury to decide the actual fact of voluntariness.

Oklahoma law could hardly be clearer:

1. OUJI-CR-9-2 provides the jury is to be instructed:
Evidence relating to an alleged statement by a defendant outside of court and after a crime has been committed may be considered by you, but only with great caution and only if you determine that it was made and it was made voluntarily. Unless you are convinced beyond a reasonable doubt that the statement was voluntary, you should disregard it entirely.

2. Notes on Use to OUJI-CR-9-2 say: "This instruction should be used if a defendant's statement is admitted into evidence so that the jury may determine whether it was made voluntarily."

3. As explained in *Parent v. State,* 2000 OK CR 27, ¶¶13, "The jury was properly instructed with both OUJI-CR 2d 9-12 and 9-13. These instructions outline the jury's role in deciding whether or not a statement or confession was voluntary. Under these instructions, jurors cannot even consider a statement or confession until they have determined beyond a reasonable doubt it was voluntarily given.

...

> ...the trial judge **initially determines** the voluntary nature of that statement for purposes of admissibility in a *Jackson v. Denno* hearing. If the judge finds the statement voluntary and thus admissible, the jury is also given the opportunity to look at the issue of whether the statement was given voluntarily or involuntarily." *Id* at 14 (emphasis added).

Oklahoma has long followed the "Massachusetts rule" and still does, post-*Jackson v. Denno*. *See Tice v. State,* 1970 OK CR 144, 13, cited in *Parent, supra,* at 21.[14]

Because there was a general verdict, there is no way to know how the jury assessed voluntariness, because the jury could have brought back a guilty verdict even if they found involuntariness. We also do not know how the jury assessed any particular testimony or evidence in the case. Thus, there can be no preclusive effect for issues which were for the jury to determine as part of its assessment of guilt or innocence.

The *Jackson II* opinion, 2000 OK CR 45, does not help the City one bit. There was no issue of coercion in that case. All statements, admittedly, were voluntary. The trial court took the facts and applied the law on a "rescue exception" to determine that the admittedly voluntary statements were **admissible** despite no Miranda warning. The OCCA affirmed. *But here again, all that happened on collateral estoppel in that case was that the statements were admissible.* There, the issue of voluntariness was not at issue, just whether the statements could be admitted. Moreover, the opinion, ¶16, carefully noted that OCCA's prior admissibility findings "were not related to or dependent upon the specific crimes alleged,"[15] and that "the statements in the car were volunteered and not the product of custodial interrogation..." Thus, *Jackson II* is inapposite.

---

[14] This answers the Court's question raised on p. 8 of its opinion, Docket # 151.

[15] By contrast, Ms. Murphy's statement was directly related to the specific crime alleged and in her case the jury ultimately was the "decider-in-chief" on voluntariness.

Since in Ms. Murphy's case there was no "final determination" of voluntariness because the jury, not the court, makes that determination in Oklahoma, the Tulsa County District Court did not "overrule" the OCCA. Moreover, it simply vacated the conviction and dismissed the case with prejudice. 22 O. S. § 1087, City Exhibit 52, provides that a final judgment under the Post-Conviction Relief Act may be appealed to the OCCA. There was no appeal of the final judgment of dismissal with prejudice.

The critical distinction between judicial decision on the admissibility of evidence on voluntariness and jury determination of the actual fact of voluntariness eviscerates the Motion's discussion of *Hatchett v. City of Detroit,* 495 Fed. Appx. 567 (6th Cir. 2012). In Oklahoma, as we have seen above, the jury decides the actual fact of voluntariness. **In Michigan, the judge's decision on voluntariness is final.** It is regrettable that the Motion did not tell the Court that Michigan's decision to proceed with judge-finality on voluntariness was established in the very case the Motion cites, n. 11, p. 25, *People v. Walker,* 132 N. W. 2d 87 (Mich. 1965).

Ms. Murphy's Application and Supplemental Application for Post-Conviction Relief referred to the issue of a coerced confession and ineffective assistance of counsel in dealing with it. *See* Fact # 47. A coerced confession may have been very important in the ultimate determination of clear and convincing evidence of a *prima facie* case of actual innocence.

## 2.   The Jury May Find That the Confession Was Coerced

"The determination of voluntariness is based on the totality of the circumstances." *United States v. Lopez,* 437 F. 3d 1059, 1063 (10th Cir. 2002). "Relevant circumstances embrace both the characteristics of the accused and the details of the interrogation." *Id.*

> Such factors include (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4)

whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment.
*Id. [citing United States v. Toles,* 297 F.3d 959, 965-966 (10th Cir. 2002)].

