# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MICHELLE DAWN MURPHY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-CV-528-GKF-FHM |
| | ) | |
| THE CITY OF TULSA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter comes before the court on the defendant City of Tulsa's Motion for Summary Judgment [Doc. #175]. For the reasons discussed below, the motion is granted.

## I.    Background

On September 12, 1994, Travis Wood, the three-month-old son of Michelle Murphy, was found dead as a result of a stab wound to the chest and incised wound to the neck. The Tulsa Police Department, headed by then Chief Ron Palmer, oversaw the investigation of infant Wood's murder. That same day, Murphy made a statement to TPD detective Michael Cook.

On September 15, 1994, Murphy was charged with murder in the first degree in the District Court in and for Tulsa County. Murphy was convicted of the charge in November of 1995 and served twenty (20) years of a sentence of life without parole. On May 30, 2014, Tulsa County District Court Judge William Kellough vacated and set aside Murphy's conviction and, on September 12, 2014, the charge against Murphy was dismissed with prejudice.

Murphy now brings this case against the City of Tulsa pursuant to 42 U.S.C. § 1983, the federal civil rights statute.[1]  Murphy seeks section 1983 relief on the basis of two constitutional violations:  (1) violation of Murphy's Fifth Amendment right against self-incrimination, and (2) violation of the Fourteenth Amendment due process clause's right to a fair trial.[2]  The City moves for summary judgment in its favor.

## II.    Procedural History and Evidentiary Issues

Before considering the City's motion for summary judgment, however, the court must first address four evidentiary issues associated with Murphy's response.

In support of its motion, the City offers eighty-three (83) material facts to which it asserts there is no dispute.  These facts are divided into six categories:  (1) "The Tulsa Police Department's Murder Investigation," fact nos. 1-28; (2) "Murphy's Confession And Probable Cause," fact nos. 29-36; (3) "Murphy's Confession was Given Knowingly and Voluntarily," fact nos. 37-46; (4) "Causation and Waiver," fact nos. 47-54; (5) "TPD Policies, Practices, Training, and Supervision," fact nos. 55-71; and (6) "The 'Earlier' Case – LaRoye Hunter," fact nos. 72-83.

---

[1] Murphy's original Complaint also named the following defendants: TPD officers Cook, Wayne Allen, Doug Noordyke, B.K. Smith, and Gary Otterstrom; TPD forensic laboratory criminalists Ann Morris, Ann Reed, Tara Valouch, and David Sugiyama; Tulsa County prosecutor Timothy Harris; Department of Human Services employees Jeri Poplin and Doris Unap; and Oklahoma Bureau of Investigation agents Tom Gibson and Mary Long.  [Doc. #2].  However, Murphy voluntarily dismissed these individual defendants prior to the filing of Murphy's First Amended Complaint.  The original Complaint also identified "other unknown supervisors" as a defendant, but "other unknown supervisors" were not included in the First Amended Complaint.

[2] The City's motion for summary judgment also includes argument regarding a § 1983 malicious prosecution claim.  However, during the dispositive motion hearing in this matter, held on February 9, 2018, Murphy's attorney informed the court that Murphy is not pursuing a separate § 1983 malicious prosecution claim.  Thus, the court need not consider the City's argument regarding any potential § 1983 malicious prosecution claim.

Murphy's response to the motion includes over 1,000 pages of exhibits. The City subsequently moved to strike the exhibits attached to Murphy's response, arguing that the exhibits did not comply with Local Civil Rule 56.1. In an order dated August 29, 2017, the court concluded that Murphy's response failed to comply with LCvR 56.1(c) and Fed. R. Civ. P. 56(c)(1) for five separate reasons. First, the court concluded that Murphy "frequently fail[ed] to 'refer with particularity' to those portions of the record upon which she relies," offering as an example Murphy's collective response to the City's first twenty-eight (28) statements of undisputed material facts. In response to the City's first 28 facts, Murphy responded with the statement "[t]he investigation was woefully inadequate, not 'thorough' or 'constitutionally sound' as asserted . . ." and cited to 140 of her own additional statements of undisputed fact, seventeen pages of an expert report prepared on her behalf by Dr. Michael D. Lyman, and twelve pages of deposition testimony from the unnamed "scene investigator." Second, Murphy did not use a consistent format for her references. Third, Murphy referenced missing exhibits. Fourth, Murphy occasionally referred to multi-page exhibits as a whole, without reference to page and line numbers. Finally, for some of the exhibits containing excerpts of testimony, Murphy did not identify the individual whose testimony was presented. In order to correct these identified deficiencies, the court granted Murphy additional time to file an amended response that complied with LCvR 56.1(c) and Fed. R. Civ. P. 56(c)(1). *See* [Doc. #279].

Pursuant to Local Civil Rule 56.1(c):

The response brief in opposition to a motion for summary judgment (or partial summary judgment) shall begin with a section which contains a concise statement of material facts to which the party asserts genuine issues of fact exist. **Each fact in dispute shall be numbered, shall refer with particularity to those portions of the record upon which the opposing party relies and, if applicable, shall state the number of the movant's facts that is disputed.** All material facts set forth in the statement of the material facts of the movant shall be deemed admitted

for the purpose of summary judgment unless specifically controverted by the statement of material facts of the opposing party.

LCvR 56.1(c) (emphasis added). The local rule is consistent with statements of the Tenth Circuit interpreting Fed. R. Civ. P. 56, and meant to further the purposes of Rule 56. The Tenth Circuit has stated that "on a motion for summary judgment, 'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record.'" *Cross v. Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) (quoting *Downes v. Beach,* 587 F.2d 469, 472 (10th Cir. 1978)). This court "is not required to comb through Plaintiffs' evidence to determine the bases for a claim that a factual dispute exists." *Bootenhoff v. Hormel Foods Corp*., No. CIV-11-1368-D, 2014 WL 3810329, at *2 n.3 (W.D. Okla. Aug. 1, 2014) (citing *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1199 (10th Cir. 2000))[3]; *see also Espinoza v. Coca-Cola Enters., Inc.,* 167 F. App'x 743, 746 (10th Cir. 2006) ("[W]here the nonmovant failed to support his case with adequate specificity, we will not fault the court for not searching the record on its own to make his case for him (nor will we take on that role of advocacy.")); *Boldridge v. Tyson Foods, Inc.,* No. 05-4055-SAC, 2007 WL 1299197, at *2 (D. Kan. May 2, 2007) ("It is not this court's task to comb through Plaintiff's submissions in an effort to link alleged facts to his arguments or to construct Plaintiff's arguments for him.") (quoting *Barcikowski v. Sun Microsystems, Inc*., 420 F. Supp. 2d 1163, 1179 (D. Colo. 2006)); *Lucas v. Office of Colo. State Pub. Def.,* No. 15-CV-00713-CBS, 2016 WL 9632933, at *5 (D. Colo. Aug. 25, 2016) ("The Court has no obligation to scour the record in search of evidence to support any

---

[3] In *Mitchell,* the Tenth Circuit discussed the necessity of such a rule, reasoning, "[t]he district court has discretion to go beyond the referenced portions of these materials, but is not required to do so. If the rule were otherwise, the workload of the district courts would be insurmountable and summary judgment would rarely be granted." *Mitchell,* 218 F.3d at 1199 (alteration in original) (quoting *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 672 (10th Cir. 1998)).

factual assertions, and where inadequate record citations have been made, the court has ignored them.").

Due to a change in Murphy's counsel, the court granted Murphy an additional extension to file her amended response. *See* [Doc. #335]. The amended response lists 197 additional material facts and again appends over 1,000 pages of exhibits which Murphy asserts preclude summary judgment. However, the amended response fails to correct several of the deficiencies previously identified by this court and, for the four following reasons, the court is persuaded that portions of Murphy's amended response do not comply with LCvR 56.1(c) and Fed. R. Civ. P. 56(c)(1).

*First*, Murphy again fails to "refer with particularity" to those portions of the record on which she relies. By way of example, Murphy did not correct all of the insufficiencies specifically identified by this court in its August 29, 2017 order regarding Murphy's opposition to the City's first twenty-eight undisputed material facts.

As previously mentioned, City fact nos. 1-28 relate to TPD's investigation of the murder of infant Wood. Murphy purports to specifically dispute only eight (8) of these facts. Rather, at the outset of Murphy's section stating the material facts to which she asserts a genuine issue of fact exists, Murphy again includes the following:

> 1-28. The investigation was woefully inadequate, not "thorough" or "constitutionally sound" as asserted on p. 31 citing these facts. See Plaintiff Facts ## 15, 21, 22, 24-103 and 142-195. *See also, **Plt. Ex. 178, Expert Report of Michael Lyman, pp. 107-124; Plt. Exh. 148, Transcript of Noordyke, p. 16, ll. 22-24, p. 23, ll. 1-3, p. 25, ll. 2-12, l. [sic] 26, ll. 2-6, p. 27, ll. 7-12, p. 31, ll. 3-16, p. 40, ll. 2-7, p. 46, ll. 4-15, p. 52, ll. 4-8, p. 65, ll. 1-24, p. 69, ll. 3-8, p. 29, ll. 7-12.[4]***

---

[4] With the court's permission, Murphy supplemented her amended response to include a reference to page 29, lines 7-12 on February 9, 2018. *See* [Doc. # 365].