The "relevant circumstances" are these:

A.   She suffered the most horrific emotional and psychological blow a mother could imagine, seeing her 3 ½ month old baby decapitated in a pool of blood, a few hours before interrogation. Her neighbors testified she was "in shock," "hysterical," "fell to the ground" and "lost it" and acted like you would expect from a mother in the circumstances. The same neighbors who gave this testimony saw her the night before and

described her as "a lot happy" and as happy as they had ever seen her. Cook admitted she was not "in control" and got "markedly upset." *See* Facts ## 7, 8, 46, 47.

B. She twice asked for the presence of her mother when Cook "was screaming at me." Fact # 64.

C. She was "***ashamed***"by Cook's sexual assault, Fact # 24, which Cook does not deny.

D. She was 17 years old, with an eighth grade education, no prior experience with the judicial system, and she had no cuts and no blood on her person or her clothes. Fact ## 59, 49.

E.   She was not medically examined for the blow on the head she suffered. Fact # 35.

F.   When Cook couldn't get her to admit she committed murder, ***Cook made a "deal" with her - say it was an accident, and you will get therapy and go home. He yelled at her until she agreed to the Deal***. Facts ## 17-19, 25, 26.

G.   She took Cook for his word that if she said it was an accident she would get therapy and go home. Fact # 152.

H.   She was barefoot and in handcuffs until she agreed to the Deal to say it was an accident. Fact # 78.

I. Cook's conduct "scared" her; she "didn't feel right about it." Fact # 24.

J. She was interrogated on five hours of sleep.

K.   The interrogation was not recorded in the entirety, which the Final Policymaker says is especially important when interrogating a juvenile (but there was no TPD policy requiring that).

L.   During the taped statement, she said something Cook didn't like, so he rewound

the tape and started over. Fact # 189.

Tellingly, the Motion is dead silent as to the 2017 testimony of Cook and of Ms. Murphy, about the circumstances of the confession[16]. **Cook now admits he did not believe she was guilty or that "malice aforethought" was applicable.** Cook's dozens of "I don't remember" may be viewed as lies by the jury, to cover up his coercing the confession. Cook eschews his trial testimony which itself presents a factual dispute with the Motion's citations to Cook's trial testimony about not coercing her. Her 2017 testimony set forth in the A- L factors, above, show coercion. The Deal itself was either a promise or a threat (as to threat, since she was told she would be able to leave if she said it was an accident, the threat of "you won't get out of here unless you say it was an accident" is an inference the jury may draw). Cook never heard that coercion can be mental as well as physical. He had no training that presenting a false confession at trial violated substantive due process.

The Tenth Circuit requirements on deciding a confession is coerced include:

A. "To be admissible a confession must be made freely and voluntarily; it must not be extracted by threats in violation of due process or obtained by compulsion or inducement of any sort." *Clanton v. Cooper,* 129 F.3d 1147, 1158 (10th Cir. 1997).

B. "Where a promise of leniency has been made in exchange for a statement, an inculpatory statement would be the product of inducement and thus not an act of free will." *Id.* at 1159, quoting *United States v. Garot,* 801 F.2d 1241, 1245 (10th Cir. 1986).

C. "A confession runs afoul of the Fifth Amendment when it is obtained by 'government acts, threats or promises that allow the defendant's will to be overborne.'" *Griffin v. Strong,* 983 F.2d 1540, 1543 (10th Cir. 1993).

The jury in this case before the Court may find that her confession was involuntary.

---

[16] *Even more telling is the Motion's citation of only 4 pages of the 541 pages of deposition testimony of Cook (1 page-to say he doesn't remember a 1990 interview in another case) and Ms. Murphy (3 pages-to say the State paid her $175,000 under the actual innocence statutes).*

### 3. The Trial Usage of the Confession Was Not Harmless Beyond a Reasonable Doubt[17]

The complete trial record is (138). The Court may find the easiest yet most penetrating analysis of whether introduction of the confession was not harmless beyond a reasonable doubt by examining the prosecutor's closing argument. The prosecutor effectively wrote off the value of the testimony of William Lee when he candidly told the jury William Lee's testimony had "problems" and asked them to "boil it down" to deciding that no mother of a murdered child would implicate herself as Ms. Murphy did to Mike Cook.