[Doc. #338, p. 1 (internal footnote omitted)]. Murphy explains that "Fact ##" refers to Murphy's additional material facts to which she asserts there is no dispute. [Doc. #338, p. 1 n.1].

Although, unlike in her original response, Murphy identifies the scene investigator as TPD officer Noordyke and includes specific page and line references, Murphy again broadly refers to 135 of her own statements of additional undisputed material facts—each of which references one or more exhibits—as well as 17 pages of Dr. Lyman's expert report, and 13 pages of Noordyke's testimony. Similarly, Murphy cites only her own statements of additional undisputed material facts to dispute the following undisputed material facts offered by the City: 20, 23, 25, 27, 37, 38[5], and 67. As previously discussed by this court, this practice requires the court to first find the referenced statements of undisputed material fact in a separate section of Murphy's response, look to the exhibits referenced in that later section, and comb through the record to find the relevant material in support of Murphy's proposition. The court is not persuaded that this burdensome procedure satisfies the particularity requirement of LCvR 56.1(c).

*Second*, Murphy fails to properly address many of the City's assertions of undisputed material fact. Murphy purports to dispute City fact nos. 22, 46, 52, 53[6], 56, 57, 63, 72, 73, and 80, but includes only argument and no reference to any portion of the evidentiary record upon which Murphy relies. It is well established that "argument of counsel is not evidence, and cannot provide a proper basis to deny summary judgment." *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052,

---

[5] In addition to her own statement of additional undisputed material facts, Murphy also refers the court to "pp. 28-29, below, items A-L" with regard to fact nos. 37 and 38 offered by the City. However, looking to pages 28-29 (both as denominated by Murphy and as identified by the ECF header), the court does not see any items designated "A-L."

[6] The court specifically excluded Murphy's argument regarding the City's undisputed material fact nos. 52 and 53 by order of September 20, 2017. *See* [Doc. #331].

1061 (10th Cir. 2009).  *See also Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.").

*Third,* although Murphy has remedied most of the deficiencies from her prior brief with regard to missing exhibits, one deficiency remains.  In opposition to the City's undisputed material fact no. 13, Murphy refers to Exhibit 15, which was not provided to the court.

*Finally*, Murphy does not purport to specifically dispute fact nos. 1-10, 12, 14, 16-19, 21, 24, 26, 28, 31, 33-36, 40-45, 48-51, 54, 64-66, 69, 74-79, and 81-83.[7]

To the extent that Murphy identifies a numbered material fact of the City relative to which she cites with particularity to the evidentiary record to demonstrate a dispute as required by LCvR 56.1(c), the court will consider the issue for purposes of the City's motion for summary judgment. The court will not "seach[] through the record on plaintiff's behalf, however, to compile the relevant facts."  *Stallings v. Werner Enters.,* 598 F. Supp. 2d 1203, 1210 (D. Kan. 2009).  To do so would require the court to comb through the record, essentially charting Murphy's arguments for her, in a manner not required by the Tenth Circuit.  Thus, the court concludes that Murphy fails to properly address the following facts, and the court will consider them undisputed for purposes

---

[7] The City offers admissible evidence in support of these facts.  The City offers certified transcripts of Murphy's preliminary hearing, *Jackson v. Denno* hearing, and criminal trial, *Fisher v. Shamburg*, 624 F.2d 156, 162 n.7 (10th Cir. 1980) ("[W]e note that it is proper to consider a certified transcript on a motion for summary judgment."); investigation records of the Tulsa Police Department, Fed. R. Evid. 803(8) (hearsay exception for public records); *Burke v. Glanz*, No. 11-CV-720-JED-PJC, 2016 WL 4036187, at *2 (N.D. Okla. July 20, 2016); and certified depositions, affidavits, admissions, and interrogatory answers, Fed. R. Civ. P. 56(c)(1).  To the extent that the City offers uncertified interview transcripts as exhibits, the court finds that Fed. R. Evid. 801, the rule against hearsay, is inapplicable, as the statements are not offered for the truth of the matter asserted.  *See, e.g.,* [Doc. #175, p. 2, ¶ 5 ("TPD officers and detectives obtained written and recorded statements from Christina Carter, Christona Lowther, and William Green) (citing Lowther taped statement, Carter taped statement, and supplementary offense report)].

of the City's motion for summary judgment: 1-10, 12-14, 16-28, 31, 33-38, 40-46, 48-54, 56-57, 63-67, 69, and 72-83.

## III. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Further, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

In considering a motion for summary judgment, "[t]he evidence and reasonable inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party." *Stover v. Martinez,* 382 F.3d 1064, 1070 (10th Cir. 2004). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson,* 477 U.S. at 249). Summary judgment is appropriate only "where 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Stover,* 382 F.3d at 1070 (quoting Fed. R. Civ. P. 56(c)).

## IV.    Undisputed Material Facts

The court finds the following facts regarding the investigation, trial, conviction, and release of Murphy:

At approximately 6:15 a.m., on Monday, September 12, 1994, EMSA and officers from the Tulsa Police Department ("TPD") arrived on scene at Michelle Murphy's apartment in response to a 911 call regarding the stabbing death of a baby.  Officer BK Smith and Officer Gary Neece were among the first to arrive.  They were directed to the back door of the apartment, where Smith observed Murphy's three-month old son, Travis Wood, dead, lying in a pool of blood. [CSOMF at ¶ 1].  Smith and Neece entered Murphy's apartment through the back door to search for additional victims.  They exited the apartment and set up a perimeter to protect the crime scene. Smith then guarded the back door of Murphy's apartment until he was relieved by a day shift officer.  [CSOMF at ¶ 2].  Ultimately, nine uniformed TPD officers and four detectives, including Det. Doug Noordyke, Scene Investigator, assisted in investigating the homicide of Travis Wood. [CSOMF at ¶ 3].

TPD officers immediately separated the witnesses.  Murphy and her neighbors, Christina Carter and Christona Lowther, were each placed in separate patrol cars.  [CSOMF at ¶ 4].  TPD officers and detectives obtained written and recorded statements from Carter, Lowther, and William Green.  [CSOMF at ¶ 5].  TPD officers and detectives also interviewed Murphy's other neighbors, James Fields, Kathy Evans, Steve Mann, LaDonna Summer, William Lee, Kevin Washington, Mike Jarnagan, Pat Jarnagan, and the security guard for the apartment complex.  They also interviewed the probation officer of one of Murphy's acquaintances.  [CSOMF at ¶ 6].  911 calls had been made by Lee and Lowther.  As part of the investigation, TPD officers obtained copies of these calls.  [CSOMF at ¶ 8].

Allen assigned the homicide investigation to Det. Corporal Mike Cook, a 20-year TPD veteran and a 13-year homicide detective. At the time, Cook had investigated hundreds of homicide cases. [CSOMF at ¶ 7]. Allen also assigned Noordyke, a 13-year TPD veteran, as the crime scene investigator. Noordyke's training included police academy training in crime scene processing, evidence recovery, and fingerprinting. He also attended specialized schools in blood stain pattern analysis and latent print examinations and had received training with senior SIU officers regarding crime scene processing. At the time of the Murphy investigation, Noordyke had processed hundreds of crime scenes. [CSOMF at ¶ 9].

When Noordyke arrived at the scene, it had been taped off and preserved. His first duties were to document the scene with video, photographs, sketches, and narrative report. He also recovered physical evidence and processed the scene for prints. [CSOMF at ¶ 10].[8] There were no signs of forced entry into the apartment.[9] [CSOMF at ¶ 11]. Noordyke collected the sheet/drape that separated the kitchen from the living room because it was stained with what appeared to be blood. He also obtained samples from what appeared to be blood on the outside of the front screen door and near the body of the baby. [CSOMF at ¶ 12]. Noordyke recovered seven knives from Murphy's apartment, including a 9-inch dagger in the closet and a large knife with a 7 ¼-inch blade found between the couch cushions. [CSOMF at ¶ 13]. The agent from the Medical

---

[8] The City references both the deposition transcript of Noordyke and the Amended Complaint to support its factual position. A complaint is not competent evidence for summary judgment. *See Wheeler v. Perry*, No. CIV-15-198-F, 2015 WL 5672607 (W.D. Okla. Aug. 21, 2015). However, Noordyke's deposition testimony sufficiently supports the City's assertion.

[9] Murphy purports to dispute the City's assertion with the following: "There was glaring evidence of unforced entry. *See Plt. Exh. 148, Transcript of Noordyke, p. 46, ll. 4-15*." However, evidence of *unforced* entry is not competent evidence to dispute the City's assertion that there was no evidence of *forced* entry. Accordingly, the court will treat the City's statement of material fact no. 11 as undisputed for purposes of the motion for summary judgment.

Examiner's office arrived at the scene, examined the victim and found a "stab wound just below the neck and a deep large laceration across the throat that was close to being a full decapitation of the infant." [CSOMF at ¶ 14]. In addition to obtaining latent prints, video, and crime scene photographs, Noordyke collected 25 separate pieces of evidence on September 12, 1994. [CSOMF at ¶ 15]. Throughout the course of its investigation, TPD generated 232 pages of TRACIS documents. The investigation included: securing the crime scene; canvassing the area for potential witnesses; separating the witnesses at the scene; obtaining witness statements; documenting the crime scene with video, photographs and diagrams; obtaining and processing evidence; obtaining DNA evidence and evidence from the Medical Examiner's office; having detectives re-visit the scene; and interviewing Murphy and obtaining her tape-recorded confession. [CSOMF at ¶ 25].