### D. The Jury May Find Causation and Culpability of the City Are Established For Cook's Knowing Presentation of (1) a Coerced Confession and (2) a False Confession, As the City Had Two Unconstitutional Policies

"The Supreme Court observed in *Brown* that when an official municipal policy itself violates federal law, issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." *Barney v. Pulsipher,* 143 F.3d1299, 1307 (10th *Cir.1998)( citing Bd. Of Cty. Comm 'rs v. Brown,* 520 U. S. 397 (1992). In this case, the City had not one unconstitutional policy concerning Constitutional limits on interrogations, but two. First, the City gave "full authority" to its interrogators to conduct interrogations however they wanted to, including threats. That is, the Constitution be damned. Second, by prohibiting threats or promises when interrogating police officers but by saying nothing about citizens, the City effectively ___authorized___ threats and promises when interrogating citizens. That is, open season on citizen interrogations. ___Each of these policies authorized Constitutional violations, which is at least as reprehensible as ratification. "Full authority" to make it up yourself, don't worry about the     Constitution___. All that remains is the issue of deliberate indifference, which the evidence allows the jury to find here. *See Lopez v. LeMaster,*

---

[17] For coerced confessions to constitute a Fair Trial violation, their usage at trial must not be harmless beyond a reasonable doubt. *Arizona v. Fulminante,* 499 U. S. 279 (1991).

172 F.3d 756, 763 (10th Cir. 1999), which holds that where a policy of understaffing the jail is unconstitutional, thereby it is the moving force of the injury, and the plaintiff need only prove deliberate indifference. Moreover, deliberate indifference is established where the final policymaker is responsible. *Id*

Interestingly, the facts in Ms. Murphy's case are all but a clone of the facts in *City of Canton*. Cook was vested with the "full authority" of TPD to conduct the interrogation of Ms. Murphy however he wanted to do it, without Constitutional limitations, including the making of threats, just as "complete authority" was vested in the policeman in *City of Canton:*

> "The evidence, construed in a manner most favorable to Mrs. Harris, could be found by a jury to demonstrate that the City of Canton had a custom or policy of vesting **complete authority** with the police supervisor of when medical treatment would be administered to prisoners. Further, the jury could find from the evidence that the vesting of such *carte blanche* authority with the police supervisor, <u>without adequate training to recognize when</u> <u>medical</u> <u>treatment is needed, was grossly negligent, or so reckless that future police</u> <u>misconduct was almost inevitable or substantially certain to result.</u>"
> 489 U. S. 378, 382 (emphasis added).

Palmer admits an officer would have to have been told about what the Supreme Court said about interrogations in order to know what the Constitution required.

### E. The Jury May Find That Failure To Supervise Caused (1) the False and/or Coerced Confession and (2) the Reckless Investigation Thereby Denied Ms. Murphy a Fair Trial

Cook, and all homicide interrogators, had the "full authority" of TPD to make their own decisions how to conduct interrogations, including threats. The policy of protecting the employment rights of police officers being interrogated (by the Manual prohibiting threats and promises), but not the Constitutional rights of citizens was a stark abandonment of the duty to supervise so as to prevent Constitutional violations in interrogations. Palmer admits that without recording equipment going on during all of an interrogation, **there is no supervision whatsoever.** But Palmer admitted recording is particularly important for a juvenile, yet

abandoned his supervisory responsibility by not having any such requirement. Allen never asked any of his interrogators what tactics they used, and never asked--in 7 years. No TPD policy required report writing. Thus, there was no paper trail to allow for supervision. TPD's failure to train Allen on interrogations was:

> a clear and unequivocal failure to supervise and failure to train both Cook and Allen, which is attributable to the system of lack of supervision which Palmer allowed to occur.

> directly attribut[able] to Police Chief Palmer's failure to establish policies, operating procedures, proper training and supervision that would address the critical issue of conducting proper criminal investigations.

Without adequate supervision of investigations and interrogations, the jury may find it plainly obvious that Constitutional violations will occur, and that lack of supervision was closely related to Cook's Constitutional violations.