Officer Gary Otterstrom was assigned to sit with Murphy in his patrol car until the detectives arrived. While Murphy was seated in the passenger seat of the patrol car, she stepped out of the vehicle several times to speak with neighbors and smoke cigarettes. [CSOMF at ¶ 23]. Allen, the on-scene supervisor, instructed Otterstrom to obtain a written search waiver from Murphy so that she could give permission for the officers to search her residence for evidence. At 7:17 a.m., September 12, 1994, Allen witnessed Otterstrom read Murphy her *Miranda* warnings from a card and then observed Murphy willingly sign a Consent to Search form for her apartment. [CSOMF at ¶ 24].

Cook arrived at the crime scene between 7:30 and 8:00 a.m. As the detective assigned to the case, he was responsible for interviewing the witnesses and putting together the reports. [CSOMF at ¶ 16]. At approximately 8:40-8:45 a.m., Cook went to the detective division to talk to Murphy. [CSOMF at ¶ 17]. Cook interviewed Harold Eugene Wood (Murphy's common-law husband and infant Wood's father) and took a tape-recorded statement of Murphy. [CSOMF at ¶

18].  Cook subsequently arrested Murphy.  [CSOMF at ¶ 31].  After obtaining Murphy's recorded statement, Cook interviewed Murphy's neighbors, William Lee and LaDonna Summer.  [CSOMF at ¶ 19].  Cook also took a recorded statement of Scottie Dale Ritchie, a close friend of Harold Eugene Wood, and obtained copies of recorded conversations between Murphy and Earl Peck while she was in jail after her arrest.  [CSOMF at ¶¶ 26 and 28].  Cook prepared a prosecution report for the Tulsa County District Attorney's Office, which identified each witness and summarized their testimony.  [CSOMF at ¶ 27].

Cook and Noordyke returned to the scene two additional times.  First, they went back to Murphy's apartment at night, on September 19, 1994, to see the field of view from the front door and front window as well as from the back door and the back window.  They checked the view during the daylight hours and returned after dark.  They specifically wanted to see if they could view where the body was on the floor, from outside the back window, looking through the mini blinds as fourteen-year old William Lee had described to police.  This line of sight was confirmed.  [CSOMF at ¶ 20].  In March of 1995, Cook and Noordyke were called back out to Murphy's apartment because the maintenance supervisor reported a possible break-in.  The detectives discovered a box from Murphy's closet had been overturned onto her bed and a maroon-handled knife was next to overturned boxes on Murphy's bed.  [CSOMF at ¶ 21].

Pursuant to 22 O.S. § 285, Murphy's preliminary hearing was held on November 14 and 15, 1994 before the Honorable J. Peter Messler.  Private counsel represented Murphy.  [CSOMF at ¶ 33].  At the preliminary hearing, the State presented nine witnesses including William Lee and officers Smith and Otterstrom.  Cook did not testify and Murphy's taped confession was not offered into evidence.  [CSOMF at ¶ 34].  At the end of the two-day preliminary hearing, Judge Messler denied Murphy's demurrer; found probable cause existed that first-degree murder had

been committed; and found probable cause existed that Murphy committed the crime. He bound Murphy over for trial for first-degree murder. [CSOMF at ¶ 35].

At a separate proceeding before the trial, on November 9, 1995, Judge E.R. (Ned) Turnbull conducted a *Jackson v. Denno* hearing to determine whether Murphy's statement was voluntary. Murphy was represented by counsel at this hearing. [CSOMF at ¶ 37]. At the *Jackson v. Denno* hearing, Cook testified regarding Murphy's statement. The notification of rights waiver was admitted without objection as State's exhibit 1. [CSOMF at ¶ 38]. Cook testified that he did not coerce Murphy in any way with any kind of punishment or promise; he did not threaten her in any way, with either physical force or mental intimidation; and he did not promise anything to get her to talk. Cook also described the manner in which he read Murphy her *Miranda* rights and obtained the rights waiver.[10] [CSOMF at ¶ 39]. Murphy testified that Cook never hit her and never used any kind of physical force against her; she never told Cook she needed to see a physician; and that she understood her rights and waived them by signing and initialing the waiver of rights. [CSOMF at ¶ 40]. At the conclusion of the *Jackson v. Denno* hearing, Judge Turnbull found that the State had shown by a preponderance of the evidence that Murphy's statement to Cook was voluntary and that Murphy was properly read her rights. Thus, Judge Turnbull overruled Murphy's motion to suppress her statements. [Doc. #175-32, p. 63:1-6].

---

[10] Murphy objects on the basis that "Cook now disavows his trial testimony. (Plt. Exh. 125, Deposition of Det. Cook, p. 282, l. 9- p. 283, l. 14)." [Doc. #338, p. 2, ¶ 39]. In support thereof, Murphy cites to deposition testimony of Cook taken in this matter. However, the court has reviewed the entirety of the exchange between Cook and Murphy's then-attorney during Cook's deposition, and the court is not persuaded by Murphy's characterization of Cook's deposition testimony. At the outset, Cook testified that, although he did not recall his testimony during Murphy's criminal trial, he assumed that the official transcript was accurate. [Doc. #349, p. 5]. Further, Cook refused to agree that the transcript was untrustworthy. [*Id.*]. Nothing in Cook's testimony proves, or is even indicative, that Cook has "disavowed his trial testimony."

During Murphy's criminal trial, which began on November 16, 1995, Murphy's taped statement to Cook was played for the jury, copies of the transcript of the statement were given to the jurors, and the statement was admitted into evidence. [CSOMF at ¶ 41]. Jury Instruction No. 16 given by the trial court defined "voluntary confession" and instructed that:

> A "voluntary confession" is a statement, freely and knowingly made by a person who is not under arrest or in custody, to a police officer or any other person which admits facts that tend to establish the commission of an offense. Such confession is freely and knowingly made when the person voluntarily states his involvement with the alleged crime or reveals details of it, without threats, pressure, coercion, or duress from any police officer or police agent.
>
> The state has offered evidence that a confession was made by the defendant to Michael Cook on September 12, 1994 [*sic*] if you find that the defendant made the alleged confession, and made it freely and voluntarily, you may take it into consideration with all the other facts in evidence and give it whatever weight and credit you find it deserves. However, if you find that the confession was induced by coercion or by a promise of immunity or a lesser punishment than might otherwise be inflicted, or that the confession was made under threat of violence or force, you should disregard the confession in arriving at your verdict.

[Doc. #175-34, p. 2].

In November of 1995, the jury convicted Murphy of first-degree murder and sentenced her to life without parole. With separate appellate counsel, Murphy appealed her conviction to the Oklahoma Court of Criminal Appeals, and the court found no error in Murphy's conviction. [CSOMF at ¶¶ 45-46; Doc. #175-35]. On September 5, 2013, Murphy filed an Application for Post-Conviction Relief. [CSOMF at ¶ 47; Doc. #97-21]. On May 29, 2014, then-Tulsa County District Attorney Tim Harris filed a motion to confess the application for post-conviction relief. [CSOMF at ¶ 49; Doc. #175-1]. On May 30, 2014, Tulsa County District Judge William C. Kellough vacated Murphy's judgment and sentence. [CSOMF at ¶ 50; Doc. #175-36]. After vacating Murphy's conviction, Judge Kellough retained jurisdiction to re-try Murphy. Judge Kellough set an appearance bond and ordered her to reappear on June 24, 2014 at 9:00 a.m. for a

status conference. [CSOMF at ¶ 51; Doc. #175-36]. Rather than retry Murphy, the State of Oklahoma filed a Motion to Dismiss the case with prejudice. [CSOMF at ¶ 51; Doc. #175-53].

The court finds the following facts regarding the Tulsa Police Department's policies, procedures, and training in 1994:

In 1994, the basic training for TPD officers, detectives and supervisors involved in the Murphy murder investigation was approximately 14 weeks at the TPD police academy which included a legal block on constitutional rights, statutes and ordinances, as well as instruction on *Miranda* warnings, interviewing, interrogations and juvenile law. [CSOMF at ¶ 56; Doc. #175-40, ¶ 3; Doc. #175-44, ¶¶ 9 and 11].[11] From at least 1978 to 2003, in order to maintain CLEET (Council of Law Enforcement Education and Training) certification, all TPD officers were required to attend forty hours of in-service training yearly that included current legal procedures and, every officer also received monthly legal bulletins regarding new ordinances, statutes, and

---

[11] The court denied Murphy's motion to strike the City's exhibit 40, the affidavit of former homicide detective Kenneth Mackinson, who averred that the TPD police academy's legal block included constitutional rights and interrogations. *See* [Doc. #355]. Murphy objects to the City's factual assertions regarding training as to constitutional rights and interrogations, citing deposition testimony in this case of Palmer and Cook. However, the court is not persuaded by Murphy's characterization of the deposition testimony. Palmer did not testify that homicide detectives were not required to be trained in interrogations, but rather that "[t]here was no requirement specifically that [he was] aware of" and that he "d[idn't] know exactly what the curriculum was for them to come into the Detective Division." [Doc. #339, Exh. 52, p. 37:6-8]. Further, Cook did not testify that he had no training in interrogations but, rather, that he could not recall his knowledge of whether there were constitutional limitations on interrogations, either in 1994 or 2017. [Doc. #339, Exh. 162, p. 55:5-8]. Even viewed in the light most favorable to Murphy, Cook's recollection of constitutional limitations on interrogations is not dispositive as to whether or not he actually received training. Because Murphy has presented no evidence to dispute the City's undisputed material facts regarding training as to constitutional rights and interrogations, the court will treat the facts as undisputed for purposes of the City's motion. *See* Fed. R. Civ. P. 56(e)(2).