### F. The Jury May Find That Lack of a Sexual Harassment Policy and Lack of Training Thereon Caused the False and/or Coerced Confession

The jury may find that Cook's sexual harassment of Ms. Murphy caused her false and/or coerced confession. *See* Fact # 22 on her feeling ashamed, afraid, unwilling to tell anyone. TPD had no sexual harassment policy as to citizens or training on same. Palmer was deliberately indifferent by saying TPD did not need such a policy. But his policy allowed touching. When touching is permitted, without a sexual harassment policy to define unacceptable behavior, it is plainly obvious that citizens will be sexually harassed. As Sgt. Allen testified, by not having sexual harassment training, TPD was just setting itself up for an officer to go a little bit far in the way of sexual harassment during an interrogation.

### G. Deliberate Indifference of The Final Policymaker

A single incident of unconstitutional conduct by a police officer can give rise to a claim under § 1983:

In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations. *Barney v. Pulsipher,* 143 F.3d 1299, 1308-091 (10th Cir. 1998) (citing *Board of Count Comm'rs v. Brown,* 520 U. S. 397, ..... (1997); *City of Canton v. Harris,* 489 U. S. 390 n. 10 (1989).

*Board of the County Comm 'rs of Bryan County, Okla. v. Brown,* 520 U. S. 397, 409 (1997)

says:

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice-namely, a violation of a specific constitutional or statutory right.

Interrogations and investigations were part of routine TPD police work. Without adequate training on the Constitutional limits (of which there was none at TPD), and on proper conduct of investigations, the jury may find the decision not to train Cook reflected "deliberate indifference" to the obvious consequence, violation of citizens' constitutional rights.

> ...[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations of deadly force, *see Tennessee v. Garner,* 471 U. S. 1 (1985), can be said to be "so obvious" that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton, Ohio v. Harris,* 489 U. S. 378, 390 n. 10 (1989).

Phrased slightly differently, Justice O'Connor added emphasis, concurring in *Canton:*

> ...[A] municipality could fail to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. As the majority notes, 489 U. S. 390, n. 10 [the quotation just above in this brief], the constitutional duty of the individual officer is clear, and it is equally clear that failure to inform city personnel of that duty will create ***an extremely high risk that constitutional violations will ensue.*** *Id* at 396

(emphasis added).

The Final Policymaker admitted it is obvious there likely will be violations of citizens' rights in interrogations, without training. TPD's training on Constitutional limits of interrogations was non-existent; on proper conduct of investigations, it was highly inadequate. Palmer admits that an officer would have to be told what the Supreme Court said about interrogations in order to know what the Constitution required, but he offered no training or policies to do that.

Why didn't Palmer simply have a policy of "don't make promises or threats during interrogations"? Palmer testified, "I don't know." Palmer admits no discipline could be imposed for Constitutional violations during interrogations when the officer does not know what such violations are. Palmer admits that in order to protect the Constitutional rights of all person, TPD should have had written policies setting forth at least the broad outlines of what those rights are, including in interrogations, but he had no such written policies. Fact # 118. In 1994 Homicide interrogators were not trained that innocent people confess. He did not require that Homicide Squad detectives have specific training in interrogations. Palmer admits there were no do's and don'ts for interrogations. Palmer admits it was his job to see that officers were up to date on interrogations. "So, the failure to have proper policies, training and supervision on do's and don'ts of interrogation of innocent persons confessing were a direct cause of Michelle Murphy's coerced confession." The wide-open, Constitution-be-damned conditions created by Palmer's decisions were put into even sharper focus by two of his deposition responses. First, when asked his reaction to homicide interrogators measuring their value by getting confessions, he replied, "so be it" . More ominously, he tried to downplay TPD Constitutional violations by saying "checks and balances" in "the court system" can discredit and/or throw out whatever (bad) was done in the TPD investigation. There was no sexual harassment policy or training, inviting sexual abuse, Sgt.

38

Allen testified. There was no policy or training on medical attention for interrogatees. There were highly inadequate policies and training on conducting investigations. *See* Fact # 93. Additional indicia of deliberate indifference are found in Fact # 120.