- 15 -

court decisions.[12] [CSOMF at ¶ 57; Doc. #175-41, p. 13:18 to 14:7]. By 1988, all officers assigned to the Detective Division were required to complete forty hours of training in interrogations, arrest warrants, search warrants and affidavits. Officers assigned to the Homicide Unit also completed this additional forty hours of training.[13] [CSOMF at ¶ 58].

In 1994, one of the written policies of the Tulsa Police Department was to protect the constitutional rights of all persons. [CSOMF at ¶ 65; Doc. #106-6, COT 4]. In 1994, TPD officers were required to take an oath of office which stated, in part, "I, _____, having been duly appointed a Police Officer of the City of Tulsa, and a Peace Officer of the State of Oklahoma, do solemnly swear, that I will defend, enforce, and obey, the Constitution and Laws of the United States, the State of Oklahoma and the Charter and Ordinances of the City of Tulsa." [CSOMF at ¶ 71; Doc. #106-6, COT 3]. Therefore, the City's general guidelines required TPD officers to be stewards of the Constitution of the United States, the laws of Oklahoma, and the laws of the City of Tulsa. [Doc. #339, Exh. 56, p. 32:15-24]. Although TPD's policy required officers to follow the Constitution, it was not possible to write a policy for every facet or intricacy of the Constitution. [CSOMF at ¶ 68; Doc. #175-41, p. 17:9-18].

## V. Discussion

"A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation, and (2) that a

_____

[12] Murphy objects to the City's reliance on the Mackinson affidavit to support its assertion that "every officer also received monthly legal bulletins regarding new ordinances, statutes, and court decisions" as hearsay, and argues that Mackinson cannot testify regarding all TPD's officers' receipt of the materials. However, the court finds sufficient evidence in the record to support the City's factual statement. *See* [Doc. #231-2 to Doc. #231-6; Doc. #175-41, p. 13:18 to p. 14:7].

[13] *See supra* n. 16.

municipal policy or custom was the moving force behind the constitutional deprivation." *Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *see also Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015) ("[A] plaintiff asserting a § 1983 claim must show '1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged.' Through 'its *deliberate* conduct,' the municipality must have been the 'moving force' behind the injury.") (emphasis in original) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). A municipality cannot be liable under § 1983 solely because its employee caused injury or damage. *See Graves v. Thomas,* 450 F.3d 1215, 1218 (10th Cir. 2006). Nor may a municipality be liable "if a jury finds that the municipal employee committed no constitutional violation." *Myers,* 151 F.3d at 1316.

### A. Constitutional Violation

As previously stated, Murphy asserts two constitutional violations: (1) violation of her Fifth Amendment right against self-incrimination through the use of Murphy's allegedly coerced statement at her criminal trial, and (2) violation of the Fourteenth Amendment due process clause's right to a fair trial. The court will consider each alleged violation separately.

### 1. Fifth Amendment

The City argues that Murphy is collaterally estopped from claiming that her statement was coerced by virtue of Judge Turnbull's ruling in the *Jackson v. Denno* hearing and, therefore, Murphy cannot establish a Fifth Amendment violation. The court is not persuaded.

"In accordance with the doctrine of issue preclusion (previously known as collateral estoppel), once a court has decided an issue of fact or law necessary to its judgment, the same parties or their privies may not relitigate that issue in a suit brought upon a different claim." *Okla.*

*Dep't of Pub. Safety v. McCrady*, 176 P.3d 1194, 1199 (Okla. 2007) (internal footnote omitted). However, for issue preclusion to apply, there must exist "**a final determination of a material issue common to both cases**." *Id.* (emphasis in original) (footnote omitted). A criminal conviction may have preclusive effect in a subsequent civil action arising from the same events. *Lee v. Knight*, 771 P.2d 1003, 1006 (Okla. 1989).

Under Oklahoma law, a judgment reversed, set aside, or vacated is of no preclusive effect. *See Wininger v. Day*, 376 P.2d 211, 213 (Okla. 1962) (in considering assertion that collateral estoppel should apply, stating "[t]he validity, if any, of such contention must necessarily be based on the fact or assumption that the verdict in the [first] case does validly exist"); *Brumark Corp. v. Corp. Comm'n of the State of Okla.,* 924 P.2d 296, 301 (Okla. Civ. App. 1996) ("A judgment that is reversed on appeal—and the cause remanded—loses its conclusive character and cannot stand as a bar to further suit on the same cause of action.") (quoting *Mobbs v. City of Lehigh*, 655 P.2d 547, 549 n.5 (Okla. 1982)); *Williams Prod. Mid-Continent Co. v. Patton Prod. Corp.*, 277 P.3d 499, 501 (Okla. Civ. App. 2012) ("In what appears to be a case of first impression before an Oklahoma court, we hold a second judgment predicated on a prior judgment later reversed cannot stand."); *see also Woodrow v. Ewing*, 263 P.2d 167, 172 (Okla. 1953) ("The judgment, *until properly set aside* is conclusive not only as to all questions actually decided but also as to all germane issues that might have been litigated or availed of.") (emphasis added); *Franklin Savs. Ass'n v. Office of Thrift Supervision*, 35 F.3d 1466, 1469 (10th Cir. 1994) ("'A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel.'") (quoting *Jaffree v. Wallace*, 837 F.2d 1461, 1466 (11th Cir. 1988)); *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253, 1266 (10th Cir. 2002) (same); *Eastom v. City of Tulsa*, No. 11-CV-0581-HE, 2012 WL 12540242, at *2 (N.D. Okla. Mar.

2, 2012) ("However, because plaintiff's conviction was vacated, there is no ruling that can be given preclusive effect.") (citing *United States v. Lacey*, 982 F.2d 410, 412 (10th Cir. 1992)).

Here, Judge Kellough vacated Murphy's judgment and sentence. [CSOMF at ¶ 50; Doc. #175-36]. Rather than retry Murphy, the State of Oklahoma dismissed the charge. [CSOMF at ¶ 51; Doc. #175-53]. As a result, based on the foregoing cases, the court is persuaded that no "final order" exists which would have any preclusive effect in this matter.

The City urges the court to consider two Oklahoma Court of Criminal Appeals decisions and give conclusive effect to Judge Turnbull's *Jackson v. Denno* ruling. *See* [Doc. #175, pp. 19-23 (citing *Jackson v. State*, 41 P.3d 395 (Okla. Crim. App. 2001) ("*Jackson I*") and *Jackson v. State*, 146 P.3d 1149 (Okla. Crim. App. 2006) ("*Jackson II*")]. However, this court is not satisfied that these cases require the court to ignore what appears to be well-established Oklahoma case law holding that vacated judgments are of no preclusive effect. In *Jackson I*, the court concluded that Shelton Jackson's confession was not coerced, but reversed Jackson's conviction for first-degree murder and remanded the matter for a new trial on the basis of ineffective assistance of counsel. *Jackson I,* 41 P.3d at 401. A jury again convicted Jackson, and Jackson appealed his second conviction and sentence to the Oklahoma Court of Criminal Appeals. *Jackson II,* 146 P.3d at 1154. During his second appeal, Jackson again sought to contest the voluntariness of his confession. *Id.* at 1156. However, the court refused to consider the issue, concluding that the issue was procedurally barred. *Id.* at 1157. In rejecting Jackson's request, the court cited Oklahoma case law holding that issues decided in extraordinary writ appeals or direct appeals will not be reconsidered on direct appeal following retrial. *Id.* (citing *Brown v. State,* 989 P.2d 913 (Okla. Crim. App. 1998) and *Humphreys v. State*, 947 P.2d 565 (Okla. Crim. App. 1997)).

Jackson I and Jackson II are factually distinguishable and do not require that this court give preclusive effect to Judge Turnbull's Jackson v. Denno ruling. Unlike the Jackson cases, this case does not present a direct appeal following Murphy's retrial. Nor is this case a request for post-conviction relief to which the Oklahoma Post Conviction Relief Act, 22 O.S. § 1086, would apply. Rather, this case is a federal civil rights case, brought after the State of Oklahoma opted not to retry Murphy and at a point when, procedurally, no valid state conviction or judgment exists. This court cannot give preclusive effect to a legal nullity.