Under the circumstances described in the preceding paragraph, the Tenth Circuit holds that neither *City of Oklahoma City v. Tuttle,* 471 U. S. 808 (1985) nor *City of Canton* require more than: (1) one incident where the failure to train caused the Constitutional injury; and (2) there is direct evidence of inadequate training. *Allen v. Muskogee,* 119 F.3d 837, 845-6 (10th Cir. 1997). There was one incident, the jury may find the failure to train caused Ms. Murphy's Constitutional injuries, and there is direct evidence of inadequate training. The Tenth Circuit is quite clear that deliberate indifference does not require "the existence of a pervasive problem." *Brown v. Gray,* 227 F.3d 1278, 1289 (10th Cir. 2000). Moreover, the usual and recurring situation requirement "need not be frequent or constant. It must merely be of the type that officers can reasonably expect to confront." *Id.* at 1288. Failure to train in recurring situations presents an "obvious" potential which meets the "highly predictable" or "plainly obvious' standard. *Barney v. Pulsipher,* 143 F.3d 1299, 1307-08 (10th Cir. 1998). That "obvious potential" establishes deliberate indifference is underscored in *Allen v. Muskogee,* 119 F.3d 837, 842 (10th Cir. 1997):

> "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." (citing *Brown v. Board, supra* and *City of Canton, supra).*

Stunningly, the Motion concedes that a "single incident" can establish notice such that deliberate indifference may be inferred, on pp. 37-38 where it cites the case law on the doctrine, but then has no facts or argument to prove its vacuous one-liner that Murphy can't survive the

City's motion for summary judgment.[18]

## H.     The City's Causation Of The Denial Of A Fair Trial For Ms. Murphy

The jury may infer causation in many ways: First. A "high degree of predictability" of a specific Constitutional violation:

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymaker's choice-namely, a violation of a specific constitutional or statutory right. ***The high degree of predictability may also support an inference of causation-that the municipality's indifference led directly to the very consequence that was so predictable.*** *Board of County Commrs v. Brown,* 520 U. S. 397, 409-410 (1997) (emphasis added).

Second. As we have seen in *Lopez, supra* and *Barney v. Pulsipher, supra,* having policies which are unconstitutional satisfies the moving force requirement. And TPD had two unconstitutional policies. Third. Failure to train. "...[S]ection 1983 plaintiffs can use a municipality's failure to train as one way to make the required showing that a municipal policy or custom was the 'moving force' behind an already established Constitutional violation." *Myers v. Okla. Cty. Board of Cty. Comm'rs,* 151 F.3d 1313, 1317 (10th Cir. 1998). The failure to have sexual harassment training which Sgt. Allen said was an invitation for sexual abuse in interrogations can be inferred as the moving force behind the confession.

And the same for failure to have policies and training on presenting false or coerced confessions at trial. As for reckless investigation, the failure to adequately train and to have adequate policies on investigations may be found as a moving force.

---

[18] The Motion, p. 36, fails to tell the Court that the *Barney* opinion says ***notice*** may be shown when there is a narrow range of circumstances where a violation of federal rights is "highly predicable" or "plainly obvious;" the Motion also fails to say the word "significantly" appears nowhere in the opinion. *Barney,* 143 F.3d at 1307.

As we saw on p. 35, above, Justice O'Connor noted that "failure to inform City personnel of that [constitutional] duty will create an extremely high risk that constitutional violations will ensue." There was no training on the do's and don'ts of interrogations, Palmer admitted (51), and it was his job to keep officers up to date on interrogations (43). Since Cook had no training on the Constitutional limits of interrogations, he did not know that interrogating her when he did, given her emotional state, was improper. *See* Fact # 197. And with no training on the Constitutional limits of interrogations, he was not trained that coercive tactics can and do produce false confessions. *See* Fact # 198. Without proper training, and being told touching was OK, he did not have adequate training on sexual harassment.

Overall, we must remember Palmer's admission that without training, it is obvious that there will be violations of citizen's rights in interrogations. Palmer's indifference "led directly to the very consequence[s] that was [were] so predictable," as the Supreme Court noted in the quote on pp. 37-38, above.

## V.    Conclusion

The City's Motion for Summary Judgment should be denied. There are many genuine disputes of the City's alleged Undisputed Material Facts.

Respectfully submitted,

Keesling Law Group, PLLC

/s/  David R. Keesling
David R. Keesling, OBA No. 17881
Timothy S. Kittle, OBA No. 21979

Attorneys for Michelle Murphy

41

## Certificate of Service

David R. Keesling states he filed electronically in the case file true and correct copy of the foregoing Plaintiff's Amended Response to Defendant's Motion For Summary Judgment this 5th day of October, 2017, which automatically sends notice to:

David E. O'Meilia, OBA # 6779
Gerald M. Bender, OBA # 14471
T. Michelle McGrew, OBA # 20279
Stephan A. Wangsgard, OBA # 18312
City Hall, One Technology Center
175 East Second Street, Suite 685
Tulsa, Oklahoma 74103

/s/ David R. Keesling