Nor is the court persuaded by the Sixth Circuit and Second Circuit cases cited by the City. See [Doc. #175, pp. 24-26 (citing Hatchett v. City of Detroit, 495 F. App'x 567 (6th Cir. 2012) and Doc. #340, p. 7 (citing Owens v. Treder, 873 F.2d 604, 610-11 (2d Cir. 1989)]. In Hatchett, an unpublished decision, the Sixth Circuit rejected plaintiff's argument that the Jackson v. Denno hearing could not preclude his civil rights claim because his conviction was "set aside," noting that "Michigan courts treat a factual finding as to voluntariness pursuant to a [Jackson v. Denno] hearing as a final determination on the merits." Id. at 570. Under Oklahoma law, however, the jury, rather than the trial judge, is the final arbiter of voluntariness.[14] See Parent v. State, 18 P.3d 348, 353 (Okla. Crim. App. 2000); Hopper v. Oklahoma, 736 P.2d 538, 539-40 (Okla. Crim. App. 1987) ("If the confession is determined to be voluntary by the trial judge, the question of

_____

[14] Oklahoma has adopted the "Massachusetts Rule," also known as the "Humane Rule," to determine the voluntariness of an accused person's confession. See Hopper v. Oklahoma, 736 P.2d 538, 539-40 (Okla. Crim. App. 1987). Other courts adopting the Massachusetts Rule generally conclude that the jury, rather than the trial court, makes the final determination as to the voluntariness of an accused's statement. See, e.g., Law v. State, 318 A.2d 859, 871 (Md. Ct. Spec. App. 1974) ("Once the statement was admitted, the final determination of its voluntariness and the weight to be accorded it were matters for the jury."); Commonwealth v. Blanchette, 564 N.E.2d 992, 996 (Mass. 1991) ("If the judge determines that the statements are voluntary, the question should be submitted to the jury so that they may make the final determination.").

voluntariness is submitted to the jury, together with all the facts and circumstances surrounding the confession."); [Jury Instruction No. 16, given by Judge Turnbull in the state murder trial, Doc. #175-34, p. 2 ("However, if you find that the confession was induced by coercion or by a promise of immunity or a lesser punishment than might otherwise be inflicted, or that the confession was made under threat of violence or force, you should disregard the confession in arriving at your verdict.")]; *see also* Okla. Unif. Jury Instruction – Criminal 9-12 ("If after considering the evidence you determine that the statement was made by the defendant and was voluntary, you may give it whatever weight you feel it deserves.").

Further, the United States District Court for the Western District of Michigan recently disagreed with *Hatchett*, stating "[t]his Court is not persuaded that Michigan courts would reach the same conclusion as the court did in *Hatchett*." *Peterson v. Heymes*, No. 15-CV-969, 2017 WL 4349456, at *6 (W.D. Mich. Sept. 29, 2017). In *Peterson,* the Western District cited Sixth Circuit case law broadly holding that a "judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel," to conclude that, because Peterson's conviction had been vacated, "no valid and final judgment exists in Peterson's criminal case, [and] collateral estoppel cannot preclude him from relitigating the issues raised in his criminal case." *Id.* at *4 (quoting *Erebia v. Chrysler Plastic Prods. Corp.*, 891 F.2d 1212, 1215 (6th Cir. 1989)).

As for *Owens*, the Second Circuit's statement in that case was *dicta.* Further, the United States District Court for the Eastern District of New York recently qualified *Owens*, stating that "[the *Owens*] standard must be read in conjunction with other rulings holding that '[a] vacated judgment, by definition, cannot have any preclusive effect in subsequent litigation.'" *Tankleff v. Cnty. of Suffolk*, No. 09-CV-1207-JS-WDW, 2010 WL 5341929, at *4 (E.D.N.Y. Dec. 21, 2010).

A conclusion that preclusive effect should not be given to Judge Turnbull's ruling in the *Jackson v. Denno* hearing is consistent with the pronouncements of other courts under factually similar circumstances. *See Spurlock v. Whitley*, 971 F. Supp. 1166, 1177 (M.D. Tenn. 1997) (concluding that a civil plaintiff's criminal guilty plea did not preclude plaintiff's subsequent civil claims because the guilty plea was vacated); *Thomas v. Riddle,* 673 F. Supp. 262, 266 (N.D. Ill. 1987) (declining to give preclusive effect to a trial court's subsequently reversed denial of a suppression motion, although the denial was reversed on other grounds, reasoning that "a judgment that has been vacated, reversed or set aside on appeal is thereby deprived of all conclusive effect, both as to res judicata and as to collateral estoppel"); *Chandler v. Louisville Jefferson Cnty. Metro Gov't*, No. 10-CV470-H, 2011 WL 781183, at *2 (W.D. Ky. Mar. 1, 2011); *McCray v. City of New York,* No. 03-CV-10080-DAB, 2007 WL 4352748, at **12-13 (S.D.N.Y. Dec. 11, 2007); *Evans v. City of Chicago,* NO. 04-C-3570, 2006 WL 463041, at *15 (N.D. Ill. Jan. 6, 2006).

Thus, this court is persuaded that issue preclusion does not apply, and Judge Turnbull's ruling in the *Jackson v. Denno* hearing is not conclusive. Murphy may challenge the voluntariness of her confession in this case.

The court now turns to whether Murphy's Fifth Amendment rights were violated. In opposition to the City's motion, Murphy submits evidentiary materials to support the following: (1) that Cook rewound and started the tape over during Murphy's statement [Doc. #339, Exh. 102, p. 238:10-15]; (2) that Cook ran his hands up Murphy's legs during the interrogation, which "scared" Murphy [Doc. #339, Exh. 116, p. 27:15-22 and Doc. #339, Exh. 119, p. 225:2-5]; (3) that Cook promised Murphy that, if she confessed, Murphy could see her daughter, receive therapy, and go home [Doc. #339, Exh. 121, p. 204:17-25; Doc. #339, Exh. 122, p. 192:1-9]; (4) that Murphy informed Cook several times that she had been hit on the head, but Cook did not examine

her for concussion symptoms [Doc. #339, Exh. 174, p. 679:13-22; Dkt. #55, ¶ 45]; and (5) that

Cook yelled at Murphy during the interrogation until she agreed to make a deal [Doc. #339, Exh.

143, p. 241:3-17; Doc. #339, Exh. 123, p. 240:10-14].  These evidentiary materials, viewed in the

light most favorable to non-movant Murphy, establish a genuine issue of material fact as to whether

Cook violated Murphy's Fifth Amendment right against self-incrimination during the September

12, 1994 interrogation.  *See Sharp v. Rohling,* 793 F.3d 1216, 1235 (10th Cir. 2015) (concluding

that, based on the totality of the circumstances, "[plaintiff's] will was overborne once Detective .

. . promised her she would not go to jail after she admitted to participating in the crime"); *see also*

*Arizona v. Fulminante,* 499 U.S. 279, 287 (1991) ("[C]oercion can be mental as well as physical,

and . . . the blood of the accused is not the only hallmark of an unconstitutional inquisition.")

(quoting *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)).[15]

---

[15] The City also argues that Murphy waived her right to bring any claim that her constitutional
rights were violated when she was questioned while she was a minor, allegedly in violation of 10
O.S. 1991 § 1109(a).  However, during the dispositive motion hearing in this matter, Murphy's
attorney informed the court that Murphy does not contend that 10 O.S. 1991 § 1109(a) was
violated.  Therefore, the City's motion regarding that statute is moot.  Further, the court is
persuaded that any violation of § 1109(a) cannot provide an independent basis for section 1983
tort liability, as the U.S. Supreme Court has never held that the Constitution requires the presence
of a parent or guardian during the interrogation of a minor.  *See Blankenship v. Estep*, 316 F. App'x
758, 760 (10th Cir. 2009) ("The Supreme Court has never held that juveniles have a right to the
presence of a parent or guardian during custodial interrogation, let alone that the parent or guardian
also must be advised of *Miranda*'s requirements."); *Wilson v. Oklahoma*, 363 F. App'x 595, 611
n.16 (10th Cir. 2010).  *See also J.D.B. v. North Carolina,* 131 S. Ct. 2394 (2011) (discussing age
as consideration in *Miranda* analysis, but not presence of parent or guardian).  In fact, the
Oklahoma Court of Criminal Appeals recognized that "the statute *expands* upon the rights of
juveniles granted by the U.S. Constitution and the Oklahoma Constitution."  *State v. M.A.L.*, 765
P.2d 787, 790 (Okla. Crim. App. 1988) (emphasis added).

2.    Fourteenth Amendment

The City next argues that Murphy cannot prove a violation of her Fourteenth Amendment due process right to a fair trial, as she cannot establish the necessary intentional or reckless misconduct.

To establish a substantive due process cause of action for failure to investigate, plaintiff must show that the state actor "intentionally or recklessly failed to investigate, thereby shocking the conscience." *Amrine v. Brooks,* 522 F.3d 823, 834 (8th Cir. 2008).[16]  Neither negligence nor gross negligence rises to the level of a constitutional deprivation. *Id*. at 833.  The Eighth Circuit has held that

> the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence.

*Winslow v. Smith,* 696 F.3d 716, 732 (8th Cir. 2012) (quoting *Akins v. Epperly*, 588 F.3d 1178, 1184 (8th Cir. 2009)).  "Negligent failure to investigate other leads or suspects does not violate due process." *Wilson v. Lawrence Cnty*., 260 F.3d 946, 955 (8th Cir. 2001).

As previously stated, viewed in the light most favorable to Murphy, there is sufficient evidence to allow the reasonable inference that a state actor—specifically Cook—attempted to

---

[16] The City's motion for summary judgment cites only Eighth Circuit case law regarding the reckless investigation claim, and does not raise the issue of whether the Tenth Circuit would recognize a substantive due process claim based on reckless investigation.  *See, e.g., Hernandez v. City of El Paso*, No. EP-08-CV-222-PRM, 2011 WL 3667174, at *5 (W.D. Tex. Aug. 18, 2011), *aff'd* 490 F. App'x 654 (5th Cir. 2012) (noting that "there is no evidence that the Fifth Circuit has ever recognized such a cause of action," and declining to do so).  However, because the City does not challenge the validity of the cause of action itself, the court will not consider the legal viability of a substantive due process reckless investigation claim in the Tenth Circuit, but will assume without deciding that the Tenth Circuit would recognize the cause of action as articulated by the Eighth Circuit.

coerce Murphy. Further, Murphy has submitted evidence based upon which a reasonable factfinder could conclude that, following Murphy's confession, Cook chose not to pursue other investigatory avenues. *See* [Doc. #339, Exh. 175, p. 751:7-11, p. 753:24 to p. 753:8 (Cook never considered whether Lee committed the murder and never questioned Lee's truthfulness); Doc. #339, Exh. 29, p. 65:8-23 (infant Wood's diaper was never tested for fingerprints)]. If the evidence is viewed in the light most favorable to Murphy, a reasonable fact finder could find that Cook systematically attempted to coerce Murphy to implicate herself, despite the potential for exculpatory evidence to the contrary. Thus, a genuine issue of fact exists as to whether Murphy's interrogation violated her Fourteenth Amendment substantive due process rights. *See Wilson*, 260 F.3d at 955 (agreeing with district court's reasoning that "[i]f Wilson's allegations about unlawful coercion are proved true, a reasonable factfinder could determine that Defendants recklessly or intentionally chose to force Wilson to confess instead of attempting to solve the murder through reliable but time consuming investigatory techniques designed to confirm their suspicions") (alterations in original).[17]

B.     *Municipal Policy or Custom*

As previously stated, "[a] municipality is not liable solely because its employees caused injury." *Mocek v. City of Albuquerque,* 813 F.3d 912, 933 (10th Cir. 2015) (citing *Graves v. Thomas,* 450 F.3d 1215, 1218 (10th Cir. 2006)). Rather, "a plaintiff asserting a § 1983 claim must

---

[17] However, the court does not find any evidentiary materials to support Murphy's assertion that Cook "deliberately framed" Murphy. Murphy cites only the following exchange from Cook's deposition testimony taken in this matter: "Q: All right, sir. After she confessed, did you deliberately frame her? A: I don't remember anything about how I felt or what I thought about after her confession." [Doc. #339, Exh. 13, p. 37:14-17]. The court is not persuaded by Murphy's interpretation of Cook's testimony. Evidence that Cook does not recall his conduct after Murphy's confession does not substantiate Murphy's claim that she was "deliberately framed" after her confession.

show 1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged.  Through its *deliberate* conduct, the municipality must have been the 'moving force' behind the injury."  *Id.* (internal citations and quotations omitted).

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; and (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson v. City of Okla. City,* 627 F.3d 784, 788 (10th Cir. 2010) (alterations in original) (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189-90 (10th Cir. 2010)).  The court will separately consider each form.

      1.  Formal Regulation or Policy Statement

Murphy cites two TPD formal regulations or policy statements which she contends were unconstitutional.  [Doc. #338, p. 34].  First, based on the testimony of former chief and final policymaker Palmer, Murphy alleges that the City gave "full authority" to its interrogators regarding the method and manner of interrogations, including the power to make threats.  However, the evidentiary materials submitted do not support Murphy's claim.  Palmer did not testify that the "full authority" of the police department included the authority to make threats.[18]

---

[18] Murphy relies on the deposition testimony of former homicide sergeant Wayne Allen that the "full authority of the department" included the authority to decide what threats and promises to make.  [Doc. #339, Exh. 50, p. 15:19 to p. 16:10].  However, during the dispositive motion hearing in this matter, the parties agreed that former chief Palmer is the only final policymaker in this matter.  *See Brammer-Hoelter*, 602 F.3d at 1189 (municipal liability based on decisions of employees applies only to final policymakers).

*See* [Doc. #339, Exh. 49, p. 27:12 to p. 29:15].  To the contrary, Palmer testified to his belief that TPD's policies prohibited interrogators from violating the constitutional rights of citizens.  [Doc. #339, Exh. 49, p. 29:1-13].  It is undisputed that one of the written policies of TPD was to protect the constitutional rights of all person, and that TPD officers swore to "defend, enforce, and obey" the Constitution and laws of the United States as well as state and local laws.  [CSOMF at ¶¶ 65 and 71].  Further, Palmer testified that TPD officers had no authority to make promises, and that striking, assaulting, or otherwise illegally touching interrogees was prohibited.  [Doc. #339, Exh. 52, p. 37:11-17; Doc. #174-41, p. 31:4-14, p. 39:13-24].  Based on this evidence, the court is persuaded that any grant of "full authority" to interrogators was constrained by TPD's policy requiring its officers to "defend, enforce, and obey" the Constitution.

Murphy's position not only lacks evidentiary support, it also lacks support in the relevant law.  Murphy attempts to analogize this case to *City of Canton,* wherein the trial court ruled that the jury properly found that the city had a custom or policy of vesting "complete authority" with the police supervisor of when medical treatment would be administered to prisoners.  *See* [Doc. #338, p. 40 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 382 (1988) (characterization of the theory of liability by the district court)].  However, *City of Canton* was premised on a failure to train theory, rather than a facially unconstitutional policy or procedure.  *City of Canton*, 489 U.S. at 386 ("There can be little doubt that on its face the city's policy regarding medical treatment for detainees is constitutional.").  In other words, § 1983 liability in *City of Canton* depended upon the grant of authority, *coupled with* the failure to adequately train, and then only if the failure to train amounted to deliberate indifference to the rights of persons with whom the police came into contact.  *Id.* at 388.  *City of Canton* is therefore distinguishable and does not obviate against summary judgment as to this issue.

Second, Murphy alleges that TPD had in force an unconstitutional policy which treated police officers differently than citizens during interrogations, because in 1994 TPD had a regulation—part of the "Police Officer Bill of Rights"—which forbade the use of threats or promises during interrogations of police officers, but did not have a similar written prohibition applicable to interrogations of ordinary citizens.  As an initial matter, Murphy's alleged second formal policy—which forbade threats or promises during interrogations of police officers, but not ordinary citizens—appears to be little more than a restatement of Murphy's first alleged formal policy—that TPD officers had *carte blanche* authority in the conduct of interrogations of ordinary citizens—which this court has rejected.

Further, Murphy has not cited nor has the court identified any Supreme Court or Tenth Circuit authority standing for the proposition that a *lack of a written policy* amounts to a formal regulation or policy statement for purposes of § 1983 tort liability.  Rather, Murphy appears to be attempting to shoehorn her theory of liability into the "formal regulation or policy statement" context in order to take advantage of the Supreme Court's pronouncement in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").  Pursuant to *City of Canton*, the omissions alleged here are more properly considered in connection with Murphy's failure to train theory.  Thus, the court finds that Murphy has failed to present evidence of an unconstitutional formal regulation or policy statement.

## 2.    Informal Custom or Usage

Municipal liability may also "be based on an informal 'custom' so long as this custom amounts to 'a widespread practice that, although not authorized by written law or express

municipal policy, is so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Brammer-Hoelter*, 602 F.3d at 1189 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). However, when the evidence is viewed in the light most favorable to Murphy, no evidence exists of a widespread TPD practice of constitutional violations in interrogations or investigations.

Although the Tenth Circuit has never adopted a bright-line rule as to the number of similar incidents required to establish the existence of a municipal policy or custom, most courts, including the Tenth Circuit, have concluded that one prior incident is insufficient. *See Williams v. City of Tulsa*, 627 F. App'x 700, 704 (10th Cir. 2015); *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice."); *Andrews v. Fowler*, 98 F.3d 1069, 1076 (8th Cir. 1996) (two instances of misconduct were insufficient to indicate a "persistent and widespread" pattern of misconduct); *Dunn v. City of Newton, Kan.*, No. 02-1346-WEB, 2003 WL 22462519, at *7 (D. Kan. Oct. 23, 2003) (two incidents insufficient).[19]

Murphy has presented no evidence of an unconstitutional informal custom or usage. Although Murphy cites the LaRoye Hunter case[20], based on the above authorities, a single incident

---

[19] Nor is this a situation where proof of a single incident is sufficient, as, for the reasons previously discussed, TPD's formal policies were not unconstitutional. *See City of Oklahoma City*, 471 U.S. at 824 ("But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.") (internal footnotes omitted).

[20] The LaRoye Hunter case refers to *State of Oklahoma v. LaRoye C. Hunter, III*, Tulsa County Case No. CF-1989-5196. ("Hunter Case"). In 1989, LaRoye Hunter was charged with Murder, First Degree and Arson, First Degree in the District Court of Tulsa County. [Doc. #175-50]. At

cannot be reasonably construed to establish the necessary "persistent and widespread" practice of misconduct. Further, the admissible evidentiary materials submitted do not establish that the Hunter case and the issues presented in this matter are sufficiently similar.

The state court's docket in the Hunter Case reflects only the following with respect to the suppression of Hunter's confession: "Beasley B.R.: Deft's Motion to Suppress Deft's Confession: Sustained. Case Remanded to Preliminary Hearings on 8/9/90 at 9:00 a.m. Deft in Custody and Represented by Loretta [Radford]. State by Dennis Fries. Reba Gibson Reporting." [Doc. #175-50, p. 9]. The court did not enter an order providing its reasons for suppressing Hunter's confession. Although Murphy alleges that Cook stopped the tape during Hunter's interrogation, Murphy has presented no admissible evidence that Cook coerced Hunter's confession.[21] *See* [Doc. #359]. Thus, Murphy has provided no evidence of a sufficient similarity to the Hunter case.

Murphy provides no further evidence of a persistent or widespread pattern of unconstitutional interrogations or investigations. Palmer testified that, prior to his deposition taken in this case, he had never heard that Mike Cook had coerced a confession [Doc. #175-41, p. 94:10-12]. Moreover, Cook's former partner, retired TPD officer, Kenneth Mackinson, averred that, to his knowledge, Cook never coerced a confession or violated a suspect's constitutional rights. [Doc. #175-40, ¶ 11]. Outside of Murphy's testimony regarding her own interrogation, Murphy

---

the time he was charged, Hunter was seventeen (17) years old. Cook participated in Hunter's interrogation, and was present when Hunter confessed. However, Hunter's confession was subsequently suppressed, and the charges against Hunter were dropped. Prior to the charges being dropped, Hunter was represented by then-Tulsa County Public Defender Loretta Radford.

[21] This court previously concluded that evidence of Cook's allegedly coercive tactics included in the contemporaneous newspaper articles or Radford's testimony is inadmissible hearsay and character evidence, respectively, unless used as "specific contradiction" during Cook's cross-examination. [Doc. #359].

has presented no evidence of any other TPD officer ever making promises to, threatening, or otherwise violating the constitutional rights of an interrogee.  To the extent that Murphy relies upon Allen's testimony that interrogators had the full authority to decide what kind of touching would occur, what kind of promises to make, and what kind of threats to make, [Doc. #339, Exh. 50, p. 16:1-10], this testimony does not give rise to an inference that TPD engaged in a widespread practice of coercing interrogees that, although not authorized by regulation or express municipal policy, was "so permanent and well settled as to constitute a 'custom or usage' with the force of law."  *Brammer-Hoelter*, 602 F.3d at 1189.  *See also Bryson v. City of Oklahoma City,* 627 F.3d 784, 791 (10th Cir. 2010).  Allen did not testify that other TPD officers routinely touched, threatened, or made promises to citizens that were being interrogated, and this court may not speculate that such practices constituted a custom or usage within the department.  *See James v. Chavez,* 830 F. Supp. 2d 1208, 1258 (D.N.M. 2011) ("While the Court must indulge all reasonable inferences in favor of the non-movant, the non-movant still has an obligation to produce evidence once the burden shifts to him or her.").  Nor has Murphy produced any evidence of constitutional violations due to reckless investigation generally.  Accordingly, the court finds that Murphy has failed to show an unconstitutional informal custom or usage.

3.     Decision of a Final Policymaker

For purposes of section 1983 liability, a municipal policy may also exist based on the "decisions of employees with final policymaking authority."  *Bryson,* 627 F.3d at 788.  At the dispositive motion hearing held in this matter, the parties agreed that the sole final policymaker in this case is former Chief of Police Ron Palmer.  As previously discussed, Palmer's testimony that the City gave "full authority" to its interrogators regarding the method and manner of interrogations does not constitute an unconstitutional policy.  Murphy identifies no additional

statements or decisions of Palmer (regarding interrogations or investigations), and the court finds no evidence upon which the jury may find an unconstitutional policy based on a decision of the final policymaker.

4.  Ratification by Final Policymaker of the Decisions of Subordinates

"[I]f a subordinate's position is subject to review by the municipality's authorized policymakers and the authorized policymakers approve a subordinate's decision and the basis for it, their ratification will be chargeable to the municipality." *Moss v. Kopp,* 559 F.3d 1155, 1169 (10th Cir. 2009). *See also Cacioppo v. Town of Vail, Colo*., 528 F. App'x 929, 933 (10th Cir. 2013) ("[A] municipality will not be found liable . . . unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions.") (quoting *Bryson,* 627 F.3d at 790). However, where the municipality is not aware of the unconstitutional actions with respect to the plaintiff, the municipality cannot be liable. *Bryson*, 627 F.3d at 790.

As previously stated, Palmer testified that, prior to his deposition taken in this case, he had never heard that Cook had coerced a confession. [Doc. #175-41, p. 94:10-12]. Murphy has presented no evidence suggesting that Palmer was aware of Cook's alleged misconduct.[22] Nor has Murphy offered any evidence that Palmer ratified the alleged deficiencies in the investigation. Thus, no genuine issue of material fact as to ratification exists.

---

[22] Murphy does assert that Palmer's statement that interrogators had "full authority" is "at least as reprehensible as ratification." [Doc. #338, p. 39]. However, the Tenth Circuit has declined to recognize "hybrid" theories of municipal liability, *Cacioppo*, 528 F. App'x at 934, and, as previously discussed, there is no evidence of an unconstitutional policy or custom. Further, during the dispositive motion hearing held in this matter, Murphy cited to Cook's training records, produced as COT 646-COT 647. However, Cook's training records have no bearing on Palmer's knowledge of Cook's specific decisions in the Murphy investigation.

5.    Failure to Adequately Train or Supervise Employees

Murphy's case primarily relies upon theories of failure to train and supervise. The court will separately consider each theory.

a.    Failure to train

As previously mentioned, the U.S. Supreme Court has held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. However, such circumstances are "limited"—"[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). The *Connick* Court went on to state:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." *Bryan Cnty.*, 520 U.S., at 410, 117 S.Ct. 1382. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407, 117 S.Ct. 1382. The city's "policy of inaction" in light of notice that its program will cause constitutional violations "is the functional equivalent of a decision by the city itself to violate the Constitution." *Canton*, 489 U.S., at 395, 109 S.Ct. 1197 (O'Connor, J., concurring in part and dissenting in part). A less stringent standard of fault for a failure-to-train claim "would result in *de facto respondeat superior liability* on municipalities . . . ." *Id.*, at 392, 109 S. Ct. 1197.

*Id.* at 1360.

Due to this stringent standard of fault, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* However, the Supreme Court has not foreclosed the possibility that, in rare circumstances, "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 1361. Such rare circumstances in which deliberate indifference may be found absent a pattern

of unconstitutional conduct exist when a municipality fails to train employees in "specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations." *Barney v. Pulsipher,* 143 F.3d 1299, 1308 (10th Cir. 1998).

In this case, there is no evidence of a pattern of similar constitutional violations during the interrogation of citizens. Although Murphy cites the LaRoye Hunter case, as previously discussed, the Hunter case does not constitute evidence of a *pattern* of constitutional violations sufficient to provide notice of a deficiency likely to result in a violation of constitutional rights.

Nor is this a situation in which deliberate indifference may be found absent a pattern of unconstitutional conduct. Murphy has presented no additional evidence of inadequate training in interrogations or investigations more broadly. Rather, it is undisputed that, at the time of the Murphy's interrogation, the basic training for TPD officers, detectives, and supervisors was approximately fourteen weeks at the TPD police academy. The police academy included a legal block on Constitutional rights, statutes, and ordinances, as well as instruction on *Miranda* warnings, interviewing, interrogations, and juvenile law. [CSOMF at ¶ 56; Doc. #175-40, ¶ 3; Doc. #175-44, ¶¶ 9 and 11]. From at least 1978 to 2003, in order to maintain CLEET (Council of Law Enforcement Education and Training) certification, all TPD officers were required to attend forty hours of in-service training yearly that included current legal procedures, and every officer also received monthly legal bulletins regarding new ordinances, statutes, and court decisions. [CSOMF at ¶ 57; Doc. #175-41, p. 14]. The evidentiary materials submitted demonstrate that the legal bulletins included training as to U.S. Supreme Court decisions examining the *Miranda* decision in three distinct areas—traffic stops, the public safety exception, and interruption to request counsel [Doc. #231-2]; *Miranda*'s requirements, including the application of *Miranda* to juveniles [Doc. #231-3]; the Supreme Court's decision in *Arizona v. Roberson,* 486 U.S. 675

(1988), regarding statements and confessions [Doc. #231-4]; questioning of juveniles [Doc. #231-5]; and statements and confessions from persons under eighteen [Doc. ##231-6; 231-7]. By 1988, all officers assigned to the Detective Division were required to complete forty hours of training in interrogations, arrest warrants, search warrants and affidavits. Officers assigned to the Homicide Unit also completed this additional forty hours of training. [CSOMF at ¶ 58].

Murphy relies heavily upon Cook's training records and deposition testimony to dispute the constitutional adequacy of TPD's training policies. However, evidence of a city's failure to train a single officer is insufficient to demonstrate a department-wide inadequacy. *See Meas v. City & Cnty. of San Francisco,* 681 F. Supp. 2d 1128, 1142 (N.D. Cal. 2010) ("A *Monell* claim will fail where the plaintiff provides evidence as to only a single officer, rather than evidence regarding department-wide inadequacy in training.") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007)).[23] Additionally, Murphy's interpretation of Cook's deposition testimony is not supported by the transcript. Citing Cook's deposition testimony in this matter, Murphy alleges "Cook had no training that there were Constitutional limitations in interrogations." [Doc. #338, p. 4]. However, Cook testified at his deposition in 2017 that he did not know whether he knew in 1994 that there were constitutional limitations on the conduct of interrogations, not that he did not receive training on the constitutional limitations of the conduct of interrogations.[24]

---

[23] Murphy also alleges that Cook's then-supervisor, Sergeant Allen, was inadequately trained. [Doc. #338, pp. 35-36]. However, Allen testified that he received training in interrogations during basic investigative training, and that he also received in-service training classes (although he could not recall if the content included interrogations), classes outside of the police department, and training on the current law made available by the district attorney's office. [Doc. #339, Exh. 60, p. 16:14-25 and p. 17:1-2, 6-8].

[24] Similarly, Cook testified in 2017 that he could not recall whether he had any training that presenting a coerced confession at trial violated substantive due process or whether he had heard

[Doc. #339, Exh. 162, p. 55:5-8]. In fact, Cook testified in 2017 that he could not recall any training he received in 1994 or the years prior. [Doc. #339, Exh. 39, p. 60:9-24].

Nor does the expert report of Dr. Michael Lyman create a disputed issue of fact regarding the adequacy of TPD's training procedures. Dr. Lyman identifies additional policies that he believes the City should have had in place. Dr. Lyman's proposed policies generally relate to the "do's and don'ts of interrogations," including prohibitions against threats and promises.[25] However, it is undisputed that TPD officers received training regarding interrogations, including a legal block during basic training, yearly in-service training, and periodic legal training bulletins.[26] [CSOMF at ¶¶ 56-57]. At least one legal training bulletin, issued on October 16, 1987, specifically stated that:

> Any coercion, physical or mental, which causes the suspect to waive his rights will invalidate his statement. Threats are strictly forbidden, but often there is little or no difference between a promise and a threat. Generally, promises of leniency should be avoided . . . . [I]t is permissible to tell a suspect that if he cooperates the prosecutor will be informed of his cooperation.

[Doc. #231-3, at COT 11.0014]. *See Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009) ("[A]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

––––––––––––––––––––––––

that coercion could be mental as well as physical, not that he never received any training regarding constitutional limitation on interrogations. *See* [Doc. #339, Exhs. 158 and 159].

[25] Dr. Lyman's report does not identify additional policies he believes the City should have had in place apart from interrogations. [Doc. #339, Exh. 178, pp. 29-31]. Murphy has presented no other evidence of a constitutional inadequacy in TPD's training program regarding investigations generally. Thus, Murphy has failed to show a constitutional inadequacy in TPD's training program regarding the conduct of investigations generally.

[26] It is unclear whether Dr. Lyman received these materials to review, as Dr. Lyman states only that he reviewed "Miscellaneous Wayne Allen Training Reports," "Miscellaneous Departmental Memoranda," and "Miscellaneous Certificates of Training." [Doc. #191-9, pp. 35-37].

believe it, a court should not adopt that version of the facts.'") (quoting *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)); *Heiman v. United Parcel Serv., Inc*., 12 F. A'ppx 656, 664 (10th Cir. 2001) ("'Summary judgment is appropriate when an ill-reasoned expert opinion suggests the court adopt an irrational inference, or rests on an error of fact or law.'") (quoting *Stearns Airport Equip. Co., Inc. v. FMC Corp.,* 170 F.3d 518, 531 n.12 (5th Cir. 1999)). Further, neither Murphy nor Dr. Lyman present any evidence or authority that some of Dr. Lyman's suggested policies or training were constitutionally required. *Compare, e.g.,* [Doc. #191-9, pp. 29-30 (suggesting training or policies that investigators record interrogations in their entirety) *with United States v. Short*, 947 F.2d 1445, 1451 (10th Cir. 1991) (police are not required to record statements)]. *See also Parker v. City of Tulsa*, No. 16-CV-0134-CVE-TLW, 2017 WL 1397955, at *4 (N.D. Okla. Apr. 18, 2017), *appeal docketed* No. 17-5054 ("Plaintiff does not present any evidence that specific, written child abuse investigation policies were ubiquitous in police departments at the time."); *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999) (generalized deficiencies in training are insufficient).

In light of the undisputed evidence regarding TPD's training, the court is not persuaded "that it was highly predictable or plainly obvious," that a TPD officer would coerce a confession. *Cf. Bryson*, 627 F.3d at 789 ("We are not persuaded, however, that it was highly predictable or plainly obvious that a forensic chemist would decide to falsify test reports and conceal evidence if she received only nine months of on-the-job training and was not supervised by an individual with a background in forensic science."); *Barney,* 143 F.3d at 1308 ("Specific or extensive training hardly seems necessary for a jailer to know that sexually assaulting inmates is inappropriate behavior."). Thus, Murphy has presented no evidence of a constitutional inadequacy in TPD's

training program, and the court finds that Murphy has failed to present evidence of deliberate indifference for purposes of § 1983 liability.

b.      Failure to Supervise

The Tenth Circuit applies the same standard to failure to supervise claims. *See Schepp v. Fremont Cnty., Wyo.,* 900 F.2d 1448, 1454 (10th Cir. 1990). Thus, to withstand summary judgment, Murphy "must provide evidence of a failure to supervise, which amounts to deliberate indifference to the federal rights of persons with whom the [TPD officers] come into contact, and that there is a direct causal link between the constitutional deprivation and the inadequate supervision." *King v. Glanz,* No. 12-CV-137-JED-TLW, 2014 WL 2838035, at *2 (N.D. Okla. June 23, 2014).

In support of her failure to supervise theory, Murphy primarily relies on the following deposition testimony of Palmer:

> Q: How can an interrogator be supervised in respect of (sic) his interrogations without a video camera with sound or a tape recorder going at all times during the interrogation?
>
> A: He can be supervised by the supervisors sitting in on the interrogation if he so chooses. That's not possible all the time, obviously. That's not possible to video or audio at all times. So the supervision of any one individual in an interrogation is not continual.
>
> Q: So that when a person is an interrogator and they are alone with a suspect, there is no supervision of that interrogation in those circumstances. Correct?
>
> A: That's correct.

[Doc. #339, Exh. 73, p. 85:6-18]. Murphy also cites to Allen's deposition testimony that he never received a report on tactics used during an interrogation, [Doc. #339, Exh. 142, p. 22:5-25], as well as Allen's alleged lack of training. However, even when viewed in the light most favorable to Murphy, this evidence does not give rise to an inference of deliberate indifference by the City.

To satisfy the deliberate indifference standard, Murphy must show that "the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney*, 143 F.3d at 1307. Murphy has presented no evidence that the City's alleged failure to supervise interrogations was substantially certain to result in constitutional violations.

As previously stated, prior to his deposition, Palmer had never heard that Cook coerced a confession and therefore had no notice, actual or constructive, of any potential risk for harm resulting from Cook's interrogation of Murphy without physically present supervision during Murphy's interrogation. Nor has Murphy offered any evidence that Allen, Cook's immediate supervisor, was aware of any potential constitutional risk posed by Cook. In fact, there is no evidence that TPD was aware of a constitutional risk posed by *any other* TPD officer. Thus, Murphy has failed to show that the City had actual or constructive notice of a substantial certainty for a potential constitutional violation such that the City was "deliberately indifferent." *See Estate of Smith v. Silvas*, 414 F. Supp. 2d 1015 (D. Colo. 2006).

c.      Direct Causal Link

As previously discussed, Murphy alleges that the City's training and supervision regarding interrogations and investigations was deficient. In order for liability to attach in a failure to train or supervise case, the identified deficiency in a city's training program must be "closely related to the ultimate injury, so that it actually caused the constitutional violation." *Carr v. Castle*, 337 F.3d 1221, 1231 (10th Cir. 2003) (quoting *Monell,* 436 U.S. at 691). A general lack of training or supervision is insufficient. *Id.*

The Tenth Circuit has recognized that "[t]he causal link between the officers' training and the alleged constitutional deprivation" is less direct in cases asserting that officers were not given

enough training.  *See Allen v. Muskogee, Okla*., 119 F.3d 837, 844 (10th Cir. 1997).  Murphy provides no evidence regarding how the alleged lack of training actually caused the alleged constitutional violations.  Although Dr. Lyman's report cites testimony by Cook that he would have followed written policies detailing the "do's and don'ts of interrogations," the court is unwilling to "partake of the post hoc, ergo propter hoc fallacy," of finding an adequate causal link.  *See Carr,* 337 F.3d at 1231.  *See also King*, 2014 WL 2838035, at *8; *City of Canton,* 489 U.S. at 391-92 ("To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.  In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.").  Further, as noted above, the City's policy prohibited promises, coercion, or touching—conduct which forms the basis of many of Murphy's allegations.  In short, Murphy has failed to show that the alleged failure to train or supervise was closely related to Murphy's alleged injury such that it actually caused the alleged constitutional violation.

Although Murphy has provided some evidence of a constitutional violation, a municipality cannot be liable under § 1983 solely because its employee caused injury or damage.  Murphy has failed to produce evidence of the requisite unconstitutional policy or custom.  The City is therefore entitled to the entry of summary judgment in its favor.

WHEREFORE, the City of Tulsa's Motion for Summary Judgment [Doc. #175] is granted.

DATED this 13th day of March, 2018.

GREGORY K. FRIZZELL, CHIEF JUDGE